ORIGINAL

FILED

Charles Nichols
PO Box 1302
Redondo Beach, CA 90278
Voice: (424) 634-7381
E-Mail: CharlesNichols@Pykrete.info
In Pro Per

2013 JAN 11 AM 10: 15

CLERK US DISTRICT COURT
CENT    ALIFORNIA
      LOS ANGELES

United States District Court

Central District of California

| | |
|---|---|
| Charles Nichols, | Case No.: |
| PLAINTIFF, | CV-11-9916 SJO (SS) |
| vs. | |
| KAMALA D. HARRIS, Attorney | **SUPPLEMENTAL AUTHORITY** |
| General, in her official capacity as | |
| Attorney General of California, CITY | |
| OF REDONDO BEACH, CITY OF | |
| REDONDO BEACH POLICE CHIEF | Date: N/A |
| JOSEPH LEONARDI, OFFICER | Time: N/A |
| | Courtroom: 23 – 3rd Flr. |
| TODD HEYWOOD and DOES 1 to 10, | Judge: Hon. Suzanne H. Segal |
| | Trial Date: Not Set |
| Defendants. | Action Filed: Nov. 30, 2011 |

Plaintiff hereby submits the attached supplemental authority on the issue of the fundamental, enumerated right to openly carry a loaded firearm in public ("bearing of arms") that must be recognized as applying outside of the home.

People v. Mitchell, Cal. App. 4th Dist., Oct. 11, 2012 - D059254A

The court applied intermediate scrutiny to the carrying of a concealed weapon noting that "…[T]he statute does not apply to the open carrying of a dirk or dagger, and it excludes from its coverage an openly-suspended sheathed knife…"

Unlike the carrying of edged weapons, the California legislature has banned the carrying of firearms, loaded or unloaded and openly or concealed, from incorporated cities and unincorporated county territory where the discharge of firearms is prohibited (AB 144, AB 1527, PC 25850).

A true and correct copy of People v. Mitchell, Cal. App. 4th Dist., Oct. 11, 2012 - D059254A from the California Court of Appeals is attached (http://www.courts.ca.gov/opinions/documents/D059254A.PDF).

Dated: December 21, 2012

Respectfully submitted,

By: Charles Nichols
PLAINTIFF in Pro Per
PO Box 1302
Redondo Beach, CA  90278
Voice: (424) 634-7381
E-Mail:
CharlesNichols@Pykrete.info

///

Nichols v. Edmund G Brown Jr et al          2          CV-11-9916 SJO (SS)

Filed 10/11/12

OPINION AFTER REHEARING

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENYATTA QUINN MITCHELL,<br><br>    Defendant and Appellant. | D059254<br><br><br><br>(Super. Ct. No. SCD229968) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge. Affirmed.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Discussion parts III and IV.

Kenyatta Mitchell was found guilty of violating former Penal Code section 12020, subdivision (a)(4), which prohibits the carrying of a concealed dirk or dagger.[1]  On appeal, he asserts his conviction should be reversed because (1) the statute prohibiting concealed carrying of a dirk or dagger violates the constitutional right to bear arms for self-defense, and (2) the trial court erred in failing to instruct the jury on intent to conceal. We reject these contentions.

As to sentencing, Mitchell asserts the court's findings on prior prison term and strike allegations must be set aside because he was not properly advised of his rights prior to admitting these allegations.  Additionally, Mitchell argues the trial court abused its discretion by imposing a $1,000 restitution fine.  In the unpublished portion of this opinion, we find no reversible error in this regard.

## FACTUAL AND PROCEDURAL BACKGROUND

At about 9:00 a.m. on September 28, 2010, trolley security officer Francisco Valenzuela removed Mitchell from the trolley because Mitchell did not have a ticket to ride the trolley.  Mitchell sat down on a bench at the trolley station while Valenzuela contacted a code compliance officer to issue a citation.  Another security officer (Alex Colon) stood behind Mitchell to provide cover.  When Mitchell leaned forward on the

---

[1]  Subsequent unspecified statutory references are to the Penal Code.
Effective in 2012, several Penal Code sections relevant to this case have been renumbered with no substantive change.  Former section 12020, subdivision (a)(4) is now section 21310; former section 12020, subdivision (c)(24) is now section 16470; former section 12020, subdivision (d) is now section 20200; and former section 653k is now sections 21510 and 17235.  For convenience, we eliminate the term "former" when referring to these statutes.

2

bench, Colon noticed the silver tip of what appeared to be a knife sticking out of the bottom of Mitchell's sweatshirt. The knife was not visible before Mitchell leaned forward.

Colon signaled to Valenzuela to alert him about the knife, and in response Valenzuela asked Mitchell to stand up and put his hands behind his back. Mitchell complied, and Valenzuela handcuffed him. Valenzuela advised Mitchell that he would be conducting a pat-down search for weapons, and asked if Mitchell had anything that would "poke" him. Mitchell denied that he had anything of this nature. During the pat-down, Valenzuela felt or saw the tip of the knife, and when he raised Mitchell's sweatshirt he observed the remainder of the knife. The knife was in between Mitchell's belt and trousers. Its total length was about 11 inches, and it had a five-inch-long, fixed blade. Mitchell told the security officers that he carried the knife for self-defense. The police were summoned and Mitchell was arrested.

At trial, Mitchell elected to represent himself and testified on his own behalf. On direct examination, Mitchell stated that he was going fishing that day and he uses the knife as a fishing tool. He claimed he was not intentionally trying to hide the knife, and he forgot that he had it. He also testified that he tried to be compliant with the security officer because he did not want to inflame the situation and he "was trying to go about [his] business and hopefully get to work on time that day."

On cross-examination, Mitchell testified that before he left for the trolley that morning he placed the knife between his belt and pants, and he was going to the harbor to fish with a friend who had fishing equipment. Although he was now claiming that he had

3

the knife for fishing purposes, he acknowledged that he did not have a fishing pole with him when he was stopped and he told the security officer that he had the knife for self-defense.

*Jury Verdict and Sentence*

The jury convicted Mitchell of carrying a concealed dirk or dagger. (§12020, subd. (a)(4).) After the jury's verdict, Mitchell admitted a prior prison term allegation and a prior strike allegation. The court sentenced him to five years in prison, consisting of four years for the concealed-carrying offense (double the two-year middle term pursuant to his strike prior) and one year for the prison prior.

## DISCUSSION

### I. *Constitutionality of Statute Prohibiting Carrying of Concealed Dirk or Dagger*

For the first time on appeal, Mitchell asserts that the statute prohibiting the carrying of a concealed dirk or dagger is unconstitutional, both facially and as applied to him. He contends that the statute violates the right to bear arms in self-defense under the Second Amendment of the federal Constitution, as interpreted by the United States Supreme Court in *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*). Although a defendant's failure to present an issue to the trial court generally forfeits it on appeal, we exercise our discretion to consider the issue to the extent it presents a pure question of law or involves undisputed facts. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881, 887-888, fn. 7; *Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 384, disapproved on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7.)

4

To review Mitchell's constitutional challenge, we summarize the statute and the *Heller* decision, and then evaluate the constitutionality of the statute on its face and as applied to Mitchell.

## A. *The Statute*

Section 12020 states: "(a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison: [¶] ... (4) Carries concealed upon his or her person any dirk or dagger." The statute defines a dirk or dagger as: "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 653k [i.e., a switchblade], or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position."[2]  (§ 12020, subd. (c)(24).)  Further, the statute provides: "Knives carried in sheaths which are worn openly suspended from the waist of the wearer are not concealed within the meaning of this section." (§ 12020, subd. (d).)

Thus, the statute generally proscribes the concealed carrying of a knife, but provides exceptions for (1) a knife placed in a sheath and visibly suspended from the waist, and (2) a nonswitchblade folding or pocketknife if the blade is not exposed and locked. (See *In re Luke W.* (2001) 88 Cal.App.4th 650, 653; *In re George W.* (1998) 68

---

[2]  Section 653k proscribes the carrying of a switchblade knife, meaning a knife with a blade length of two or more inches that can be released automatically, with some exceptions when certain features are present, including a mechanism that provides resistance that must be overcome when opening the blade.

5

Cal.App.4th 1208, 1213-1215.) The Legislature's purpose in enacting the statute was to combat the dangers arising from the *concealment* of weapons. (See *In re Luke W., supra,* 88 Cal.4th at p. 653.) "The policy underlying the prohibition against concealed weapons is based on the protection of those persons who may come into contact with a weapon bearer. If a weapon is not concealed, one may take notice of the weapon and its owner and govern oneself accordingly, but no such opportunity for cautious behavior or self-preservation exists for one encountering the bearer of a concealed weapon. In light of this policy, the question whether a particular weapon was concealed should be considered from the point of view of one approaching the location of the weapon, and the intent of the defendant as to concealment should not be considered, since a defendant's innocent intent does not make a concealed weapon any more visible." (94 C.J.S. (2001) Weapons, § 21, p. 594.)

In short, the prohibition against carrying a concealed dirk or dagger is designed to give third parties the opportunity to protect themselves from the risk of a surprise attack by a person carrying a weapon. (See *In re Luke W., supra*, 88 Cal.App.4th at p. 653.) The openly-displayed sheathed knife exception does not detract from the statutory purpose because the bearer's possession of the knife is visible. Similarly, the folding or pocketknife exception is consistent with the statute's objective because folded knives are not capable of ready use "without a number of intervening machinations that give the intended victim time to anticipate and/or prevent an attack." (*Ibid.*)

The statute does not require that the defendant intend to use the concealed dirk or dagger as a stabbing instrument. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 331

6

(*Rubalcava*).) However, "the absence of a specific intent requirement does *not* make the carrying of a concealed dirk or dagger a strict liability offense." (*Ibid.*) Although a "defendant's intended use of the instrument [is not] an element of the offense, . . . to commit the offense, a defendant must still have the requisite *guilty mind*: that is, the defendant must knowingly and intentionally carry concealed upon his or her person an instrument 'that is capable of ready use as a stabbing weapon.'. . . A defendant who does not know that he is carrying the weapon or that the concealed instrument may be used as a stabbing weapon is therefore not guilty . . . ." (*Id.* at pp. 331-332.)

In addition to incorporating a knowledge element, the California Supreme Court has generally recognized that when a defendant is charged with an offense that penalizes possession of an instrument that is ordinarily usable for peaceful purposes, the defendant may justify the possession by showing the possession was "in accordance with [the instrument's] ordinary legitimate design." (*People v. Grubb* (1965) 63 Cal.2d 614, 621, fn. 9; see *Rubalcava, supra*, 23 Cal.4th at p. 329 ["the surrounding circumstances of possession—including defendant's intended use—were relevant to the issue of whether the [object] was a prohibited weapon"].) Consistent with this principle, the standard CALCRIM instruction for the offense of carrying a concealed dirk or dagger directs that when the instrument may have innocent uses, the jury should be given an instruction stating: "When deciding whether the defendant knew the object . . . could be used as a stabbing weapon, consider all the surrounding circumstances, including the time and place of possession. Consider also the destination of the defendant, the alteration of the object from standard form, and other facts, if any." (CALCRIM No. 2501, parentheses

7

and bracketed punctuation omitted; see also CALJIC 12.41 [the "mental state with which a knife or other instrument is carried may be inferred from the evidence, including the attendant circumstances, the time, place, destination of the possessor . . . and any other relevant facts established by the evidence"].)

## B. *The* Heller *Decision*

In *Heller*, the United States Supreme Court held that the Second Amendment to the federal Constitution codifies the long-existing right of an individual to possess and carry weapons for self-defense in case of confrontation. (*Heller, supra*, 554 U.S. at pp. 592-595; see also *McDonald v. City of Chicago* (2010) __ U.S. __ [130 S.Ct. 3020] [Second Amendment applies to the states].) Based on this constitutional right, the *Heller* court struck down statutes that totally banned handgun possession in the home and required that lawful firearms in the home be rendered inoperable by disassembly or binding with a trigger lock. (*Heller, supra*, at pp. 628-629, 635.) The court reasoned that the handgun ban prohibited an entire class of arms that was overwhelmingly chosen by society for self-defense, and at a location (the home) where the need for self-defense is most acute. (*Ibid.*) Further, the requirement that firearms in the home be kept inoperable made it impossible to use them in immediate fashion "for the core lawful purpose of self-defense[.]" (*Id.* at pp. 630, 635.)

However, the *Heller* court recognized that the right to bear arms in self-defense, like most constitutional rights, is not unlimited. (*Heller, supra*, 554 U.S. at pp. 595, 626.) "[T]he right [is] not a right to keep and carry any weapon whatsoever *in any manner whatsoever* and for whatever purpose." (*Id.* at p. 626, italics added.) Of particular

8

relevance here, the *Heller* court commented that the majority of 19th-century courts held

that "prohibitions on carrying *concealed* weapons were lawful under the Second

Amendment. . . ." (*Ibid.*, italics added.)

### C. *Analysis*

#### 1. *Facial Constitutionality*

Consistent with the historical interpretation permitting prohibitions on the carrying

of concealed weapons, we find no facial unconstitutionality in the statute proscribing the

carrying of a concealed dirk or dagger.

When evaluating a facial challenge to the constitutional validity of a statute, we

consider the text of the statute itself, not its application to the particular circumstances of

the individual. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) If a statute is

constitutional in its general and ordinary application, the statute is not facially

unconstitutional merely because "there might be some instances in which application of

9

the law might improperly impinge upon constitutional rights." (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 347; see *Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1126.)[3] Any overbreadth in a generally constitutional statute can be cured by a case-by-case analysis of the particular fact situation. (See *Guardianship of Ann S., supra*, 45 Cal.4th at p. 1132; *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 311.)

When evaluating the constitutionality of a statute, the courts have developed several levels of scrutiny (i.e., strict, intermediate, and rational-basis), depending on the nature of the right affected by the statute and the manner in which the right is impacted. (See *Heller, supra*, 554 U.S. at p. 628.) We reject Mitchell's contention that the constitutionality of the concealed-carrying statute should be evaluated under the strict scrutiny test, and conclude the proper test is intermediate scrutiny.[4] "Strict scrutiny does not apply automatically any time an enumerated [constitutional] right is involved."

---

[3]  There has been some debate about the proper standard to apply when evaluating a facial challenge to a statute's constitutionality, i.e., a stricter standard that requires a showing of unconstitutionality in all cases, versus a more lenient standard that only requires a showing of unconstitutionality in the great majority of cases. (*Guardianship of Ann S., supra*, 45 Cal.4th at p. 1126.) In any event, under either standard, the challenger cannot prevail merely by pointing to some instances of potential unconstitutional application. At a minimum, a successful facial challenge requires a showing that the statute is unconstitutional as to "a substantial portion of those persons to whom the statute applies." (*American Academy of Pediatrics v. Lungren, supra*, 16 Cal.4th at p. 348; see also *Kolender v. Lawson* (1983) 461 U.S. 352, 358, fn. 8 [statute that unconstitutionally impacts a substantial amount of protected conduct may be facially invalidated even when it could have some constitutional application].)

[4]  *Heller* rejected application of the rational-basis test to Second Amendment infringement issues, but left open whether strict or intermediate scrutiny should be applied. (*Heller, supra*, 554 U.S. at pp. 628 & fn. 27, 634.)

(*United States v. Marzzarella* (3d Cir. 2010) 614 F.3d 85, 96 (*Marzzarella*).) In

*Marzzarella*, the court concluded that intermediate scrutiny should be applied because the

statute under review regulated the manner of possession of a weapon, but did not

completely ban the possession of the weapon. (*Id.* at p. 97; accord *People v. Ellison*

(2011) 196 Cal.App.4th 1342, 1347.) The dirk or dagger concealed-carrying restriction

does not entirely prohibit the carrying of a sharp instrument for self-defense; rather, it

limits the manner of exercising that right by proscribing concealed carrying of a dirk or

dagger unless the bearer uses a visible knife sheath or nonswitchblade folding or

pocketknife. Because the statute regulates but does not completely ban the carrying of a

sharp instrument, we subject it to intermediate scrutiny.

Under the intermediate scrutiny test, the statute must serve an important

governmental interest and there should be a reasonable fit between the regulation and the

governmental objective. (*Marzzarella, supra*, 614 F.3d at pp. 97-98.) The regulation

need not be the least restrictive means of serving the governmental interest, but it should

be narrowly tailored to serve the interest, should not burden the protected right more than

is reasonably necessary to further the governmental interest, and should leave open ample

alternative means of exercising the protected right. (*Ibid.*)

Several California appellate courts, including our own court, have concluded that

statutes restricting the carrying of concealed firearms pass constitutional muster after

*Heller*. (*People v. Yarbrough, supra*, 169 Cal.App.4th at p. 314; *People v. Flores* (2008)

169 Cal.App.4th 568, 575; *People v. Ellison, supra*, 196 Cal.App.4th at p. 1348.) In

*Yarbrough*, the court reasoned: "Unlike possession of a gun for protection within a

11

residence, carrying a concealed firearm prevents a recognized 'threat to public order,' . . .

A person who carries a concealed firearm on his person . . . 'which permits him

immediate access to the firearm but impedes others from detecting its presence, poses an

"imminent threat to public safety . . . ." . . . .' . . . . [¶] Rather than cast any doubt upon

the continued constitutional validity of concealed weapons bans, the *Heller* opinion

specifically expressed constitutional approval of the accepted statutory proscriptions

against carrying concealed weapons." (*Yarbrough, supra*, 169 Cal.App.4th at p. 314.)

 We reach the same conclusion here. The ban on carrying a concealed dirk or

dagger serves the important governmental interest of allowing third parties to protect

themselves from exposure to the risk of a surprise attack from a bearer of a weapon. The

risk of a surprise attack exists even if the weapon bearer originally intends to use the

weapon only for legitimate self-defense. The public safety risk arising from possession

of a weapon (including a knife) even for "anticipatory self-defense" was explained in

*Mack v. United States* (D.C. App.Ct. 2010) 6 A.3d 1224: "When dangerous weapons are

readily available, death or serious injury too often result. One who carries a knife, a

pistol, or an ice pick may think that he will use it only in lawful self-defense. But threats,

violence, and other unsettling events may occur without warning. People who are

startled or upset may overreact, lose their tempers, or make poor judgments under stress.

Even when they start out with good intentions, persons who carry items capable of

inflicting death or great bodily injury may use them in ways and in situations that are not

justified — with grave results." (*Id.* at p. 1232.)

12

Further, an instrument qualifies as a dirk or dagger only if it is a knife or other instrument capable of ready use as a stabbing weapon that may inflict great bodily injury or death; hence, the statute is narrowly restricted to concealed stabbing instruments that pose a serious threat to physical safety. Further, the statute does not apply to the open carrying of a dirk or dagger, and it excludes from its coverage an openly-suspended sheathed knife, as well as nonswitchblade folding and pocketknives kept in a closed or unlocked position. Thus, the statute provides other means of carrying a dirk or dagger for self-defense. We conclude the statute does not run afoul of the Second Amendment because it is narrowly tailored to serve the important governmental interest of preventing exposure to the risk of surprise attacks and does not burden the right to bear arms in self-defense beyond what is reasonably necessary to serve that interest.

Mitchell asserts that the statement in *Heller* referencing 19th century court approval of prohibitions on concealed weapons should not be controlling under today's societal circumstances. He posits that in modern society a person who openly carries a dirk or dagger for self-defense would be subject to police interference and the only reasonable avenue of bearing a knife in self-defense is to carry it in concealed fashion. Accordingly, he asserts that the statute leaves no reasonable means of carrying a knife for self-defense. This contention ignores the fact that the statute permits a visible sheathed knife which would not necessarily draw the attention of the authorities and a concealed folding or pocketknife which would be unobservable. Thus, regardless of the modern-day reality that may make the open carrying of a knife unrealistic in most circumstances, the statute still provides a reasonable means of carrying a knife for self-defense.

13

Mitchell also argues that the statute fits squarely within the type of regulation struck down in *Heller* because (like the handgun ban) it bans the most preferred method of carrying knives for self-defense, and (like the disassembly/trigger lock requirement) it prevents quick use of a knife for self-defense. Even if we construe the effect of the statute in this fashion, the contention is unavailing because it fails to recognize the markedly different contexts involved in the statutes at issue in *Heller* and the statute before us. *Heller* concerned statutes explicitly restricting *a person's ability to immediately defend against intruders in the home*. In contrast, the dirk/dagger statute restricts the concealment of weapons on a person *to protect the rights of third parties not to be exposed to surprise attacks*. The statute does not contain any express restriction on concealment of weapons on the person at home, and to the extent it is capable of being applied improperly in the home context (see discussion below), any overbreadth can be cured on a case-by-case basis. Further, the strong governmental interest in protecting third parties from exposure to the risk of surprise attacks (which was not implicated in *Heller*) justifies reasonable restrictions on the concealment of stabbing instruments, even if these restrictions require some manipulation that prevents instantaneous use of a knife in self-defense. Mitchell's assertion that the statutes at issue in *Heller* are analogous to the statute before us is unpersuasive. (See *Mack v. United States, supra*, 6 A.3d at p. 1236 [*Heller*'s holding does not invalidate conviction based on concealed carrying of ice pick for self-defense].)

In support of his facial challenge, Mitchell posits scenarios in which the statute could be applied to a person carrying a concealed sharp instrument under circumstances

14

that clearly posed no threat to public safety; i.e., a shopper who purchases a knife and carries it in a shopping bag, or a mother who packs a knife in a picnic basket to cut an apple at a picnic.[5] In *Rubalcava, supra*, 23 Cal.4th at page 333, the California Supreme Court acknowledged that the statute "may seem overbroad as a matter of common sense" if it was applied to such innocuous circumstances as a tailor who places a pair of scissors in his jacket, a shopper who walks out of a store with a recently purchased steak knife in his pocket, or a parent who wraps a sharp knife in a paper towel and places it in his coat to take to a PTA potluck dinner. (*Id.* at pp. 331, 333.) However, the court concluded that it would not find the statute "*unconstitutionally* overbroad without some concrete impairment of constitutionally protected conduct." (*Id.* at p. 333.) Mitchell has not explained how applying the statute to a person who carries a concealed sharp instrument for an obviously harmless purpose is impeded in his or her ability to exercise the right to bear arms for self-defense. Because in these circumstances the person is *not* carrying the instrument for self-defense, there is no infringement on that constitutional right.

   In a similar vein, Mitchell cites circumstances where a person might conceal a knife to legitimately use in self-defense but which do not involve the governmental interest in protecting third parties from exposure to the risk of surprise attacks; e.g., a

---

5     These examples presume that the offense of carrying a concealed dirk or dagger is necessarily committed even when the instrument is in some type of carrying container rather than carried directly on the person's body. The proscription against carrying a concealed weapon " 'upon his person' " has been applied to a *firearm* carried in a suitcase. (See *People v. Dunn* (1976) 61 Cal.App.3d Supp. 12, 13-14.) We will assume, without deciding, that the same interpretation applies to a dirk or dagger.

15

person at home who places a knife in his or her pocket to confront a trespasser in a driveway, or a hunter who carries a knife in his or her backpack for self-defense purposes (see fn. 5, *ante*). However, a defendant cannot prevail on a facial challenge to a statute that is constitutional in its general and ordinary application " ' "by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular application of the statute . . . ." ' " (*Tobe v. City of Santa Ana, supra*, 9 Cal.4th at p. 1084, italics omitted; *American Academy of Pediatrics v. Lungren, supra*, 16 Cal.4th at p. 347.) Mitchell has not shown that the general and ordinary application of the statute extends to such innocuous circumstances.

Moreover, as set forth above, the California Supreme Court has recognized that in cases involving an instrument that may have innocent uses, the defendant may defend against the charges based on circumstances showing innocuous possession. (*People v. Grubb, supra*, 63 Cal.2d at p. 621, fn. 9.) This concept is incorporated in the standard CALCRIM instruction for the concealed dirk or dagger offense which—when the instrument may have innocent purposes—directs the jury to consider all the surrounding circumstances (including time, place, and destination) when deciding whether the defendant knew the instrument could be used as a stabbing weapon. (CALCRIM No. 2501.) The description of the offense reflected in the standard jury instructions serves to ameliorate concerns that the statute will be applied in overbroad fashion to innocuous carrying of a concealed knife. If the statute nevertheless is applied to a particular defendant in a manner that defies common sense and infringes on the constitutional right

16

to bear arms in self-defense, the defendant may raise an as-applied challenge to the statute.

Mitchell additionally argues that the statute is facially unconstitutional because it severely punishes even accidental concealment of a knife that could occur if "clothing inadvertently covered some portion of the weapon." To the contrary, as we shall discuss in more detail when addressing Mitchell's claim of instructional error on intent, culpability for accidental concealment is precluded under the principles of general intent which require that the defendant intentionally commit the prohibited act. (See *People v. Padilla* (2002) 98 Cal.App.4th 127, 135.)

### 2. *As-applied Constitutionality*

We also reject Mitchell's claim that the statute is unconstitutional as applied to him. When considering a claim that a facially valid statute has been applied in a constitutionally impermissible manner, "the court evaluates the propriety of the application on a case-by-case basis to determine whether to relieve the defendant of the sanction." (*Tobe v. City of Santa Ana, supra*, 9 Cal.4th at p. 1084.) An as-applied challenge "contemplates analysis of the facts of a particular case . . . to determine the circumstances in which the statute . . . has been applied and to consider whether in those particular circumstances the application deprived the [defendant] of a protected right." (*Ibid.*) When reviewing an as-applied constitutional challenge on appeal, we defer to the trial court's findings on historical facts that are supported by substantial evidence, and then independently review the constitutionality of the statute under those facts. (See *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1127-1130.)

17

Mitchell argues that he "posed no threat to anybody [who] did not attack him," and reiterates essentially the same assertions he made in his facial challenge. Regardless of Mitchell's claimed intent to use the weapon only defensively, as we have explained, the statute survives constitutional scrutiny because it is reasonably necessary to serve the important governmental interest of diminishing the risk of a surprise attack that accompanies concealed carrying of a dirk or dagger.

To support his claim of as-applied unconstitutionality, Mitchell contends that if he had carried the knife openly in a sheath rather than hidden under his sweatshirt, this would increase the danger to the public because the knife could be more easily grabbed by a third party. This contention fails to recognize that the *concealment* prohibition is designed to provide third parties the opportunity to avoid *surprise attacks*. Thus, by prohibiting concealment the statute advances the governmental purpose irrespective of the ease with which an unconcealed weapon can be accessed.

Mitchell also asserts that he "was an indigent man who was struggling for subsistence" and who could not financially afford a permissible self-defense weapon. This issue concerns factual matters that were not presented to the trial court for resolution; thus, Mitchell may not prevail on this claim for the first time on appeal unless the matter can be resolved as a matter of law. (See *Charisma R. v. Kristina S., supra*, 175 Cal.App.4th at pp. 384-385.) He has cited no evidence showing as a matter of law that the permitted alternative means of carrying a knife (a sheathed knife or folding or pocket knife) are so cost-prohibitive as to unconstitutionally affect his right to bear arms for self-defense.

18

Mitchell does not assert that the statute was unconstitutionally applied to him based on his testimony that he had the knife with him for fishing. It is apparent from the record that the jury rejected this claim. The jury was given the standard CALCRIM instruction relating to innocent use, which stated that the jury should consider all the surrounding circumstances when deciding whether the defendant knew the object could be used as a stabbing weapon.[6] Consistent with this instruction, in closing arguments the prosecutor did not suggest to the jury that Mitchell would be guilty even if he was merely carrying the knife for fishing; instead the prosecutor asserted that the fishing explanation "appeared to be something he just thought of this day" and noted there was "[n]o fishing pole, nothing like that." Thus, this is not a case involving a conviction based on an innocuous possession of a knife.

Mitchell's constitutional challenge to the statute fails.

## II. *No Duty To Instruct on Specific Intent To Conceal*

Based on the language of CALCRIM No. 2501, the jury was instructed that to prove the offense of carrying a concealed dirk or dagger, the prosecution must prove that Mitchell carried on his person a dirk or dagger; he knew that he was carrying it and that it could readily be used as a stabbing weapon; and the dirk or dagger was substantially concealed on his person. Mitchell asserts the trial court erred by failing to sua sponte instruct the jury that intent to conceal is also an element of the concealed dirk or dagger offense. Although section 12020 does not contain any language stating that intent to

---

[6]    The trial court concluded this instruction should be given since Mitchell claimed he had the knife for the innocent use of fishing.

19

conceal is an element of the offense, Mitchell argues that the knowledge element defined

by the California Supreme Court in *Rubalcava, supra,* 23 Cal.4th 322 includes the intent

to conceal. He asserts that instruction on intent to conceal was crucial in his case because

he testified he was not intentionally trying to hide the knife. He also posits that

"[i]nadvertent concealment of a substantial part of a carried knife is always a risk during

routine use."

 Intent to conceal can be defined as the defendant's specific, subjective intent to

prevent someone from seeing the knife, or as the defendant's general intent to

purposefully commit the act of placing the knife in a concealed location. As we shall

explain, to the extent Mitchell is asserting that specific intent to conceal the knife from

onlookers is an element of the offense, his contention is unavailing. To the extent he is

asserting that intentional, rather than inadvertent, commission of the act of concealment is

an element of the offense, we agree but find there was no instructional error as to this

requirement.

 In *Rubalcava* the court held the concealed dirk or dagger offense was a general

intent crime, and the statute did not require that the defendant intend to use the concealed

instrument as a stabbing instrument. (*Rubalcava, supra,* 23 Cal.4th at pp. 330-332.)

However, *Rubalcava* construed the offense as requiring a knowledge element, stating the

defendant must "knowingly and intentionally carry concealed upon his or her person an

instrument 'that is capable of ready use as a stabbing weapon.' " (*Id.* at pp. 331-332.)

The *Rubalcava* court cited two instances, supported by examples, when the requisite

knowledge element would be absent: (1) a defendant who does not know that he is

carrying the weapon (for example, if someone slipped a knife into a defendant's pocket without the defendant's knowledge); or (2) a defendant who does not know that the concealed instrument may be used as a stabbing weapon (for example, if someone gave a defendant a fixed-blade knife wrapped in a paper towel, but told the defendant the knife has a folding blade that cannot lock). (*Id.* at p. 332 & fn. 6.)

There is nothing in *Rubalcava* that suggests the knowledge element incorporates a specific intent to conceal the weapon from other persons. However, a requirement that the defendant intentionally commit the act of concealment is encompassed within the principle of general intent. As the jury was instructed, general intent means that the "person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she *intentionally* does a prohibited act . . . ." (Italics added; see CALCRIM No. 250.) Here, the prohibited act is the concealed carrying of a dirk or dagger; thus, the defendant must intentionally commit the act of concealment. As a corollary to this principle, a defendant may present an accident defense based on a claim that he or she acted accidentally rather than with the intent required for the crime. (§ 26; *People v. Anderson* (2011) 51 Cal.4th 989, 996; see, e.g., *People v. Jeffers* (1996) 41 Cal.App.4th 917, 922 ["a felon who acquires possession of a firearm through misfortune or accident, but who has no intent to exercise control or to have custody, commits the prohibited act without the required wrongful intent"].) The trial court is generally not required to instruct sua sponte on accident given that the mental state instructions adequately convey to the jury the required mental elements. (*People v. Anderson, supra*, 51 Cal.4th at pp. 992, 998; see *People v. Padilla, supra*, 98

21

Cal.App.4th at pp. 134-136 [instruction that defendant must act intentionally apprised jury of defense based on accidental carrying of concealed firearm in car].)

Allowing a defendant to avoid culpability based on an accidental/unintentional concealment does not mean the prosecution has the burden to prove an additional element of specific intent to conceal that is distinct from the concept of general intent. There is nothing in the statute or *Rubalcava* that supports inclusion of a specific intent to conceal element based on the defendant's subjective intent to hide the object from onlookers.[7]

The offense is established if the prosecution proves that the defendant intentionally and knowingly committed the proscribed act of carrying a concealed dirk or dagger, and no further proof concerning intent is required. Because the offense does not include a requirement of specific intent to conceal the instrument from other persons, the trial court had no duty to instruct on this element. (See *Rubalcava, supra*, 23 Cal.4th at pp. 333-334.) Further, the trial court properly instructed the jury on general intent, which encompassed the requirement of an intentional, not accidental, act of concealing the weapon.

---

[7]      A concurring justice in *Rubalcava* noted that adding the element of intent to conceal (apparently referring to intent to hide the instrument from onlookers) would narrow the statute by removing innocuous acts of concealment (such as a parent carrying a concealed knife to a PTA potluck) from its scope. (*Rubalcava, supra*, 23 Cal.4th at p. 338, fn. 1 (conc. opn. of Werdegar, J.).) However, the concurring justice recognized that "[r]eading an intent-to-conceal element into the statute may not be consistent with its overall purposes, as carrying a concealed dagger is dangerous to public safety whether or not the bearer purposely concealed the weapon." (*Ibid.*)

III. *Failure To Advise Before Admission of Prior Conviction Allegations*

Mitchell argues that the findings on the prior prison term and strike allegations must be vacated because he was not properly advised of his rights before he admitted the priors.

A. *Background*[8]

Prior to the presentation of evidence to the jury, the court and parties discussed adjudication of the prior prison term and strike allegations, which were based on three prior felony convictions. The trial court told Mitchell that he had "*a right to a jury trial on the issue of* [*his*] *prior convictions,*" and he could waive that right and have a bench trial. (Italics added.) Mitchell responded that he would "like a hearing on that." When the court asked whether he wanted it in front of the judge or jury, Mitchell answered, "*In front of the judge.*" (Italics added.) The court then stated that he had waived the jury on the issue of the priors.[9]

---

[8]    In an opinion originally published by this court, we reversed Mitchell's sentence and remanded for redetermination of the prior conviction allegations because the record before us did not show that Mitchell had been advised of, or that he understood, his right to a jury trial on the priors. After the filing of our opinion, the superior court provided this court and the parties with an amended minute order and additional reporter's transcript that had not been included in the initial appellate record and which showed the full advisals given to Mitchell. Based on this new information, on our own motion we granted rehearing, augmented the record, and gave the parties an opportunity to file supplemental briefing. Our analysis is now premised on the complete record concerning the advisements provided to Mitchell before he admitted the prior conviction allegations.

[9]    The colloquy on the jury trial waiver was as follows: "The Court: ". . . *You have a right to a jury trial on the issue of your prior convictions.* You can waive that right. Most people waive that right, but it's up to you. You just have a bench trial. How it works on the prior convictions is the prosecution simply brings them in, brings in the

23

The next day while the jury was deliberating, the court and parties revisited the issue of the prior conviction allegations. The trial court told Mitchell that the priors "will be used as the component portion of [his] sentencing," and asked if he wanted to admit them. The prosecutor interjected that the court needed to advise Mitchell "*that he does have the right to remain silent. He does have the right to an attorney, and he does have the right to confront and cross-examine witnesses.*" (Italics added.) The following colloquy then occurred:

"The Court: All right. *Do you want to give up those rights*, Mr. Mitchell?"

"[Prosecutor]: Just so the record is clear, he's previously waived his right to a jury trial earlier in the proceeding.

"The Court: Yes.

"The Defendant: We just had a jury trial, right?

"The Court: Yes. But this is a different issue. This is on your prior convictions.

"The Defendant: *Do I want to admit that I sustained those convictions*?

"The Court: Right. The first one is 2004, SCS189716, charge is petty theft [with a prior] 484.

"The Defendant: *Yes.*

"The Court: So he's admitted that he suffered and sustained the conviction on 12-16-04 . . . ." (Italics added.)

---

dockets, and *he establishes that, in fact, these convictions are you, okay? You can have a jury prove that*, or you can have a judge look at the evidence and make a ruling as to it. It's a very short — [¶] The Defendant: As to whether they are going to be applied to the case? [¶] . . . [¶] The Court: For the purposes of the sentencing. [¶] . . . The Defendant: *I'd like a hearing on that.* [¶] The Court: In front of the judge or jury? [¶] The Defendant: *In front of the judge.* [¶] The Court: Okay. *Waive the jury on the issue of priors.*" (Italics added.)

After accepting the admission of the theft prior felony conviction, the court asked Mitchell if he wanted to admit that he incurred two additional prior felony convictions (corporal injury to a girlfriend in 2005 and assault with a deadly weapon in 2006); that the assault conviction was a strike prior; and that he went to prison for all three of the prior felony convictions. Mitchell answered yes for all of these allegations, and the court accepted his admissions.

## B. *Analysis*

Before a trial court accepts a defendant's admission to a prior conviction allegation, the court must enumerate the three rights the defendant is waiving (i.e., to a jury trial, to remain silent, and to confront witnesses), and must obtain waivers of these rights from the defendant. (*People v. Mosby* (2004) 33 Cal.4th 353, 356, 359-360 (*Mosby*).) If an express waiver of these rights is not secured from the defendant, reversal is required unless the record as a whole shows the admission was voluntary and intelligent under the totality of circumstances. (*Id.* at pp. 360-361.) The question is whether the defendant's admission was intelligent and voluntary "because it was given with an understanding of the rights waived." (*Id.* at p. 361.)[10]

---

10    We note the right to have a jury determine whether a defendant has suffered a prior conviction is a state statutory right, and the rights to silence and confrontation that flow from this statutory jury trial right are likely state constitutional due process rights. (*Mosby, supra,* 33 Cal.4th at p. 360.) In any event, the reversible error inquiry is the same for all three rights; i.e., whether the record shows the admission was intelligent and voluntary under the totality of the circumstances. (*Id.* at pp. 360-361; see also *People v. Hinton* (2006) 37 Cal.4th 839, 875, fn. 12.)

25

In *Mosby*, the California Supreme Court found the defendant's admission of his priors was intelligent and voluntary under the totality of the circumstances, notwithstanding the failure to advise and obtain a waiver on the rights to silence and confrontation of witnesses. (*Mosby, supra*, 33 Cal.4th at pp. 356, 360, 364-365.) The lynchpin of *Mosby*'s conclusion was that the defendant was expressly advised about, and had expressly waived, his right to a jury or court trial on the priors. (*Ibid.*) The *Mosby* court reasoned that it was apparent the defendant knew about and intended to waive the two rights attendant to a trial (i.e., silence and witness confrontation) because he had just participated in a trial on the substantive offenses where those very same rights were operative. (*Id.* at pp. 364-365.)[11]

Here, as in *Mosby*, the record shows an effective advisement and waiver of the right to a jury or court trial on the priors. Mitchell was told he could have his priors resolved before a jury or a judge, and Mitchell said he wanted a hearing before a judge. Thus, Mitchell expressly waived his jury trial right and selected a court trial. The record shows that the following day he also elected to waive the court trial and admit the priors. That is, when the court and parties were discussing the priors and the fact that he had already waived his jury trial right, Mitchell himself asked, "Do I want to admit that I sustained those convictions?" Mitchell's statement in this regard reflects that he

---

[11]     *Mosby* distinguished cases where there was absolutely no advisement and waiver of the jury or court trial right, or where the trial court's reference to the trial right was fleeting and without response from the defendant so that the circumstances in effect equated with a complete lack of advisement and waiver. (*Mosby, supra*, 33 Cal.4th at pp. 361-362.)

26

understood he had *a choice* to admit or not admit the priors. Mitchell's subsequent statements that he wanted to make the admissions shows that he elected to waive the court trial.

Mitchell argues the trial court's advisement of the jury or court trial right was confusing, and he appears to have thought the hearing would merely be a sentencing hearing rather than an opportunity to challenge the truth of the prior conviction allegations. The record does not support this contention. The trial court told Mitchell the prosecution had to prove Mitchell's identity as the defendant in the priors; thus, Mitchell knew he could challenge whether he had incurred them. (See fn. 9, *ante*.) Further, when taking his admissions, the court asked Mitchell if he *wanted* to admit them and he said yes. This advisement shows Mitchell knew he had a choice to admit the priors or to challenge their truth by declining to admit them and requiring that the prosecution prove them.

As to Mitchell's waiver of the attendant trial rights (the rights to silence and witness confrontation), we are satisfied Mitchell understood he had these rights and he was giving them up by opting to admit the allegations rather than have the court decide them. Although Mitchell did not provide an explicit waiver of the silence and confrontation rights, they were expressly delineated by the prosecutor, followed by the court asking if Mitchell wanted to give up those rights and Mitchell's response that he wanted to admit the allegations. If Mitchell had not wanted to give up the trial rights of which he was just advised, he would not have told the court he wanted to admit the priors. Additionally, Mitchell's criminal history reflects he had previously pled guilty in

27

other cases, during which he would have been advised of, and waived, the silence and confrontation rights.

Based on the totality of circumstances, we conclude Mitchell's admissions of his priors were knowing and voluntary.

Mitchell also argues for reversal because the trial court failed to advise him of the penal consequences of his admissions of the prior conviction allegations. A defendant who admits a prior conviction must first be advised of the increased sentence that might be imposed; however, this advisal requirement is a judicially-declared rule of criminal procedure, not a constitutional mandate. (*People v. Wrice* (1995) 38 Cal.App.4th 767, 770.) A challenge based on the failure to advise of the sentencing consequences of a prior conviction admission is forfeited on appeal unless the error is raised at or before sentencing. (*People v. Jones* (2009) 178 Cal.App.4th 853, 858-859; *People v. Wrice, supra,* 38 Cal.App.4th at pp. 770-771; see *People v. McClellan* (1993) 6 Cal.4th 367, 377; *People v. Walker* (1991) 54 Cal.3d 1013, 1023, overruled on other grounds in *People v. Villalobos* (2012) 54 Cal.4th 177, 183.) The forfeiture doctrine is designed to encourage a defendant to bring errors to the attention of the trial court so they may be expeditiously corrected or avoided. (*People v. Wrice, supra,* at p. 771.) This policy " 'ensure[s] the fair and orderly administration of justice.' " (*Ibid.*) If the imposition of sentence on enhancement allegations comes as a genuine surprise, it is a simple matter for the defendant to bring the issue to the attention of the sentencing court. (*Ibid.*)

Here, based on the sentencing recommendation in the probation report, Mitchell was provided notice before sentencing that his priors could increase his sentence.

28

Further, prior to sentencing Mitchell (still representing himself) filed a motion requesting that the court strike his prior strike conviction, which reflects that he understood there were sentencing implications from his admissions. If Mitchell wanted to challenge his admissions because he did not know about the sentencing consequences, he could have raised this issue at sentencing and the matter could have been resolved at that juncture. Having failed to complain at sentencing, he cannot now seek relief on appeal.

Moreover, " '[u]nlike an uninformed waiver of the specified constitutional rights which renders a plea or admission involuntary and requires that it be set aside, an uninformed waiver based on the failure of the court to advise an accused of the consequences of an admission constitutes error which requires that the admission be set aside only if the error is prejudicial to the accused.' " (*People v. Walker, supra*, 54 Cal.3d at pp. 1022-1023; *People v. McClellan, supra*, 6 Cal.4th at p. 378.) The defendant must demonstrate that it is reasonably probable he or she would not have made the admission if the advisal had been provided. (*Walker, supra*, at p. 1023.) Mitchell has not shown that it is reasonably probable he would have declined to admit the priors if he had been advised of the precise sentencing consequences.

### IV. *Restitution Fine*

Mitchell was ordered to pay a $1,000 restitution fine under section 1202.4, subdivision (b). He argues that the trial court abused its discretion in ordering an amount greater than the $200 statutory minimum.

At the time of Mitchell's offense, section 1202.4 provided that when a defendant is convicted of a felony, the trial court must impose a restitution fine that was not less than

29

$200 and not more than $10,000. (§ 1202.4, subd. (b)(1).)  The fine "shall be set at the

discretion of the court and commensurate with the seriousness of the offense. . . ." (*Ibid.*)

The statute provides that "the court may determine the amount of the fine as the product

of . . . $200 . . . multiplied by the number of years of imprisonment the defendant is

ordered to serve . . . ." (§ 1202.4, subd. (b)(2).)  A defendant's inability to pay cannot be

used as a reason for excusing the fine; however, the court may consider inability to pay

when deciding whether to increase the amount beyond the $200 minimum. (§ 1202.4,

subds. (c), (d).)  The court may consider the defendant's future earning capacity, and the

defendant has the burden of demonstrating inability to pay. (§ 1202.4, subd. (d).)  When

setting an amount in excess of $200, the court should consider (in addition to inability to

pay) any other relevant factors, including, but not limited to, the seriousness and gravity

of the offense and the circumstances of its commission, any economic gain derived by the

defendant, any losses incurred by another person, and the number of victims. (*Ibid.*)  The

trial court is not required to make express findings as to the factors bearing on the amount

of the fine. (*Ibid.*)

Mitchell contends that he does not have the ability to pay $1,000.  Because

Mitchell did not raise this objection before the trial court, it is forfeited on appeal.

(*People v. Nelson* (2011) 51 Cal.4th 198, 227.)  Moreover, even if we evaluate the issue

on the merits, Mitchell has not carried his burden to show inability to pay.  To support his

claim, Mitchell contends that the probation report shows his "only income was a $300 per

month stipend."  According to the probation report, Mitchell said he "was relying on the

$300.00 per month General Relief Welfare as a college student for his subsistence"; he

was required to pay the " 'loan' " back; and he has "no other means of support." He also said that he has completed high school and two semesters of community college. Regarding work history, he said he worked part-time at Jamba Juice in 2003 and 2004; part-time for Vons in 2004; as a telemarketer in 2007; and for " 'Labor Ready' " on numerous occasions. He told the probation officer that he was estranged from his parents due to his behavior, and he currently considered himself " 'homeless.' " At sentencing, Mitchell asked the court to dismiss his strike prior and grant him probation based on various factors, including that he had "a stable work history since 2003" and he had attended community college and had "numerous certifications in computer technology[.]" In his trial testimony, Mitchell at one point indicated that he was on his way to work when he was stopped by the trolley security officer.

Mitchell's statement concerning his income does not compel a finding that he cannot pay the $1,000 fine. He was 25 years old at the time of sentencing, and he described a stable work history and some college and computer-related education. There is nothing in the record indicating that he is completely, permanently destitute. On this record, the trial court was not required to find that he is unable to pay the fine now or in the future. (See *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [absent showing of "absolute inability to ever pay" fine, amount of fine was not abuse of discretion even though payment would be difficult and would take a long time and fine might never be paid]; *People v. Frye* (1984) 21 Cal.App.4th 1483, 1487 [court may consider defendant's ability to pay fine in the future; " '[a]bility to pay does not necessarily require existing employment or cash on hand' "].)

31

Mitchell also asserts that a $1,000 fine is not supported by the other relevant factors delineated in the statute. He posits that his offense was not serious, there were no victims, and he did not derive any economic gain. We reject this contention. The $1,000 fine is supported by the statutory formula of $200 multiplied by his five-year sentence. Further, when declining to dismiss the prior strike conviction, the trial court was apparently persuaded by the views of the probation officer and prosecutor that Mitchell's current offense of arming himself with a knife on the trolley was serious in light of his criminal history. The prosecutor cited Mitchell's 2005 assault with a deadly weapon conviction in which he "assaulted and stabbed [the victim] with a deadly weapon." Further, the prosecutor referred to another incident in 2000 when, as a juvenile, "he tried to stab his father with a fork." Additionally, the probation report describes other incidents of violent or potentially violent behavior, including 1998 juvenile offenses when he stabbed a student in the arm with a pen and on another occasion hit a student in the mouth; a 2005 incident when he pushed his girlfriend onto a couch, struck her in the face, and prevented her from leaving the apartment; a 2009 offense in which he was near the residence of a person who had filed a restraining order against him and was holding a club with protruding nails; and a 2009 offense where he "smacked" a person in the street who he claimed was a "protester[]." The probation officer noted that the 2010 current concealed-carrying offense was his fifth weapons-related offense and opined that if his "penchant for carrying [a] deadly weapon is not curtailed, it would just be a matter of time before he inflicts injury to others via the use of this type of weapon."

32

Mitchell's current offense of carrying a concealed knife on the trolley, viewed in the context of his criminal history involving numerous assaults, supports the court's conclusion that a $1,000 fine was warranted. (See *People v. Griffin* (1987) 193 Cal.App.3d 739, 740-742 [$2,000 restitution fine for petty theft with a prior was not abuse of discretion; defendant's extensive criminal history was relevant factor to consider when determining amount of fine].) There was no abuse of discretion.

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

33

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **SUPPLEMENTAL AUTHORITY** was served via United States Mail, postage prepaid, on this 22 , day of December, 2012; on the following:

KAMALA D. HARRIS
Attorney General of California
PETER K. SOUTHWORTH
Supervising Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
State Bar No. 184162
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Attorneys for Defendant California Attorney General Kamala Harris

AND

T. PETER PIERCE
LISA BOND
AARON C. O'DELL
RICHARDS WATSON & GERSHON
A Professional Corporation
355 South Grand Avenue, 40th Floor
Los Angeles, California 90071-3101
Attorney for Defendants:
CITY OF REDONDO BEACH, CITY OF REDONDO BEACH POLICE CHIEF
JOSEPH LEONARDI,  OFFICER TODD HEYWOOD and DOES 1 to 10

Charles Nichols
Plaintiff, In Pro Per