ORIGINAL

Charles Nichols
PO Box 1302
Redondo Beach, CA  90278
Voice: (424) 634-7381
E-Mail: CharlesNichols@Pykrete.info
In Pro Per

FILED
CLERK, U.S. DISTRICT COURT

APR 1 0 2013

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# United States District Court

# Central District of California

Charles Nichols,

        PLAINTIFF,

    vs.

KAMALA D. HARRIS, Attorney

General, in her official capacity as

Attorney General of California, CITY

OF REDONDO BEACH and DOES 1

to 10,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.: CV-11-9916 SJO (SS)**

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBITS 1 THROUGH 26**

Date: May 20, 2013
Time: 10:00 a.m.
Location: United States Courthouse
      312 North Spring Street
      Los Angeles, CA 90012-4701
Courtroom: 1 - 2nd Floor
Judge: Samuel James Otero
Date Action Filed: November 30, 2011

**TO THIS COURT, ALL PARTIES, AND ATTORNEYS OF RECORD:**

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

1

Plaintiff Charles Nichols, in pro per, on behalf of himself and others
similarly situated hereby requests this court to take judicial notice of the following
materials. This request is made in connection with Plaintiff's Motion for a
Preliminary Injunction and is supported by Federal Rule of Evidence 201.

The Court may take judicial notice of any matter "not subject to reasonable
dispute because it: (1) is generally known within the trial court's territorial
jurisdiction; or (2) can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Since all
materials, except for "24" are from the government's own publications and
records, defendants can hardly object to this Court's taking notice of the data and
records that they themselves maintain and publish, including on their own
websites, and rely upon. Exhibit "24" is a publication from the official
government website of the State of Oregon containing Oregon Revised Statute
821.240 which defines "unloaded" firearm consistent with the State of California's
definition of "unloaded" prior to the enactment of former California Penal Code
section 12031 in July of 1967 and is supported by an excerpt attached herein from
"The Mulford Act of 1967" of which former PC 12031 was a part.

1. California Penal Code section 25850
2. California Penal Code section 26350
3. California Penal Code section 26400
4. California Penal Code section 26150
5. California Penal Code section 26165
6. California Penal Code section 26155
7. California Penal Code section 26160
8. California Penal Code section 26175
9. California Penal Code section 26180

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

10. California Penal Code section 26185

11. California Penal Code section 26190

12. California Penal Code section 26200

13. California Penal Code section 26202

14. California Penal Code section 26205

15. California Penal Code section 26210

16. California Penal Code section 26215

17. California Penal Code section 26220

18. California Penal Code section 17030

19. California Senate Bill 1080 (Effective date 1/1/2012) – first page

20. California Assembly Bill No. 144 (Effective date 1/1/2012)

21. California Assembly Bill No. 1527 (Effective date 1/1/2013)

22. Senate Bill No. 146 (Approved by Governor on 9/5/1997) – first page

23. Assembly Bill No. 1363 (Approved by Governor on 10/11/2009)

24. Oregon Revised Statute 821.240

25. California Attorney General's Opinions Volume 51 - 1968 pgs 197-201.

26. Selected excerpts from the California State Archives legislative file of Assembly Bill 1591 ("The Mulford Act of 1967").

Dated: April 8, 2013                                 Respectfully submitted,

By: Charles Nichols
PLAINTIFF in Pro Per
PO Box 1302
Redondo Beach, CA  90278
Voice: (424) 634-7381
E-Mail:
CharlesNichols@Pykrete.info

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

3

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=25001-26000&file=25850

# PENAL CODE
# SECTION 25850

25850.   (a) A person is guilty of carrying a loaded firearm when the
person carries a loaded firearm on the person or in a vehicle while
in any public place or on any public street in an incorporated city
or in any public place or on any public street in a prohibited area
of unincorporated territory.
   (b) In order to determine whether or not a firearm is loaded for
the purpose of enforcing this section, peace officers are authorized
to examine any firearm carried by anyone on the person or in a
vehicle while in any public place or on any public street in an
incorporated city or prohibited area of an unincorporated territory.
Refusal to allow a peace officer to inspect a firearm pursuant to
this section constitutes probable cause for arrest for violation of
this section.
   (c) Carrying a loaded firearm in violation of this section is
punishable, as follows:
   (1) Where the person previously has been convicted of any felony,
or of any crime made punishable by a provision listed in Section
16580, as a felony.
   (2) Where the firearm is stolen and the person knew or had
reasonable cause to believe that it was stolen, as a felony.
   (3) Where the person is an active participant in a criminal street
gang, as defined in subdivision (a) of Section 186.22, under the
Street Terrorism Enforcement and Prevention Act (Chapter 11
(commencing with Section 186.20) of Title 7 of Part 1), as a felony.
   (4) Where the person is not in lawful possession of the firearm,
or is within a class of persons prohibited from possessing or
acquiring a firearm pursuant to Chapter 2 (commencing with Section
29800) or Chapter 3 (commencing with Section 29900) of Division 9 of
this title, or Section 8100 or 8103 of the Welfare and Institutions
Code, as a felony.
   (5) Where the person has been convicted of a crime against a
person or property, or of a narcotics or dangerous drug violation, by
imprisonment pursuant to subdivision (h) of Section 1170, or by
imprisonment in a county jail not to exceed one year, by a fine not
to exceed one thousand dollars ($1,000), or by both that imprisonment
and fine.
   (6) Where the person is not listed with the Department of Justice
pursuant to Section 11106 as the registered owner of the handgun, by
imprisonment pursuant to subdivision (h) of Section 1170, or by
imprisonment in a county jail not to exceed one year, or by a fine
not to exceed one thousand dollars ($1,000), or both that fine and
imprisonment.

# EXHIBIT 1-1

(7) In all cases other than those specified in paragraphs (1) to (6), inclusive, as a misdemeanor, punishable by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

(d) (1) Every person convicted under this section who has previously been convicted of an offense enumerated in Section 23515, or of any crime made punishable under a provision listed in Section 16580, shall serve a term of at least three months in a county jail, or, if granted probation or if the execution or imposition of sentence is suspended, it shall be a condition thereof that the person be imprisoned for a period of at least three months.

(2) The court shall apply the three-month minimum sentence except in unusual cases where the interests of justice would best be served by granting probation or suspending the imposition or execution of sentence without the minimum imprisonment required in this section or by granting probation or suspending the imposition or execution of sentence with conditions other than those set forth in this section, in which case, the court shall specify on the record and shall enter on the minutes the circumstances indicating that the interests of justice would best be served by that disposition.

(e) A violation of this section that is punished by imprisonment in a county jail not exceeding one year shall not constitute a conviction of a crime punishable by imprisonment for a term exceeding one year for the purposes of determining federal firearms eligibility under Section 922(g)(1) of Title 18 of the United States Code.

(f) Nothing in this section, or in Article 3 (commencing with Section 25900) or Article 4 (commencing with Section 26000), shall preclude prosecution under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a greater penalty than this section.

(g) Notwithstanding paragraphs (2) and (3) of subdivision (a) of Section 836, a peace officer may make an arrest without a warrant:

(1) When the person arrested has violated this section, although not in the officer's presence.

(2) Whenever the officer has reasonable cause to believe that the person to be arrested has violated this section, whether or not this section has, in fact, been violated.

(h) A peace officer may arrest a person for a violation of paragraph (6) of subdivision (c), if the peace officer has probable cause to believe that the person is carrying a handgun in violation of this section and that person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner of that handgun.

# EXHIBIT 1-2

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26350

# PENAL CODE
## SECTION 26350

26350.    (a) (1) A person is guilty of openly carrying an unloaded
handgun when that person carries upon his or her person an exposed
and unloaded handgun outside a vehicle while in or on any of the
following:
    (A) A public place or public street in an incorporated city or
city and county.
    (B) A public street in a prohibited area of an unincorporated area
of a county or city and county.
    (C) A public place in a prohibited area of a county or city and
county.
    (2) A person is guilty of openly carrying an unloaded handgun when
that person carries an exposed and unloaded handgun inside or on a
vehicle, whether or not on his or her person, while in or on any of
the following:
    (A) A public place or public street in an incorporated city or
city and county.
    (B) A public street in a prohibited area of an unincorporated area
of a county or city and county.
    (C) A public place in a prohibited area of a county or city and
county.
    (b) (1) Except as specified in paragraph (2), a violation of this
section is a misdemeanor.
    (2) A violation of subparagraph (A) of paragraph (1) of
subdivision (a) is punishable by imprisonment in a county jail not
exceeding one year, or by a fine not to exceed one thousand dollars
($1,000), or by both that fine and imprisonment, if both of the
following conditions exist:
    (A) The handgun and unexpended ammunition capable of being
discharged from that handgun are in the immediate possession of that
person.
    (B) The person is not in lawful possession of that handgun.
    (c) (1) Nothing in this section shall preclude prosecution under
Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing
with Section 29900) of Division 9, Section 8100 or 8103 of the
Welfare and Institutions Code, or any other law with a penalty
greater than is set forth in this section.
    (2) The provisions of this section are cumulative and shall not be
construed as restricting the application of any other law. However,
an act or omission punishable in different ways by different
provisions of law shall not be punished under more than one
provision.
    (d) Notwithstanding the fact that the term "an unloaded handgun"
is used in this section, each handgun shall constitute a distinct and
separate offense under this section.

# EXHIBIT 2

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26400

# PENAL CODE
# SECTION 26400

26400.   (a) A person is guilty of carrying an unloaded firearm that
is not a handgun in an incorporated city or city and county when that
person carries upon his or her person an unloaded firearm that is
not a handgun outside a vehicle while in the incorporated city or
city and county.
   (b) (1) Except as specified in paragraph (2), a violation of this
section is a misdemeanor.
   (2) A violation of subdivision (a) is punishable by imprisonment
in a county jail not exceeding one year, or by a fine not to exceed
one thousand dollars ($1,000), or by both that fine and imprisonment,
if the firearm and unexpended ammunition capable of being discharged
from that firearm are in the immediate possession of the person and
the person is not in lawful possession of that firearm.
   (c) (1) Nothing in this section shall preclude prosecution under
Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing
with Section 29900) of Division 9, Section 8100 or 8103 of the
Welfare and Institutions Code, or any other law with a penalty
greater than is set forth in this section.
   (2) The provisions of this section are cumulative and shall not be
construed as restricting the application of any other law. However,
an act or omission punishable in different ways by different
provisions of law shall not be punished under more than one
provision.
   (d) Notwithstanding the fact that the term "an unloaded firearm
that is not a handgun" is used in this section, each individual
firearm shall constitute a distinct and separate offense under this
section.

# EXHIBIT 3

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26150

26150. (a) When a person applies for a license to carry a pistol,
revolver, or other firearm capable of being concealed upon the
person, the sheriff of a county may issue a license to that person
upon proof of all of the following:
    (1) The applicant is of good moral character.
    (2) Good cause exists for issuance of the license.
    (3) The applicant is a resident of the county or a city within the
county, or the applicant's principal place of employment or business
is in the county or a city within the county and the applicant
spends a substantial period of time in that place of employment or
business.
    (4) The applicant has completed a course of training as described
in Section 26165.
    (b) The sheriff may issue a license under subdivision (a) in
either of the following formats:
    (1) A license to carry concealed a pistol, revolver, or other
firearm capable of being concealed upon the person.
    (2) Where the population of the county is less than 200,000
persons according to the most recent federal decennial census, a
license to carry loaded and exposed in only that county a pistol,
revolver, or other firearm capable of being concealed upon the
person.

# EXHIBIT 4

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26165

**26165.  (a) For new license applicants, the course of training for**
issuance of a license under Section 26150 or 26155 may be any course
acceptable to the licensing authority, shall not exceed 16 hours, and
shall include instruction on at least firearm safety and the law
regarding the permissible use of a firearm.
   (b) Notwithstanding subdivision (a), the licensing authority may
require a community college course certified by the Commission on
Peace Officer Standards and Training, up to a maximum of 24 hours,
but only if required uniformly of all license applicants without
exception.
   (c) For license renewal applicants, the course of training may be
any course acceptable to the licensing authority, shall be no less
than four hours, and shall include instruction on at least firearm
safety and the law regarding the permissible use of a firearm. No
course of training shall be required for any person certified by the
licensing authority as a trainer for purposes of this section, in
order for that person to renew a license issued pursuant to this
article.
   (d) The applicant shall not be required to pay for any training
courses prior to the determination of good cause being made pursuant
to Section 26202.

# EXHIBIT 5

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26155

**26155. (a) When a person applies for a license to carry a pistol,**
revolver, or other firearm capable of being concealed upon the
person, the chief or other head of a municipal police department of
any city or city and county may issue a license to that person upon
proof of all of the following:
    (1) The applicant is of good moral character.
    (2) Good cause exists for issuance of the license.
    (3) The applicant is a resident of that city.
    (4) The applicant has completed a course of training as described
in Section 26165.
    (b) The chief or other head of a municipal police department may
issue a license under subdivision (a) in either of the following
formats:
    (1) A license to carry concealed a pistol, revolver, or other
firearm capable of being concealed upon the person.
    (2) Where the population of the county in which the city is
located is less than 200,000 persons according to the most recent
federal decennial census, a license to carry loaded and exposed in
only that county a pistol, revolver, or other firearm capable of
being concealed upon the person.
    (c) Nothing in this chapter shall preclude the chief or other head
of a municipal police department of any city from entering an
agreement with the sheriff of the county in which the city is located
for the sheriff to process all applications for licenses, renewals
of licenses, and amendments to licenses, pursuant to this chapter.

# EXHIBIT 6

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26160

26160.  Each licensing authority shall publish and make available a
written policy summarizing the provisions of Section 26150 and
subdivisions (a) and (b) of Section 26155.

# EXHIBIT 7

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26175

### 26175. (a) (1) Applications for licenses, applications for
amendments to licenses, amendments to licenses, and licenses under
this article shall be uniform throughout the state, upon forms to be
prescribed by the Attorney General.

(2) The Attorney General shall convene a committee composed of one
representative of the California State Sheriffs' Association, one
representative of the California Police Chiefs Association, and one
representative of the Department of Justice to review, and as deemed
appropriate, revise the standard application form for licenses. The
committee shall meet for this purpose if two of the committee's
members deem that necessary.

(b) The application shall include a section summarizing the
statutory provisions of state law that result in the automatic denial
of a license.

(c) The standard application form for licenses described in
subdivision (a) shall require information from the applicant,
including, but not limited to, the name, occupation, residence, and
business address of the applicant, the applicant's age, height,
weight, color of eyes and hair, and reason for desiring a license to
carry the weapon.

(d) Applications for licenses shall be filed in writing and signed
by the applicant.

(e) Applications for amendments to licenses shall be filed in
writing and signed by the applicant, and shall state what type of
amendment is sought pursuant to Section 26215 and the reason for
desiring the amendment.

(f) The forms shall contain a provision whereby the applicant
attests to the truth of statements contained in the application.

(g) An applicant shall not be required to complete any additional
application or form for a license, or to provide any information
other than that necessary to complete the standard application form
described in subdivision (a), except to clarify or interpret
information provided by the applicant on the standard application
form.

(h) The standard application form described in subdivision (a) is
deemed to be a local form expressly exempt from the requirements of
the Administrative Procedure Act (Chapter 3.5 (commencing with
Section 11340) of Part 1 of Division 3 of Title 2 of the Government
Code).

(i) Any license issued upon the application shall set forth the
licensee's name, occupation, residence and business address, the
licensee's age, height, weight, color of eyes and hair, and the
reason for desiring a license to carry the weapon, and shall, in
addition, contain a description of the weapon or weapons authorized
to be carried, giving the name of the manufacturer, the serial
number, and the caliber. The license issued to the licensee may be
laminated.

# EXHIBIT 8

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26180

**26180.  (a) Any person who files an application required by Section**
26175 knowing that any statement contained therein is false is guilty
of a misdemeanor.
   (b) Any person who knowingly makes a false statement on the
application regarding any of the following is guilty of a felony:
   (1) The denial or revocation of a license, or the denial of an
amendment to a license, issued pursuant to this article.
   (2) A criminal conviction.
   (3) A finding of not guilty by reason of insanity.
   (4) The use of a controlled substance.
   (5) A dishonorable discharge from military service.
   (6) A commitment to a mental institution.
   (7) A renunciation of United States citizenship.

# EXHIBIT 9

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26185

**26185. (a) (1) The fingerprints of each applicant shall be taken**
and two copies on forms prescribed by the Department of Justice shall
be forwarded to the department.
    (2) Upon receipt of the fingerprints and the fee as prescribed in
Section 26190, the department shall promptly furnish the forwarding
licensing authority a report of all data and information pertaining
to any applicant of which there is a record in its office, including
information as to whether the person is prohibited by state or
federal law from possessing, receiving, owning, or purchasing a
firearm.
    (3) No license shall be issued by any licensing authority until
after receipt of the report from the department.
    (b) Notwithstanding subdivision (a), if the license applicant has
previously applied to the same licensing authority for a license to
carry firearms pursuant to this article and the applicant's
fingerprints and fee have been previously forwarded to the Department
of Justice, as provided by this section, the licensing authority
shall note the previous identification numbers and other data that
would provide positive identification in the files of the Department
of Justice on the copy of any subsequent license submitted to the
department in conformance with Section 26225 and no additional
application form or fingerprints shall be required.
    (c) If the license applicant has a license issued pursuant to this
article and the applicant's fingerprints have been previously
forwarded to the Department of Justice, as provided in this section,
the licensing authority shall note the previous identification
numbers and other data that would provide positive identification in
the files of the Department of Justice on the copy of any subsequent
license submitted to the department in conformance with Section 26225
and no additional fingerprints shall be required.

# EXHIBIT 10

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26190

26190.  (a) (1) Each applicant for a new license or for the renewal
of a license shall pay at the time of filing the application a fee
determined by the Department of Justice. The fee shall not exceed the
application processing costs of the Department of Justice for the
direct costs of furnishing the report required by Section 26185.
   (2) After the department establishes fees sufficient to reimburse
the department for processing costs, fees charged shall increase at a
rate not to exceed the legislatively approved annual cost-of-living
adjustments for the department's budget.
   (3) The officer receiving the application and the fee shall
transmit the fee, with the fingerprints if required, to the
Department of Justice.
   (b) (1) The licensing authority of any city, city and county, or
county may charge an additional fee in an amount equal to the actual
costs for processing the application for a new license, including any
required notices, excluding fingerprint and training costs, but in
no case to exceed one hundred dollars ($100), and shall transmit the
additional fee, if any, to the city, city and county, or county
treasury.
   (2) The first 20 percent of this additional local fee may be
collected upon filing of the initial application. The balance of the
fee shall be collected only upon issuance of the license.
   (c) The licensing authority may charge an additional fee, not to
exceed twenty-five dollars ($25), for processing the application for
a license renewal, and shall transmit an additional fee, if any, to
the city, city and county, or county treasury.
   (d) These local fees may be increased at a rate not to exceed any
increase in the California Consumer Price Index as compiled and
reported by the Department of Industrial Relations.
   (e) (1) In the case of an amended license pursuant to Section
26215, the licensing authority of any city, city and county, or
county may charge a fee, not to exceed ten dollars ($10), for
processing the amended license.
   (2) This fee may be increased at a rate not to exceed any increase
in the California Consumer Price Index as compiled and reported by
the Department of Industrial Relations.
   (3) The licensing authority shall transmit the fee to the city,
city and county, or county treasury.
   (f) (1) If psychological testing on the initial application is
required by the licensing authority, the license applicant shall be
referred to a licensed psychologist used by the licensing authority
for the psychological testing of its own employees. The applicant may
be charged for the actual cost of the testing in an amount not to
exceed one hundred fifty dollars ($150).
   (2) Additional psychological testing of an applicant seeking
license renewal shall be required only if there is compelling
evidence to indicate that a test is necessary. The cost to the
applicant for this additional testing shall not exceed one hundred
fifty dollars ($150).

# EXHIBIT 11-1

(g) Except as authorized pursuant to this section, no requirement, charge, assessment, fee, or condition that requires the payment of any additional funds by the applicant, or requires the applicant to obtain liability insurance, may be imposed by any licensing authority as a condition of the application for a license.

# EXHIBIT 11-2

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26200

**26200.  (a) A license issued pursuant to this article may include**
any reasonable restrictions or conditions that the issuing authority
deems warranted, including restrictions as to the time, place,
manner, and circumstances under which the licensee may carry a
pistol, revolver, or other firearm capable of being concealed upon
the person.
   (b) Any restrictions imposed pursuant to subdivision (a) shall be
indicated on any license issued.

# EXHIBIT 12

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26202

**26202. Upon making the determination of good cause pursuant to**
Section 26150 or 26155, the licensing authority shall give written
notice to the applicant of the licensing authority's determination.
If the licensing authority determines that good cause exists, the
notice shall inform the applicants to proceed with the training
requirements specified in Section 26165. If the licensing authority
determines that good cause does not exist, the notice shall inform
the applicant that the request for a license has been denied and
shall state the reason from the department's published policy,
described in Section 26160, as to why the determination was made.

# EXHIBIT 13

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26205

**26205.  The licensing authority shall give written notice to the**
applicant indicating if the license under this article is approved or
denied. The licensing authority shall give this notice within 90
days of the initial application for a new license or a license
renewal, or 30 days after receipt of the applicant's criminal
background check from the Department of Justice, whichever is later.
If the license is denied, the notice shall state which requirement
was not satisfied.

# EXHIBIT 14

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26210

**26210. (a) When a licensee under this article has a change of**
address, the license shall be amended to reflect the new address and
a new license shall be issued pursuant to subdivision (b) of Section
26215.
   (b) The licensee shall notify the licensing authority in writing
within 10 days of any change in the licensee's place of residence.
   (c) If both of the following conditions are satisfied, a license
to carry a concealed handgun may not be revoked solely because the
licensee's place of residence has changed to another county:
   (1) The licensee has not breached any of the conditions or
restrictions set forth in the license.
   (2) The licensee has not become prohibited by state or federal law
from possessing, receiving, owning, or purchasing a firearm.
   (d) Notwithstanding subdivision (c), if a licensee's place of
residence was the basis for issuance of a license, any license issued
pursuant to Section 26150 or 26155 shall expire 90 days after the
licensee moves from the county of issuance.
   (e) If the license is one to carry loaded and exposed a pistol,
revolver, or other firearm capable of being concealed upon the
person, the license shall be revoked immediately upon a change of the
licensee's place of residence to another county.

# EXHIBIT 15

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26215

26215.    (a) A person issued a license pursuant to this article may
apply to the licensing authority for an amendment to the license to
do one or more of the following:
    (1) Add or delete authority to carry a particular pistol,
revolver, or other firearm capable of being concealed upon the
person.
    (2) Authorize the licensee to carry concealed a pistol, revolver,
or other firearm capable of being concealed upon the person.
    (3) If the population of the county is less than 200,000 persons
according to the most recent federal decennial census, authorize the
licensee to carry loaded and exposed in only that county a pistol,
revolver, or other firearm capable of being concealed upon the
person.
    (4) Change any restrictions or conditions on the license,
including restrictions as to the time, place, manner, and
circumstances under which the person may carry a pistol, revolver, or
other firearm capable of being concealed upon the person.
    (b) If the licensing authority amends the license, a new license
shall be issued to the licensee reflecting the amendments.
    (c) An amendment to the license does not extend the original
expiration date of the license and the license shall be subject to
renewal at the same time as if the license had not been amended.
    (d) An application to amend a license does not constitute an
application for renewal of the license.

# EXHIBIT 16

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=26001-27000&file=26150-26225

# PENAL CODE
# SECTION 26220

26220. (a) Except as otherwise provided in this section and in
subdivision (c) of Section 26210, a license issued pursuant to
Section 26150 or 26155 is valid for any period of time not to exceed
two years from the date of the license.

(b) If the licensee's place of employment or business was the
basis for issuance of a license pursuant to Section 26150, the
license is valid for any period of time not to exceed 90 days from
the date of the license. The license shall be valid only in the
county in which the license was originally issued. The licensee shall
give a copy of this license to the licensing authority of the city,
county, or city and county in which the licensee resides. The
licensing authority that originally issued the license shall inform
the licensee verbally and in writing in at least 16-point type of
this obligation to give a copy of the license to the licensing
authority of the city, county, or city and county of residence. Any
application to renew or extend the validity of, or reissue, the
license may be granted only upon the concurrence of the licensing
authority that originally issued the license and the licensing
authority of the city, county, or city and county in which the
licensee resides.

(c) A license issued pursuant to Section 26150 or 26155 is valid
for any period of time not to exceed three years from the date of the
license if the license is issued to any of the following
individuals:

(1) A judge of a California court of record.

(2) A full-time court commissioner of a California court of
record.

(3) A judge of a federal court.

(4) A magistrate of a federal court.

(d) A license issued pursuant to Section 26150 or 26155 is valid
for any period of time not to exceed four years from the date of the
license if the license is issued to a custodial officer who is an
employee of the sheriff as provided in Section 831.5, except that the
license shall be invalid upon the conclusion of the person's
employment pursuant to Section 831.5 if the four-year period has not
otherwise expired or any other condition imposed pursuant to this
article does not limit the validity of the license to a shorter time
period.

(e) A license issued pursuant to Section 26170 to a peace officer
appointed pursuant to Section 830.6 is valid for any period of time
not to exceed four years from the date of the license, except that
the license shall be invalid upon the conclusion of the person's
appointment pursuant to Section 830.6 if the four-year period has not
otherwise expired or any other condition imposed pursuant to this
article does not limit the validity of the license to a shorter time
period.

# EXHIBIT 17

http://www.leginfo.ca.gov/cgi-bin/displaycode?section=pen&group=16001-17000&file=16100-17360

## PENAL CODE
## SECTION 17030

17030.  As used in this part, "prohibited area" means any place
where it is unlawful to discharge a weapon.

# EXHIBIT 18

http://www.leginfo.ca.gov/pub/09-10/bill/sen/sb_1051-1100/sb_1080_bill_20100930_chaptered.pdf

**California Senate Bill 1080 (Effective date 1/1/2012) – first page**

# EXHIBIT 19

## Senate Bill No. 1080

### CHAPTER 711

An act to add Sections 626.91 and 830.95 to, to add Title 2 (commencing with Section 12001) to Part 4 of, to add Part 6 (commencing with Section 16000) to, to repeal Section 653k of, and to repeal Title 2 (commencing with Section 12000) of Part 4 of, the Penal Code, relating to nonsubstantive reorganization of deadly weapon statutes.

[Approved by Governor September 30, 2010. Filed with
Secretary of State September 30, 2010.]

LEGISLATIVE COUNSEL'S DIGEST

SB 1080, Committee on Public Safety. Deadly weapons.

Existing law generally regulates deadly weapons.

This bill would reorganize without substantive change the provisions of the Penal Code relating to deadly weapons, to be operative January 1, 2012.

This bill would incorporate additional changes proposed by AB 1810, AB 1934, AB 2263, AB 2358, AB 2668, SB 282, SB 1062, and SB 1190, contingent on the prior enactment of those bills.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 626.91 is added to the Penal Code, to read:

626.91.  Possession of ammunition on school grounds is governed by Section 30310.

SEC. 2.  Section 653k of the Penal Code is repealed.

SEC. 3.  Section 830.95 is added to the Penal Code, to read:

830.95.  (a)  Any person who wears the uniform of a peace officer while engaged in picketing, or other informational activities in a public place relating to a concerted refusal to work, is guilty of a misdemeanor, whether or not the person is a peace officer.

(b)  This section shall not be construed to authorize or ratify any picketing or other informational activities not otherwise authorized by law.

SEC. 4.  Title 2 (commencing with Section 12000) of Part 4 of the Penal Code is repealed.

SEC. 5.  Title 2 (commencing with Section 12001) is added to Part 4 of the Penal Code, to read:

### TITLE 2. SENTENCE ENHANCEMENTS

12001.  As used in this title, "firearm" has the meaning provided in subdivision (a) of Section 16520.

EXHIBIT 19-1

http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_0101-0150/ab_144_bill_20111009_chaptered.pdf

**California Assembly Bill No. 144 (Effective date 1/1/2012)**

# EXHIBIT 20

## Assembly Bill No. 144

### CHAPTER 725

An act to amend Sections 7574.14 and 7582.2 of the Business and Professions Code, and to amend Sections 16520, 16750, 16850, 25595, and 25605 of, to add Sections 626.92, 16950, 17040, 17295, 17512, and 25590 to, and to add Chapter 6 (commencing with Section 26350) to Division 5 of Title 4 of Part 6 of, the Penal Code, relating to firearms.

[Approved by Governor October 9, 2011. Filed with
Secretary of State October 9, 2011.]

LEGISLATIVE COUNSEL'S DIGEST

AB 144, Portantino. Firearms.

Existing law, subject to certain exceptions, makes it an offense to carry a concealed handgun on the person or in a vehicle, as specified. Existing law provides that firearms carried openly in belt holsters are not concealed within the meaning of those provisions.

This bill would establish an exemption to the offense for transportation of a firearm between certain areas where the firearm may be carried concealed, or loaded, or openly carried unloaded, as specified.

Existing law prohibits, with exceptions, a person from possessing a firearm in a place that the person knows or reasonably should know is a school zone, as defined.

This bill would additionally exempt a security guard authorized to openly carry an unloaded handgun and an honorably retired peace officer authorized to openly carry an unloaded handgun from that prohibition.

Existing law, subject to certain exceptions, makes it an offense to carry a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory.

The bill would, subject to exceptions, make it a misdemeanor to openly carry an unloaded handgun on the person or openly and exposed in a motor vehicle in specified public areas and would make it a misdemeanor with specified penalties to openly carry an exposed handgun in a public place or public street, as specified, if the person at the same time possesses ammunition capable of being discharged from the handgun, and the person is not in lawful possession of the handgun, as specified.

Existing law makes it a misdemeanor for any driver or owner of a motor vehicle to allow a person to bring a loaded firearm into the motor vehicle in a public place, as specified.

This bill would expand the scope of that crime to include allowing a person to bring an open and exposed unloaded handgun into the vehicle, as specified.

95

Exhibit 20-1

By creating a new offense, and expanding the scope of existing crimes, this bill would impose a state-mandated local program.

The bill would make conforming and nonsubstantive technical changes.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1. Section 7574.14 of the Business and Professions Code is amended to read:

7574.14. This chapter shall not apply to the following:

(a) An officer or employee of the United States of America, or of this state or a political subdivision thereof, while the officer or employee is engaged in the performance of his or her official duties, including uniformed peace officers employed part time by a public agency pursuant to a written agreement between a chief of police or sheriff and the public agency, provided the part-time employment does not exceed 50 hours in any calendar month.

(b) A person engaged exclusively in the business of obtaining and furnishing information as to the financial rating of persons.

(c) A charitable philanthropic society or association incorporated under the laws of this state that is organized and duly maintained for the public good and not for private profit.

(d) Patrol special police officers appointed by the police commission of any city, county, or city and county under the express terms of its charter who also under the express terms of the charter (1) are subject to suspension or dismissal after a hearing on charges duly filed with the commission after a fair and impartial trial, (2) must be not less than 18 years of age nor more than 40 years of age, (3) must possess physical qualifications prescribed by the commission, and (4) are designated by the police commission as the owners of a certain beat or territory as may be fixed from time to time by the police commission.

(e) An attorney at law in performing his or her duties as an attorney at law.

(f) A collection agency or an employee thereof while acting within the scope of his or her employment, while making an investigation incidental to the business of the agency, including an investigation of the location of a debtor or his or her property where the contract with an assignor creditor is for the collection of claims owed or due or asserted to be owed or due or the equivalent thereof.

(g) Admitted insurers and agents and insurance brokers licensed by the state, performing duties in connection with insurance transacted by them.

Exhibit 20-2

(h)  Any bank subject to the jurisdiction of the Commissioner of Financial
Institutions of the State of California under Division 1 (commencing with
Section 99) of the Financial Code or the Comptroller of Currency of the
United States.

(i)  A person engaged solely in the business of securing information about
persons or property from public records.

(j)  A peace officer of this state or a political subdivision thereof while
the peace officer is employed by a private employer to engage in off-duty
employment in accordance with Section 1126 of the Government Code.
However, nothing herein shall exempt such a peace officer who either
contracts for his or her services or the services of others as a private patrol
operator or contracts for his or her services as or is employed as an armed
private security officer. For purposes of this subdivision, "armed security
officer" means an individual who carries or uses a firearm in the course and
scope of that contract or employment.

(k)  A retired peace officer of the state or political subdivision thereof
when the retired peace officer is employed by a private employer in
employment approved by the chief law enforcement officer of the jurisdiction
where the employment takes place, provided that the retired officer is in a
uniform of a public law enforcement agency, has registered with the bureau
on a form approved by the director, and has met any training requirements
or their equivalent as established for security personnel under Section 7583.5.
This officer may not carry an unloaded and exposed handgun unless he or
she is exempted under the provisions of Article 2 (commencing with Section
26361) of Chapter 6 of Division 5 of Title 4 of Part 6 of the Penal Code,
and may not carry a loaded or concealed firearm unless he or she is exempted
under the provisions of Sections 25450 to 25475, inclusive, of the Penal
Code or Sections 25900 to 25910, inclusive, of the Penal Code or has met
the requirements set forth in subdivision (d) of Section 26030 of the Penal
Code. However, nothing herein shall exempt the retired peace officer who
contracts for his or her services or the services of others as a private patrol
operator.

(l)  A licensed insurance adjuster in performing his or her duties within
the scope of his or her license as an insurance adjuster.

(m)  Any savings association subject to the jurisdiction of the
Commissioner of Financial Institutions or the Office of Thrift Supervision.

(n)  Any secured creditor engaged in the repossession of the creditor's
collateral and any lessor engaged in the repossession of leased property in
which it claims an interest.

(o)  A peace officer in his or her official police uniform acting in
accordance with subdivisions (c) and (d) of Section 70 of the Penal Code.

(p)  An unarmed, uniformed security person employed exclusively and
regularly by a motion picture studio facility employer who does not provide
contract security services for other entities or persons in connection with
the affairs of that employer only and where there exists an
employer-employee relationship if that person at no time carries or uses any
deadly weapon, as defined in subdivision (a), in the performance of his or

Exhibit  20-3

her duties, which may include, but are not limited to, the following business purposes:

(1) The screening and monitoring access of employees of the same employer.

(2) The screening and monitoring access of prearranged and preauthorized invited guests.

(3) The screening and monitoring of vendors and suppliers.

(4) Patrolling the private property facilities for the safety and welfare of all who have been legitimately authorized to have access to the facility.

(q) An armored contract carrier operating armored vehicles pursuant to the authority of the Department of the California Highway Patrol or the Public Utilities Commission, or an armored vehicle guard employed by an armored contract carrier.

SEC. 2.  Section 7582.2 of the Business and Professions Code is amended to read:

7582.2.  This chapter does not apply to the following:

(a) A person who does not meet the requirements to be a proprietary private security officer, as defined in Section 7574.1, and is employed exclusively and regularly by any employer who does not provide contract security services for other entities or persons, in connection with the affairs of the employer only and where there exists an employer-employee relationship if that person at no time carries or uses any deadly weapon in the performance of his or her duties. For purposes of this subdivision, "deadly weapon" is defined to include any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, any dirk, dagger, pistol, revolver, or any other firearm, any knife having a blade longer than five inches, any razor with an unguarded blade and any metal pipe or bar used or intended to be used as a club.

(b) An officer or employee of the United States of America, or of this state or a political subdivision thereof, while the officer or employee is engaged in the performance of his or her official duties, including uniformed peace officers employed part time by a public agency pursuant to a written agreement between a chief of police or sheriff and the public agency, provided the part-time employment does not exceed 50 hours in any calendar month.

(c) A person engaged exclusively in the business of obtaining and furnishing information as to the financial rating of persons.

(d) A charitable philanthropic society or association duly incorporated under the laws of this state that is organized and maintained for the public good and not for private profit.

(e) Patrol special police officers appointed by the police commission of any city, county, or city and county under the express terms of its charter who also under the express terms of the charter (1) are subject to suspension or dismissal after a hearing on charges duly filed with the commission after a fair and impartial trial, (2) must be not less than 18 years of age nor more than 40 years of age, (3) must possess physical qualifications prescribed by the commission, and (4) are designated by the police commission as the

95

Exhibit 204

owners of a certain beat or territory as may be fixed from time to time by the police commission.

(f) An attorney at law in performing his or her duties as an attorney at law.

(g) A collection agency or an employee thereof while acting within the scope of his or her employment, while making an investigation incidental to the business of the agency, including an investigation of the location of a debtor or his or her property where the contract with an assignor creditor is for the collection of claims owed or due or asserted to be owed or due or the equivalent thereof.

(h) Admitted insurers and agents and insurance brokers licensed by the state, performing duties in connection with insurance transacted by them.

(i) Any bank subject to the jurisdiction of the Commissioner of Financial Institutions of the State of California under Division 1 (commencing with Section 99) of the Financial Code or the Comptroller of Currency of the United States.

(j) A person engaged solely in the business of securing information about persons or property from public records.

(k) A peace officer of this state or a political subdivision thereof while the peace officer is employed by a private employer to engage in off-duty employment in accordance with Section 1126 of the Government Code. However, nothing herein shall exempt a peace officer who either contracts for his or her services or the services of others as a private patrol operator or contracts for his or her services as or is employed as an armed private security officer. For purposes of this subdivision, "armed security officer" means an individual who carries or uses a firearm in the course and scope of that contract or employment.

(*l*) A retired peace officer of the state or political subdivision thereof when the retired peace officer is employed by a private employer in employment approved by the chief law enforcement officer of the jurisdiction where the employment takes place, provided that the retired officer is in a uniform of a public law enforcement agency, has registered with the bureau on a form approved by the director, and has met any training requirements or their equivalent as established for security personnel under Section 7583.5. This officer may not carry an unloaded and exposed handgun unless he or she is exempted under the provisions of Article 2 (commencing with Section 26361) of Chapter 6 of Division 5 of Title 4 of Part 6 of the Penal Code, and may not carry a loaded or concealed firearm unless he or she is exempted under the provisions of Article 2 (commencing with Section 25450) of Chapter 2 of Division 5 of Title 4 of Part 6 of the Penal Code or Sections 25900 to 25910, inclusive, of the Penal Code or has met the requirements set forth in subdivision (d) of Section 26030 of the Penal Code. However, nothing herein shall exempt the retired peace officer who contracts for his or her services or the services of others as a private patrol operator.

(m) A licensed insurance adjuster in performing his or her duties within the scope of his or her license as an insurance adjuster.

Exhibit 20 - 5

(n) Any savings association subject to the jurisdiction of the Commissioner of Financial Institutions or the Office of Thrift Supervision.

(o) Any secured creditor engaged in the repossession of the creditor's collateral and any lessor engaged in the repossession of leased property in which it claims an interest.

(p) A peace officer in his or her official police uniform acting in accordance with subdivisions (c) and (d) of Section 70 of the Penal Code.

(q) An unarmed, uniformed security person employed exclusively and regularly by a motion picture studio facility employer who does not provide contract security services for other entities or persons in connection with the affairs of that employer only and where there exists an employer-employee relationship if that person at no time carries or uses any deadly weapon, as defined in subdivision (a), in the performance of his or her duties, which may include, but are not limited to, the following business purposes:

(1) The screening and monitoring access of employees of the same employer.

(2) The screening and monitoring access of prearranged and preauthorized invited guests.

(3) The screening and monitoring of vendors and suppliers.

(4) Patrolling the private property facilities for the safety and welfare of all who have been legitimately authorized to have access to the facility.

(r) The changes made to this section by the act adding this subdivision during the 2005–06 Regular Session of the Legislature shall apply as follows:

(1) On and after July 1, 2006, to a person hired as a security officer on and after January 1, 2006.

(2) On and after January 1, 2007, to a person hired as a security officer before January 1, 2006.

SEC. 3.  Section 626.92 is added to the Penal Code, to read:

626.92.  Section 626.9 does not apply to or affect any of the following:

(a) A security guard authorized to openly carry an unloaded handgun pursuant to Chapter 6 (commencing with Section 26350) of Division 5 of Title 4 of Part 6.

(b) An honorably retired peace officer authorized to openly carry an unloaded handgun pursuant to Section 26361.

SEC. 4.  Section 16520 of the Penal Code is amended to read:

16520.  (a) As used in this part, "firearm" means any device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of any explosion or other form of combustion.

(b) As used in the following provisions, "firearm" includes the frame or receiver of the weapon:

(1) Section 16550.

(2) Section 16730.

(3) Section 16960.

(4) Section 16990.

(5) Section 17070.

(6) Section 17310.

Exhibit 20-6

— 7 —                                    Ch. 725

(7) Sections 26500 to 26588, inclusive.
(8) Sections 26600 to 27140, inclusive.
(9) Sections 27400 to 28000, inclusive.
(10) Section 28100.
(11) Sections 28400 to 28415, inclusive.
(12) Sections 29010 to 29150, inclusive.
(13) Sections 29610 to 29750, inclusive.
(14) Sections 29800 to 29905, inclusive.
(15) Sections 30150 to 30165, inclusive.
(16) Section 31615.
(17) Sections 31705 to 31830, inclusive.
(18) Sections 34355 to 34370, inclusive.
(19) Sections 8100, 8101, and 8103 of the Welfare and Institutions Code.

(c) As used in the following provisions, "firearm" also includes any rocket, rocket propelled projectile launcher, or similar device containing any explosive or incendiary material whether or not the device is designed for emergency or distress signaling purposes:

(1) Section 16750.
(2) Subdivision (b) of Section 16840.
(3) Section 25400.
(4) Sections 25850 to 26025, inclusive.
(5) Subdivisions (a), (b), and (c) of Section 26030.
(6) Sections 26035 to 26055, inclusive.

(d) As used in the following provisions, "firearm" does not include an unloaded antique firearm:

(1) Subdivisions (a) and (c) of Section 16730.
(2) Section 16550.
(3) Section 16960.
(4) Section 17310.
(5) Chapter 6 (commencing with Section 26350) of Division 5 of Title 4.
(6) Sections 26500 to 26588, inclusive.
(7) Sections 26700 to 26915, inclusive.
(8) Section 27510.
(9) Section 27530.
(10) Section 27540.
(11) Section 27545.
(12) Sections 27555 to 27570, inclusive.
(13) Sections 29010 to 29150, inclusive.

(e) As used in Sections 34005 and 34010, "firearm" does not include a destructive device.

(f) As used in Sections 17280 and 24680, "firearm" has the same meaning as in Section 922 of Title 18 of the United States Code.

(g) As used in Sections 29010 to 29150, inclusive, "firearm" includes the unfinished frame or receiver of a weapon that can be readily converted to the functional condition of a finished frame or receiver.

SEC. 5.  Section 16750 of the Penal Code is amended to read:

95

Exhibit 207

**Ch. 725**                — 8 —

16750.  (a) As used in Section 25400, "lawful possession of the firearm"
means that the person who has possession or custody of the firearm either
lawfully owns the firearm or has the permission of the lawful owner or a
person who otherwise has apparent authority to possess or have custody of
the firearm. A person who takes a firearm without the permission of the
lawful owner or without the permission of a person who has lawful custody
of the firearm does not have lawful possession of the firearm.

(b) As used in Article 2 (commencing with Section 25850), Article 3
(commencing with Section 25900), and Article 4 (commencing with Section
26000) of Chapter 3 of Division 5 of Title 4, and Chapter 6 (commencing
with Section 26350) of Division 5 of Title 4, "lawful possession of the
firearm" means that the person who has possession or custody of the firearm
either lawfully acquired and lawfully owns the firearm or has the permission
of the lawful owner or person who otherwise has apparent authority to
possess or have custody of the firearm. A person who takes a firearm without
the permission of the lawful owner or without the permission of a person
who has lawful custody of the firearm does not have lawful possession of
the firearm.

SEC. 6.  Section 16850 of the Penal Code is amended to read:

16850.  As used in Sections 17740, 23925, 25105, 25205, and 25610, in
Article 3 (commencing with Section 25505) of Chapter 2 of Division 5 of
Title 4, and in Chapter 6 (commencing with Section 26350) of Division 5
of Title 4, "locked container" means a secure container that is fully enclosed
and locked by a padlock, keylock, combination lock, or similar locking
device. The term "locked container" does not include the utility or glove
compartment of a motor vehicle.

SEC. 7.  Section 16950 is added to the Penal Code, to read:

16950.  As used in Chapter 6 (commencing with Section 26350) of
Division 5 of Title 4, a handgun shall be deemed to be carried openly or
exposed if the handgun is not carried concealed within the meaning of
Section 25400.

SEC. 8.  Section 17040 is added to the Penal Code, to read:

17040.  As used in Chapter 6 (commencing with Section 26350) of
Division 5 of Title 4, "public place" has the same meaning as in Section
25850.

SEC. 9.  Section 17295 is added to the Penal Code, to read:

17295.  For purposes of Chapter 6 (commencing with Section 26350) of
Division 5 of Title 4, a handgun shall be deemed "unloaded" if it is not
"loaded" within the meaning of subdivision (b) of Section 16840.

SEC. 10.  Section 17512 is added to the Penal Code, to read:

17512.  It is a misdemeanor for a driver of any motor vehicle or the owner
of any motor vehicle, whether or not the owner of the vehicle is occupying
the vehicle, to knowingly permit any other person to carry into or bring into
the vehicle a firearm in violation of Section 26350.

SEC. 11.  Section 25590 is added to the Penal Code, to read:

Exhibit 20-8

— 9 —                    **Ch. 725**

25590.  Section 25400 does not apply to, or affect, the transportation of a firearm by a person if done directly between any of the places set forth below:

(a) A place where the person may carry that firearm pursuant to an exemption from the prohibition set forth in subdivision (a) of Section 25400.

(b) A place where that person may carry that firearm pursuant to an exemption from the prohibition set forth in subdivision (a) of Section 25850, or a place where the prohibition set forth in subdivision (a) of Section 25850 does not apply.

(c) A place where that person may carry a firearm pursuant to an exemption from the prohibition set forth in subdivision (a) of Section 26350, or a place where the prohibition set forth in subdivision (a) of Section 26350 does not apply.

SEC. 12.  Section 25595 of the Penal Code is amended to read:

25595.  This article does not prohibit or limit the otherwise lawful carrying or transportation of any handgun in accordance with the provisions listed in Section 16580.

SEC. 13.  Section 25605 of the Penal Code is amended to read:

25605.  (a) Section 25400 and Chapter 6 (commencing with Section 26350) of Division 5 shall not apply to or affect any citizen of the United States or legal resident over the age of 18 years who resides or is temporarily within this state, and who is not within the excepted classes prescribed by Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, who carries, either openly or concealed, anywhere within the citizen's or legal resident's place of residence, place of business, or on private property owned or lawfully possessed by the citizen or legal resident, any handgun.

(b) No permit or license to purchase, own, possess, keep, or carry, either openly or concealed, shall be required of any citizen of the United States or legal resident over the age of 18 years who resides or is temporarily within this state, and who is not within the excepted classes prescribed by Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, to purchase, own, possess, keep, or carry, either openly or concealed, a handgun within the citizen's or legal resident's place of residence, place of business, or on private property owned or lawfully possessed by the citizen or legal resident.

(c) Nothing in this section shall be construed as affecting the application of Sections 25850 to 26055, inclusive.

SEC. 14.  Chapter 6 (commencing with Section 26350) is added to Division 5 of Title 4 of Part 6 of the Penal Code, to read:

95

Exhibt 209

CHAPTER 6. OPENLY CARRYING AN UNLOADED HANDGUN

Article 1. Crime of Openly Carrying an Unloaded Handgun

26350. (a) (1) A person is guilty of openly carrying an unloaded handgun when that person carries upon his or her person an exposed and unloaded handgun outside a vehicle while in or on any of the following:

(A) A public place or public street in an incorporated city or city and county.

(B) A public street in a prohibited area of an unincorporated area of a county or city and county.

(C) A public place in a prohibited area of a county or city and county.

(2) A person is guilty of openly carrying an unloaded handgun when that person carries an exposed and unloaded handgun inside or on a vehicle, whether or not on his or her person, while in or on any of the following:

(A) A public place or public street in an incorporated city or city and county.

(B) A public street in a prohibited area of an unincorporated area of a county or city and county.

(C) A public place in a prohibited area of a county or city and county.

(b) (1) Except as specified in paragraph (2), a violation of this section is a misdemeanor.

(2) A violation of subparagraph (A) of paragraph (1) of subdivision (a) is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment, if both of the following conditions exist:

(A) The handgun and unexpended ammunition capable of being discharged from that handgun are in the immediate possession of that person.

(B) The person is not in lawful possession of that handgun.

(c) (1) Nothing in this section shall preclude prosecution under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a penalty greater than is set forth in this section.

(2) The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by different provisions of law shall not be punished under more than one provision.

(d) Notwithstanding the fact that the term "an unloaded handgun" is used in this section, each handgun shall constitute a distinct and separate offense under this section.


Article 2. Exemptions

26361. Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by any peace officer or any honorably retired peace officer if that officer may carry a concealed firearm pursuant to Article 2

95

Exhibit 20-10

— 11 —                        Ch. 725

(commencing with Section 25450) of Chapter 2, or a loaded firearm pursuant
to Article 3 (commencing with Section 25900) of Chapter 3.

26362.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun by any person to the extent that person may openly
carry a loaded handgun pursuant to Article 4 (commencing with Section
26000) of Chapter 3.

26363.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun as merchandise by a person who is engaged in the
business of manufacturing, importing, wholesaling, repairing, or dealing in
firearms and who is licensed to engage in that business, or the authorized
representative or authorized agent of that person, while engaged in the lawful
course of the business.

26364.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun by a duly authorized military or civil organization, or
the members thereof, while parading or while rehearsing or practicing
parading, when at the meeting place of the organization.

26365.  Paragraph (1) of subdivision (a) of Section 26350 does not apply
to, or affect, the open carrying of an unloaded handgun by a member of any
club or organization organized for the purpose of practicing shooting at
targets upon established target ranges, whether public or private, while the
members are using handguns upon the target ranges or incident to the use
of a handgun at that target range.

26366.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun by a licensed hunter while engaged in hunting or while
transporting that handgun when going to or returning from that hunting
expedition.

26367.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun incident to transportation of a handgun by a person
operating a licensed common carrier, or by an authorized agent or employee
thereof, when transported in conformance with applicable federal law.

26368.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun by a member of an organization chartered by the
Congress of the United States or a nonprofit mutual or public benefit
corporation organized and recognized as a nonprofit tax-exempt organization
by the Internal Revenue Service while on official parade duty or ceremonial
occasions of that organization or while rehearsing or practicing for official
parade duty or ceremonial occasions.

26369.  Paragraph (1) of subdivision (a) of Section 26350 does not apply
to, or affect, the open carrying of an unloaded handgun within a gun show
conducted pursuant to Article 1 (commencing with Section 27200) and
Article 2 (commencing with Section 27300) of Chapter 3 of Division 6.

26370.  Section 26350 does not apply to, or affect, the open carrying of
an unloaded handgun within a school zone, as defined in Section 626.9,
with the written permission of the school district superintendent, the
superintendent's designee, or equivalent school authority.

95

Exhibit 20-11

26371.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun when in accordance with the provisions of Section 171b.

26372.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by any person while engaged in the act of making or attempting to make a lawful arrest.

26373.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to loaning, selling, or transferring that handgun in accordance with Article 1 (commencing with Section 27500) of Chapter 4 of Division 6, or in accordance with any of the exemptions from Section 27545, so long as that handgun is possessed within private property and the possession and carrying is with the permission of the owner or lessee of that private property.

26374.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person engaged in firearms-related activities, while on the premises of a fixed place of business that is licensed to conduct and conducts, as a regular course of its business, activities related to the sale, making, repair, transfer, pawn, or the use of firearms, or related to firearms training.

26375.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses the handgun as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

26376.  Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to obtaining an identification number or mark assigned for that handgun from the Department of Justice pursuant to Section 23910.

26377.  Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun at any established target range, whether public or private, while the person is using the handgun upon the target range.

26378.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person when that person is summoned by a peace officer to assist in making arrests or preserving the peace, while the person is actually engaged in assisting that officer.

26379.  Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to any of the following:

(a) Complying with Section 27560 or 27565, as it pertains to that handgun.

(b) Section 28000, as it pertains to that handgun.

(c) Section 27850 or 31725, as it pertains to that handgun.

95

Exhibit 20 - 12

(d) Complying with Section 27870 or 27875, as it pertains to that handgun.

(e) Complying with Section 27915, 27920, or 27925, as it pertains to that handgun.

26380.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to, and in the course and scope of, training of or by an individual to become a sworn peace officer as part of a course of study approved by the Commission on Peace Officer Standards and Training.

26381.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to, and in the course and scope of, training of or by an individual to become licensed pursuant to Chapter 4 (commencing with Section 26150) as part of a course of study necessary or authorized by the person authorized to issue the license pursuant to that chapter.

26382.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun incident to and at the request of a sheriff or chief or other head of a municipal police department.

26383.  Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a person when done within a place of business, a place of residence, or on private property, if done with the permission of a person who, by virtue of subdivision (a) of Section 25605, may carry openly an unloaded handgun within that place of business, place of residence, or on that private property owned or lawfully possessed by that person.

26384.  Paragraph (1) of subdivision (a) of Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun if all of the following conditions are satisfied:

(a) The open carrying occurs at an auction or similar event of a nonprofit public benefit or mutual benefit corporation, at which firearms are auctioned or otherwise sold to fund the activities of that corporation or the local chapters of that corporation.

(b) The unloaded handgun is to be auctioned or otherwise sold for that nonprofit public benefit or mutual benefit corporation.

(c) The unloaded handgun is to be delivered by a person licensed pursuant to, and operating in accordance with, Sections 26700 to 26925, inclusive.

26385.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun pursuant to paragraph (3) of subdivision (b) of Section 171c.

26386.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun pursuant to Section 171d.

26387.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun pursuant to subparagraph (F) of paragraph (1) subdivision (c) of Section 171.7.

26388.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun on publicly owned land, if the possession and use of

a handgun is specifically permitted by the managing agency of the land and the person carrying that handgun is in lawful possession of that handgun.

26389.  Section 26350 does not apply to, or affect, the carrying of an unloaded handgun if the handgun is carried either in the locked trunk of a motor vehicle or in a locked container.

SEC. 15.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

Exhibit 20 H

<u>http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_1501-
1550/ab_1527_bill_20120928_chaptered.pdf</u>

**California Assembly Bill No. 1527 (Effective date 1/1/2013)**

# EXHIBIT 21

## Assembly Bill No. 1527

### CHAPTER 700

An act to amend Sections 7574.14 and 7582.2 of the Business and
Professions Code, and to amend Sections 626.92, 16520, 16750, 16850,
and 17295 of, to add Sections 16505, 26366.5, 26390, and 26391 to, and to
add Chapter 7 (commencing with Section 26400) to Division 5 of Title 4
of Part 6 of, the Penal Code, relating to firearms.

[Approved by Governor September 28, 2012. Filed with
Secretary of State September 28, 2012.]

LEGISLATIVE COUNSEL'S DIGEST

AB 1527, Portantino. Firearms.

Existing law prohibits, with exceptions, a person from possessing a firearm
in a place that the person knows or reasonably should know is a school zone,
as defined.

This bill would, additionally, exempt a security guard authorized to openly
carry an unloaded firearm that is not a handgun and an honorably retired
peace officer authorized to openly carry an unloaded firearm that is not a
handgun from that prohibition.

Existing law, subject to certain exceptions, makes it an offense for a
person to carry an exposed and unloaded handgun on his or her person
outside a motor vehicle or inside or on a motor vehicle in public areas and
public streets, as specified.

This bill would exempt a person from the crime of openly carrying an
unloaded handgun if he or she is in compliance with specified provisions
relating to carrying a handgun in an airport or the open carrying of an
unloaded handgun by a licensed hunter while actually engaged in training
a hunting dog or while transporting the handgun while going to or from that
training.

This bill would, subject to exceptions, make it a misdemeanor for a person
to carry an unloaded firearm that is not a handgun on his or her person
outside a motor vehicle in an incorporated city or city and county and would
make it a misdemeanor with specified penalties if a person carries an
unloaded firearm that is not a handgun outside a motor vehicle in an
incorporated city or city and county and the person at the same time
possesses ammunition capable of being discharged from the unloaded firearm
that is not a handgun, and the person is not in lawful possession of the
unloaded firearm that is not a handgun, as specified.

By creating a new offense, and expanding the scope of existing crimes,
this bill would impose a state-mandated local program.

The bill would make conforming technical changes.

94

Exhibit 21-1

This bill would incorporate additional changes to Section 16520 of the Penal Code proposed by SB 1366, that would become operative only if SB 1366 and this bill are both enacted, both bills become effective on or before January 1, 2013, and this bill is enacted last.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 7574.14 of the Business and Professions Code is amended to read:

7574.14.  This chapter shall not apply to the following:

(a)  An officer or employee of the United States of America, or of this state or a political subdivision thereof, while the officer or employee is engaged in the performance of his or her official duties, including uniformed peace officers employed part time by a public agency pursuant to a written agreement between a chief of police or sheriff and the public agency, provided the part-time employment does not exceed 50 hours in a calendar month.

(b)  A person engaged exclusively in the business of obtaining and furnishing information as to the financial rating of persons.

(c)  A charitable philanthropic society or association incorporated under the laws of this state that is organized and duly maintained for the public good and not for private profit.

(d)  Patrol special police officers appointed by the police commission of a city, county, or city and county under the express terms of its charter who also under the express terms of the charter (1) are subject to suspension or dismissal after a hearing on charges duly filed with the commission after a fair and impartial trial, (2) must be not less than 18 years of age nor more than 40 years of age, (3) must possess physical qualifications prescribed by the commission, and (4) are designated by the police commission as the owners of a certain beat or territory as may be fixed from time to time by the police commission.

(e)  An attorney at law in performing his or her duties as an attorney at law.

(f)  A collection agency or an employee thereof while acting within the scope of his or her employment, while making an investigation incidental to the business of the agency, including an investigation of the location of a debtor or his or her property where the contract with an assignor creditor is for the collection of claims owed or due or asserted to be owed or due or the equivalent thereof.

(g)  Admitted insurers and agents and insurance brokers licensed by the state, performing duties in connection with insurance transacted by them.

Exhibit 21-2

— 3 —                                        **Ch. 700**

(h) A bank subject to the jurisdiction of the Commissioner of Financial Institutions of the State of California under Division 1 (commencing with Section 99) of the Financial Code or the Comptroller of Currency of the United States.

(i) A person engaged solely in the business of securing information about persons or property from public records.

(j) A peace officer of this state or a political subdivision thereof while the peace officer is employed by a private employer to engage in off-duty employment in accordance with Section 1126 of the Government Code. However, nothing herein shall exempt such a peace officer who either contracts for his or her services or the services of others as a private patrol operator or contracts for his or her services as or is employed as an armed private security officer. For purposes of this subdivision, "armed security officer" means an individual who carries or uses a firearm in the course and scope of that contract or employment.

(k) A retired peace officer of the state or political subdivision thereof when the retired peace officer is employed by a private employer in employment approved by the chief law enforcement officer of the jurisdiction where the employment takes place, provided that the retired officer is in a uniform of a public law enforcement agency, has registered with the bureau on a form approved by the director, and has met any training requirements or their equivalent as established for security personnel under Section 7583.5. This officer may not carry an unloaded and exposed handgun unless he or she is exempted under the provisions of Article 2 (commencing with Section 26361) of Chapter 6 of Division 5 of Title 4 of Part 6 of the Penal Code, may not carry an unloaded firearm that is not a handgun unless he or she is exempted under the provisions of Article 2 (commencing with Section 26405) of Chapter 7 of Division 5 of Title 4 of Part 6 of the Penal Code, and may not carry a loaded or concealed firearm unless he or she is exempted under the provisions of Sections 25450 to 25475, inclusive, of the Penal Code or Sections 25900 to 25910, inclusive, of the Penal Code or has met the requirements set forth in subdivision (d) of Section 26030 of the Penal Code. However, nothing herein shall exempt the retired peace officer who contracts for his or her services or the services of others as a private patrol operator.

(*l*) A licensed insurance adjuster in performing his or her duties within the scope of his or her license as an insurance adjuster.

(m) A savings association subject to the jurisdiction of the Commissioner of Financial Institutions or the Office of Thrift Supervision.

(n) A secured creditor engaged in the repossession of the creditor's collateral and a lessor engaged in the repossession of leased property in which it claims an interest.

(o) A peace officer in his or her official police uniform acting in accordance with subdivisions (c) and (d) of Section 70 of the Penal Code.

(p) An unarmed, uniformed security person employed exclusively and regularly by a motion picture studio facility employer who does not provide contract security services for other entities or persons in connection with

94

Exhibit 21-3

the affairs of that employer only and where there exists an
employer-employee relationship if that person at no time carries or uses a
deadly weapon, as defined in subdivision (a), in the performance of his or
her duties, which may include, but are not limited to, the following business
purposes:

(1) The screening and monitoring access of employees of the same
employer.

(2) The screening and monitoring access of prearranged and preauthorized
invited guests.

(3) The screening and monitoring of vendors and suppliers.

(4) Patrolling the private property facilities for the safety and welfare of
all who have been legitimately authorized to have access to the facility.

(q) An armored contract carrier operating armored vehicles pursuant to
the authority of the Department of the California Highway Patrol or the
Public Utilities Commission, or an armored vehicle guard employed by an
armored contract carrier.

SEC. 2.  Section 7582.2 of the Business and Professions Code is amended
to read:

7582.2.  This chapter does not apply to the following:

(a) A person who does not meet the requirements to be a proprietary
private security officer, as defined in Section 7574.01, and is employed
exclusively and regularly by an employer who does not provide contract
security services for other entities or persons, in connection with the affairs
of the employer only and where there exists an employer-employee
relationship if that person at no time carries or uses a deadly weapon in the
performance of his or her duties. For purposes of this subdivision, "deadly
weapon" is defined to include an instrument or weapon of the kind
commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal
knuckles, a dirk, dagger, pistol, revolver, or any other firearm, a knife having
a blade longer than five inches, a razor with an unguarded blade, and a metal
pipe or bar used or intended to be used as a club.

(b) An officer or employee of the United States of America, or of this
state or a political subdivision thereof, while the officer or employee is
engaged in the performance of his or her official duties, including uniformed
peace officers employed part time by a public agency pursuant to a written
agreement between a chief of police or sheriff and the public agency,
provided the part-time employment does not exceed 50 hours in any calendar
month.

(c) A person engaged exclusively in the business of obtaining and
furnishing information as to the financial rating of persons.

(d) A charitable philanthropic society or association duly incorporated
under the laws of this state that is organized and maintained for the public
good and not for private profit.

(e) Patrol special police officers appointed by the police commission of
a city, county, or city and county under the express terms of its charter who
also under the express terms of the charter (1) are subject to suspension or
dismissal after a hearing on charges duly filed with the commission after a

94

Exhibit 214

fair and impartial trial, (2) must be not less than 18 years of age nor more than 40 years of age, (3) must possess physical qualifications prescribed by the commission, and (4) are designated by the police commission as the owners of a certain beat or territory as may be fixed from time to time by the police commission.

(f) An attorney at law in performing his or her duties as an attorney at law.

(g) A collection agency or an employee thereof while acting within the scope of his or her employment, while making an investigation incidental to the business of the agency, including an investigation of the location of a debtor or his or her property where the contract with an assignor creditor is for the collection of claims owed or due or asserted to be owed or due or the equivalent thereof.

(h) Admitted insurers and agents and insurance brokers licensed by the state, performing duties in connection with insurance transacted by them.

(i) A bank subject to the jurisdiction of the Commissioner of Financial Institutions of the State of California under Division 1 (commencing with Section 99) of the Financial Code or the Comptroller of the Currency of the United States.

(j) A person engaged solely in the business of securing information about persons or property from public records.

(k) A peace officer of this state or a political subdivision thereof while the peace officer is employed by a private employer to engage in off-duty employment in accordance with Section 1126 of the Government Code. However, nothing herein shall exempt a peace officer who either contracts for his or her services or the services of others as a private patrol operator or contracts for his or her services as or is employed as an armed private security officer. For purposes of this subdivision, "armed security officer" means an individual who carries or uses a firearm in the course and scope of that contract or employment.

(l) A retired peace officer of the state or political subdivision thereof when the retired peace officer is employed by a private employer in employment approved by the chief law enforcement officer of the jurisdiction where the employment takes place, provided that the retired officer is in a uniform of a public law enforcement agency, has registered with the bureau on a form approved by the director, and has met any training requirements or their equivalent as established for security personnel under Section 7583.5. This officer may not carry an unloaded and exposed handgun unless he or she is exempted under the provisions of Article 2 (commencing with Section 26361) of Chapter 6 of Division 5 of Title 4 of Part 6 of the Penal Code, may not carry an unloaded firearm that is not a handgun unless he or she is exempted under the provisions of Article 2 (commencing with Section 26405) of Chapter 7 of Division 5 of Title 4 of Part 6 of the Penal Code, and may not carry a loaded or concealed firearm unless he or she is exempted under the provisions of Article 2 (commencing with Section 25450) of Chapter 2 of Division 5 of Title 4 of Part 6 of the Penal Code or Sections 25900 to 25910, inclusive, of the Penal Code or has met the requirements

94

Exhibit 21-5

set forth in subdivision (d) of Section 26030 of the Penal Code. However, nothing herein shall exempt the retired peace officer who contracts for his or her services or the services of others as a private patrol operator.

(m) A licensed insurance adjuster in performing his or her duties within the scope of his or her license as an insurance adjuster.

(n) A savings association subject to the jurisdiction of the Commissioner of Financial Institutions or the Office of Thrift Supervision.

(o) A secured creditor engaged in the repossession of the creditor's collateral and a lessor engaged in the repossession of leased property in which it claims an interest.

(p) A peace officer in his or her official police uniform acting in accordance with subdivisions (c) and (d) of Section 70 of the Penal Code.

(q) An unarmed, uniformed security person employed exclusively and regularly by a motion picture studio facility employer who does not provide contract security services for other entities or persons in connection with the affairs of that employer only and where there exists an employer-employee relationship if that person at no time carries or uses a deadly weapon, as defined in subdivision (a), in the performance of his or her duties, which may include, but are not limited to, the following business purposes:

(1) The screening and monitoring access of employees of the same employer.

(2) The screening and monitoring access of prearranged and preauthorized invited guests.

(3) The screening and monitoring of vendors and suppliers.

(4) Patrolling the private property facilities for the safety and welfare of all who have been legitimately authorized to have access to the facility.

(r) The changes made to this section by the act adding this subdivision during the 2005–06 Regular Session of the Legislature shall apply as follows:

(1) On and after July 1, 2006, to a person hired as a security officer on and after January 1, 2006.

(2) On and after January 1, 2007, to a person hired as a security officer before January 1, 2006.

SEC. 3.  Section 626.92 of the Penal Code is amended to read:

626.92.  Section 626.9 does not apply to or affect any of the following:

(a) A security guard authorized to openly carry an unloaded handgun pursuant to Chapter 6 (commencing with Section 26350) of Division 5 of Title 4 of Part 6.

(b) An honorably retired peace officer authorized to openly carry an unloaded handgun pursuant to Section 26361.

(c) A security guard authorized to openly carry an unloaded firearm that is not a handgun pursuant to Chapter 7 (commencing with Section 26400) of Division 5 of Title 4 of Part 6.

(d) An honorably retired peace officer authorized to openly carry an unloaded firearm that is not a handgun pursuant to Section 26405.

SEC. 4.  Section 16505 is added to the Penal Code, to read:

94

Exhibit 21-6

16505.  For purposes of Chapter 7 (commencing with Section 26400) of Division 5 of Title 4, a firearm is "encased" when that firearm is enclosed in a case that is expressly made for the purpose of containing a firearm and that is completely zipped, snapped, buckled, tied, or otherwise fastened with no part of that firearm exposed.

SEC. 5.  Section 16520 of the Penal Code is amended to read:

16520.  (a)  As used in this part, "firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion.

(b)  As used in the following provisions, "firearm" includes the frame or receiver of the weapon:

(1) Section 16550.
(2) Section 16730.
(3) Section 16960.
(4) Section 16990.
(5) Section 17070.
(6) Section 17310.
(7) Sections 26500 to 26588, inclusive.
(8) Sections 26600 to 27140, inclusive.
(9) Sections 27400 to 28000, inclusive.
(10) Section 28100.
(11) Sections 28400 to 28415, inclusive.
(12) Sections 29010 to 29150, inclusive.
(13) Sections 29610 to 29750, inclusive.
(14) Sections 29800 to 29905, inclusive.
(15) Sections 30150 to 30165, inclusive.
(16) Section 31615.
(17) Sections 31705 to 31830, inclusive.
(18) Sections 34355 to 34370, inclusive.
(19) Sections 8100, 8101, and 8103 of the Welfare and Institutions Code.

(c)  As used in the following provisions, "firearm" also includes a rocket, rocket propelled projectile launcher, or similar device containing an explosive or incendiary material, whether or not the device is designed for emergency or distress signaling purposes:

(1) Section 16750.
(2) Subdivision (b) of Section 16840.
(3) Section 25400.
(4) Sections 25850 to 26025, inclusive.
(5) Subdivisions (a), (b), and (c) of Section 26030.
(6) Sections 26035 to 26055, inclusive.

(d)  As used in the following provisions, "firearm" does not include an unloaded antique firearm:

(1) Subdivisions (a) and (c) of Section 16730.
(2) Section 16550.
(3) Section 16960.
(4) Section 17310.

94

Exhibit 21-7

(5) Chapter 6 (commencing with Section 26350) of Division 5 of Title 4.

(6) Chapter 7 (commencing with Section 26400) of Division 5 of Title 4.

(7) Sections 26500 to 26588, inclusive.

(8) Sections 26700 to 26915, inclusive.

(9) Section 27510.

(10) Section 27530.

(11) Section 27540.

(12) Section 27545.

(13) Sections 27555 to 27570, inclusive.

(14) Sections 29010 to 29150, inclusive.

(e) As used in Sections 34005 and 34010, "firearm" does not include a destructive device.

(f) As used in Sections 17280 and 24680, "firearm" has the same meaning as in Section 922 of Title 18 of the United States Code.

(g) As used in Sections 29010 to 29150, inclusive, "firearm" includes the unfinished frame or receiver of a weapon that can be readily converted to the functional condition of a finished frame or receiver.

SEC. 5.5. Section 16520 of the Penal Code is amended to read:

16520. (a) As used in this part, "firearm" means a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion.

(b) As used in the following provisions, "firearm" includes the frame or receiver of the weapon:

(1) Section 16550.

(2) Section 16730.

(3) Section 16960.

(4) Section 16990.

(5) Section 17070.

(6) Section 17310.

(7) Sections 25250 to 25256, inclusive.

(8) Sections 26500 to 26588, inclusive.

(9) Sections 26600 to 27140, inclusive.

(10) Sections 27400 to 28000, inclusive.

(11) Section 28100.

(12) Sections 28400 to 28415, inclusive.

(13) Sections 29010 to 29150, inclusive.

(14) Sections 29610 to 29750, inclusive.

(15) Sections 29800 to 29905, inclusive.

(16) Sections 30150 to 30165, inclusive.

(17) Section 31615.

(18) Sections 31705 to 31830, inclusive.

(19) Sections 34355 to 34370, inclusive.

(20) Sections 8100, 8101, and 8103 of the Welfare and Institutions Code.

(c) As used in the following provisions, "firearm" also includes a rocket, rocket propelled projectile launcher, or similar device containing an

94

Exhibit 21-8

explosive or incendiary material, whether or not the device is designed for emergency or distress signaling purposes:

(1) Section 16750.

(2) Subdivision (b) of Section 16840.

(3) Section 25400.

(4) Sections 25850 to 26025, inclusive.

(5) Subdivisions (a), (b), and (c) of Section 26030.

(6) Sections 26035 to 26055, inclusive.

(d) As used in the following provisions, "firearm" does not include an unloaded antique firearm:

(1) Subdivisions (a) and (c) of Section 16730.

(2) Section 16550.

(3) Section 16960.

(4) Section 17310.

(5) Sections 25250 to 25256, inclusive.

(6) Chapter 6 (commencing with Section 26350) of Division 5 of Title 4.

(7) Chapter 7 (commencing with Section 26400) of Division 5 of Title 4.

(8) Sections 26500 to 26588, inclusive.

(9) Sections 26700 to 26915, inclusive.

(10) Section 27510.

(11) Section 27530.

(12) Section 27540.

(13) Section 27545.

(14) Sections 27555 to 27570, inclusive.

(15) Sections 29010 to 29150, inclusive.

(e) As used in Sections 34005 and 34010, "firearm" does not include a destructive device.

(f) As used in Sections 17280 and 24680, "firearm" has the same meaning as in Section 922 of Title 18 of the United States Code.

(g) As used in Sections 29010 to 29150, inclusive, "firearm" includes the unfinished frame or receiver of a weapon that can be readily converted to the functional condition of a finished frame or receiver.

SEC. 6.  Section 16750 of the Penal Code is amended to read:

16750.  (a)  As used in Section 25400, "lawful possession of the firearm" means that the person who has possession or custody of the firearm either lawfully owns the firearm or has the permission of the lawful owner or a person who otherwise has apparent authority to possess or have custody of the firearm. A person who takes a firearm without the permission of the lawful owner or without the permission of a person who has lawful custody of the firearm does not have lawful possession of the firearm.

(b)  As used in Article 2 (commencing with Section 25850), Article 3 (commencing with Section 25900), and Article 4 (commencing with Section 26000) of Chapter 3 of Division 5 of Title 4, Chapter 6 (commencing with Section 26350) of Division 5 of Title 4, and Chapter 7 (commencing with Section 26400) of Division 5 of Title 4, "lawful possession of the firearm"

Exhibit 21-9

means that the person who has possession or custody of the firearm either lawfully acquired and lawfully owns the firearm or has the permission of the lawful owner or person who otherwise has apparent authority to possess or have custody of the firearm. A person who takes a firearm without the permission of the lawful owner or without the permission of a person who has lawful custody of the firearm does not have lawful possession of the firearm.

SEC. 7.   Section 16850 of the Penal Code is amended to read:

16850.   As used in Sections 17740, 23925, 25105, 25205, and 25610, in Article 3 (commencing with Section 25505) of Chapter 2 of Division 5 of Title 4, in Chapter 6 (commencing with Section 26350) of Division 5 of Title 4, and in Chapter 7 (commencing with Section 26400) of Division 5 of Title 4, "locked container" means a secure container that is fully enclosed and locked by a padlock, keylock, combination lock, or similar locking device. The term "locked container" does not include the utility or glove compartment of a motor vehicle.

SEC. 8.   Section 17295 of the Penal Code is amended to read:

17295.   (a)  For purposes of Chapter 6 (commencing with Section 26350) of Division 5 of Title 4, a handgun shall be deemed "unloaded" if it is not "loaded" within the meaning of subdivision (b) of Section 16840.

(b)  For purposes of Chapter 7 (commencing with Section 26400) of Division 5 of Title 4, a firearm that is not a handgun shall be deemed "unloaded" if it is not "loaded" within the meaning of subdivision (b) of Section 16840.

SEC. 9.   Section 26366.5 is added to the Penal Code, to read:

26366.5.   Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun by a licensed hunter while actually engaged in training a dog for the purpose of using the dog in hunting that is not prohibited by law, or while transporting the firearm while going to or returning from that training.

SEC. 10.   Section 26390 is added to the Penal Code, to read:

26390.   Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun in any of the following circumstances:

(a)  The open carrying of an unloaded handgun that is regulated pursuant to Chapter 1 (commencing with Section 18710) of Division 5 of Title 2 by a person who holds a permit issued pursuant to Article 3 (commencing with Section 18900) of that chapter, if the carrying of that handgun is conducted in accordance with the terms and conditions of the permit.

(b)  The open carrying of an unloaded handgun that is regulated pursuant to Chapter 2 (commencing with Section 30500) of Division 10 by a person who holds a permit issued pursuant to Section 31005, if the carrying of that handgun is conducted in accordance with the terms and conditions of the permit.

(c)  The open carrying of an unloaded handgun that is regulated pursuant to Chapter 6 (commencing with Section 32610) of Division 10 by a person who holds a permit issued pursuant to Section 32650, if the carrying is conducted in accordance with the terms and conditions of the permit.

Exhibit 21-10

(d) The open carrying of an unloaded handgun that is regulated pursuant to Article 2 (commencing with Section 33300) of Chapter 8 of Division 10 by a person who holds a permit issued pursuant to Section 33300, if the carrying of that handgun is conducted in accordance with the terms and conditions of the permit.

SEC. 11.  Section 26391 is added to the Penal Code, to read:

26391.  Section 26350 does not apply to, or affect, the open carrying of an unloaded handgun when done in accordance with the provisions of subdivision (d) of Section 171.5.

SEC. 12.  Chapter 7 (commencing with Section 26400) is added to Division 5 of Title 4 of Part 6 of the Penal Code, to read:

### CHAPTER 7. CARRYING AN UNLOADED FIREARM THAT IS NOT A HANDGUN IN AN INCORPORATED CITY OR CITY AND COUNTY

### Article 1. Crime of Carrying an Unloaded Firearm that is not a Handgun in an Incorporated City or City and County

26400.  (a) A person is guilty of carrying an unloaded firearm that is not a handgun in an incorporated city or city and county when that person carries upon his or her person an unloaded firearm that is not a handgun outside a vehicle while in the incorporated city or city and county.

(b) (1) Except as specified in paragraph (2), a violation of this section is a misdemeanor.

(2) A violation of subdivision (a) is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment, if the firearm and unexpended ammunition capable of being discharged from that firearm are in the immediate possession of the person and the person is not in lawful possession of that firearm.

(c) (1) Nothing in this section shall preclude prosecution under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a penalty greater than is set forth in this section.

(2) The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by different provisions of law shall not be punished under more than one provision.

(d) Notwithstanding the fact that the term "an unloaded firearm that is not a handgun" is used in this section, each individual firearm shall constitute a distinct and separate offense under this section.

### Article 2. Exemptions

26405.  Section 26400 does not apply to, or affect, the carrying of an unloaded firearm that is not a handgun in any of the following circumstances:

94

Exh.t  21-11

(a) By a person when done within a place of business, a place of residence, or on private property, if that person, by virtue of subdivision (a) of Section 25605, may carry a firearm within that place of business, place of residence, or on that private property owned or lawfully possessed by that person.

(b) By a person when done within a place of business, a place of residence, or on private property, if done with the permission of a person who, by virtue of subdivision (a) of Section 25605, may carry a firearm within that place of business, place of residence, or on that private property owned or lawfully possessed by that person.

(c) When the firearm is either in a locked container or encased and it is being transported directly between places where a person is not prohibited from possessing that firearm and the course of travel shall include only those deviations between authorized locations as are reasonably necessary under the circumstances.

(d) If the person possessing the firearm reasonably believes that he or she is in grave danger because of circumstances forming the basis of a current restraining order issued by a court against another person or persons who has or have been found to pose a threat to his or her life or safety. This paragraph may not apply when the circumstances involve a mutual restraining order issued pursuant to Division 10 (commencing with Section 6200) of the Family Code absent a factual finding of a specific threat to the person's life or safety. Upon a trial for violating subdivision (a), the trier of fact shall determine whether the defendant was acting out of a reasonable belief that he or she was in grave danger.

(e) By a peace officer or an honorably retired peace officer if that officer may carry a concealed firearm pursuant to Article 2 (commencing with Section 25450) of Chapter 2, or a loaded firearm pursuant to Article 3 (commencing with Section 25900) of Chapter 3.

(f) By a person to the extent that person may openly carry a loaded firearm that is not a handgun pursuant to Article 4 (commencing with Section 26000) of Chapter 3.

(g) As merchandise by a person who is engaged in the business of manufacturing, importing, wholesaling, repairing, or dealing in firearms and who is licensed to engage in that business, or the authorized representative or authorized agent of that person, while engaged in the lawful course of the business.

(h) By a duly authorized military or civil organization, or the members thereof, while parading or while rehearsing or practicing parading, when at the meeting place of the organization.

(i) By a member of a club or organization organized for the purpose of practicing shooting at targets upon established target ranges, whether public or private, while the members are using handguns upon the target ranges or incident to the use of a firearm that is not a handgun at that target range.

(j) By a licensed hunter while engaged in hunting or while transporting that firearm when going to or returning from that hunting expedition.

94

Exhibit 21-12

(k) Incident to transportation of a handgun by a person operating a licensed common carrier, or by an authorized agent or employee thereof, when transported in conformance with applicable federal law.

(*l*) By a member of an organization chartered by the Congress of the United States or a nonprofit mutual or public benefit corporation organized and recognized as a nonprofit tax-exempt organization by the Internal Revenue Service while on official parade duty or ceremonial occasions of that organization or while rehearsing or practicing for official parade duty or ceremonial occasions.

(m) Within a gun show conducted pursuant to Article 1 (commencing with Section 27200) and Article 2 (commencing with Section 27300) of Chapter 3 of Division 6.

(n) Within a school zone, as defined in Section 626.9, with the written permission of the school district superintendent, the superintendent's designee, or equivalent school authority.

(o) When in accordance with the provisions of Section 171b.

(p) By a person while engaged in the act of making or attempting to make a lawful arrest.

(q) By a person engaged in firearms-related activities, while on the premises of a fixed place of business that is licensed to conduct and conducts, as a regular course of its business, activities related to the sale, making, repair, transfer, pawn, or the use of firearms, or related to firearms training.

(r) By an authorized participant in, or an authorized employee or agent of a supplier of firearms for, a motion picture, television or video production, or entertainment event, when the participant lawfully uses that firearm as part of that production or event, as part of rehearsing or practicing for participation in that production or event, or while the participant or authorized employee or agent is at that production or event, or rehearsal or practice for that production or event.

(s) Incident to obtaining an identification number or mark assigned for that firearm from the Department of Justice pursuant to Section 23910.

(t) At an established public target range while the person is using that firearm upon that target range.

(u) By a person when that person is summoned by a peace officer to assist in making arrests or preserving the peace, while the person is actually engaged in assisting that officer.

(v) Incident to any of the following:

(1) Complying with Section 27560 or 27565, as it pertains to that firearm.

(2) Section 28000, as it pertains to that firearm.

(3) Section 27850 or 31725, as it pertains to that firearm.

(4) Complying with Section 27870 or 27875, as it pertains to that firearm.

(5) Complying with Section 27915, 27920, or 27925, as it pertains to that firearm.

(w) Incident to, and in the course and scope of, training of, or by an individual to become a sworn peace officer as part of a course of study approved by the Commission on Peace Officer Standards and Training.

94

Exhibit 21-13

(x) Incident to, and in the course and scope of, training of, or by an individual to become licensed pursuant to Chapter 4 (commencing with Section 26150) as part of a course of study necessary or authorized by the person authorized to issue the license pursuant to that chapter.

(y) Incident to and at the request of a sheriff, chief, or other head of a municipal police department.

(z) If all of the following conditions are satisfied:

(1) The open carrying occurs at an auction or similar event of a nonprofit public benefit or mutual benefit corporation at which firearms are auctioned or otherwise sold to fund the activities of that corporation or the local chapters of that corporation.

(2) The unloaded firearm that is not a handgun is to be auctioned or otherwise sold for that nonprofit public benefit or mutual benefit corporation.

(3) The unloaded firearm that is not a handgun is to be delivered by a person licensed pursuant to, and operating in accordance with, Sections 26700 to 26925, inclusive.

(aa) Pursuant to paragraph (3) of subdivision (b) of Section 171c.

(ab) Pursuant to Section 171d.

(ac) Pursuant to subparagraph (F) of paragraph (1) of subdivision (c) of Section 171.7.

(ad) On publicly owned land, if the possession and use of unloaded firearm that is not a handgun is specifically permitted by the managing agency of the land and the person carrying that firearm is in lawful possession of that firearm.

(ae) By any of the following:

(1) The carrying of an unloaded firearm that is not a handgun that is regulated pursuant to Chapter 1 (commencing with Section 18710) of Division 5 of Title 2 by a person who holds a permit issued pursuant to Article 3 (commencing with Section 18900) of that chapter, if the carrying of that firearm is conducted in accordance with the terms and conditions of the permit.

(2) The carrying of an unloaded firearm that is not a handgun that is regulated pursuant to Chapter 2 (commencing with Section 30500) of Division 10 by a person who holds a permit issued pursuant to Section 31005, if the carrying of that firearm is conducted in accordance with the terms and conditions of the permit.

(3) The carrying of an unloaded firearm that is not a handgun that is regulated pursuant to Chapter 6 (commencing with Section 32610) of Division 10 by a person who holds a permit issued pursuant to Section 32650, if the carrying of that firearm is conducted in accordance with the terms and conditions of the permit.

(4) The carrying of an unloaded firearm that is not a handgun that is regulated pursuant to Article 2 (commencing with Section 33300) of Chapter 8 of Division 10 by a person who holds a permit issued pursuant to Section 33300, if the carrying of that firearm is conducted in accordance with the terms and conditions of the permit.

Exhibit 21-17

**Ch. 700**

(af)  By a licensed hunter while actually engaged in training a dog for the purpose of using the dog in hunting that is not prohibited by law, or while transporting the firearm while going to or returning from that training.

(ag)  Pursuant to the provisions of subdivision (d) of Section 171.5.

(ah)  By a person who is engaged in the business of manufacturing ammunition and who is licensed to engage in that business, or the authorized representative or authorized agent of that person, while the firearm is being used in the lawful course and scope of the licensee's activities as a person licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and regulations issued pursuant thereto.

(ai)  On the navigable waters of this state that are held in public trust, if the possession and use of an unloaded firearm that is not a handgun is not prohibited by the managing agency thereof and the person carrying the firearm is in lawful possession of the firearm.

SEC. 13.  Section 5.5 of this bill incorporates amendments to Section 16520 of the Penal Code proposed by both this bill and Senate Bill 1366. It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2013, (2) each bill amends Section 16520 of the Penal Code, and (3) this bill is enacted after Senate Bill 1366, in which case Section 5 of this bill shall not become operative.

SEC. 14.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

Exhibit 21-15

http://www.leginfo.ca.gov/pub/97-98/bill/sen/sb_0101-0150/sb_146_bill_19970905_chaptered.pdf

**Senate Bill No. 146 (Approved by Governor on September 5, 1997)**

# EXHIBIT 22

**Senate Bill No. 146**

CHAPTER 408

An act to amend Section 12050 of the Penal Code, relating to weapons.

[Approved by Governor September 5, 1997. Filed with Secretary of State September 5, 1997.]

LEGISLATIVE COUNSEL'S DIGEST

SB 146, Johnston.   Firearms: licenses.

Existing law authorizes the chief or other head of a municipal police department of any city or city and county to issue a license to carry a concealed firearm to a qualified resident of the county in which the city is located.

This bill instead would provide that the chief or other head of a municipal police department of a city or city and county may only issue a license to carry a concealed firearm to a qualified resident of that city.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 12050 of the Penal Code is amended to read:

12050.   (a) (1) (A) The sheriff of a county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying is a resident of the county or a city within the county, may issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person in either one of the following formats:

(i) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

(ii) Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in that county a pistol, revolver, or other firearm capable of being concealed upon the person.

(B) The chief or other head of a municipal police department of any city or city and county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying is a resident of that city, may issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person in either one of the following formats:

(i) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

(ii) Where the population of the county in which the city is located is less than 200,000 persons according to the most recent federal

96

Exhibit 22-1

<u>http://www.leginfo.ca.gov/pub/09-10/bill/asm/ab_1351-1400/ab_1363_bill_20091011_chaptered.pdf</u>

**Assembly Bill No. 1363 (Approved by Governor on 10/11/2009)**

# EXHIBIT 23

## Assembly Bill No. 1363

### CHAPTER 288

An act to amend Sections 12031 and 12050 of the Penal Code, relating to concealed firearms.

[Approved by Governor October 11, 2009. Filed with
Secretary of State October 11, 2009.]

LEGISLATIVE COUNSEL'S DIGEST

AB 1363, Davis. Firearms.

Existing law establishes the offense of carrying a loaded firearm, as specified, and provides exceptions to those provisions, including an exception permitting the carrying of handguns by persons who are authorized to carry those weapons pursuant to provisions relating to licenses to carry concealed firearms.

This bill would revise the exception to permit the carrying of handguns by persons as authorized pursuant to provisions relating to licenses to carry concealed firearms.

By narrowing the exception to an offense, this bill would impose a state-mandated local program.

The bill would also delete obsolete language pertaining to reports to be filed by the Attorney General. The bill would make other technical, nonsubstantive changes.

Existing law authorizes the sheriff of a county, or the chief or other head of a municipal police department, subject to certain criteria being met, and where the population of the county is less than 200,000 persons according to the most recent federal decennial census, to issue a license to carry a handgun "loaded and exposed in that county."

This bill would authorize the sheriff of a county, or the chief or other head of a municipal police department, subject to certain criteria being met, and where the population of the county is less than 200,000 persons according to the most recent federal decennial census, to issue a license to carry a handgun "loaded and exposed in only that county."

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 12031 of the Penal Code is amended to read:

96

EXHIBIT 23-1

http://www.leg.state.or.us/ors/821.html

# Oregon Revised Statute 821.240

**821.240 Operating snowmobile or all-terrain vehicle while carrying firearm or bow; exemptions; penalty.** (1) A person commits the offense of operating a snowmobile or an all-terrain vehicle while carrying a firearm or bow if the person operates any snowmobile or all-terrain vehicle with a firearm in the possession of the person, unless the firearm is unloaded, or with a bow, unless all arrows are in a quiver.

(2) Subsection (1) of this section does not apply to a person who is licensed under ORS 166.291 and 166.292 to carry a concealed handgun.

(3) As used in this section, "unloaded" means:

(a) If the firearm is a revolver, that there is no live cartridge in the chamber that is aligned with the hammer of the revolver;

(b) If the firearm is a muzzle-loading firearm, that the firearm is not capped or primed; or

(c) If the firearm is other than a revolver or a muzzle-loading firearm, that there is no live cartridge in the chamber.

(4) The offense described in this section, operating a snowmobile or an all-terrain vehicle while carrying a firearm or bow, is a Class B traffic violation. [1983 c.338 §729; 1985 c.393 §45; 1985 c.459 §31a; 1987 c.587 §14; 1989 c.991 §15a; 1991 c.589 §1; 2011 c.662 §6]

# EXHIBIT 24

California Attorney General's Opinions Volume 51 – 1968 - pgs 197-201

# EXHIBIT 25

[VOLUME 51]

write the statute
-time difficulties,

rly construe and
art that:

hout exam-
ints should
8. Because
applications
registration

y those charged
ght. *Automatic*
5).

to file with the
e plain meaning
ing deadline, it
te as December
suggests that an
that the Board,
uch application

der the statute
Board may not
arge number of
ecognize that a
tion, will prob-
ings extending
e Board would
ng an applicant
ated that such

come from the
e has found it
to "grandfather
Cal. Atty. Gen.

ns up through
section 6767.5

Opinion No. 68-175—October 3, 1968

SUBJECT: FIREARMS—The term "firearm" includes rifles and shotguns; firearms may be carried in areas where no regulations exist; "every public road or highway" is a "prohibited area"; "public street" is not synonymous with "public road or highway"; and "safety zone" is a "prohibited area" only when it coincides with a "public place."

Requested by: DIRECTOR, DEPARTMENT OF FISH AND GAME

Opinion by: THOMAS C. LYNCH, Attorney General
Edward W. Bergtholdt, Deputy

The Honorable Walter T. Shannon, Director, Department of Fish and Game, has requested an opinion on the following questions:

1. Does the term "firearm" as used in Penal Code section 12031 include rifles and shotguns?

2. Does Penal Code section 12031 prohibit the carrying of a rifle or shotgun with unexpended shells or cartridges in the magazine on a public road in an unincorporated area where there are no local ordinances or other laws or regulations prohibiting the discharge of firearms?

3. Does Penal Code section 374c make every "public road or highway" a "prohibited area," as defined in section 12031?

4. Is the term "public street" as used in section 12031 synonymous with "public road or highway" as used in Penal Code section 374c?

5. Would the "safety zone" described in Fish and Game Code section 3004 be considered a "prohibited area" as defined in section 12031(d)?

The conclusions are:

1. The term "firearm" as used in Penal Code section 12031 includes rifles and shotguns.

2. Penal Code section 12031 does not prohibit the carrying of a rifle or shotgun with unexpended shells or cartridges in the magazine on a public road in an unincorporated area where there are no local ordinances or other laws or regulations prohibiting the discharge of firearms.

3. Penal Code section 374c does make every "public road or highway" a "prohibited area" as defined in section 12031.

4. The term "public street" as used in section 12031 is not synonymous with "public road or highway" as used in Penal Code section 374c.

5. The "safety zone" described in Fish and Game Code section 3004 is a "prohibited area" as defined in section 12031, but carrying of loaded weapons is proscribed therein only when it coincides with a "public place."

# EXHIBIT 25 – 1



## ANALYSIS

Penal Code section 12031 was enacted by the 1967 Legislature as an urgency measure and provides in part as follows:

"(a) . . . every person who carries a loaded firearm on his person or in a vehicle while in any public place or on any public street in an incorporated city or *in any public place or on any public street in a prohibited area of unincorporated territory* is guilty of a misdemeanor.

. . .

"(d) As used in this section *'prohibited area'* means any place where it is unlawful to discharge a weapon.

"(e) A firearm shall be deemed to be loaded for the purposes of this section when there is an unexpended cartridge or shell, consisting of a case which holds a charge of powder and a bullet or shot, in, or attached in any manner to, the firearm, including, but not limited to, in the firing chamber, magazine, or clip thereof attached to the firearm; except that a muzzle-loader firearm shall be deemed to be loaded when it is capped or primed and has a powder charge and ball or shot in the barrel or cylinder." (Emphasis added.)

In order to respond properly to the questions raised, it is necessary to look at the circumstances surrounding the enactment of section 12031 and the attitude of the Legislature to these circumstances.

In April 1967 Assembly Bill 1591 was introduced and included the addition of section 12031 to the Penal Code. At this time it prohibited the carrying of a loaded firearm on a public street or in a public place in an incorporated city. On May 2, 1967, members of the Black Panther organization entered the Assembly Chambers armed with "pistols, rifles and at least one sawed-off shotgun," all to the great alarm of the members of the Assembly. The Sacramento Bee, May 2, 1967, at 1. A.B. 1591 was then made an urgency measure. The provisions of the proposed section 12031 were expanded to extend the application of the section to certain parts of unincorporated areas. The revised bill also proposed the addition of sections 171c, 171d, and 171e to the Penal Code. These sections prohibited the carrying of loaded firearms at the State Capitol, at public schools, including state colleges and the University of California, and at the Governor's Mansion or residence of any elected state officials.

The urgency clause first appended to A.B. 1591 referred to organized bands of men "armed with loaded firearms" entering the Assembly Chambers. This was a clear reference to the appearance of members of the Black Panther organization referred to above. A.B. 1591 was subsequently enacted into law (Stats. 1967, ch. 960, p. 2459) as an urgency measure. The urgency clause of the bill as enacted reads as follows:

"The State of California has witnessed, in recent years, the increasing

incidence of organized groups and individuals publicly arming themselves for purposes inimical to the peace and safety of the people of California.

"Existing laws are not adequate to protect the people of this state from either the use of such weapons or from violent incidents arising from the mere presence of such armed individuals in public places. Therefore, in order to prevent the potentially tragic consequences of such activities, it is imperative that this statute take effect immediately."

Although this final version of the clause is broader than its earlier versions, it remains clear that the Legislature did not direct the provisions of section 12031 against all uses of firearms but only at uses of firearms which are "inimical to the peace and safety of the people of California."

Question No. 1 represents an opinion whether the word "firearm" in section 12031 includes rifles and shotguns. *The word "firearm" includes rifles and shotguns.*

The fact that this section is a part of this state's Dangerous Weapons Control Law (Penal Code Part IV, Title 2, Chapter 1, commencing with section 12000), dealing with *concealed* weapons, might suggest its limitation to such weapons. Reading Penal Code section 12031 in its entirety suggests, however, that "firearm" includes rifles and shotguns. Subdivision (b), subparagraph (4) talks of "hunting," an activity which more often involves rifles or shotguns than pistols or revolvers, and subparagraph (8) uses the word "weapon" without any restriction such as "concealed." In subdivisions (d) and (j) the word "weapon" appears again without any restriction.

The inclusion of rifles and shotguns within the definition of "firearm" is also suggested by the circumstances surrounding its enactment and the wording of the urgency clause. There can, therefore, be little doubt that the word "firearm," as it appears in section 12031, is not limited in meaning to "concealed weapons," as defined in Penal Code section 12001. We must conclude that the word "firearm" as used in section 12031 embraces, among other weapons, rifles and shotguns.[1]

Question No. 2 requests an opinion whether section 12031 prohibits the carrying of a loaded firearm on a public road in an unincorporated area. We conclude that section 12031 does not prohibit the carrying of loaded firearms on such public ways. For the reasons set forth in our answer to question No. 4, the term "public streets" in section 12031(a) must be given a narrow construction. There is a distinction between "public roads" and "public streets" which is discussed more fully below. The proscriptions of section 12031 are therefore not applicable to "public roads" because they are not "public streets" as that term is used in section 12031.[2]

---

[1] For a comprehensive discussion of all the laws of this state relating to firearms see Assem. Int. Comm. on Crim. Proc., *Regulation and Control of Firearms*, 22 Assembly Reports 1963-1965, No. 6 (1965).

[2] The carrying of a rifle or shotgun in a vehicle with an unexpended round in the chamber is prohibited on "public highways" by Fish and Game Code section 2006, which provides in part:

"It is unlawful to possess a loaded rifle or shotgun in any vehicle . . . which



Question No. 3 requests an opinion whether Penal Code section 374c[2] makes every "public road" a "prohibited area" as defined by section 12031. Because the discharge of firearms is prohibited on "public roads and highways," these public ways are by definition "prohibited areas" (section 12031(d)). This does not, however, alter our conclusion that the proscriptions of section 12031 are not applicable to such public ways because, as set forth in our response to your question No. 4, the term "public road or highway" is not synonymous with the term "public street."

Question No. 4 requests an opinion whether the term "public street" in section 12031 is synonymous with the term "public road or highway" used in Penal Code section 374c. Our response is that the terms "public road or highway" are not synonymous with the term "public street."

The discussion above regarding the Legislature's purpose in enacting section 12031 suggests that the term "public street" is to be given a narrow meaning. The thrust of the section is not against the use of all firearms but only against use "inimical to the peace and safety of the people of California." Further, the application of the section's prohibition to unincorporated areas is modified by the injection of the concept, "prohibited area." It is clear, therefore, that the Legislature intended that there be a recognizable distinction in applying the prohibition of section 12031 as between incorporated areas and unincorporated areas. To make "public streets" synonymous with "public roads and highways" would leave little meaningful difference between incorporated and unincorporated areas.

Additionally, earlier versions of A.B. 1591 would have amended Fish and Game Code section 2006. Such amendment was designed to conform the definition of a loaded rifle or shotgun in Fish and Game Code section 2006 to the definition of a loaded firearm in Penal Code section 12031. Section 2006 applies on all "public highway[s] or other way[s] open to the public." The failure of the Legislature to enact such an amendment to section 2006 suggests that it did not intend that section 2006 be superseded by section 12031. Had it desired section 2006 to be superseded, it would have either amended its definition of a loaded weapon to conform to section 12031 or repealed it entirely.

For these reasons we must conclude that the Legislature intended the term "public streets" be given a narrow meaning. It is not synonymous, then, with "public roads and highways," but includes only the public ways of towns and villages and not the "open roads" in rural sections of unincorporated areas.

Attention should also be called to the effect of Penal Code section 415 which provides: "Every person who . . . fire[s] any gun or pistol in . . . [an] unincorporated

is standing on or along or is being driven on or along any public highway or other way open to the public.

"A rifle or shotgun shall be deemed loaded . . . when there is an unexpended cartridge or shell in the firing chamber but not when the only cartridges or shells are in the magazine."

[2] Penal Code section 374c provides: "Every person who shoots any firearm from or upon a public road or highway is guilty of a misdemeanor." (Emphasis added.)

de section 374c¹ makes
ion 12031. Because the
highways," these public
1(d)). This does not,
section 12031 are not
our response to your
t synonymous with the

public street" in section
ay" used in Penal Code
d or highway" are not

ose in enacting section
en a narrow meaning.
arms but only against
ilifornia." Further, the
reas is modified by the
refore, that the Legis-
pplying the prohibition
orated areas. To make
ays" would leave little
ated areas.

ve amended Fish and
conform the definition
2006 to the definition
1 2006 applies on all
e failure of the Legis-
that it did not intend
:sired section 2006 to
f a loaded weapon to

re intended the term
onymous, then, with
ays of towns and vil-
orated areas.

de section 415 which
. [an] unincorporated

: highway or other

is an unexpended
ridges or shells are

y firearm from or upon
led.)

town . . . is guilty of a misdemeanor . . . ." Section 12031(d) defines a "prohibited area" as "any place where it is unlawful to discharge a weapon." An unincorporated town thereby becomes a "prohibited area." The proscription of section 12031 is applicable to the "public streets" of such towns and to all "public places" therein. We have therefore "public places" and "public streets" in the narrow sense where the discharge of firearms is prohibited and thus the concurrence of the necessary factors to bring the proscriptions into play.

Question No. 5 requests an opinion whether the term "safety zone" in Fish and Game Code section 3004⁴ is a "prohibited area." The answer is in the affirmative, subject to the qualifications given below.

The "safety zone" described in Fish and Game Code section 3004 which lies in unincorporated areas is a "prohibited area" as that term is defined by section 12031(d). Again, however, for the proscriptions of section 12031 to be applicable, there must be a concurrence of a "prohibited area" and a "public place." Further, "public places" which do not have a building located thereon (e.g., a park) would not be "prohibited areas" and, thus, the proscription of section 12031 would not be applicable. The same would be true for those areas of "public places" more than 150 yards from any building.

It should also be noted that certain persons are excepted from the operation of Fish and Game Code section 3004. Because this exception is not in conflict with the intent of the Legislature these persons would be exempt in any case from the proscriptions of 12031.

---

Opinion No. 68-77—October 8, 1968

SUBJECT: MEETINGS—Public bodies may negotiate and discuss in private without amending the Ralph M. Brown Act if a quorum of the board is present and a state conciliator has intervened in the proceedings.

Requested by: DIRECTOR, DEPARTMENT OF INDUSTRIAL RELATIONS

Opinion by: THOMAS C. LYNCH, Attorney General
Clayton P. Roche, Deputy

The Honorable Albert C. Beeson, Director of the Department of Industrial Relations, has requested an opinion on the following question:

"Is there any way without amending the [Ralph M. Brown] Act that our Conciliators can advise public bodies that they may . . . discuss or negotiate in private rather than in . . . a public hearing."

⁴ Fish and Game Code section 3004 states:

"It is unlawful for any person, other than the owner, person in possession of the premises, or a person having the express permission of the owner or person in possession of the premises, to hunt or to discharge while hunting, any firearm . . . within 150 yards of any occupied dwelling house, residence, or other building or any barn or other outbuilding used in connection therewith. The 150-yard area is a 'safety zone.' "

# EXHIBIT 25 - 5

## CALIFORNIA STATE ARCHIVES

**Legislative History Worksheet**

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A  Bill # _1591_          Ch.# _960_ (_____)   Year _1967_

Code & Section _____

Author___ _Mulford_     _LP393.12-16_

**Assembly Committees**          **Senate Committees**

1. _Crim Pro_                1. _Jud_

2.                          2.

3.                          3.

**Assembly Republican Caucus:**
1973-1978, 1981-1990 available on microfilm.
Check Minerva for current holdings

**Senate Democratic Caucus:**
1975-1984 available on microfilm

**Senate Republican Caucus:**
1972-1984 available on microfilm

**Senate Republican Office of Policy:**
Begins in 1999. Check Minerva for current holdings

**Senate Republican Fiscal Office:**
Begins in 2001. Check Minerva for current holdings

**Senate Rules Committee:**
1985-1988 available on microfilm

**Office of Senate Floor Analyses:**
Begins in 1991. Check Minerva for current holdings

**Governor's Chaptered Bill File:**   _mf. b:2(c4)_
1943-2003 available on microfilm.
Check Minerva for current holdings.
Current administration with Governor's Office.

CSA-30b
(2008 gt; 2010 lj)

# EXHIBIT 26 - 1



ASSEMBLY BILL NO. 1591

1967 SESSION          CHAPTER 960          1967

AUTHOR _____

RECEIVED _____ 1967

LAST DAY _____ 1967

ACTION OF GOVERNOR _____ 7/28

Legislative Counsel

Adjutant General
Aeronautics Commission
Agriculture
Alcoholic Beverage Control
Atomic Energy Development
Banks
Compensation Insurance Fund
Conservation
Consumer Counsel
Controller
Corporation Commissioner
Corrections
Disaster Office
Economic Development Agency
Education
Employees Retirement
Employment
Equalization
Finance
Fire Marshal
Fish and Game
Franchise
General Services
Harbors
Highway Patrol
Industrial Accident
Industrial Relations

EXHIBIT 26 – 2

SECRETARY OF STATE, DEBRA BOWEN
The Original of This Document is in
CALIFORNIA STATE ARCHIVES
1020 "O" STREET
SACRAMENTO, CA 95814

# EXHIBIT 26 – 3

RE AB 1591

Proposed Amendments:

        Any firearm that has a cartridge in the chamber, the magazine or clip thereof.

        (I am seeking a more accurate description of "loaded" because present law indicates one in the chamber.)

Amend:

        line 15 to read "Persons who are using target ranges for the purpose of practice shooting with a firearm, shooting clubs, but only on the premises thereof, for the purpose of hunting."

        (Exclusion to protect one's self on one's own property)

# EXHIBIT 26 – 4

DONALD L. GRUNSKY
*Chairman*

ANTHONY C. BEILENSON
CLARK L. BRADLEY
GORDON COLOGNE
GEORGE E. DANIELSON
GEORGE DEUKMEJIAN

JUL 31 1967

ROBERT S. STEVENS
*Vice Chairman*

RICHARD J. DOLWIG
JOHN L. HARMER
ROBERT J. LAGOMARSINO
GEORGE R. MOSCONE
LEWIS F. SHERMAN
ALFRED H. SONG

## California Legislature

### SENATE COMMITTEE ON JUDICIARY

ROOM 2191, STATE CAPITOL
SACRAMENTO, CALIFORNIA 95814
TELEPHONE: 445-8887

R. BLAIR REYNOLDS, COUNSEL

July 28, 1967

TO:    The Honorable Don Mulford

FROM:  Blair Reynolds

SUBJ:  AB 1591

Dear Mr. Mulford:

In response to the call from the Governor's office concerning the wire service story of yesterday leading people to thinking that AB 1591 makes it illegal to carry ammunition in near proximity to an otherwise unloaded weapon I thought this memo might be helpful.

Section 4 of this bill states that a firearm shall be deemed loaded whenever both the firearm and ammunition therefor are in the immediate possession of the same person, i.e., in near proximity. However, this section is expressly limited to the simultaneous possession of the firearm and its ammunition in the following places:  the State Capitol, any Legislative office, any office of the Governor or other constitutional officer, any hearing room in which any Committee of the Senate or Assembly is conducting a hearing, the State Capitol grounds, the Governor's Mansion or other residence of the Governor, the residence of any other constitutional officer or Legislator, the grounds of any public school, the University of California or the state colleges.

Other than these specifically mentioned places, the possession of ammunition in near proximity to an unloaded firearm is no violation under the provisions of AB 1591. Therefore, it would be perfectly legal under this bill to carry ammunition and firearms together while on a public street while enroute to a place of hunting, etc.

Although I have not personally seen the wire service story, it is my impression from discussions with your office and people in Senator Grunsky's district that this story raised the implication that in all cases the gun and ammunition could not be kept together while in a public place or on a public street.

# EXHIBIT 26 – 5

The Honorable Don Mulford
Page 2

I hope this memorandum is suffieient to dispel thes
erroneous impression and will be helpful to you.

R. Blair Reynolds
Committee Counsel

RBR:bh

# EXHIBIT 26 – 6

INTRODUCTION FOR AB 1591
By Senator GRUNSKY

      Gentlemen, I arise for the purpose of introducing what I believe to be one of the most important bills of this session. The measure before you is AB 1591, authored by Assemblyman Don Mulford.

      Briefly, this bill prohibits unauthorized persons from carrying a loaded firearm in a public place, on a public street, or in an unincorporated territory where it is already illegal to discharge a firearm. Provisions of the bill extend to our schools, the Capitol, the homes and offices of the State's Constitutional officers, and to the homes and offices of members of the Senate and the Assembly.

      This bill, gentlemen, is an excellent, well-thought-out piece of legislation. Much work on both sides of the Legislature has gone into it. As you will notice, the bill has been amended six times. Each amendment has been meticulously considered by both the Criminal Procedure Committee in the Assembly and the Senate Judiciary Committee.

      I have told you, without going into minute detail, what the bill does. Now, just for a moment, allow me to tell you what this measure does not do. One thing it doesn't do, and perhaps the most important, it does not discriminate against the honest citizen. And in this same vein, it does not work a hardship on the legitimate hunter. In fact, this bill has the active support of the National Rifle Association.

# EXHIBIT 26 – 7

Assemblyman Mulford submitted this legislation at the urgent request of law enforcement officials in the Bay Area and Southern California because they need a tool to deal with some persons who arm themselves with the sole purpose of intimidating society.

Armed bands, carrying loaded shotguns, automatic and semi-automatic rifles and pistols, have invaded our courts, the offices of municipal government, and, indeed, they have even violated the Chambers of the Assembly here in the State Capitol.  They have carried their loaded weapons into school-houses while children were attending school.  They have formed vigilante gangs with the purpose of taking the law into their own hands.  And they have paraded up and down our city streets brandishing their loaded weapons.

An Oakland police officer told Assmblyman Mulford, and I quote:  "I hope you have good luck with your bill.  As policemen out on our beats, we can cope with almost any weapon except a gun.  When someone has a loaded gun -- he is as well armed as the police who have the responsibility of maintaining law and order."

The thrust of this bill, gentlemen, is to prohibit unauthorized persons from carrying a loaded weapon where they have no business being armed.  The bill is constitutional according to the Legislative Counsel's office, and it fills a vital need of today's society.  Therefore, I ask that you approve AB 1591 today.

# EXHIBIT 26 – 8

*23 1591*



## State of California

GOVERNOR'S OFFICE
SACRAMENTO 95814

RONALD REAGAN
GOVERNOR

May 3, 1967

REC'D    1967

Mr. John A. Nejedly, District Attorney
Contra Costa County Courthouse
Martinez, California

Dear John:

Governor Reagan has asked me to answer your letter of
April 20, 1967, concerning the need for legislation to
provide for additional controls on the use of firearms.

We are very cognizant of the severe recent incidents
throughout California, in which armed groups have openly
displayed their weapons, thus constituting an imminent
threat to the peace and safety of many citizens.

Effective legislation in this area is difficult to
achieve, due both to drafting problems and to a great
deal of resistance from certain special interest groups.
We are presently working with legislators and law enforce-
ment organizations to develop some new proposals.  In this
endeavor, we appreciate the information in your case,
which is an excellent example in support of such legisla-
tion.

If there are any further incidents of this kind in your
county, I would appreciate your advising me so that we can
add them to the evidence in support of additional firearms
controls.

Best personal wishes.

Sincerely,

Edwin Meese III
Extradition and
Clemency Secretary

cc:  Assemblyman Don Mulford

# EXHIBIT 26 – 9

COPY



**RONALD REAGAN**
GOVERNOR

$\mathfrak{State\ of\ California}$

GOVERNOR'S OFFICE
SACRAMENTO 95814

*Q.3 /5 9/*

May 3, 1967

$\sum 1967$

Mr. John A. Nejedly, District Attorney
Contra Costa County Courthouse
Martinez, California

Dear John:

Governor Reagan has asked me to answer your letter of
April 20, 1967, concerning the need for legislation to
provide for additional controls on the use of firearms.

We are very cognizant of the severe recent incidents
throughout California, in which armed groups have openly
displayed their weapons, thus constituting an imminent
threat to the peace and safety of many citizens.

Effective legislation in this area is difficult to
achieve, due both to drafting problems and to a great
deal of resistance from certain special interest groups.
We are presently working with legislators and law enforce-
ment organizations to develop some new proposals.  In this
endeavor, we appreciate the information in your case,
which is an excellent example in support of such legisla-
tion.

If there are any further incidents of this kind in your
county, I would appreciate your advising me so that we can
add them to the evidence in support of additional firearms
controls.

Best personal wishes.

                              Sincerely,


                              Edwin Meese III
                              Extradition and
                                Clemency Secretary

√cc:  Assemblyman Don Mulford

# EXHIBIT 26 – 10

June 14, 1967

Mr. Bill Post
L.H. Hospital
7th and Dewey Blvd.
San Francisco, Calif. 94116

Dear Mr. Post:

Thank you for your recent letter concerning Assembly Bill 1591, which I authored. This measure was passed in the Assembly on June 8, 1967. I enclose an amended copy.

The measure prohibits unauthorized persons from carrying loaded weapons on a public street or in a public place. It does not discriminate against the legitimate sportsman or the private citizen who keeps a loaded weapon in his home. It does not violate the Constitutional rights of citizens to protect themselves.

The intent of the measure is to discourage armed gangs from roaming our streets and intimidating citizens with loaded weapons.

I appreciate hearing from you on legislative matters of concern to you.

                    Cordially,


                    DON MULFORD

em

Enclosure


# EXHIBIT 26 – 11

*AB 1591*

June 16, 1967

Mr. Roger A. Hanes
126 Sears Street
San Francisco, California  94112

Dear Mr. Hanes:

Thank you for your letter concerning my gun-control
bill.  I am enclosing a copy of the bill as you
requested.

As you will see after studying this measure, the bill
does not discriminate against the legitimate citizen
or the hunter.  The intent of the bill is to prohibit
unauthorized persons from carrying loaded weapons in a
public place or on a public street.

I do not believe there is a place in modern society for
armed gangs to parade up and down our city streets in-
timidating honest citizens.

Thank you for your interest in this legislation.

                    Cordially,


                    DON MULFORD

cw/ fd
     enclosure

# EXHIBIT 26 – 12

June 15, 1967

Mr. Lloyd E. Stahl
6400 Rampart Drive
Carmichael, Calif. 95608

Dear Mr. Stahl:

Thank you very much for sending me a copy of your letter of May 12 to the Editor of the Sacramento Bee.

I am sure you are aware that I am very grateful to the National Rifle Association for its help in making my gun control bill, AB 1591, a workable piece of legislation, yet protecting the Constitutional rights of citizens.

I am enclosing a copy of this bill in its amended form, as it was passed by the Assembly.

Thank you for writing to me.

                    Cordially,



                    DON MULFORD


em

Enclosure


# EXHIBIT 26 – 13

# SOULÉ STEEL COMPANY

1750 ARMY STREET · BOX 3510 RINCON ANNEX · SAN FRANCISCO, CALIFORNIA 94119
TELEPHONE · 824-4141

May 5, 1967

MAY C 1967

The Honorable Don Mulford
State Assemblyman
State Capitol Building
Sacramento, California 95814

Dear Don:

I am greatly encouraged to hear that you are introducing legislation into the State Assembly to prevent the carrying of arms, particularly in loaded condition, as witnessed during the recent invasion of the Chamber at Sacramento by the Black Panthers.

I also agree with you that we should go a lot further than this, and if we allow armed men to indiscriminately roam our streets there is no telling what can happen to the individual citizen, and he will have no way of protecting his life and property and will be subjected to gangster tactics.

Sincerely yours,

Edward Lee Soulé, Jr.
President

LS:eb

**Soulé**

# EXHIBIT 26 – 14

June 15, 1967

Mr. Paul F. Perati
6110 Aspinwall Road
Oakland 11, California

Dear Mr. Perati:

I purposely refrained from acknowledging your card
of May 10 until my bill, AB 1591, was amended to my
satisfaction. As you know now, the Assembly has
passed it and it is on its way to the Senate.

The bill enjoyed the full support of the National Rifle
Association and was without opposition in the committee
after we had amended it.

I was particularly careful to make sure that the consti-
tutional rights of citizens to protect themselves was
included in this measure. I must disagree with you that
present laws have given excellent coverage in this field.
If this were true, we would not have armed bands of
citizens frightening school children, invading courts,
invading police departments, invading the halls of the
Legislature, with loaded weapons.

Regarding your comment that my record on civil rights
and civil liberties is the poorest of any elected
Republican Assemblyman since September 9, 1850, I would
be interested to know the source of your statistics.

                    Sincerely,



                    DON MULFORD

        em

# EXHIBIT 26 – 15

June 14, 1967

Mr. Lyle C. Cloutier
2547 E. 29th Street
Oakland, California 94602

Dear Mr. Cloutier:

Thank you for your recent letter concerning Assembly
Bill 1591, which I authored, and the Crippled
Children Service Program.

AB 1591 was passed in the Assembly on June 8, 1967.
I enclose an amended copy.

The measure prohibits unauthorized persons from
carrying loaded weapons on a public street or in a
public place.  It does not discriminate against the
legitimate sportsman or the private citizen who
keeps a loaded weapon in his home.  It does not violate
the Constitutional rights of citizens to protect
themselves.

The intent of the measure is to discourage armed gangs
from roaming our streets and intimidating citizens
with loaded weapons.

I agree with you that the Crippled Children Service
Program  is an important one and worthy of support.

I appreciate hearing from you on legislative matters
of concern to you.

                    Cordially,


                    DON MULFORD

em

# EXHIBIT 26 – 16

June 16, 1967

Mr. F.D. deGroot
961 Tulare Avenue
Berkeley, Calif. 94707

Dear Mr. deGroot:

I purposely refrained from acknowledging your letter
of May 10 until my bill was in final form and amended
to my satisfaction.  My bill, AB 1591, has passed the
Assembly and is on its way to the Senate.

I shall attempt to answer your letter in detail.

First, let me point out that this bill was introduced
at the specific request of law enforcement people,
specifically the police departments, sheriffs, and
district attorneys of Alameda and Contra Costa counties.
I hope you will read my bill, which I attach.

We have very carefully worked to protect the consti-
tutional right of people to bear arms, but at the same
time I do not believe there is any justification for
armed bands on our public streets and entering public
buildings, schools, colleges and the University with
loaded weapons.

I believe the information you had about charges that
could be preferred against the Black Panthers was
inaccurate.

The Black Panthers are now being prosecuted in several
areas, but primarily for having a loaded weapon near a
jail, and for violation of the Fish & Game Act.

# EXHIBIT 26 – 17

Mr. F.D. de Groot - 6/16/67 - 2

I believe the people have had ample notice because my bill has been available for public review for several weeks, as you can tell from the date on the face of the bill.

I point out to you that the National Rifle Association has cooperated with me and helped me amend this bill into its present form.

Thank you very much for your interest.

Sincerely yours,


DON MULFORD

em

# EXHIBIT 26 – 18

June 14, 1967


Mr. John Barale
3721 Elston Avenue
Oakland, Calif. 94602

Dear Mr. Barale:

Thank you for your letter of June 7 concerning
Assembly Bill 1591, which I authored.  This
measure was passed in the Assembly on June 8,
1967.

I enclose an amended copy.

The measure prohibits unauthorized persons from
carrying loaded weapons on a public street or
in a public place.  It does not discriminate
against the legitimate sportsman or the private
citizen who keeps a loaded weapon in his home.
It does not violate the Constitutional rights
of citizens to protect themselves.

The intent of the measure is to discourage armed
gangs from roaming our streets and intimidating
citizens with loaded weapons.

I appreciate hearing from you on legislative
matters of concern to you.

                    Cordially,



                    DON MULFORD


em

Enclosure

# EXHIBIT 26 – 19

June 14, 1967

Mrs. Fay Maxwell
855 York Street
Oakland, California 94610

Dear Mrs. Maxwell:

Thank you for your recent letter concerning Assembly
Bill 1591, which I authored. This measure was passed
in the Assembly on June 8, 1967. I enclose an amended
copy.

The measure prohibits unauthorized persons from carry-
ing loaded weapons on a public street or in a public
place. It does not discriminate against the legitimate
sportsman or the private citizen who keeps a loaded
weapon in his home. It does not violate the Consti-
tutional rights of citizens to protect themselves.

The intent of the measure is to discourage armed gangs
from roaming our streets and intimidating citizens
with loaded weapons.

I appreciate hearing from you on legislative matters
of concern to you.

                                    Cordially,


                        DON MULFORD
em

Enclosure


# EXHIBIT 26 – 20

AB1591

June 14, 1967

Mrs. R.M. Pickens
754 Rand Avenue
Oakland, California 94610

Dear Mrs. Pickens:

Thank you for your recent letter concerning Assembly Bill 1591, which I authored. This measure was passed in the Assembly on June 8, 1967. I enclose an amended copy.

The measure prohibits unauthorized persons from carrying loaded weapons on a public street or in a public place. It does not discriminate against the legitimate sportsman or the private citizen who keeps a loaded weapon in his home. It does not violate the Constitutional rights of citizens to protect themselves.

The intent of the measure is to discourage armed gangs from roaming our streets and intimidating citizens with loaded weapons.

I appreciate hearing from you on legislative matters of concern to you.

                    Cordially,

                    DON MULFORD

em

Enclosure

# EXHIBIT 26 – 21

June 19, 1967

Mr. William C. Dietrich
100 Ardmore Road
Kensington, California 94707

Dear Mr. Dietrich:

I have purposely refrained from acknowledging your
very welcome letter regarding my gun bill, AB 1591,
until it was amended and approved by the Assembly.

I am unaware, incidentally, of any legislation here
that will restrict B-B and $CO_2$ guns.

I hope that after you have read this legislation
you will agree with me that it does not restrict
the constitutional right of citizens to protect
themselves, yet it does treat the problem of armed
bands of citizens carrying loaded weapons in public
places.

The Oakland Police Department sent me an urgent request
for this legislation and I am optimistic that this bill
will be of some assistance in the protection of innocent
citizens of the State.

                              Sincerely,


                          DON MULFORD

ek
Enclosure


# EXHIBIT 26 – 22

June 20, 1967

Miss Mary A. Boland
550 Battery Street, Apt. 910
San Francisco, California

Dear Miss Boland:

Thank you for your recent letter concerning Assembly Bill
1591, which I authored. This measure was passed in the
Assembly on June 8, 1967. I enclose an amended copy.

The measure prohibits unauthorized persons from carrying
loaded weapons on a public street or in a public place.
It does not discriminate against the legitimate sportsman
or the private citizen who keeps a loaded weapon in his
home. It does not violate the Constitutional rights of
citizens to protect themselves.

The intent of the measure is to discourage armed gangs from
roaming our streets and intimidating citizens with loaded
weapons.

I appreciate hearing from you on legislative matters of
concern to you.

                           Cordially,


                           DON MULFORD

DM:bmk
Enclosure

# EXHIBIT 26 – 23

Sec. 4.   Section 2006 of the Fish and Game Code
is amended to read:

magazine, or clip there

2006.  It is unlawful to possess a loaded rifle or shotgun in
any vehicle or conveyance or its attachments which is stand-
ing on or along or is being driven on or along any public
highway or other way open to the public.
   A rifle or shotgun shall be deemed to be loaded for the pur-
poses of this section when there is an unexpended cartridge
or shell in the firing chamber but not when the only cartridges
or shells are in the magazine.
   The provisions of this section shall not apply to peace offi-
cers or members of the armed forces of this State or the
United States, while on duty or going to or returning from
duty.

Sec. 5.   This act is an urgency statute necessary
for the immediate preservation of the public peace, health
or safety within the meaning of Article IV of the Constitu-
tion and shall go into immediate effect.  The facts consti-
tuting such necessity are:

An organized band of men armed with loaded firearms
has recently entered the Capitol of the State of California,
knocked aside an Assistant Sergeant at Arms of the Assembly
and invaded the Chambers of the Assembly, thereby creating
a serious threat to the orderly function of the government
of the state.  Existing laws are not adequate to prevent
such serious interruptions in the orderly processes of the
government of this state and threats to the safety and wel-
fare of the officers of this state.  It is, therefore, im-
perative that this statute, which will make unlawful actions
such as these of the armed band which invaded the State
Capitol, take effect immediately.

-5-

# EXHIBIT 26 – 24

RE AB 1591

Proposed Amendments:

Any firearm that has a cartridge in the chamber, the magazine or clip thereof.

(I am seeking a more accurate description of "loaded" because present law indicates one in the chamber.)

Amend:

line 15 to read "Persons who are using target ranges for the purpose of practice shooting with a firearm, shooting clubs, but only on the premises thereof, for the purpose of hunting."

(Exclusion to protect one's self on one's own property)

# EXHIBIT 26 – 25

AMENDMENTS TO ASSEMBLY BILL NO. 1591

AMENDMENT NO. 1

On page 2, after line 16, of the printed bill,

insert:

(c)  In order to determine whether or not a firearm
is loaded for the purpose of enforcing this section, peace
officers are authorized to examine any firearm carried by
anyone on his person while on a public street or in a public
place within any city.

-1-

# EXHIBIT 26 – 26

MAY  2 1967

Req. #18718

AMENDMENTS TO ASSEMBLY BILL NO. 1591

AMENDMENT NO. 1

On page 2, after line 16, of the printed bill,
insert:

(c)  In order to determine whether or not a
firearm is loaded for the purpose of enforcing this section,
peace officers are authorized to examine any firearm carried
by anyone on his person while on a public street or in a
public place within any city, provided that the circumstances
are such that they would give a reasonable man probable
cause to believe that such firearm is loaded.

-1-

EXHIBIT 26 – 27

MAY 2 1967

Req. #18720

AMENDMENTS TO ASSEMBLY BILL NO. 1591

AMENDMENT NO. 1

On page 2, after line 16, of the printed bill, insert:

(5) Members of shooting clubs, but only while on the premises of such clubs.

(e) A firearm shall be deemed to be loaded for the purposes of this section when there is an unexpended cartridge or shell in the firing chamber, magazine, or clip thereof.

-1-

# EXHIBIT 26 – 28

## REQUEST FOR CHANGES IN LEGISLATION
## CONCERNING THE CONTROL OF FIREARMS

Recent activities in the City of Oakland involving the carrying of concealed firearms, rifles and shotguns by individuals and youth groups who are presenting constant and aggravated problems to this Department, and posing a threat to the citizens of the community, indicate a dire need for the enactment of new legislation for the effective control of such weapons.

More than 100 incidents were reported to the Juvenile Division of this Department within the past year and this can only be considered a sampling of the firearm problem among youths.  All of the major youth clubs and gangs in the City have been involved with firearms by possession, rude display or use within that period of time.

Many other incidents involving firearms among juveniles, young adults and gangs have come to the attention of this Department. For example:

1.  A student took a loaded shotgun to school in an attempt to kill her teacher.

2.  Officers at a downtown teen dance removed numerous firearms, knives and clubs from patrons.

3.  Recreation directors have removed firearms from juveniles attending teen club meetings.

4.  Members of a juvenile gang committed two armed robberies with a shotgun and fired the weapon at a victim.

5.  A youth was murdered on the street with a pistol. Gang members are suspect.

6.  A youth was recently arrested for burglary and auto theft.  In his possession was one rifle, one pistol and 150 rounds of ammunition.

7.  A juvenile gang conceals sawed-off shotguns by strapping them over the top of a vehicle's gas tank.

8.  A gang incident broke up when one gang member fired a shotgun at others.

9.  A juvenile group fired at rivals from a rooftop with a shotgun.

# EXHIBIT 26 – 29

-2-

10. Another such group was reported to be in possession of 13 pistols.

11. A gang fight at a high school resulted in two pistols being displayed.

12. A gang member was shot in the chest by a rifle wielded by an opponent.

In addition, the number of narcotic addicts and other criminals who are armed with pistols or revolvers at the time of their arrest is increasing at an alarming rate.

The major concern of this Department, however, is the increasing evidence of the flagrant disregard and disrespect for constituted authority on the part of certain militant negro groups in this City. The group which is causing the most acute problems is the Black Panther Party for Self Defense. This is an extremely militant, anti-white political organization that has established a headquarters in Oakland at 5624 Grove Street. At one meeting, 22 negro juveniles and young adults attended and were armed with various weapons. To date, there has been no violation of existing laws concerning the possession of firearms. The concealable weapons have always been carried in plain view. When stopped and questioned by members of the Oakland Police Department, they have been extremely hostile towards officers and made statements to the effect that "the only good white man is a dead white man."

On November 27, 1966, a vehicle containing a leader and two identified members of the Black Panther Party was stopped for a traffic violation. Lying on the rear seat, in open view, officers observed one (1) .17 cal. Derringer pistol, one (1) Beretta 25 cal. automatic pistol, one (1) 22 cal. revolver, and one (1) 30 cal. U.S. carbine.

On February 21, 1967, 20 armed negroes, identified as members of the Black Panther Party, appeared at the San Francisco Airport as an escort and bodyguard for Betty Shabazz, widow of the late Malcolm X, assassinated member of the Black Muslims.

On February 21, 1967, an identified male negro spoke at a Berkeley, California High School rally which was attended by approximately 300 students, and made the following statement, "We are proud to be black and we don't hide behind our women. One day it will be molotov cocktails; next, hand grenades and bullets. If we can't have our freedom, then white America will die."

The next speaker, also an identified male negro and member of the Black Panther Party, who was wearing a holstered pistol on his belt, made the following statement after patting the pistol on his side. "We have this, but you can't fight just with guns. The next step is to go into the black community and organize for your needs. If we don't get them, then we can dissolve this Union of America."

# EXHIBIT 26 – 30

-3-

Another leader of the Oakland Black Panther Party recently made
the statement at a rally at the University of California that he
could muster 50 armed negroes ready for action on one hour's
notice.

On March 4, 1967, three members of the Black Panther Party were
involved in an accident in the City of Oakland. One was armed
with an automatic pistol in a shoulder holster in plain view.
These subjects were antagonistic toward police and attempted to
provoke an incident regarding the weapon which was being carried.

On March 9, 1967, at the Arroyo Viejo Recreation Center in
Oakland, a negro youth group known as the "Cowboys" was holding
a meeting when the Director observed approximately 30-35 young
adults approaching the center. Approximately 8 or 10 were ob-
served to be armed. The leader of this group was informed by
the Director that weapons were not allowed at the center.
The leader then ordered the armed members to deposit the
weapons in one of their vehicles, posted a member as guard and
the remaining members entered the meeting.

On April 17, 1967 at 12:01 P.M., members of the Black Panther
Party were observed showing what appeared to be weapons and
ammunition to Helms Junior High School students, who were on
school premises, in the City of San Pablo. Following this,
members entered the school, made derogatory remarks about the
school and demanded of the principal that he bring forth a
school counselor who took disciplinary action against a student.

On April 18, 1967, three members of the Black Panther Party were
stopped by officers when they were observed displaying a shotgun
in their moving vehicle. This was at 9:40 P.M. in the vicinity
of Merritt Business College in Oakland when groups of adult
students were on their way home from school. The driver was
in possession of a shotgun, and one passenger was carrying a
loaded .45 cal. automatic pistol on his belt, in open view,
Shouting in a loud voice to students, the driver said, "We are
here to protect you against these white baby killers." He made
continual reference to a burglar who had been shot in Richmond
and the Hunters Point shooting in San Francisco in 1966. Students
were invited to attend the next meeting of the Black Panther
Party to "learn how to shoot the white Facist Police."

On April 20, 1967, approximately 15 members of the Black Panther
Party accompanied by several negro women, appeared at the Contra
Costa County Administration Building at Martinez and demanded to
see Sheriff Young. They were armed with shotguns and pistols
at the time and insisted on entering the building with these
weapons. Their alleged presence was to protest the shooting of
a young negro burglar in Richmond. Deputies and the Undersheriff
were subjected to verbal abuse and called "white devils and dogs."

On April 25, 1967 at 6:30 P.M., a male negro was kidnapped from
his home at gunpoint by several heavily armed negroes who were
reportedly members of the Black Panther Party.

# EXHIBIT 26 – 31

-4-

Two identified Black Panther Party leaders emphasized that their
prime objective is to arm the negro community to full capacity
for the purpose of backing all plays by the negro community and
to act as a deterrent to all organizations, including the Oakland
and San Francisco Police Departments.

Leaders of the Black Panther Party for Self Defense are actively
involved in left-wing causes. They have been identified openly
selling "The Red Guard Handbook," a publication of Communist
China, on the campus of the University of California at Berkeley.

On September 26, 1966, and for a week previous, picketing activity
at Port Chicago protesting the war in Vietnam aroused the ire
of residents of Clyde, a suburb, who armed and organized themselves
as The Citizens Patrol for Protection of Clyde, to prepare for
eventualities. Several automobiles were fired upon and shots
were fired into a house.

The Constitution of the United States provides that a "well
regulated militia being necessary to the security of a free state,
the right of the people to keep and bear arms shall not be
infringed." Like all the provisions of the Bill of Rights, this
has been held to be a restriction only on the power of Congress
and the Federal Government, and not on the power of the states
(Presser v. Illinois, 116 U.S. 252: U.S. v. Cruikshank, 92 U.S.
542,553). Numerous state constitutions have been reportedly held
to confer a collective and not an individual right to bear arms.
They do not restrict a state from requiring an individual to
obtain a license to carry a firearm. They do not prevent a state
from regulating an individual in the manufacture, transport,
disposition and possession of weapons in order to preserve the
peace and prevent crime (People v. Persce, 204 N.Y. 397:
People v. Warder of City Prison, 154 app. Div. 413: Commonwealth
v. Patsone, 231 pa. 46, affirmed, 232 U.S. 138).

More than a quarter of a million serious crimes are committed
with weapons annually in the United States, and the number is
increasing steadily. FBI statistics show that during the
period 1962-65, a firearm was used as a weapon in 56% of the
36,000 willful killings in the United States. The basic problem
is the handgun, which was used in 70% of the murders. A shotgun
was used in 20% and a rifle in 10%. Of the 278 police officers
killed by criminals in 1960-65, 96% of these deaths resulted
from the use of guns, 78% of which were handguns. Northeastern
states, where strict gun controls exist, reported 36% of their
murders were caused by guns. The rest of the country, where
minimum gun controls exist, reported between 55% and 64% of their
murders resulted from the use of firearms.

In murder, the availability and easy accessibility of a firearm
appear to be major factors in the problem. Because of its lethal
nature, a gun makes murder easy. While a hardened criminal will
obtain a firearm regardless of the controls applied, most authori-
ties agree controls would make acquisition more difficult and
would deter the majority who are so inclined. In addition to

# EXHIBIT 26 – 32

-5-

murder, in 1965 there were 34,700 aggravated assaults with guns
and over 68,400 armed robberies, two-thirds of which involved
firearms.

Laws regulating firearms in California are permissive as compared
to some other high population density states. Some types of
firearms are generally prohibited, such as sawed-off shotguns
and machine guns, however, conventional pistols and revolvers are
not subject to such strict control and rifles and shotguns are
subject to minimal control. A dealer in concealable firearms
must be licensed, but individuals other than dealers can make
casual sales without a license.

There are restrictions on the sale of such firearms to aliens,
felons, narcotic addicts, mental patients and minors under 18.
It is not necessary to obtain a license or permit to own or
possess a concealable firearm and only a formality, involving a
delay in delivery, is required. Generally, a license is required
to carry such firearm concealed.

In California, the carrying of a concealable firearm upon the
person or concealed within a vehicle, without a license providing
for such concealment, is a violation of the law. The requirement
for a license does not apply, however, to the carrying of fire-
arms openly. Additionally, rifles and shotguns may be carried
openly without restriction. This permissiveness in the law
presents problems for the law enforcement officer.

It is recognized that the particular needs for the effective
regulation and control of firearms may vary between jurisdictions.
For this reason, the authority to enact ordinances or other
regulations to correct specific problems in an affected area
should rest with that jurisdiction. There is a definite need,
however, for the passage of additional laws by the State Legis-
lature to provide uniformity in all jurisdictions for basic con-
trols as follows:

1.  To maintain current identity of all owners of concealable
    firearms, consideration should be given to require their
    registration with the State, and notification to that agency
    in the event of sale or transfer, much the same as is re-
    quired with vehicles. When an individual who is in possession
    of such a weapon on the streets is stopped by a law enforce-
    ment officer, he must then produce evidence that he is in
    fact the registered owner of the weapon. This procedure will
    also call to the attention of State authorities, automatically,
    purchases by other than legitimate dealers of large numbers
    of concealable weapons, and those which are contraband.
    In addition, a better control would be effected concerning
    the possession of a concealable firearm by aliens, addicts
    and convicted felons who are by law prohibited from
    possessing same.

2.  Current procedures followed by individuals who desire to
    purchase a concealable firearm should be amended. In addition
    to existing requirements, the purchaser should be compelled to
    be fingerprinted and photographed by the law enforcement
    jurisdiction involved.

# EXHIBIT 26 – 33

-6-

There are no such requirements at present, and pistols and revolvers may be obtained by presenting fictitious evidence of identification at the time of the purchase.

On December 30, 1958, an ordinance of the City of Oakland, No. 5698, which contained these requirements, was repealed by the City Council. The reason for this action resulted from complaints from local merchants that purchasers were going to neighboring cities with less stringent requirements to obtain such weapons. State laws providing the same control that resulted from Oakland's Gun Purchase Permit Ordinance, if applied from the State level, would be uniform in enforcement and provide more adequate identification procedures.

Because of the ever-increasing transient nature of the criminal element today, regulations governing the purchase of firearms in one city have little effect since the buyer need only go to another jurisdiction where weapons regulations are not as restrictive or non-existent. Modern freeway and transportation facilities enable the criminal element to travel the length and breadth of the State with ease, and law enforcement agencies must constantly improve upon their mutual aid and cooperation procedures to effectively combat criminal activity.

3. Section No. 12025 of the California Penal Code should be amended to increase the penalty of carrying a concealed firearm without a license from a misdemeanor to a felony. Section No. 12020 P.C. makes it a felony to carry a black-jack, dagger, slig shot, brass knuckles or other less offensive or dangerous weapons, while it is only a mis-demeanor to carry a loaded revolver or pistol.

4. Although a concealable firearm, sawed-off shotgun, machine gun and tear gas weapon is defined, the Deadly Weapons Control Law, for the purposes of this statute, should also include a definition of the term "firearm." Under Section 901 (3) of the Federal Firearms Act, a "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or silencer, or any part or parts of such weapon. It is recommended that this definition, excluding the words "and a firearm muffler or silencer, or any part or parts of such weapon" be adopted.

The statute already contains specific sections for the control of these devices. In addition, however, the definition should include gas or air operated rifles, revolvers and pistols capable of propelling a projectile with sufficient pene-trating force to cause grievous bodily injury or death. Simple air rifles, commonly known as BB guns, which lack this force should be excluded. An increasing number of these pellet guns are being used in the commission of armed robbery.

# EXHIBIT 26 – 34

-7-

The primary purpose of this request for additional legislation is
to provide law enforcement officers with better tools for the con-
trol of the possession of firearms by individuals, groups or
organizations who have no apparent reason or need for carrying
such weapons, particularly those who have openly expressed an
intention to use the weapons at an opportune moment against the
police or other constituted authority.

It is not the intention of law enforcement agencies to deprive
recognized sportsmen's organizations or individuals from partici-
pating in legitimate activities involving the use of firearms
to include hunting, fishing, competitive or other shooting on
established ranges, and persons who are engaged in the collection
of antique or other firearms as a hobby or for other legitimate
purposes as defined in Section 12027(h) of the Deadly Weapons
Control Law.  Proposed legislation would merely provide needed
controls without restricting such activities.

# EXHIBIT 26 – 35



# EXHIBIT 26 – 36



Police disarm members of a Black Panther group outside the Capitol Building after their invasion of the Assembly yesterday before the noon recess. Bee Photos

# EXHIBIT 26 – 36

# The Gun Wearing 'Black Panthers'



Page 4 Section I    ☆☆☆☆    S. F. Sunday Examiner & Chronicle, April 30, 1967

**BOBBY GEORGE SEALE (L) AND HUEY NEWTON**
They make no bones about being anti-white or about being revolutionaries

# EXHIBIT 26 – 37



## Panthers' Plead Guilty

SACRAMENTO (AP) — Six members of the Black Panther Party for Self-Defense pleaded guilty Thursday to reduced misdemeanor charges of disrupting the Assembly May 2. Charges against nine others were dropped.

Three others failed to show up. Two had good excuses — they were in jail — and a warrant was issued for the arrest of the third. The cases of five juveniles remain to be completed in Juvenile Court.

Sentencing of the six was scheduled for Aug. 9 in the Municipal Court of Judge Oscar Kistle. The men, ranging in age from 18 to 30 and living in Oakland and San Francisco addresses, all applied for probation. They were released on bail.

Cases against nine others at the request of the deputy district attorney, who said there was lack of evidence to prove they were among those who burst into the Assembly.

The Oakland-based group of youths, urging youth to protect themselves against the "white power structure," burst into the legislature's lower house to protest proposed legislation.

The legislation, sponsored by Assemblyman Don Mulford, R-Piedmont, whose district includes Oakland, would outlaw carrying of weapons in public places. The Panthers punctuated their protest by marching into the Assembly with loaded weapons.

Mulford's legislation since passed the Assembly and awaits action on the Senate floor.

The six who pleaded guilty could receive a $500 fine or six months in jail or both under the misdemeanor provisions. The original charges of felony conspiracy were dropped.

# EXHIBIT 26 – 38



# BLACK PANTHER PARTY FOR SELF DEFENSE

5-624 GROVE ST.
OAKland, California

## WHAT WE WANT   WHAT WE BELIEVE

WHAT WE WANT NOW! :

1. WE WANT FREEDOM. WE WANT POWER TO DETERMINE THE DESTINY OF OUR BLACK COMMUNITY.

2. WE WANT FULL EMPLOYMENT FOR OUR PEOPLE.

3. WE WANT AN END TO THE ROBBERY BY THE WHITE MAN OF OUR BLACK COMMUNITY.

4. WE WANT DECENT HOUSEING FIT FOR SHELTER OF HUMAN BEINGS.

5. WE WANT EDUCATION FOR OUR PEOPLE THAT EXPOSES THE TRUE NATURE OF THIS DECADENT AMERICAN SOCIETY. WE WANT EDUCATION THAT TEACHES US  OUR TRUE HISTORY AND OUR ROLE IN THE PRESENT DAY SOCIETY.

6. WE WANT ALL BLACK MEN TO BE EXEMPT FROM MILITARY SERVICE.

7. WE WANT AN IMMEDIATE END TO POLICE BRUTALITY AND MURDER OF BLACK PEOPLE.

8. WE WANT FREEDOM FOR ALL BLACK MEN AND WOMEN HELD IN FEDERAL, STATE, COUNTY, AND CITY PRISONS AND JAILS.

9. WE WANT ALL BLACK PEOPLE WHEN BROUGHT TO TRIAL, TO BE TRIED IN COURT BY A JURY OF THEIR PEER! GROUP OR PEOPLE FROM THEIR BLACK COMMUNITIES, AS DEFINED BY THE CONSTITUTION OF THE UNITED STATES.

10. WE WANT LAND, BREAD, HOUSEING, EDUCATION, CLOTHING, JUSTICE AND PEACE.

# EXHIBIT 26 – 39

WHAT WE BELIEVE:

1. WE BELIEVE THAT BLACK PEOPLE WILL NOT BE FREE UNTIL WE ARE ABLE TO
DETERMINE OUR DESTINY

2. WE BELIEVE THAT THE FEDERAL GOVERNMENT IS RESPONSIBLE AND OBLIGATED TO
GIVE EVERY MAN EMPLOYMENT OR A GUARANTEED INCOME.
WE BELIEVE THAT IF THE WHITE AMERICAN BUSINESS MEN WILL NOT GIVE FULL
EMPLOYMENT, THEN THE MEANS OF PRODUCTION SHOULD BE TAKEN FROM THE
BUSINESS MEN AND PLACED IN THE COMMUNITY SO THAT THE PEOPLE OF THE
COMMUNITY CAN ORGANIZE AND EMPLOY ALL OF ITS PEOPLE AND GIVE A HIGH
STANDARDS OF LIVING.

3. WE BELIEVE THAT THIS RACIST GOVERNMENT HAS ROBBED US AND NOW WE ARE
DEMANDING THE OVERDUE DEBT OF FORTY ACRES AND TWO MULES. FORTY ACRES
AND TWO MULES WAS PROMISED 100 YEARS AGO AS RETRIBUTION FOR SLAVE
LABOR AND MASS MURDER OF BLACK PEOPLE. WE WILL ACCEPT THE PAYMENT IN
CURRENCY WHICH WILL BE DISTRIBUTED TO OUR MANY COMMUNITIES. THE
GERMANS ARE NOW AIDING THE JEWS IN ISRAEL FOR THE GENOCIDE OF THE
JEWISH PEOPLE. THE GERMANS MURDERED 6,000,000 MILLION JEWS. THE
AMERICAN RACIST HAS TAKEN PART IN THE SLAUGHTER OF OVER 50,000,000
MILLION BLACK PEOPLE; THEREFORE, WE FEEL THAT THIS IS A MODEST DEMAND
THAT WE MAKE.

4. WE BELIEVE THAT IF THE WHITE LANDLORDS WILL NOT GIVE DECENT HOUSEING
TO OUR BLACK COMMUNITY THEN THE HOUSEING AND THE LAND SHOULD BE MADE
INTO COOPERATIVES SO THAT OUR COMMUNITY, WITH GOVERNMENT AIDE, CAN
BUILD AND MAKE DECENT HOUSEING FOR ITS PEOPLE.

5. WE BELIEVE IN AN EDUCATIONAL SYSTEM THAT WILL GIVE TO OUR PEOPLE A
KNOWLEDGE OF SELF. IF A MAN DOES NOT HAVE KNOWLEDGE OF HIMSELF AND
HIS POSITION IN SOCIETY AND THE WORLD, THEN HE HAS LITTLE CHANCE TO

# EXHIBIT 26 – 40

RELATE TO ANYTHING ELSE.

6. WE BELIEVE THAT BLACK PEOPLE SHOULD NOT BE FORCED TO FIGHT IN THE MILITARY SERVICE TO DEFEND A RACIST GOVERNMENT THAT DOSE NOT PROTECT US. WE WILL NOT FIGHT AND KILL OTHER PEOPLE OF COLOR IN THE WORLD WHO, LIKE BLACK PEOPLE, ARE BEING VICTIMIZED BY THE WHITE RACIST GOVERNMENT OF AMERICA. WE WILL PROTECT OURSELVES FROM THE FORCE AND VIOLENCE OF THE RACIST POLICE AND THE RACIST MILITARY, BY WHATEVER MEANS NECESSARY.

7. WE BELIEVE WE CAN END POLICE BRUTALITY IN OUR BLACK COMMUNITY BY ORGANIZING BLACK SELF DEFENSE GROUPS THAT ARE DEDICATED TO DEFENDING OUR BLACK COMMUNITY FROM RACIST POLICE OPPRESSION AND BRUTALITY. THE SECOND AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES GIVES US A RIGHT TO BEAR ARMS. WE THEREFORE BELIEVE THAT ALL BLACK PEOPLE SHOULD ARM THEMSELVES FOR SELF DEFENSE.

8. WE BELIEVE THAT ALL BLACK PEOPLE SHOULD BE RELEASED FROM THE MANY JAILS AND PRISONS BECAUSE THEY HAVE NOT RECIVED A FAIR AND IMPARTIAL TRIAL.

9. WE BELIEVE THAT THE COURTS SHOULD FOLLOW THE UNITED STATES CONSTITUTION SO THAT BLACK PEOPLE WILL RECEIVE FAIR TRIALS. THE 14th AMENDMENT OF THE U.S. CONSTITUTION    GIVES A MAN A RIGHT TO BE TRIED BY HIS PEER GROUP. A PEER IS A PERSON FROM A SIMILAR ECONOMICAL, SOCIAL, RELIGIOUS, GEOGRAPHICAL, ENVIRONMENTAL, HISTORICAL AND RACIAL BACKGROUND. TO DO THIS THE COURT WILL BE FORCED TO SELECT A JURY FROM THE BLACK COMMUNITY FROM WHICH THE BLACK DEFENDENT CAME. WE HAVE BEEN, AND ARE BEING TRIED BY ALL WHITE JURIES THAT HAVE NO UNDERSTANDING OF THE "AVERAGE REASONING MAN" OF THE BLACK COMMUNITY.

# EXHIBIT 26 – 41

10. WHEN IN THE COURSE OF HUMAN EVENTS, IT BECOMES NECESSARY FOR
ONE PEOPLE TO DISSOLVE THE POLITICAL BONDS WHICH HAVE CONNECTED
THEM WITH ANOTHER, AND TO ASSUME AMONG THE POWERS OF THE
EARTH, THE SEPARATE AND EQUAL STATION TO WHICH THE LAWS OF NATURE
AND NATURE'S GOD ENTITLE THEM, A DECENT RESPECT TO THE OPINIONS
OF MANKIND REQUIRES THAT THEY SHOULD DECLARE THE CAUSES WHICH
IMPEL THEM TO THE SEPARATION.

WE HOLD THESE TRUTHS TO BE SELF-EVIDENT, THAT ALL MEN ARE
CREATED EQUAL, THAT THEY ARE ENDOWED BY THEIR CREATOR WITH
CERTAIN UNALIENABLE RIGHTS, THAT AMONG THESE ARE LIFE, LIBERTY
AND THE PURSUIT OF HAPPINESS. THAT TO SECURE THESE RIGHTS,
GOVERNMENTS ARE INSTITUTED AMONG MEN, DERIVING THEIR JUST
POWERS FROM THE CONSENT OF THE GOVERNED,--THAT WHENEVER ANY
FORM OF GOVERNMENT BECOMES DESTRUCTIVE OF THESE ENDS, IT IS
THE RIGHT OF PEOPLE TO ALTER, OR TO ABOLISH IT, AND TO INSTITUTE
NEW GOVERNMENT, LAYING ITS FOUNDATION ON SUCH PRINCIPLES AND
ORGANIZING ITS POWERS IN SUCH FORM, AS TO THEM SHALL SEEM MOST
LIKELY TO EFFECT THEIR SAFETY AND HAPPINESS.

PRUDENCE, INDEED, WILL DICTATE THAT GOVERNMENTS LONG ESTABLISHED
SHOULD NOT BE CHANGED FOR LIGHT AND TRANSIENT CAUSES; AND
ACCORDINGLY ALL EXPERIENCE HATH SHEWN, THAT MANKIND ARE MORE
DISPOSED TO SUFFER, WHILE EVILS ARE SUFFERABLE, THAN TO RIGHT
THEMSELVES BY ABOLISHING THE FORMS TO WHICH THEY ARE ACCUSTOMED.
BUT WHEN A LONG TRAIN OF ABUSES AND USURPATIONS, PURSUING IN-
VARIABLY THE SAME OBJECT, EVINCES A DESIGN TO REDUCE THEM
UNDER ABSOLUTE DESPOTISM, IT IS THEIR RIGHT, IT IS THEIR DUTY,
TO THROW OFF SUCH GOVERNMENT, AND TO PROVIDE NEW GUARDS FOR
THEIR FUTURE SECURITY.

# EXHIBIT 26 – 42

BLACK
PANTHER
PARTY
FOR
SELF
DEFENSE

## BURN BABY BURN
### BY MARVIN X

TIRED
SICK AND TIRED
AND TIRED OF BEING SICK AND TIRED

LOST
LOST IN THE WILDERNESS
OF WHITE ASS AMERICA

ARE THE MASSES ASSES?

COOL!
"COOL" SAID THE MASTER TO THE SLAVE,
"DON'T ROB AND STEAL I'LL BE YOUR
DRIVING WHEEL"
COOL!
AND HE WHEELED US INTO 350 YEARS OF
                    BLACK MADNESS

TO HOGGUTTS,CONKED HAIR, AND COVODISES
TO BLEACHING CREAMS AND UNCLE THOMASES

TO THE STREETS

TO *WATTS*

TO KILLLLLLLLL!!!!
*BOOMMMMM........*
                    TWO HONKIES GONE

MOTHERFUCK THE POLICE
                AND PARKER'S SISTER TOO

BLACK PEOPLE
TIRED, SICK AND TIRED
AND TIRED OF BEING SICK AND TIRED

COME ON CHULL*NS
DON'T MINE THE TAGS
GET ALL DEM BOSS RAGS

GET ALL DAT MOTHERFUCK'N PLUCK
GET THEM GUNS TOO
WE DON'T GIVE A FUCK

BURN, BABY, BURN
COOK OUT OF SIGHT!

        FINEBURGS

    WHITEFRONT

    WINEBURGS

    BLACKFRONT

    SAFEWAY
        NOWAY

BURN!

*BURN BABY BURN*

    IN TIME
        HE'LL
            LEARN

# EXHIBIT 26 – 43

## T H E    B L A C K    P A N T H E R    M O V E M E N T

In recent weeks, activities of the gun-toting Black Panthers have caused serious concern to Law Enforcement Agencies. Although the Black Panther movement has been known of for some time, it is only recently that there has been demonstration of a show of force. Reference is made to three (3) incidents:

1. Black Panther members entered a meeting, held on April 17, 1967, which had been called by the Welfare Rights Organization for the purpose of bringing together the District Attorney and members of the Dowell family to discuss the death of Denzil DOWELL, killed by a Deputy Sheriff of Contra Costa County on April 1, 1967. That meeting was held in the building of the Council of Community Services.

2. On April 20, 1967, in the City of Martinez, a number of Black Panthers, all bearing arms, attempted to enter the office of the Sheriff so that they might discuss the Dowell shooting.

3. On April 22, 1967, at the corner of Filbert and Chesley in North Richmond, armed members of the Black Panthers appeared for the purpose of recruiting new members into their group.

There have been other incidents in the East Bay where armed Black Panthers have come into contact with police officers. Details of the incidents will be set forth later in this report. We mention them at this time merely to point out the recent activities of the Black Panthers.

To better understand the Black Panther movement, particularly as it exists in the East Bay, one must go back to its origin.

The Black Panther Party started in Alabama in 1966 (?). It was organized as a political party by the Student Non-Violent Coordinating Committee (SNCC). Its purpose was to enter Negro candidates in counties where Negroes had a potential voting majority. The "Black Panther" was chosen as a symbol as they felt they needed a visual name that would depict the Southern Negro. It is supposed to represent courage, determination and freedom.

# EXHIBIT 26 – 44

-2-

Since the founding of SNCC, other organizations have supported it. The magazine, "The Young Socialist", in its issues for May, June and July of 1966, offered them support. This magazine is published by the Young Socialist Alliance (YSA). In one of their issues it was indicated that the YSA in Berkeley was supporting the Black Panther party by selling buttons.

Although the Student Non-violent Coordinating Committee implies non-violence, it is generally known that they do, in fact, advocate violence. Stokley Carmichael, the National Director of SNCC, preaches hate of the white man, as well as the use of force by the Negro to obtain what is "justly" his. Mr. Carmichael is a young Negro, well educated and a firey orator. He appeared at the Contra Costa College a few months ago, at the invitation of the Associated Students. Some 700 or 800 attended and about 90% were Negro. Mr. Carmichael's audiences are always large and he is in constant demand as a speaker. He is given extremely good coverage by the press, newspapers and television.

SNCC, an organization based in Alabama, was organized for the purpose of voter registration and to encourage Negroes to run for various public offices. As stated before, non-violence has given way to violence which is advocated by their leader, Carmichael. There is no SNCC organization in the Bay Area. There is, however, a group known as "The Friends of SNCC" who have offices in Berkeley. It is understood that the purpose of this organization is to act in support of SNCC in Alabama. There is an extensive list of supporters to whom they mail monthly notices of SNCC activities. Much of the information they impart is contained in reports from Loundes County, Alabama, as well as in their newspaper, "The Movement". In addition, they collect money, food and clothing for the needy Negroes of the South.

The local leaders of the Black Panther Party are known for their dislike of the whites. They have demonstrated their hate and openly advocated

# EXHIBIT 26 – 45

-3-

Violence, even to the point of attempting overthrow of our government.

Bobby Seale, reported to be the leader of the Oakland Black Panther party, came to our attention in August, 1965. At that time, he was identified with the Western Student Movement. This organization is located in North Richmond. Its purpose is to tutor elementary school children of that community. At that time, it was funded through OEO with $59,000 Federal funds and approximately $6,000 from the Rosenburg Foundation.

The Western Student Movement resulted in issuance of fliers, inviting the public to a debate to be held at Shields Park in North Richmond. The subject for debate was, "Violence Versus Non-Violence". The principal speakers were Ken Freeman, Hermon Blake and Ron Bridgeport. All spoke and all advocated the use of violence by the Negro to focus attention upon their demands and "get what is rightfully theirs". Bobby Seale was also present, but took only a small part in the program. Both Seale and Freeman are not identified with the Black Panther party.

Also in 1965, a publication entitled "Soulbook" was issued. It was produced in Berkeley by the Afro-American Research Institution". Members of the Editorial Board were Donald Freeman, Isaac Moore, Ernest Allen, Jr., Carroll Holmes, Ken Freeman and Bob Hamilton. Bobby Seale is listed as Distribution Manager and is credited with all printing.

It is interesting to note that an organization known as "The Revolutionary Action Movement" (RAM) includes as members many of the same people as the Afro-American Research Institution. Further, they subscribe to beliefs such as were expressed by the speakers in Shields Park and contained in the publication, "Soulbook", i.e., hatred of whites and the condoning of violence. Literature distributed by RAM in the Berkeley-Oakland area contains identification of the following persons as officers: Ernest Allen Jr., Kenneth Freeman,

# EXHIBIT 26 – 46

-4-

Donald Freeman, Carol Freeman, Isaac Moore and Bob Hamilton. Bobby Seale is known as a close associate.

RAM is described as a revolutionary organization which advocates a world-wide black revolution to create a "new world", free from exploitation and oppression of man by man. RAM envisions a seizure of power and, to accomplish this goal, they have devised a three-stage plan. Stage #1 is referred to as "Ideological Warfare" which consists of education and recruitment. Youthful criminals from youth groups are of particular interest to recruiters. Stage #2 is referred to as "Expropriation". Funds derived will be obtained by both legal and illegal methods. Stage #3 is "Direct Action". Implication is that the system of government in the United States will be replaced by violence, if necessary.

RAM's National leader is Robert Franklin Williams. In August, 1961, Williams and his family fled to Cuba, just hours before he was indicted on charges of kidnapping a white couple and holding them for several hours during a racial disturbance. A Federal warrant is outstanding for William's arrest.

As we now face the militant Black Panther Party, there is evidence of a continued similarity through all of the aforementioned organizations. With some variations, Stage #1 of RAM coincides very much with violence, as demonstrated by the Black Panthers. Furthermore, many of the same people have been active in all organizations.

There is deep concern on the part of Law Enforcement officials over the recent activities of the Black Panthers, as well as over the group's publications. Quoted here are some of their demands and beliefs:

"We want freedom. We want power to determine the destiny of our black community."

"We want an end to the robbery by the white man of our black community."

"We want all black men to be exempt from military service."

"We want an immediate end to Police Brutality and Murder of black people."

"We want freedom for all black men and women held in Federal, State, County and City Prisons and Jails."

# EXHIBIT 26 – 47

-5-

"We want all black people, when brought to trial, to be tried in court by a jury of their peer group, or people from their black communities, as defined by the Constitution of the United States."

"We believe that black people should not be forced to fight in the military service, to defend a racist government that does not protect us. We will not fight and kill other people of color in the world who, like black people, are being victimized by the white racist government of America. We will protect ourselves from the force and violence of the Racist police and the Racist military, by whatever means necessary."

"We believe we can end police brutality in our black community by organizing black self defense groups that are dedicated to defending our black community from racist police oppression and brutality. The second amendment of the Constitution of the United States gives us a right to bear arms. We therefore believe that all black people should arm themselves for self defense.

"We believe that all black people should be released from the many jails and prisons because they have not received a fair and impartial trial."

The local (Oakland) Black Panther party is known in full as, "The Black Panther Party for Self Defense". In their terminology, this means defending one's self with a weapon, be it a pistol, rifle or shotgun. It is clear that members are well informed concerning the laws governing the ownership and carrying of weapons. However, they are seen almost daily with weapons on their persons, particularly in recent days when they have moved about in numbers of from six to twenty-five. This, then, represents a threat to the peace of any community in which they choose to appear.

The first big showing of the Black Panthers was in San Francisco at the airport on February 21st and 22nd, 1967. This was in connection with the Malcolm X Grassroots Memorial, at which time Mrs. Betty Shabazz, widow of Malcolm X, was the featured guest. About twenty Black Panther party members appeared at the San Francisco airport, carrying an assortment of guns. The entire incident was vividly covered by the press.

Oakland has had several contacts with armed Black Panthers, as has Berkeley. Each contact with the police is a potentially explosive situation. They are very antagonistic toward the police and attempt to provoke incidents concerning their carrying or wearing weapons.

# EXHIBIT 26 – 48

-6-

Mr. John Nejedly, District Attorney of Contra Costa County, was in attendance at a meeting in Richmond, at the office of the Council of Community Services, on Monday, April 17, 1967. The purpose of the meeting was, as previously indicated in this report, to discuss a recent Coroner's inquest with the parents of the subject of the inquest who had been killed by a Deputy Sheriff. Before the meeting had gotten under way, a number of Black Panthers, said to have been seven, invaded the meeting. All were armed with shotguns, rifles or sidearms. On Thursday of the same week, a large number of Black Panthers appeared before the County Building in the City of Martinez, again fully armed. They attempted to enter the building with their weapons, to meet with the Sheriff. They were told they could not bring the weapons into the building. They reluctantly left their weapons in their vehicles.

It is reported that on Saturday, April 22, 1967, the Black Panthers held a street rally at the corner of Chesley and 4th Street in North Richmond. Well over one hundred persons gathered around. It would appear that this type meeting is for the purpose of gaining support and to recruit new members.

For police agencies to be aware of the activities of the Black Panther party is not enough. With Black Panther leaders, Bobby Seale and Huey Newton, stating that their prime objective is to arm the Negro community to full capacity for the purpose of backing all plays by the Negro community, and to act as a deterrent to all organizations, including police departments, it is evident that new enforceable legislation is urgently needed so that there may be better control over the use of weapons by any group. This is particularly true when the weapons are used as a threat to the peace of any community. Under presently existing laws, the police are powerless to act.

NOTE:  The name Bob Hamilton has appeared in this report. The correct spelling of the first name is BOBB.

# EXHIBIT 26 – 49



The Black Panther Party for Self Defense is an extremely militant, anti-white political organization. Their head-quarters in Oakland are at 5624 Grove Street. This is a vacant store where they hold meetings each Saturday at 4:30 p. m. At one meeting they attracted 22 persons, all negro. Many of the persons who attend these meetings are armed with various weapons. To date these subjects have not violated any existing laws concerning the possession of firearms. The concealable weapons have always been carried in plain view, and the subjects have not been in possession of fully automatic rifles or sawed off shotguns. When subjects have been stopped and questioned by the OPD, they have been extremely hostile toward officers and made statements to the effect that the only good white man is a dead white man. Serial numbers taken from subjects' guns have thus far been clear.

On February 21, 1967, 20 armed negroes, who identified themselves as members of the Black Panther Party, appeared at the San Francisco Airport and acted as bodyguards for Betty Shabazz, who is the widow of Malcolm X.

On February 21, 1967, a male negro by the name of Eldridge Cleaver spoke at a Berkeley High School rally which was attended by approximately 300 students, and made the following statement, "We are proud to be black and we don't hide behind our women. One day it will be molotov cocktails; next, hand grenades and bullets. If we can't have our freedom, then white America will die."

The next speaker was Huey Newton, MN/24, who was wearing a holstered pistol on his belt, and made the following statement after patting the pistol on his waist. "We have this, but you can't fight just with guns. The next step is to go into the black community and organize for your needs. If we don't get them, then we can dissolve this Union of America." Newton is identified as a member of the Black Panther Party.

Bobby G. Seale, MN/30, who is a leader of the Oakland Black Panther Party, recently made the statement at a rally at the University of California that he could have 50 armed negroes ready for action on one hour's notice.

On March 9, 1967, at the Arroyo Viejo Recreation Center, a meeting of the "Cowboys" (a negro youth group) was being held when Mr. Martin, the director, observed approximately 30-35 young adults approaching the center. Of this group, approximately 8 or 10 were observed to be armed. The leader of this, Bobby Seale, was told by Mr. Martin that weapons were not allowed in the recreation center. Bobby Seale then ordered the armed members to deposit the weapons in one of their vehicles and posted one member to guard the vehicle and the remaining members entered the meeting.

13

# EXHIBIT 26 – 50

-2-

On March 4, 1967, Bobby Seale, Huey Newton, and Melvin Newton, MN-29, were involved in an accident at 9th and Broadway. Bobby Seale was armed with an automatic pistol in a shoulder holster. These subjects were very antagonistic toward police and attempted to provoke an incident regarding the weapon Seale was wearing.

On November 27, 1966, a vehicle driven by Mark Comfort, MN-34, and containing as passengers Lafayette Robinson, MN-16, and Ernest Allen, MN-17, was stopped in the 8600 block of A Street. Lying in the back seat, in plain view, were the following:  1 .17 cal. Derringer, 1 Berretta .25 cal. automatic, 1 .22 cal. revolver, and 1 .30 cal. carbine.

Bobby Seale and Huey Newton emphasized their prime objective is to arm the negro community to full capacity for the purpose of backing all plays by the negro community and to act as a deterrent to all organizations, including the Oakland Police Department and the San Francisco Police Department.

Confidential

# EXHIBIT 26 – 51

November 15, 1967

Honorable Don Mulford
California State Legislature
State Capitol
Sacramento, California 95814

Dear Mr. Mulford:

Since the recent enactment of the Mulford Firearms Control Act by the California Legislature there have been two occasions in which it was necessary to use the Act to avert serious civil disorder in the City of Berkeley.

In both cases the responsible person was carrying a loaded firearm under conditions that would have been lawful prior to the adoption of the Mulford Act by the Legislature. In one instance the arrested person who was carrying the firearm openly in his automobile had a long criminal record and a history of violence. In addition to the firearms violation under Section 12031 of the California Penal Code the subject was also found to have narcotics in his possession.

While these are only two examples, it has occurred to me that you might be interested to know of the use that has been made to date of your Legislative efforts to prevent irresponsible and potentially dangerous persons from transporting and using firearms in public streets and other places covered by the statutes.

The new Legislation has been and will continue to be of significant help to law enforcement and public safety.

Best regards,

W. P. BEALL
Chief of Police

CL/201

# EXHIBIT 26 – 52

SENATOR JOHN G. SCHMITZ
34TH DISTRICT
5070 STATE CAPITOL
SACRAMENTO
PHONE: 445-5831

PRESS RELEASE: July 24, 1967

State Senator John G. Schmitz, R-Tustin (Orange County), has warned
of "serious danger threatening every American living in an urban or suburban
area if the present wave of nation-wide rioting continues."

Senator Schmitz said:

"For years we have been preaching peace, love and handouts to those
who tell us, in Mao Tse-tung's words, that 'political power grows out of
the barrel of a gun.' With each new riot we have been urged to give even
more in unearned benefits to match the robbery and looting which are fast
becoming the primary purpose of these outbreaks. The carnival of destruction
now underway in Detroit is strange and bitter fruit of the incessant pro-
paganda during the last twenty years from those who claim to love mankind
-- in the collective and abstract -- so much.

"The time has come for justice. The cornerstone of justice is each
man's absolute right to defend his home and family against violent assault.
The police, much as they have been abused, will do all they can to protect
us. But alone they are not enough. When the Governor of Michigan finds it
necessary to call upon not only the National Guard but the United States
Army to help the Detroit police, it becomes obvious that this rioting has
gone beyond mere crime to the first stage of armed revolution.

"Consequently this is the worst possible time for the California
legislature to pass any bill limiting the individual's right of self-
defense and his right to bear arms. If my home and family is threatened,
I would far rather have guns of my own to defend them, than the mere empty
assurance that the guns carried by the rioters are not being legally used."

- 30 -

# EXHIBIT 26 – 53



# *The* BLACK PANTHER

BLACK COMMUNITY NEWS SERVICE

**VOLUME 1**   APRIL 25, 1967   **NUMBER 1**

P.O. BOX 8641   OAK. CALIF. EMERYVILLE BRANCH

PUBLISHED BY THE BLACK PANTHER PARTY FOR SELF DEFENSE

# WHY WAS DENZIL DOWELL KILLED

APRIL FIRST 3:50 a.m.

## "I BELIEVE THE POLICE MURDERED MY SON" SAYS THE MOTHER OF DENZIL DOWELL.

Brothers and Sisters of the Richmond community, here is the view of the family's side of the death of Denzil Dowell as compiled by the Black Panther Party for Self Defense, concerned citizens, and the Dowell Family. As you know, April 1st, 1967, Denzel Dowell (age 22), was shot and killed by an "officer of the Martinez Sheriff's Department", so read the newspaper.

But there are too many unanswered questions that have been raised by the Dowell family and other neighbors in the North Richmond community. Questions that don't meet the satisfaction of the killing of Denzil. The Richmond Police, the Martinez Sheriff's Department, and the Richmond Independent would have us black people believe something contrary to Mrs. Dowell's accusation. That is, her son was "unjustifiably" murdered by a racist cop.

There are too many questionable facts supporting the Dowell family's point of view.

These questionable facts are as follows:

1. Denzil Dowell was unarmed so how can six bullet holes and shot gun blasts be considered "justifiable homocide"? (Con't Page 2)



WE BLACK PEOPLE ARE MEETING SATURDAY 1:30 AT 1717 SECOND STREET LET US SUPPORT THE DOWELL FAIMLY EVERY BLACK BROTHER AND SISTER MUST UNITE FOR REAL POLITICAL ACTION

# EXHIBIT 26 – 54

THE BLACK PANTHER   APRIL 25, 1967

2. Why did the newspaper and police say only three shots were fired when the coroner's report and surrounding neighbors established the fact that six to ten shots were used and heard?

3. The police and the newspaper stated that the time of the shooting was 4:49 A.M. to 5:01 A.M., yet Denzil Dowell's sister and neighbors in the area testified to hearing shots at 3:50 A.M.

4. Only Richmond police were first seen on the scene; not until later (an hour or so), around 4:50 A.M. were Martinez sheriffs seen on the scene where Denzil Dowell was murdered.

5. The police reported that Denzil Dowell was running and jumped a fence and ran to jump another when he was shot. The Dowell family knows that Denzil had been injured in the hip in a car accident some time ago and after leaving the hospital could not run much at all, let alone jump two fences with a hammer in his hand.

6. The lot that Denzil was supposed to have run across between the two fences is an old car junk yard loaded with grease and oil and why wasn't oil found on his shoes?

7. The coroner reported that Denzil Dowell bled to death. Where was the blood where Denzil Dowell lay? Denzil's sister remembers that night and says she saw very little blood. She said she never saw a pool of blood and yet the coroner said he bled to death after being shot ten times.

8. Denzil Dowell was found by his brother and friend and they noticed that no attempt had been made by police to summon a doctor or to save his life.

9. The family of Denzil Dowell has been denied the right to see or have the clothes that Denzil was murdered in. They want the clothes to see how many bullet holes the clothes have in them. The family was also denied the right to take pictures of his body so they could check for numerous bullet holes.

10. The newspaper came out with a statement of "justifiable homicide" 2 hours before the jury gave its verdict. The foreman on the jury could not read. A biased jury of 10 white people and two "Negroes" protected the racist cop who murdered Denzil Dowell.

11. The Dowell family also notes a very important fact. The cop who shot Denzil Dowell knew him by name and had stopped Denzil and hollered to him many times, "Denzil Dowell give me your identification." The cop had at other times threatened to kill him.

The Dowell family and concerned citizens have called for a Grand Jury investigation and are demanding that all law enforcement officers change their policy of killing people over property.

On April 18th a group of concerned citizens went to discuss this proposal with Sheriff Young of Martinez. The citizens enumerated the areas of doubt in the case of Denzil Dowell and requested that the officer who admitted doing the shooting be removed from duty pending an investigation. The Sheriff REFUSED to hear our request and we consider his action to be a racist disregard for the reasonable request of black taxpayers and citizens concerned with the survival of black people.

LET US ORGANIZE
TO DEFEND OURSELVES

"We believe we can end police brutality in our black community by organizing black self-defense groups that are dedicated to defending our black community from racist police oppression and brutality. The Second Amendment of the Constitution of the United States gives a right to bear arms. We therefore believe that all black people should arm themselves for self defense." (from the program of the Black Panther Party for Self Defense, Point No. 7 of "What We Believe")

WHY MUST BLACK PEOPLE ORGANIZE?

---The murder of Denzil Dowell April 1, 1967 her in North Richmond;

---The murder of two black Brothers a week before last Christmas here in North Richmond;

---The brutal beating of a black woman here in Richmond;

---The killing of George Thompson in Hunters Point, San Francisco (Con't Page 3)

# EXHIBIT 26 – 55



in September, 1966;

--The beating of a 14 year old girl in East Oakland in October 1966.

These are only a few of the murders and brutal beatings by racist cops that have happened and been reported in the newspaper and are known about in the black community.

BROTHERS AND SISTERS THESE RACIST MURDERS ARE HAPPENING EVERY DAY; THEY COULD HAPPEN TO ANY ONE OF US.

BROTHERS AND SISTERS WE MUST UNITE. MANY OTHER MURDERS AND BRUTAL BEATINGS HAVE TAKEN PLACE WITHOUT US DOING MUCH OF ANYTHING BUT LET'S STOP IT NOW!

WITH
SOME
REAL
NITTY GRITTY
POLITICAL ACTION

# ARMED BLACK BROTHERS IN RICHMOND COMMUNITY

15 Black Brothers, most of them armed; with Magnum 12 gauge shot guns, M-1 rifles, and side arms, held a street rally at the corner of Third and Chesley in North Richmond last Saturday afternoon about 5 P.M. The nice thing about these Bloods is that they had their arms to defend themselves and their Black Brothers and Sisters while they exercised their Constitutional Rights: Freedom of Speech, and the right to Peacefully Assemble. And while they exercised another Constitutional right: the right to bear arms to defend themselves.

The racist cops could only look on. The Dog Cops made no attempt to break up the meeting like they generally do when Black people get together to sound out their greviances against the white power structure. The point to get firmly into your mind is that both the Black Brothers and the racist cops had "POWER". They had righteous "GUN POWER", but the significant thing is that the Black Brothers had some of this POWER. In the (con't page 4)

# MEETING

APRIL 29TH

EVERYBODY

THIS COMMING SATURDAY

SO WE'LL KNOW WHAT TO DO AND HOW TO DO IT NOW!

1717 SECOND STREET

NORTH RICHMOND

AT 1:30 P.M.

EXHIBIT 26 – 56

| Page 4 | THE BLACK PANTHER -- April 25, 1967 |

past, Black People have been at the mercy of cops who feel that their badges are a license to shoot, maim, and out-right murder any Black man, woman, or child who crosses their gun-sights. But there are now strong Black men and women on the scene who are willing to step out front and do what is necessary to bring peace, security, and justice to a people who have been denied all of these for four hundred years.

At this rally, the Brothers were uptight and knew exactly what they were doing at all times. They knew that they were acting strictly within their rights. These Brothers have become aware of something that the white racists have been trying to keep secret from Black people all the time; that a citizen has the right to protect himself. They were ready to insure that the rally went ahead as planned, without any interference from outlaw cops who wanted to suppress the meeting so that other Black People would not get the message.

Black People must realize that the time is short and growing shorter by the day. Check it out. People talk about "Power". There is White Power, Black Power, Yellow Power, Green Power, etc, but all Black People want out of all these different forms of Power is BLACK POWER. Black People want and need the power to stop the white racist power structure from grinding the life out of the Black Race through the daily operation of this system which is designed to exploit and oppress Black People.

The beautiful thing about the Brothers who held the rally is that they are organized, disciplined and politically aware of all the ins and outs of the problems facing Black People throughout the Bay Area in particular. When the cops came rolling up looking, the brothers spreaded out all across the street waiting for some fool cop to try and start something. The brothers were organized.

So, Brothers and Sisters everywhere: righteous BLACK POWER organized is where its at. The BLACK PANTHER PARTY FOR SELF-DEFENSE really has something going. These brothers are the cream of Black Manhood. They are there for the protection and defense of our Black Community. The Black Community owes it to itself, to the future of our people, to get behind these

brothers and to let the world know that black people are not stupid fools who are unable to recognize when someone is acting in the best interest of Black People. These Brothers have a political perspective. Most important, they are down here on the GRASS ROOTS LEVEL where the great majority of our people are. The BLACK PANTHER PARTY FOR SELF DEFENSE moves. The PARTY takes action. Everybody else just sits back and talk. All Black People know what needs to be done, but not all of them are willing to do it. The White man has instilled fear into the very hearts of our people. We must act to remove this fear. The only way to remove this fear is to stand up and look the white man in his blue eyes. Many Black People are able nowadays to look the white man in the eyes--but the line thins out when it comes to looking the white cops in the eye. But the white cop is the instrument sent into our community by the Power Structure to keep Black People quiet and under control. So it is not surprising that the action these days centers around the conduct of these white cops who come from way across town to patrol our communities for 8 hours a day. But Black People have to live in these communities 24 hours a day. So it is time that Black People start moving in a direction that will free our communities from this form of outright brutal oppression. The BLACK PANTHER PARTY FOR SELF DEFENSE has worked out a program that is carefully designed to cope with this situation.
BLACK MEN!!! It is your duty to your women and children, to your mothers and sisters, to investigate the program of the PARTY. There is no other way. We have tried everything else. This is the moment in history when Black People have no choice but to move and move rapidly to gain their freedom, justice, and all the other ingredients of civilized living that have been denied to us. This is where it is at. Check it out, Black Brothers and Sisters! This is our Day!!!!!

# EXHIBIT 26 – 57

MAY 2  1967

Richmond, Calif
29 Apr 67

TO: Chief Brown
     Capt. Bacon
     Lt. Phelps
     Sgt. Garfield
     Off. Rawson

Dear Sirs:
     On this date, at app. 1:30 PM I drove into the area of 1717
2nd St., Richmond, Cal.  This was the area of the so called Black
Panther rally.  At this time there were app. 100 people in the
immediate area just milling about, of this number there were app.
20 juveniles ranging in age from 10 to 16 years.  The first sight
I noticed was armed guards.  At 1717 2nd St an armed guard was
stationed on top of the building with a carbine, across the street
another guard was stationed on a building with a shotgun.  There
were two men at both ends of the 1700 block of 2nd St, both armed
with side arms and pistol belts.  I asked one of the guards as to
their number and he replied, there were 16 of the panthers at
the rally.  I noted that there were about 4 white persons in the
group around the speaker, there was also a man that appeared to
be chinese wearing a sidearm.  I noted four people in the crowd
taking pictures and one person with a tape recorder.  As the
speaker began to speak the crowd grew larger to about 150 to
200 people.  This number did not last long but soon returned to
about 100 people.  A great number of people drove by the area
and saw the crowd, parked their cars and went into the area to see
what was happening.  After about ten minutes these people would
return to their cars and drive on.  I talked to several of these
persons and received replys such as "This is what's happening baby-
We should have did this a long time ago-We shall overcome-They
found out the truth and are telling the people about it."  In more
common terms these statements ment that the Black people were going
to take over, it is right for the Black man to arm himself against
the white man and the Black Panther party was telling the people
the truth about the death of Denzil Dowell.
     At this point I moved closer to the speaker to hear his speech
The speaker was un-identified to me, But during my stay in the
area he was the only person who took the platform.  He spoke
on black unity against the white opressor, namely the white cop
who is the enforcer for the white power structure.  The speaker
stated that the only way to keep the white cop from killing off
the Negro community was to arm themselves as a safety measure.
This message was met with a mixed reaction from the crowd.
The speaker received his greatest cheers from the young Negros
in the crowd, mostly teenagers.  The speaker spoke of the great
injustices that have been done to the Negro people for the
past One hundred years and of the liberties that has been taken
with Negro women by the White man. These statements were also

Page 1 of 2

# EXHIBIT 26 – 58

Page 2 of 2

met with a great response from the crowd. After speaking on these subjects for some lenth the speaker then went into the crowd and big what appeared to be trying to sign young fellows into the movement. After trying this for about ten minutes the speaker would again take the platform.  At this point I was recognized as a Richmond Police Officer and I therefore left the area. I did stay in the area for another half hour and I noted that the crowd did not swell to any greater number.

T. D. Nelson

Pat. 591P
Richmond Police Dept

# EXHIBIT 26 – 59

MEMO TO:  ASSEMBLYMAN DON MULFORD              April 21, 1967

FROM:  MARVIN C. BUCHANAN

RE:  BLACK PANTHERS
     RICHMOND, CALIFORNIA

On April 19, 1967, Walter Pdretti, Chief, San Pablo Police
Department, advised that on April 17, 1967, his department had
had some difficulties with a group of negroes who he assumed were
either members of the Black Panthers or the Black Muslims.

He stated that this difficulty had been sparked by an incident at
the Walter Helms Junior High School at the Park Plaza in San Pablo,
California.  The incident occurred on Tuesday, April 11, 1967 and
it involved the disciplining of a negro boy by the Dean of Men,
a Mr. Perrone (or Carrone).  The boy had been misbehaving and the
school authorities had obtained permission from the boy and his
guardian to discipline him.  At the time the Dean of Boys attempted
to administer the discipline, the boy suddenly decided he did not
want to be disciplined and in the ensuing struggle, slipped from
the grasp of Mr. Perrone and injured his head.

Chief Pdretti stated that he actually did receive quite a noticable
bruise.  The guardian immediately thereafter took the boy to two
different doctors and an attorney then ultimately brought him to
the Police Department to make a complaint.

He advised that the incident would have died down, except that a
few parents with the assistance of an organization, which he
believed to be either the Black Panthers or the Black Muslims, had
kept the incident alive.

He advised that on April 17, 1967, one of his officers drove by a
group of negroes who had gathered at the Walter Helms School and
in one automobile he observed an ammunition bandolier, a carbine,
military type, and a .380 pistol inside of a car.  He stated that
there were no weapons in evidence on the person of any of the people
in the group and no other weapons of any kind were seen.  The officer
stopped immediately upon seeing the weapons and inquired about them.
A negro named (FNU) Newton stated that the car was him and the weapons
also were his.  He furthermore pointed out to the officer that he had
a constitutional right to carry arms and made several snide remarks
to the Officer.  In the meantime the officer found himself encircled
by the group and becoming apprehensive, he called for assistance.
The Chief and other supporting officers arrived shortly thereafter
and after a short conference, the negroes drifted away.  He stated
that there were several hecklers who made comments such as, 'we are
used to police harassment' and 'we are going to get justice,' etc.

Chief Pdretti stated that a small group of the negroes entered the
Walter Helms School along with the principal, a Mr. Lyons.  After

cc - 1 - Walthall

# EXHIBIT 26 – 60

BLACK PANTHERS                    -2-                    April 21, 1967

they got inside the school, they interviewed some of the children
and made voice recordings of the interviews.  Lyons then demanded
the immediate arrest of the people inside the school.  Chief
Pdretti pointed out, however, that the group had accompanied him
into the school.  Lyons stated that they were not in the school
by his invitation.  Pdretti told him, however, that they were
inside with his implied consent because he made no objection
and furthermore, other parents were inside of the building along
with the protesting negroes and he would not be able to sustain
a conviction by singling out only those that Lyon wished removed
from the school.

Chief Pdretti stated that there were approximately 30 to 35 men
and women in the group of negroes who were protesting.  He did
not know how many had actually gone inside the school but he
believed that there had been about 9 or 10.  He estimated there
were 8 or 9 women in the group of 30 to 35.  He advised that
among those in the group who entered the school, he believed was
Beverly Axelrod, who is believed to be a member of the American
Federation of Teachers and an activist who has been involved in
many of the protest movements on UC Campus.

The Chief stated that no photographs of this group or their
activities were taken as far as he knew.  He stated that Jack
Frances, investigator for the Contra Costa Prosecuting Attorney's
Office was probably more familiar with the activities of this
group than was anyone else in the area.


hmh


# EXHIBIT 26 – 61

HALL   OF   JUSTICE

Richmond, California

April 19, 1967

TO:    C. E. BROWN, CHIEF OF POLICE

FROM:  R. RAWSON, DETECTIVE

This past week has brought an outside group into our community known as the "Black Panther Party." Their interest was focused because of the shooting of the burglar, Dowell, by a deputy sheriff and the alleged slugging of a student by a counsellor at Helms Junior High School.

The following narration covers largely only the activities of this week, April 17th through April 18th.

Mr. Nejedly agreed to meet with the family of the deceased after the Dowell inquest should there be any questions still in their minds. Apparently there were so a meeting was set for Monday, April 17th at 10:00 a.m. in the office of Dave Williams, Community Organizer, Council of Community Services.

Mr. Nejedly kept the appointment and found possibly one member of the family – possibly the mother of the deceased but not introduced – plus a representative group of the so-called Black Panthers led by Curtis Lee Baker, also known as "Black Jesus." The Black Panthers were fully armed with shotguns, rifles, cartridge belts of ammunition and side-arms.

After the meeting, the Black Panthers were seen around the Walter Helms Junior High School. Curtis Lee Baker and Bobbie Seale were identified as two of them. Guns were not seen but the ammo belts were in evidence. An unknown number of the Black Panther group entered the school property, engaging some of the youth in conversation and making obvious derogatory remarks about the school.

Marvin Smith had occasion to be at the Council of Community Services' office and saw the group of Black Panthers sitting in the meeting room adjacent to the business office. Officer Smith saw one person with a side-arm but saw no rifles or shotguns. Also present at this gathering was Nobel Coleman, who works with Rudy Webbe of the Dynamic Youth Group. Smith also observed a quantity of literature apparently brought in by the Black Panthers.

Officer Smith, it should be noted, was at the Council of Community Services on another matter and paid little attention to the described meeting. It should also be noted that he did not see Mr. Dave Williams or Mr. Nejedly but was made aware of Mr. Nejedly's presence.

# EXHIBIT 26 – 62

CHIEF BROWN – page 2                          April 19, 1967

Mr. Nat Shaffer called my office, stating that rumors were out
that Mr. Dave Williams had Curtis Lee Baker as his house guest and had
in fact invited him and his followers to the meeting with Mr. Nejedly.
Mr. Shaffer assured me that this was not true.  Mr. Williams was as
surprised as Mr. Nejedly when they made their bold appearance.

Mr. Shaffer stated that the Welfare Rights Organization had set up
the meeting between the Dowell family and Mr. Nejedly.  Mr. Williams is
the Staff Supervisor for this group.

The issue thought to have motivated the Black Panthers to the
Richmond area was the death of the burglar suspect, Dowell, by the hands
of a deputy sheriff.  However, it would appear that they have a second
interest in the incident at Helms Junior High in which a North Richmond
student was alleged to have been injured by a school employee.

It is also alleged that Curtis Baker called a meeting for Friday
evening at a local park.  It is further alleged that the meeting was
announced over one of the bay area radio stations, possibly KDIA.  There
was some confusion as to where the meeting would be – 10th and Virginia
or 10th and Lucas, both being public parks.  A group did gather at 10th
and Lucas and a patrol car drove by.  A number of persons were at the park.
There was some name calling from the crowd to the officer, one being, "White
Devil."  It is also alleged that the Black Panthers requested the use of
Neighborhood House on N. Jade Street but were refused.  Another building
leased by Neighborhood House on Alamo Street in Richmond was used for a
meeting.  Mr. Red Stephenson was contacted regarding the meeting on Alamo
Street and he stated he had also heard this but it had not been verified.

At 6:00 p.m., April 18th, Sergeant Laird called me by phone, stating
that two men from the Governor's Office were at the station and wished to
discuss the current unrest with me.  I called Captain Bacon and we both
returned to the station.  We were met by Mr. Ray Norton of the Governor's
office and Mr. John K. Ford of the Lieutenant Governor's office.  We
filled them in on the local rumble, pointing out our concern for the
interest and activities of the Black Panthers in the Richmond area.  These
men will be in the Bay Area until Friday and agreed to meet with either Captain
Bacon or me on Thursday.

Attached hereto are three articles of interest:

    1.  A four-page explanation as to who the Black Panther
        Party is and what they believe in.  Also, the words
        of a song they are pushing.  All material furnished
        by them and left in the Council of Community Services.

    2.  A confidential report furnished by the Oakland Police
        relative to some Black Panther activities.

    3.  A list of twelve demands made upon the Richmond
        Unified School District, Walter T. Helms Junior
        High School in particular.

# EXHIBIT 26 – 63



County of Los Angeles
Office of the Sheriff
Hall of Justice
Los Angeles, California 90012

PETER J. PITCHESS, SHERIFF

April 19, 1967

Mr. Patrick D. McGee
17304 Sherman Way
Van Nuys, California 91406

Dear Pat:

I know that this is a busy time of the year for you and for that reason I shall be as brief as possible.

As a representative of the people I know you are vitally concerned with the crime situation that presently exists in Los Angeles County. It is a dangerous condition and is increasing daily. Until we are able to root out the causes of crime we are going to have to use direct measures to stop it. This can only be done with a sufficient force of law enforcement officers. My Department is greatly understaffed and I am unable to provide for the safety of our citizens. Repeated pleas have been made to the Los Angeles County Board of Supervisors to provide the incentives to recruit and retain Deputy Sheriffs. These pleas have been all but ignored.

These circumstances compel me to request your assistance in pointing out to the Board of Supervisors the seriousness of the situation. For your convenience I have enclosed a copy of a letter recently sent to them. Any positive action you can take in this matter will be greatly appreciated.

Sincerely,

PETER J. PITCHESS
SHERIFF

# EXHIBIT 26 – 64

From ASSEMBLYMAN DON MULFORD                                  Date 3-27-67

To George Murphy                                              Re: Private armies

#14707

Research the attached for bill that would control private armies. I am particularly interested in legislation that would control firearms being carried by organizations such as the BLACK PANTHERS without ~~infrig~~ infringing on the rights of legitimate hunters to carry arms.

Prepare bill ~~[illegible]~~ to cover above

Bill to ~~[illegible]~~ prohibit public displays.

Don Mulford

By Clyde Walthall

#14707

MAR 17 1967

MEMO TO:  ASSEMBLYMAN DON MULFORD        March 16, 1967

FROM:  MARVIN C. BUCHANAN

RE:  BLACK PANTHERS
PROPOSED LEGISLATION

On March 16, 1967, Captain John Arca, Oakland Police Department, telephonically contacted the writer at the Legislative office and advised that there was a group of "Black Panthers" now located in Oakland. He stated that these negroes were violently anti-white and carried loaded shotguns around with them and had 45 automatics strapped on their hips.

He stated that he was very apprehensive concerning this developing situation and was fearful that there would be a "shoot-out" in the not too distant future. He was fearful that innocent bystanders might also be injured.

He was hopeful that some kind of corrective legislation might be initiated but was well aware that this would be fought by the National Rifle Association. He stated that he would prepare some information on the subject and contact the writer or Assemblyman Mulford.

He requested that the writer contact him at the station in order that he might take the writer on a tour to exhibit precisely what is developing.

cc - 1 - Buchanan

hmh

# EXHIBIT 26 – 66

2150 FRANKLIN STREET
OAKLAND, CALIFORNIA 94612
836-3050

SACRAMENTO ADDRESS
STATE CAPITOL
95814
445-7554

COMMITTEES
WAYS AND MEANS
GOVERNMENT ORGANIZATION
PUBLIC HEALTH
LEGISLATIVE REPRESENTATION
RULES EX OFFICIO

# Assembly
# California Legislature

### DON MULFORD
MEMBER CALIFORNIA LEGISLATURE, SIXTEENTH ASSEMBLY DISTRICT

CHAIRMAN
MINORITY CAUCUS

Dear

I have received many letters regarding gun legislation.

I am the author of the first gun control law to be passed in
California in many years and, in my opinion, one of the
toughest laws to be passed in the United States on the subject
of gun control.  I enclose letters from law enforcement officials
reporting on the effectiveness of this law.

We are in the final few weeks of this Session of the Legislature.
It is my understanding that a gun control bill will be introduced
within the next few weeks.  I intend to examine this legislation,
if introduced, very carefully.  I personally believe the subject
requires federal legislation in order to be truly effective.  What
good is it to have a California gun law if a person may obtain a
gun from the neighboring states of Nevada, Arizona, and Oregon,
or through the mail.

This is a serious and complex problem.  I assure you I will
approach the subject very seriously.

I appreciate hearing from you on this subject.

Sincerely,

DON MULFORD

hrt
Enclosures - 3

# EXHIBIT 26 – 67

OFFICE OF
C. E. BROWN
CHIEF OF POLICE



CALIFORNIA



December 22, 1967

Hon. Don Mulford, Assemblyman
2150 Franklin Street
Oakland, California 94612

Dear Sir:

I thought you might be interested in the fact that the
revisions of the Penal Code concerning the carrying of loaded
firearms, under your instigation, were very important to our
citizenry last night.

Co-incidental with the funeral services in our city of a
murdered San Francisco Police Officer, two alleged black panthers
were observed carrying a .30 caliber MI Carbine in our downtown
business area. We also had other problems from the panthers
directly connected with the funeral.

Because of the new teeth in the law, we were able to minimize
the effect the panthers wished to convey by searching and identify-
ing them and their weapon.

No arrest was made because the weapon was not loaded and ammunition
was not immediately available to them. We were, however, able to im-
mediately allay the fears of merchants and citizens present.

It also enabled us to legally contact, identify and surveille
the men without fear of being accused of illegal search or harrass-
ment.

Thanks for the good work on behalf of law enforcement.

Very truly yours,

C. E. BROWN
Chief of Police

CEB:ML

# EXHIBIT 26 – 68

# Armed Foray In Assembly Stirs Wrath

### By ED SALZMAN
#### Tribune Capital Bureau

SACRAMENTO — Shocked by an invasion by armed members of the Eastbay's "Black Panther Party For Self Defense," the Assembly today appears prepared to enact tough legislation prohibiting anyone from carrying a loaded gun in public.

A d o z e n Panthers carrying l o a d e d rifles, pistols and shotguns yesterday knocked down a sergeant-at-arms and barged into the Assembly chamber while the House was in session.

About 25 more armed men, most of them from the Eastbay, circulated in the Capitol at the same time to protest a bill by Assemblyman Don Mulford, R-Oakland, outlawing carrying of loaded w e a p o n s on a public s t r e e t or in a public place.

Upon departure from the capitol, 24 of the Panthers aged 17 to 25 were arrested.

About four hours after the invasion, the Assembly Criminal Procedure Committee met to consider Mulford's bill.

The assemblyman a s k e d that the committee take the measure under submission—but only to give him time to prepare amendments tightening up the bill and making it a felony for anyone to enter the legislative chambers carrying a loaded weapon.

He also reported he must resolve a constitutional question about the right to bear arms.

Some members of the committee said that they were willing to go even further than Mulford and enact comprehensive gun-registration laws.

Assemblyman J o h n T. Knox, D-Richmond, suggested an u r g e n c y clause which would place the bill into effect

Continued Page 5, Col. 1

## 'Panther' Invasion Shocks Assembly

Continued from Page 1

immediately after it is signed by the governor.

The invasion of the Assembly began when S e r g e a n t-At-Arms James Rodney was knocked down attempting to prevent the armed band from entering the chamber.

The Panthers were surrounded by cameramen as they entered the chamber. Assemblyman Carlos Bee, D-Hayward speaker pro tempore, was presiding and spotted only the photographers.

"Sergeant-At-Arms," h e shouted, "will you remove the cameramen? They have no permission to be in this chamber."

Sergeant-at-arms T o n y Beard managed to expel both the photographers and the Panthers. "They broke right through the men guarding the entrance to the chamber," he reported. "We hustled them out as fast as we could."

State police temporarily disarmed the men. The weapons were returned unloaded.

Meanwhile, Mulford told the Assembly that there had been an "historical invasion and I am shocked beyond belief." He said his bill is directed against "this same type of shocking episode."

Panther Boby Seale, 30, of Oakland, said his group was protesting "the racist Oakland police" and demonstrating for the right to bear arms.

The armed visitors handed out mimeographed s h e e t s signed by Huey P. Newton, identified as the party's "minister of defense."

The leaflet stated that the "racist California L e g i s l a-ture" is considering a bill "aimed at keeping the black people disarmed and powerless at the very same time that racist police agencies throughout the country are intensifying the terror, brutality, murder and repression of black people."

Bobby Seale, 30, of Oakland, said his group was also protesting what he called the "racist" shooting April 1 of Denzil Dowell, 22, a Richmond laborer killed by a Contra Costa sheriff's deputy investigating an a t t e m p t e d burglary in North Richmond.

A coroner's jury ruled the death justifiable homicide.

Two of those arrested yesterday were Dowell's brothers, James, 17, and George, 26.

1

OAKLAND TRIBUNE
May 3, 1967

The armed band left the Capitol just before Gov. Ronald Reagan was scheduled to join a group of Pleasant Hill youngsters for a picnic on the west lawn of the Capitol.

The governor was mobbed by newsmen and spectators. As a result, the luncheon was moved indoors to Reagan's office.

"Americans don't go around carrying guns with the idea of using them to influence other A m e r i c a n s," Reagan declared. "This is a ridiculous way to solve p r o b l e m s ... anyone who would approve of this type of demonstration must be out of his mind."

By the time the committee met to consider Mulford's bill,

most of the Panthers were under custody of the Sacramento police and there was no need for a heavy police guard in the committee room.

Mulford said the bill was proposed by law enforcement officials as a result of incidents in Alameda and Contra Costa Counties.

Some of the problems, he emphasized, have been caused by Caucasians "and this has nothing whatsoever to do with the charge that it is pointed at one ethnical group."

Police, Mulford declared, are becoming alarmed at the number of bands of armed citizens "intimidating and coercing people in the streets of our communities."

Supporting the bill were Dist. Atty. John A. Nejedly Dist. Atty. John A. Nejedly and Undersheriff Harry Ramsey of Contra Costa County, Deputy Chief Joseph J. Veretto of the Oakland Police Department and Jules Lyons, principal of Walter T. Helms Junior High School in San Pablo.

They described a series of incidents in Clyde, Orinda, North Richmond, and Oakland in which armed bands have become serious problems for police.

# EXHIBIT 26 – 69

June 21, 1967

The Honorable Fred Maggiora
Councilman
City Hall
Oakland, California

Dear Fred:

I thought you would be interested to learn that Assembly
Bill 1591, which I authored, was passed in the Assembly
on June 3, 1967.

I enclose an amended copy.

The measure prohibits unauthorized persons from carrying
loaded weapons on a public street or in a public place.
It does not discriminate against the legitimate sportsman
or the private citizen who keeps a loaded weapon in his
home.   It does not violate the Constitutional rights of
citizens to protect themselves.   The intent of the
measure is to discourage armed gangs from roaming our
streets and intimidating citizens with loaded weapons.

I appreciate hearing from you on legislative matters of
concern to you.

                    Cordially,


                    DON MULFORD

DM:bmk
Enclosure


# EXHIBIT 26 – 70

OFFICE OF
C. E. BROWN
CHIEF OF POLICE

*City of Richmond*
CALIFORNIA

APR 2 7 1967



April 26, 1967

Honorable Don Mulford
State Assemblyman
Capitol Building
Sacramento, California

Dear Sir:

Enclosed is a report, prepared within this department, on the Black Panther movement.

I also have in my possession a report on the Black Panthers, prepared in the San Francisco office of the Federal Bureau of Investigation and dated April 20, 1967. It is marked confidential so I cannot send it to you, but I am sure they would send you one should you request it of them.

Your cooperation is appreciated.

Very truly yours,

C. E. BROWN
Chief of Police

CEB:DH
Encls.

# EXHIBIT 26 – 71

April 20, 1967

MEMORANDUM TO  PHILIP M. BATTAGLIA AND LYN NOFZIGER:

Dear Phil and Lyn:

In view of today's incident regarding task force personnel prowling around the University of California, I urge you to give serious consideration for a briefing of any personnel you are sending into the University.

Without knowledge of who are the good guys and the bad guys, I would challenge the accuracy of any information your task force people may obtain.  It all depends on the source of information.   As I have explained to you, Lyn, the cancer grows.

I respectfully request that you arrange a briefing session with the Governor, each of you and myself, plus others you may want to invite, to meet with Hardin Jones next Thursday.  Jones does not have classes on that day and is most anxious to talk with the Governor and bring him up to date on the current situation in view of Kerr's renewed activity.

I urge you not to sit on this because the organization is proceeding rapidly to strengthen itself in anticipation of a new president.  Any president will be seriously handicapped unless he has the capacity and courage to terminate the bad guys at the top as soon as he arrives. This is going to be difficult.

I submit that we must be constantly aware of what is happening if we are to protect the Governor on the Campus.

Sincerely,

DON MULFORD

# EXHIBIT 26 – 72

JOHN A. NEJEDLY
  DISTRICT ATTORNEY
JOHN B. CLAUSEN
  ASSISTANT DISTRICT ATTORNEY
GEORGE W. McCLURE
  CHIEF CIVIL DEPUTY
DONALD R. WALKER
  CHIEF CRIMINAL DEPUTY

INVESTIGATORS
  DAVID COOK JR., CHIEF
  JACK W. FRANCIS
  JOSEPH J. HAASZ
  CHARLES A. WYNNE
  WILLIAM R. PRICE

## OFFICE OF DISTRICT ATTORNEY

# CONTRA COSTA COUNTY

COURT HOUSE, 4TH FLOOR
P.O. BOX 670
MARTINEZ, CALIFORNIA. 94553
PHONE: 415/228-3000

DEPUTIES
CIVIL DIVISION
J. H. DISNEY
K. D. EWART
S. FISHMAN
W. W. McCOMBS
J. H. McSHARRY
V. H. PYNN
G. F. SWIFT
P. C. RANK
A. W. WALGHIA, JR.
V. J. WESTMAN

CRIMINAL DIVISION
W. H. BARTLETT
D. L. BOAZ

K. J. BRANCH
H. C. FRYER
G. L. GINDER
R. T. GONSALVES
B. D. GLENN
W. R. HARTMAN
J. D. HATZENBUHLER
L. F. HOLDRICH
S. H. MESNICK
J. S. ODA
D. M. QUINLAN
T. G. SMITH
L. L. SNYDEN
E. M. SWANN

April 20, 1967

Honorable Ronald Reagan
State Capitol
Sacramento, California

APR 21 1967

Dear Sir:

May I respectfully call to your attention recent incidents
in this area that may suggest consideration of legislation
to provide more effective controls in the area of
possession of firearms.

Incident to the peace demonstrations at Port Chicago,
certain residents of Clyde, an unincorporated community
near the Naval Ammunitions Base, armed themselves with
rifles and patrolled the streets, particularly at night.
I was concerned with the obvious possibilities, met with
these people and an agreement to terminate the carrying
of arms was reached.

In December, groups in Orinda, concerned about incidents
involving women and delays in securing Sheriff response,
similarly armed themselves and instituted a patrol service.
Again in meeting with these people we were able to secure
the termination of this practice.

Last Friday, a request was made to me, through the Council
of Community Services in Richmond, to meet with the family
of a young man killed by a deputy sheriff in the course of
a burglary. I met with the family in good faith only to be
confronted with an armed group, the Black Panthers. This
group was armed with pistols and shotguns and threatened
to obtain "justice" if their demands were not met.

Today, this same group is appearing before the County
Administration Building similarly armed, apparently as
an incident to a meeting arranged with Sheriff Young on
the same matter.



# EXHIBIT 26 – 73

Honorable Rona  Reagan        Page 2        April 20, 1967

As the acts of carrying a firearm of these types are not per se a violation of the law, I respectfully bring these conditions to your attention.  I am concerned as to the possibilities, particularly when one realizes that in the last instances, we are dealing with a group not sensitive to reasonable decisions.

                              Very truly yours,


                              John A. Nejedly
                              District Attorney

JAN:ems

cc:  Assemblyman Don Mulford

# EXHIBIT 26 – 74

April 21, 1967

The Honorable Ronald Reagan
Governor of California
State Capitol

My dear Governor:

Regarding the copy of letter from John A. Nejedly, District Attorney, Contra Costa County, I have introduced AB 1591, which will be polished with the addition of amendments.   The Black Panther movement is creating a serious problem.  The bill was inroduced at the request of the Oakland Police Department.

At the proper time, I shall discuss it with you because we may need your personal help.  I cannot help feeling that the people of this State are concerned about individuals armed with loaded weapons walking the streets of our communities in numbers.

Regarding the letter from Hardin Jones, I have requested that we all meet on next Thursday and bring Jones to Sacramento.  His letter underwrites the reason for this meeting.

Sincerely,

DON MULFORD

Enclosures
cc  Mr. Philip M. Battaglia
    Mr. Lyn Nofziger

# EXHIBIT 26 – 75

**BILL MEMORANDUM**

Date: July 28, 1967

TO   :  GOVERNOR REAGAN

FROM:  VERNON L. STURGEON
Legislative Secretary, Senate

JACK B. LINDSEY
Legislative Secretary, Assembly

Assembly
BILL No. 1591   By   Mulford

VOTE:  Senate         29 ayes
                       7 noes - Collier, Marler, Miller, Mills, Schmitz, Schrad
                                 Teale

Assembly

Assembly Bill No. 1591 prohibits the carrying of a loaded firearm
on one's person or in a vehicle while in any public place or on
any public street in an incorporated city or in any public place or
on any public street in a prohibited area of unincorporated
territory, except for specified law enforcement officers, military
personnel, bank guards and messengers, sportsmen, private investiga-
tors and patrol operators, and persons authorized to carry concealab
weapons.

The bill prohibits bring a loaded firearm into, or possessing a
loaded firearm within, any public school, the State Capitol, any
legislative office, any hearing room in which a committee of the
Senate or Assembly is conducting a hearing, any office of the
Governor or other constitutional officer, the Governor's residence
or the residence of any other constitutional officer or the residenc
of any Member of the Legislature.

The bill is actively supported by law enforcement groups.

Assemblyman Mulford, the author, requests approval.


RECOMMENDATION: Approve


rw

# EXHIBIT 26 – 76

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of **PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** was served via United States Mail, postage prepaid, on this 9 , day of April, 2013; on the following:

KAMALA D. HARRIS
Attorney General of California
PETER K. SOUTHWORTH
Supervising Deputy Attorney General
JONATHAN M. EISENBERG
Deputy Attorney General
State Bar No. 184162
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Attorneys for Defendant California Attorney General Kamala Harris

AND

T. PETER PIERCE
LISA BOND
AARON C. O'DELL
RICHARDS WATSON & GERSHON
A Professional Corporation
355 South Grand Avenue, 40th Floor
Los Angeles, California 90071-3101
Attorney for Defendants:
CITY OF REDONDO BEACH and DOES 1 to 10

Charles Nichols
Plaintiff, In Pro Per
Case No. CV-11-9916 SJO (SS)