1    ROB BONTA
     Attorney General of California
2    R. MATTHEW WISE
     Supervising Deputy Attorney General
3    IRAM HASAN
     Deputy Attorney General
4    State Bar No. 320802
      455 Golden Gate Avenue, Suite 11000
5     San Francisco, CA 94102-7004
      Telephone: (415) 510-3793
6     Fax: (415) 703-5480
      E-mail: Iram.Hasan@doj.ca.gov
7    *Attorneys for Defendant Rob Bonta, in his*
     *official capacity as Attorney General of*
8    *California*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **CHARLES NICHOLS,** | 2:11-cv-09916-SSS-KES |
| Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **ROB BONTA in his official capacity as Attorney General of California,** | Date:      September 17, 2024 |
| Defendant. | Time:     10:00 a.m. |
| | Courtroom: 6D |
| | Judge:     The Honorable Sunshine S. Sykes |
| | Magistrate Judge: The Honorable Karen E. Scott |
| | Trial Date:   None set |
| | Action Filed: 11/30/2011 |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................... 1

Background ..................................................................................................... 2

    I.      California's Public Carry Laws ............................................ 2

    II.     Procedural History ............................................................. 4

    III.    Plaintiff's Remaining Claims ............................................ 5

Legal Standard ............................................................................................... 6

Argument ....................................................................................................... 6

    I.      California's Restrictions on the Unlicensed Open Carriage of Firearms Comport with the Second Amendment ................................. 6

          A.    The Plain Text of the Second Amendment Does Not Presumptively Protect Plaintiff's Proposed Conduct ................. 7

               1.    The Second Amendment Does Not Require Unlicensed Open Carry ..................................................... 7

               2.    The Second Amendment Does Not Require a Particular Manner of Public Carry ........................................ 9

          B.    California's Open Carry Restrictions Are Consistent with the Nation's Historical Tradition of Firearms Regulation ........ 10

               1.    Governments Have Long Regulated the Public Carry of Weapons ........................................................ 11

                     a.    Historical Licensing Requirements ..................... 11

                     b.    Historical Restrictions on the Open Carry of Weapons ................................................................ 14

                     c.    Distinction Between Urban and Rural Areas ....... 17

               2.    California's Public-Carry Restrictions Are Consistent with Historical Principles of Public-Carry Regulation ............................................................. 17

    II.     Plaintiff's Equal Protection Claim Fails as a Matter of Law ............. 20

Conclusion ................................................................................................... 22

Certificate of Compliance ........................................................................... 23

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Abed v. United States*
  278 A.3d 114 (D.C. 2022) ................................................................. 20

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986) ........................................................................... 6

*Antonyuk v. Chiumento*
  89 F.4th 271 (2d Cir. 2023) ............................................................. 14

*Atkinson v. Garland*
  70 F.4th 1018 (7th Cir. 2023) ............................................................ 8

*Baird v. Bonta*
  __ F. Supp. 3d __, 2023 WL 9050959 (E.D. Cal. Dec. 29, 2023) .............*passim*

*Baird v. Bonta*
  81 F.4th 1036 (9th Cir. 2023) .......................................................... 18

*District of Columbia v. Heller*
  554 U.S. 570 (2008) ........................................................... 1, 7, 8, 15

*Doe v. Bonta*
  101 F.4th 633 (9th Cir. 2024) ............................................................ 6

*Frey v. Bruen*
  No. 23-208 (2d Cir. 2023) ................................................................. 9

*Frey v. Nigrelli*
  661 F. Supp. 3d 176 (S.D.N.Y. 2023) ........................................... 9, 20

*Frlekin v. Apple, Inc.*
  979 F.3d 639 (9th Cir. 2020) ............................................................. 6

*Gallinger v. Becerra*
  898 F.3d 1012 (9th Cir. 2018) .......................................................... 21

*Honolulu Weekly, Inc. v. Harris*
  298 F.3d 1037 (9th Cir. 2002) .......................................................... 20

**TABLE OF AUTHORITIES**
(continued)

Page

*Ledezma-Cosino v. Sessions*
    857 F.3d 1042 (9th Cir. 2017) ................................................. 21

*McDonald v. Chicago*
    561 U.S. at 742 (2010) ........................................................... 8

*McRorey v. Garland*
    99 F.4th 831 (5th Cir. 2024) ................................................... 8

*Merrifield v. Lockyer*
    547 F.3d 978 (9th Cir. 2008) ................................................. 21

*Nat'l Ass'n for Gun Rts. v. Lamont*
    685 F. Supp. 3d 63 (D. Conn. 2023) ...................................... 20

*New York State Rifle & Pistol Ass'n v. Bruen*
    597 U.S. 1 (2022) ........................................................... *passim*

*Nichols v. Newsom*
    144 S. Ct. 569 (2024) ........................................................ 5, 7

*Nichols v. Newsom*
    9th Cir. No. 14-55873, Dkt. 148 ............................................. 5

*Nichols v. Newsom*
    U.S. No. 23-526, Dkt. 1 ......................................................... 5

*Nordyke v. King*
    681 F.3d 1041 (9th Cir. 2012) (en banc) ............................... 20

*Olson v. California*
    104 F.4th 66 (9th Cir. 2024) ............................................ 20, 21

*State v. Jumel*
    13 La.Ann. 399 (1858) ......................................................... 19

*Tyler v. Cain*
    533 U.S. 656 (2001) ............................................................. 14

*United States ex rel. Kelly v. Serco, Inc.*
    846 F.3d 325 (9th Cir. 2017) ................................................... 6

iii

1
2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3
4

*United States v. Perez-Garcia*
    96 F.4th 1166 (9th Cir. 2024) ........................................................... 11

5
6

*United States v. Rahimi*
    144 S. Ct. 1889 (2024) ............................................................... *passim*

7
8

*United States v. Salerno*
    481 U.S. 739 (1987) ................................................................... 6, 10

9

*Vincent v. Garland*
    80 F.4th 1197 (10th Cir. 2023) ........................................................... 8

10
11

**STATUTES**

12

United States Code, Title 18
    § 922(g)(8) ........................................................................... 17, 18

13
14

Act of 1776, 7 *Records of the Colony of Rhode Island & Province*
    *Plantations in New England* 567 ........................................................ 12

15
16

Act of 1777, Chapter 6, § 9, 24 *The State Records of North Carolina*
    89 (Clark ed., 1905) .................................................................... 12

17
18

Act of Dec. 1775, *The Public Records of the Colony of Connecticut*
    *from May, 1775 to June, 1776 inclusive* 193 ........................................... 12

19
20

Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut*
    *from May, 1775 to June, 1776 inclusive* 193 (Charles J. Hoadly ed.,
    1890) ................................................................................. 12

21
22
23

Act of May 1, 1776, Chapter 21, §§ 1-2, 5 *The Acts and Resolves,*
    *Public and Private, of the Province of the Massachusetts Bay* 479-
    81 (1886) ............................................................................. 12

24
25
26

Act of May 1777, Chapter 3, 9 *The Statutes at Large, being a*
    *Collection of All the Laws of Virginia from the First Session of the*
    *Legislature, in the Year 1619* 281-283 (Hening ed., 1821) ............................. 12

27

Act of June 13, 1777, Chapter 756, 9 *The Statutes at Large of*
    *Pennsylvania from 1682 to 1801* 111 (1903) ........................................... 12

28

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4

Act of Sept. 20, 1777, Chapter 40 § 20, *Acts of the General Assembly of the State of New Jersey* 90 ................................................................. 12

5

California Penal Code
6
 § 25640 ..................................................................................................... 4
 § 25850 ............................................................................................. *passim*
7
 § 25850(a) ................................................................................................ 4
 § 26010 ................................................................................................... 10
8
 § 26045 ............................................................................................. *passim*
9
 § 26050 ............................................................................................. 4, 18
 § 26150 ............................................................................................. *passim*
10
 § 26150(a) ......................................................................................... 3, 19
11
 § 26150(a)(4) .......................................................................................... 9
 § 26150(b)(2) .......................................................................................... 4
12
 § 26155 ............................................................................................. *passim*
13
 § 26155(a) ......................................................................................... 3, 19
 § 26155(a)(4) .......................................................................................... 9
14
 § 26155(b)(2) .......................................................................................... 4
15
 § 26185 ..................................................................................................... 9
 § 26185(a)(2) .......................................................................................... 3
16
 § 26190(f) ............................................................................................... 3
17
 § 26195 ..................................................................................................... 9
 § 26195(a) ............................................................................................... 3
18
 § 26202 ..................................................................................................... 3
 § 26202(d)(1) .......................................................................................... 3
19
 § 26350 ............................................................................................. *passim*
20
 § 26362 ................................................................................................... 10
 § 26366 ..................................................................................................... 4
21
 § 26400 ............................................................................................. *passim*
22

23
Senate Bill 2 (2023 Cal. Stats., ch. 249) ................................................. 2
 §§ 1(a), (j), (m), 2023-2024 Leg. Sess. (Ca. 2023) ........................... 21
24

25
Florida Statutes
 § 790.01 (effective May 21, 2015, to June 30, 2023) ....................... 8
26
 § 790.053 (effective May 21, 2015, to June 30, 2023) ..................... 8
27
 § 790.06(1) (effective June 29, 2021, to June 30, 2022) ................... 8
 § 790.06(12)(a) (effective June 29, 2021, to June 30, 2022) ............ 8
28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

CONSTITUTIONAL PROVISIONS

United States Constitution
  Second Amendment ......................................................................*passim*
  Fourth Amendment ............................................................................ 4
  Fourteenth Amendment ..............................................................*passim*

**INTRODUCTION**

California authorizes the concealed carry of weapons through shall-issue license laws that do not require any resident to show a special need for a permit. California also authorizes the open carry of weapons in counties of less than 200,000 people by individuals issued a permit to carry in the county by local authorities. California law otherwise prohibits the open carry of firearms, subject to certain exceptions, including where a person reasonably believes that carrying a firearm is necessary to prevent immediate danger to any person, or the property of any person. Cal. Penal Code § 26045.[1]

Plaintiff Charles Nichols brings a facial challenge under the Second Amendment, seeking to largely invalidate California's restrictions on the open carry of firearms in public places, codified in California Penal Code sections 25850, 26350, and 26400. Plaintiff believes that "no license is required for a private citizen to exercise his Second Amendment right to self-defense" by openly carrying a firearm throughout the State. Second Am. Compl. (SAC) at 30, 36. But his claim fails as a matter of law. "'Like most rights' . . . 'the right secured by the Second Amendment is not unlimited.'" *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). It protects the right to keep and "bear commonly used arms in public subject to certain reasonable, well-defined restrictions," including restrictions on "the manner of public carry" of firearms. *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 59, 70 (2022). It does not protect the unlicensed public carriage of firearms or a particular mode of carry. *See id*. at 17. Because California's laws adhere to those requirements by authorizing those with a permit to carry a concealed weapon throughout the State while placing certain geographic restrictions on the open carry of firearms, the analysis should end here.

---

[1] Unless otherwise indicated, citations herein are to the California Penal Code.

In any event, California's public-carry licensing scheme is consistent with the Nation's historical tradition of firearms regulation.  To justify California's public-carry laws, the government need only show that the law "comport[s] with the principles underlying the Second Amendment," not that it "precisely match[es] its historical precursors." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30).  Defendant has met that burden here.  As shown below, the open carry of firearms, particularly loaded firearms, was not a common practice for much of the Nation's history due to the limits of then-existing technology and then-prevailing social norms.  As technology improved and practices changed, governments regulated or prohibited the open carry of weapons and often required licenses for public carry— consistent with the longer tradition of regulating when and how individuals could carry arms in public.  Moreover, the tradition of regulating the manner of public carry dates back to when the Second and Fourteenth Amendments were ratified.  California's laws impose more modest burdens than the surveyed historical laws and are comparably justified.

Plaintiff's equal protection claim also fails.  Plaintiff's claim that he has suffered discrimination because open-carry licenses are only available to individuals who reside in counties with smaller populations is not subject to heightened scrutiny because he is not part of a protected class, and California's public-carry restrictions do not violate the Second Amendment.  California's open-carry licensing laws serve the legitimate State interest of public safety, and are therefore constitutionally sound under rational basis review.

Because there are no triable issues of fact and California's public-carry laws are constitutional as a matter of law, this Court should grant summary judgment for Defendant.

## BACKGROUND

### I.  CALIFORNIA'S PUBLIC CARRY LAWS

Following the Supreme Court's decision in *Bruen*, California enacted Senate

Bill 2 (2023 Cal. Stats., ch. 249) (SB 2) to implement a shall-issue permitting regime for the concealed and open carry of firearms in the state.[2]  Under current law, a licensing authority "shall issue or renew a license" to an applicant upon proof that the applicant (1) "is not a disqualified person" under section 26202; (2) is at least 21 years of age; (3) provides "evidence of residency within the county or a city within the county"; (4) "has completed a course of training" as described in the statute; and (5) is the recorded owner of the firearm for which the license will be issued.  §§ 26150(a), 26155(a).  Issuing authorities may also require psychological testing.  § 26190(f).  If the licensing authority determines that the applicant is not a disqualified person, it will notify the applicant to proceed with training requirements and submit fingerprints to the Department of Justice.  § 26202(d)(1).  The Department then "promptly furnish[es] the forwarding licensing authority information as to whether the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm."  § 26185(a)(2).  Licenses "shall not be issued if the [Department] determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm."  § 26195(a).

Concealed-carry permits allow individuals to carry their weapons concealed throughout the State.  With respect to the open carriage of firearms in public, licensing authorities in counties with populations of less than 200,000 persons "shall issue" licenses to carry "loaded and exposed in only that county a pistol,

---

[2] Since the operative complaint was filed in 2013, three of the statutes at issue in this case—Penal Code sections 25850, 26150, and 26155—were amended by SB 2 and became effective on January 1, 2024.  Among other changes, sections 26150 and 26155 no longer require a showing of good cause or good moral character to obtain a concealed-carry weapons permit.  Another contested statute, section 26400, was amended in 2017 to expand its scope to certain unincorporated areas of counties, and became effective on January 1, 2018.  The final statute challenged here, section 26350, remains unchanged since the SAC was filed.

revolver, or other firearm capable of being concealed upon the person."
§§ 26150(b)(2), 26155(b)(2).  The same requirements for obtaining concealed-carry
licenses apply to open-carry licenses.

Absent a concealed-carry or open-carry license, a person may not carry a
firearm in public.  *See* § 25850(a) (prohibiting the carry of a loaded firearm in
certain public places); § 26350 (prohibiting the carry of an unloaded handgun in
certain public places); § 26400 (prohibiting the carry of an unloaded firearm that is
not a handgun in certain public places).  But there are several exceptions to these
prohibitions.  There is a limited self-defense exception that authorizes individuals to
carry a loaded firearm if they reasonably believe it is necessary to protect
themselves or their property from immediate, grave danger, while awaiting the
arrival of law enforcement, if it is reasonably possible to notify them.  § 26045.
There is also an exception for a person making or attempting to make a lawful
citizen's arrest.  § 26050.  Neither exception requires a license or permit.  §§ 26045,
26050.  Additionally, licensed hunters and fishers may carry handguns while
engaged in those activities.  §§ 25640, 26366.

## II.  PROCEDURAL HISTORY

Plaintiff, a Los Angeles County resident, filed the operative second amended
complaint in March 2013, challenging on facial grounds California's public-carry
restrictions and open-carry licensing regime under the Second, Fourth, and
Fourteenth Amendments. ECF No. 83.  After filing the complaint, Plaintiff
voluntarily dismissed all defendants except the Attorney General.  ECF No. 125.

In November 2013, Plaintiff filed a partial motion for summary judgment
(ECF Nos. 131-136), and the Attorney General moved for judgment on the
pleadings (ECF No. 129).  A Report and Recommendation (R&R) issued in March
2014 addressed both motions.  ECF No. 162.  The R&R described the SAC as
raising "a single, multi-faceted claim under the Second, Fourth and Fourteenth
Amendments" and rejected each of Plaintiff's arguments.  *Id.* at 7, 12 n.10, 22-23,

26-28, 32-35, 42-43.  The district court accepted the R&R, denied Plaintiff's motion for partial summary judgment, granted the Attorney General's motion for judgment on the pleadings, and dismissed this action with prejudice.  ECF Nos. 162, 166-167.

In May 2014, Plaintiff appealed.  ECF No. 168.  The Ninth Circuit stayed the appeal of this Court's judgment while other cases addressing Second Amendment claims were pending.  ECF No. 173.  In September 2022, the Ninth Circuit issued an order vacating the district court's judgment and remanding the case for further proceedings consistent with *Bruen*.  ECF No. 180.  Plaintiff later filed a petition for rehearing en banc (*Nichols v. Newsom*, 9th Cir. No. 14-55873, Dkt. 148), followed by a petition for a writ of certiorari (*Nichols v. Newsom*, U.S. No. 23-526, Dkt. 1), and this Court stayed proceedings in the district court pending the outcome of those petitions (ECF Nos. 197, 200).  Plaintiff's petitions were denied.  *See Nichols*, No. 14-55873, Dkt. 152; *see also Nichols v. Newsom*, 144 S. Ct. 569 (2024).  In January 2024, this Court lifted the stay and updated the discovery and briefing schedule.  ECF No. 203.

## III.  PLAINTIFF'S REMAINING CLAIMS

In a December 2022 order, this Court clarified that only "Plaintiff's Second Amendment argument and Licensing Equal Protection argument" are before it on remand, "because the district court's prior ruling on those two arguments relied on pre-*Bruen* Second Amendment jurisprudence."  ECF No. 190 at 5.  Accordingly, the remaining issues before this Court are: (1) whether California Penal Code sections 25850, 26350, and 26400, which broadly criminalize the unlicensed open carriage of firearms in public places, violate the Second Amendment; and (2) whether Penal Code sections 26150 and 26155, which set forth licensing requirements for the concealed and open carriage of firearms in California, violate the Fourteenth Amendment's Equal Protection Clause because they restrict open-carry licenses to counties with populations of less than 200,000 people.  *Id*. at 2-3.

## LEGAL STANDARD

"Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). To survive summary judgment, a party "must establish *evidence* on which a reasonable jury could find for" that party. *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 330 (9th Cir. 2017). Where, as here, a plaintiff asserts a facial challenge to a state law, he must "'establish that no set of circumstances exists under which the [law] would be valid.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

## ARGUMENT

### I. CALIFORNIA'S RESTRICTIONS ON THE UNLICENSED OPEN CARRIAGE OF FIREARMS COMPORT WITH THE SECOND AMENDMENT

The Ninth Circuit's mandate requires the Court to apply *Bruen* to evaluate whether California Penal Code sections 25850, 26350, and 26400—which generally criminalize the unlicensed, open carriage of loaded and unloaded firearms in public places—violate the Second Amendment. ECF No. 162 at 10; ECF No. 180; ECF No. 190 at 2, 5; ECF No. 199. Put another way, this Court must determine whether, as Plaintiff claims, "law-abiding citizens have a right to openly carry firearms, loaded and unloaded, in non-sensitive public places for the purpose of self-defense" without a license. ECF No. 83 at 27, 30; *see Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024) (the "initial and critical inquiry" is to define the relevant "'proposed course of conduct,'" which is "what the plaintiffs wanted to do and what the challenged law prevented them from doing").

The Supreme Court has adopted a two-part test for assessing Second Amendment claims, requiring (1) the plaintiff to demonstrate that the Second

Amendment's plain text covers and presumptively protects the conduct at issue, and, if that is the case, (2) the government to show that the regulation of that conduct is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24; *see Rahimi*, 144 S. Ct. at 1887(explaining that "when [a] government regulates arms-bearing conduct," its burden is to demonstrate that "the challenged regulation is consistent with the principles that underpin our regulatory tradition."). Plaintiff's claim fails at both stages because the Second Amendment does not presumptively protect his proposed conduct, and even if it did, California's laws are consistent with principles that underlie the Nation's historical tradition of firearms regulation.

### A. The Plain Text of the Second Amendment Does Not Presumptively Protect Plaintiff's Proposed Conduct

#### 1. The Second Amendment Does Not Require Unlicensed Open Carry

Plaintiff seeks an injunction enjoining Penal Code sections 25850, 26350, and 26400 (*see* ECF No. 83 at 30, 37), but fails to meet his burden at the threshold because the plain text of the Second Amendment does not presumptively protect Plaintiff's proposed conduct—the unlicensed, open carriage of firearms. *See Bruen*, 597 U.S. at 17. *Bruen* confirmed that states may retain licensing regimes for the public carry of firearms, and explicitly approved shall-issue licensing regimes. *Bruen*, 597 U.S. at 13-15. *Bruen* clarified "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. But the Court did not announce a right to openly carry a firearm without a license. In fact, it has repeatedly cautioned that "[t]he right to keep and bear arms is . . . 'not unlimited.'" *Rahimi*, 144 S. Ct. at 1891 (quoting *Heller*, 554 U.S. at 626); *see Bruen*, 597 U.S. at 9, 15, 26, 29-31, 34, 38, 60, 70-71 & nn.8-9 (internal citations omitted)). The Supreme Court has also repeatedly explained that the Second Amendment "does not imperil every law

regulating firearms," *McDonald*, 561 U.S. at 786 (plurality opinion), that many "regulatory measures" concerning firearms are, in fact, "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26; and, most relevant here, that "shall-issue" licensing regimes are lawful so long as they are not "put toward abusive ends" (for example, where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry"), *Bruen*, 597 U.S. at 38 n.9.

Accordingly, governments remain free under the Second Amendment to enact and enforce "'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a permit.'" *Id*. That is what California has done. *See* §§ 26150, 26155. Such regimes are consistent with the Second Amendment because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9; *id*. at 79 (Kavanaugh, J., concurring) (The Second Amendment "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense.").[3]

Courts therefore have understood *Bruen* and *Heller* to say that "shall-issue" licensing schemes and similar background check requirements "are presumptively constitutional." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024); *see also Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). *Bruen* implicitly endorsed "reasonable, well-defined" restrictions on the public carrying of firearms, with "narrow, objective, and definite standards." *Id*. at 38 n.9, 69. And both the majority opinion and

---

[3] The Supreme Court cited with approval the "shall-issue" licensing schemes of 43 States in effect at the time. *See Bruen*, 597 U.S. at 14 n.1, 38 n.9. In Florida, for example, qualifying citizens in 2022 could obtain a license "to carry concealed weapons or concealed firearms" in public, but those licenses did "not authorize any person to openly carry a handgun." Fla. Stat. §§ 790.06(1), (12)(a) (effective June 29, 2021, to June 30, 2022). And like California, Florida enforced those limitations through criminal penalties. *See* Fla. Stat. § 790.01 (effective May 21, 2015, to June 30, 2023); *id*. § 790.053 (effective June 17, 2011, to June 30, 2023).

Justice Kavanaugh's concurring opinion approved of states continuing to require that a public carry license applicant first pass a background check—as California law does in section 26185 and 26195—and pass a firearms safety course—as required in sections 26150(a)(4) and 26155(a)(4).  *See Bruen*, 597 U.S. at 12-15, 78-79.  Notably, the Court endorsed such "shall issue" licensing schemes without conducting any historical analysis under *Bruen*'s second step.  Under the Supreme Court's jurisprudence, then, the Second Amendment's plain text does not prevent States from prohibiting the carrying of firearms by those who do not secure a license in the first instance.

### 2.   The Second Amendment Does Not Require a Particular Manner of Public Carry

While the term "bear" in "to keep and bear arms" requires some form of public carry, it does not require a particular manner of public carry.  U.S. Const. amend. II; *see Rahimi*, 144 S. Ct. at 1891, *see also Bruen*, 597 U.S. at 32, 59.  It has long been understood that "States could lawfully eliminate one kind of public carry" so long as they did not "ban public carry altogether."  *Bruen*, 597 U.S. at 53, 59; *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 199 (S.D.N.Y. 2023) (declining to preliminarily enjoin New York's open-carry laws because New York allows public carry), appeal pending sub nom.  *Frey v. Bruen*, No. 23-208 (2d Cir. 2023).  Accordingly, the Second Amendment does not require any right to openly carry when concealed carry (and open carry under more limited circumstances) is authorized, as it is in California.  *See id.* at 52.

In California, concealed-carry licenses are available to residents of all counties and, once issued, the licenses are valid in all counties.  §§ 26150, 26155.  Plaintiff does not challenge the concealed-carry licensing regime.  ECF No. 83 at 3-4.  Nor does he claim that he applied for or was denied such a license.  And it is undisputed that California law exempts all persons from criminal prosecution under the challenged statutes, regardless of locality, if a statutory exception applies—for

9

1  example, if a person possesses an appropriate license to carry a firearm or

2  reasonably believes it necessary to openly carry to prevent an immediate and grave

3  danger to any person or property.  §§ 26010, 26362, 26045.  Taken together,

4  California's law amply accommodates the right to publicly carry.[4]

5  **B.   California's Open Carry Restrictions Are Consistent with the Nation's Historical Tradition of Firearms Regulation**

6

7  The operative inquiry under *Bruen*'s second step is whether the challenged

8  regulation is consistent with the *principles* that underpin our regulatory tradition."

9  *Rahimi*, 144 S. Ct. at 1898 (emphasis added) (citing *Bruen*, 597 U.S. at 26-31).  To

10  demonstrate consistency with those principles, the government need not identify "a

11  'dead ringer' or a 'historical twin.'"  *Id.*; *see id.* at 1897 (observing that "some

12  courts have misunderstood the methodology of our recent Second Amendment

13  cases," and noting that those "precedents were not meant to suggest a law trapped

14  in amber").  Instead, the government need only show that "the new law is

15  'relevantly similar' to laws that our tradition is understood to permit" "in both why

16  and how it burdens the Second Amendment right."  *Id.* at 1898, 1891; *see id*. at

17  1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a

18  wider lens:  Historical regulations reveal a principle, not a mold.").  In ascertaining

19  the governing historical principles, it is appropriate to consider post-ratification

20  laws and practices.  *See, e.g.*, *id*. at 1900 (majority opinion); *id*. at 1916

21  (Kavanaugh, J., concurring) ("post-ratification history" can "be important for

22  interpreting vague constitutional text and determining exceptions to individual

23  constitutional rights").

24  Even if Plaintiff could show that California's restrictions on the unlicensed

25  open carriage of firearms implicate the Second Amendment, these restrictions are

26  constitutionally sound because they are consistent with "the historical tradition"

---

27  [4] For this reason, Plaintiff cannot satisfy his burden to show that "no set of circumstances exists under which the Act would be valid."  *Salerno*, 481 U.S. at

28  745.

that "delineate[s] the contours of the right" to keep and bear arms. *Rahimi*, 144 S. Ct. at 1897.

### 1.   Governments Have Long Regulated the Public Carry of Weapons

Historical analogues confirm that the challenged laws comport with the Second Amendment.  Plaintiff claims that California cannot "prohibit Plaintiff or similarly situated individuals from openly carrying a fully functional firearm (loaded and unloaded) for the purpose of self-defense (or for other lawful purposes) in non-sensitive public places[.]"  ECF No. 83 at 3.  But the historical "principles that underpin our regulatory tradition" do not support that argument. *Rahimi*, 144 S. Ct. at 1898.  Indeed, the unrebutted evidence from the government's experts establishes both that "licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons," Def.'s Stmt. of Unrefuted Facts & Concl. of L. Supp. Mot. for Summ. J. (SUF) 3, and that "the manner of public carry [of firearms] was subject to reasonable regulation." *Bruen*, 597 U.S. at 59.  The principles thus justify California's licensing and manner-of-carry statutory schemes.

### a.   Historical Licensing Requirements

Consistent with California's current regulatory scheme, "[w]eapons licensing or permitting was a widespread and varied regulatory tool utilized in America." SUF 4.  As it evolved, the Nation's historical tradition of regulating weapons and ammunition through licensing regimes represented "a more flexible form of government regulation[.]"  SUF 5.

Before formal licensing regimes became common, colonial governments identified classes of persons who were ineligible to possess or carry arms.  At the start of the Revolutionary War, for example, the Continental Congress recommended the disarmament of loyalists and those "notoriously disaffected to the cause of America."  SUF 6; *see also United States v. Perez-Garcia*, 96 F.4th 1166,

11

1186-89 (9th Cir. 2024) ("legislatures have long disarmed groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others").  Many colonies followed suit and enacted similar disarmament provisions.[5]

To carry out those measures, colonial legislatures also enacted regulatory requirements that were designed to determine whether individuals were prohibited from possessing arms.  In 1777, for example, Pennsylvania required all "male white inhabitants" to "take and subscribe" to a loyalty oath before a justice of the peace. Act of June 13, 1777, ch. 756, 9 *The Statutes at Large of Pennsylvania from 1682 to 1801* 111 (1903).  The justices were also required to "keep fair registers of the names and surnames of the person so sworn or affirmed," and those who "refus[ed] or neglecte[d] to take and subscribe the said oath" were to be "disarmed by the lieutenant or sub-lieutenants of the cities or counties respectively."  9 *Statutes at Large of Pennsylvania* 112-13.  Connecticut, Massachusetts, Rhode Island, North Carolina, New Jersey, and Virginia all required similar oaths and several provided for similar registration lists.[6]

Eighteenth and early-19th century governments also established licensing regimes aimed at regulating activities that posed a danger to the public—including

---

[5] *See, e.g.*, Act of Dec. 1775, 15 *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* 193 (Charles J. Hoadly ed., 1890) (disarming any person "duly convicted" of certain types of "libel or defam[ation]").

[6] Act of Dec. 1775, *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* 193; Act of May 1, 1776, ch. 21, §§ 1-2, 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-81 (1886); Act of 1776, 7 *Records of the Colony of Rhode Island & Province Plantations in New England* 567; Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Clark ed., 1905); Act of Sept. 20, 1777, ch. 40 § 20, *Acts of the General Assembly of the State of New Jersey* 90; Act of May 1777, ch. 3, 9 *The Statutes at Large, being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619* 281-283 (Hening ed., 1821).

the possession (or use) of firearms and other dangerous items.  In 1713, for example, Philadelphia penalized "'firing a Gun without a license,'" and other colonial laws from 1750 imposed criminal penalties on "'shooting . . . guns' or setting off fireworks" without "a 'governor's special license.'"  SUF 7.  And gunpowder—an item essential to the use of firearms—was extensively regulated through licensing.  SUF 8.

Licensing regimes increased in popularity following the Civil War, in part because of the "dramatic rise in the availability" of revolvers, which coincided with "a proliferation of interpersonal violence" in American communities.  SUF 9. Throughout this period, State and local legislatures required residents to acquire licenses after satisfying "review criteria and discretionary judgment of local officials who were empowered to grant carry licenses."  SUF 10.  Many jurisdictions also adopted surety laws "that required certain individuals to post bond before carrying weapons in public" as a method of insurance for any breaches of the peace.  *Bruen*, 597 U.S. at 55; *see id.* at 55-60 & n.23 (collecting examples); *see also Rahimi*, 144 S. Ct. at 1891.

Although the open carry of firearms was not a customary practice early in the Nation's history due to technology limitations and societal norms (SUF 11), licensing schemes regulating the open carry of weapons became more common over time.  *See, e.g.*, SUF 12 (providing examples of laws regulating the open-carry of firearms); *see also* SUF 13 (explaining that a wide range of concealed or public-carry licensing schemes became ubiquitous in the late 1800s)  For example, Jersey City enacted a law in 1873 that "bears great similarity to contemporary gun licensing schemes[,]" permitting its municipal court to grant permits to carry certain weapons and "impose such conditions and restrictions as the court shall deem proper."  SUF 14.  Further, "permits would not be granted to 'any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control.'"  SUF 15.  Municipalities in California, "[o]ne of the

earliest proponents of licensing as a way of regulating the carrying of pistols . . .
began passing ordinances that provided for licensing in order to carry a pistol in
public" after 1866.  SUF 16.  And Florida adopted a law in 1893 that made it
unlawful for any person "to carry around with him on his person and in his manual
possession [a] Winchester rifle or other repeating rifle" "without first taking out a
license from the County Commissioner of the respective counties."  SUF 17.

The widespread adoption of such licensing regimes is particularly notable
because the record contains no evidence that these regimes were ever determined to
be unconstitutional or even challenged on constitutional grounds.  *See Baird v.
Bonta*, __ F. Supp. 3d __, 2023 WL 9050959, at *26 (E.D. Cal. Dec. 29, 2023),
appeal pending, No. 24-565 (9th Cir. 2024); *see also Antonyuk v. Chiumento*, 89
F.4th 271, 320 (2d Cir. 2023) (concluding that licensing schemes "appear to have
existed without constitutional qualms or challenges").[7]  This is strong evidence that
licensing regimes are "part of the nation's tradition of firearm regulation" and thus
constitutionally sound.  *Id.* (emphasis omitted); *see Rahimi*, 144 S. Ct. at 1898 ("[I]f
laws at the founding regulated firearm use to address particular problems, that will
be a strong indicator that contemporary laws imposing similar restrictions for
similar reasons fall within a permissible category of regulations."); *see also Baird v.
Bonta*, 2023 WL 9050959, at *22 (observing that "[t]he Supreme Court has all but
confirmed that states may require people to obtain licenses before they carry
firearms in public" (internal citations omitted)).

### b.    Historical Restrictions on the Open Carry of Weapons

Historical regulators placed restrictions on particular methods of public carry
and often "eliminate[d] one kind of public carry" altogether.  *Bruen*, 597 U.S. at 59

---

[7] On July 2, 2024, the Supreme Court granted a petition for a writ of
certiorari in *Antonyuk*, vacated the Second Circuit's decision, and remanded for
further consideration in light of *Rahimi*.  Such an order is not a reversal on the
merits.  *See Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001).  The *Antonyuk* decision is
referenced for the persuasive value of its prior reasoning.

(emphasis omitted).  Such laws were in effect when the Second and Fourteenth Amendments were ratified, and even before the founding.  Def.'s Req. for Jud. Not. Supp. Mot. for Summ. J. (RJN) ¶¶ 1-26, 31, 33; *Id.*, Ex. 1-26, 31, 33; *Id.*, Ex 34 at RJN_138-166; SUF 18.  In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 597 at 20 (internal quotation marks omitted).  That "'*pre-existing* right'" was "'not unlimited.'"  *Id.* at 20, 21 (quoting *Heller*, 554 U.S. at 626); *see Rahimi*, 144 S. Ct. at 1889, 1897.  The right was understood as "a public allowance," subject to "due restrictions" necessary to protect the peace.  SUF 19.  Indeed, the public carry of firearms was generally prohibited in populous areas in England before the founding, with limited exceptions for community defense, law enforcement, and the upper class.  SUF 20.

For example, a 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives (SUF 21), and a 1686 New Jersey law prohibited the wearing of "pistols" and other specified weapons "privately," and also levied penalties for the open carrying of weapons (SUF 22). Several colonial governments adopted laws that prohibited the carry of firearms because the act was considered to be "in terror of the people."  SUF 23.  Those statutes punished individuals who "'went armed offensively'" in public places like "'fairs,'" "'markets,'" or "'in the presence of the King's Justices.'" SUF 24.

"[P]ublic-carry restrictions proliferate[d]" in the period after the ratification of the Second Amendment in 1791, most often "proscrib[ing[ the concealed carry of pistols and other small weapons," but certain jurisdictions also imposed restrictions on open carry. *Bruen*, 597 U.S. at 50, 52 n.16; SUF 25.  In the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other specified deadly weapons, whether they were carried in a concealed manner or openly.  SUF 26.  States also adopted less direct methods for discouraging the public carry of firearms, like imposing one- or ten-dollar taxes on

1  pistols and other specified weapons.  SUF 27.  Such laws were enacted in Florida in

2  1838 and North Carolina in 1850.  *Id.*

3       Public-carry restrictions increased in frequency during the Reconstruction era

4  and through the early-20th century.  SUF 28.  For example, an 1871 Texas law

5  criminalized the carry of certain weapons "on or about [one's] person, saddle, or in

6  his saddle bags . . . unless for provable self-defense or in service to the

7  government."  SUF 29.  Additionally, an 1875 Arkansas statute and an 1872

8  Nebraska City ordinance criminalized the carry of pistols and other firearms.  SUF

9  30.

10       These dangerous weapons laws are relevantly similar to California's open

11  carry regulations in light of their comparable burdens and justifications.  They all

12  restrict the manner of carry, and many have similar or near-identical provisions to

13  California's challenged regulations.  For example, like the exception in California

14  law allowing open carry if individual reasonably believe it is necessary to prevent

15  an immediate and grave danger to any person or property (§ 26045), an 1835

16  Massachusetts law and an 1847 Maine law prohibited the carrying of any dangerous

17  weapon, including pistols, "without reasonable cause to fear an assault."  RJN ¶ 20,

18  Ex. 20.  Other laws provided cities and towns specific authority to restrict or

19  prohibit the public carry of weapons.  *See, e.g.*, RJN ¶ 14, Ex. 14 (1837 Mississippi

20  law authorizing a town to enact "the total inhibition of the odious and savage

21  practice" of carrying dirks, Bowie knives, or pistols).

22       California itself has a long tradition of restricting the public carry of weapons.

23  In 1849, San Francisco prohibited the carrying of pistols, guns, and other weapons

24  with the intent to assault.  RJN, ¶ 27, Ex. 27.  A similar statewide prohibition was

25  adopted the following year.  *See* RJN, Ex. 28 (1850, California, ch. 125, div. 11, §

26  127).  An 1855 California law prohibited the display of weapons, including a pistol

27  or gun, in a threatening manner.  RJN, ¶ 20, Ex. 20.  An 1864 California law

28  prohibited the concealed carry of pistols and other weapons.  RJN, ¶ 29, Ex. 29.

And an 1878 City of Los Angeles ordinance prohibited all persons except peace officers and anyone traveling through the city from carrying a deadly weapon concealed or otherwise.  RJN, ¶ 30, Ex. 30.

### c.  Distinction Between Urban and Rural Areas

California's policy choice to allow open-carry licensing in less populated counties also fits within a long historical tradition of governments drawing distinctions "about the relative danger of deadly weapons in urban versus rural locales." SUF 31.  Governments have historically applied stricter requirements concerning the public carry of weapons in more urban centers versus rural locales. SUF 32.

For example, from 1852-1889, Colorado, Idaho, Montana, Arizona, New Mexico, and Wyoming prohibited the concealed carry of weapons in towns and settlements.  SUF 33.  Cities and towns located near western railheads likewise prohibited the carrying of any weapons within city and town limits.  SUF 34.  For example, Dodge City, Kansas passed such an ordinance in 1878.  SUF 35.  Laws restricting the public carry of weapons often made exceptions for long-distance travelers, who would openly carry because they were vulnerable to attack.  SUF 36. But this type of carry was "closely guarded" by requiring travelers to "check [their] weapons upon arriving to a town or to depart town as soon as [their] business was finished[.]"  SUF 37.

### 2.  California's Public-Carry Restrictions Are Consistent with Historical Principles of Public-Carry Regulation

Applying the history and principles framework to 18 U.S.C. § 922(g)(8), which prohibits individuals subject to a domestic violence restraining order from possessing a firearm, the Supreme Court identified "two distinct legal regimes" relevant to its analysis:  surety laws and prohibitions on "going armed" in public. *Rahimi*, 144 S. Ct. at 1891; *see supra*, p. 10.  It then distilled from those regimes the applicable Second Amendment principle.  "Taken together," the Court

1   explained, those laws "confirm what common sense suggests:  When an individual
2   poses a clear threat of physical violence to another, the threatening individual may
3   be disarmed." *Id*. at 1901.  The Court acknowledged that section 922(g)(8) is "by
4   no means identical" to the surety and going armed laws, but recognized that "it does
5   not need to be" because the statute "fits neatly within the tradition the surety and
6   going armed laws represent." *Id*.  Ultimately, the Court had "no trouble"
7   concluding that section 922(g)(8) falls within this regulatory tradition, which allows
8   the government to "disarm individuals who present a credible threat to the physical
9   safety of others." *Id.* at 1902.

10          Following this approach, California's public-carry restrictions compare
11   favorably to historical precursors—they impose only a minimal burden on
12   Plaintiff's Second Amendment right, far less severe than the historical "manner of
13   carry" and licensing laws that date back to before the founding.  *See Baird v. Bonta*,
14   81 F.4th 1036, 1047 (9th Cir. 2023) (directing the district court to look for
15   analogues for California's scheme that burden the open carry of firearms "to a
16   comparable degree, with a comparable severity, and with a comparable blanket
17   enforcement"); *see also Baird*, 2023 WL 9050959, at *30 (finding that
18   "California's licensing system . . . imposes a similar or lesser burden" than
19   "historical restrictions on how people could carry firearms in public").  Many of
20   those historical precursors entirely eliminated one form of public carry for all
21   individuals, typically concealed carry.  *See Bruen*, 597 U.S. at 52-55.  But
22   California's more modest statutory scheme allows public carry for those who
23   possess valid licenses—concealed carry statewide, and open carry in certain
24   geographic locales—or who fall under an applicable exception.  *See* §§ 26150,
25   26155, 26045, 26050; *see also Bruen*, 597 U.S. at 38 n.9 (public carry restrictions
26   "designed to ensure only that those bearing arms in the jurisdiction are, in fact,
27   'law-abiding, responsible citizens'" are consistent with the Second Amendment).
28   In addition, California's "shall-issue" regime relies entirely on objective criteria,

18

1  *Baird*, 2023 WL 9050959, at *26, *28, unlike the licensing schemes adopted in the

2  years immediately following the Civil War, which relied on criteria that "were

3  generally highly discretionary for the individuals or bodies granting them."  SUF

4  38; *see* SUF 39.

5         The minimal burden imposed by California's licensing regime is also

6  comparably justified when held next to its historical precursors.  *See Baird*, 2023

7  WL 9050959, at *39 (finding that "California's licensing system is similarly

8  justified by reference to widespread and categorical expectations about what is

9  intimidating, frightening and dangerous.").  Historically, jurisdictions adopted

10  licensing regimes for reasons of public safety.  *See, e.g.*, SUF 40.  Similar concerns

11  animated early Americans' decisions to impose "manner of carry" restrictions.

12  Governments hoping to mitigate the risk of "interpersonal violence" tended to focus

13  their regulatory efforts on "deadly weapons," which were "associate[ed] with crime

14  and needless bloodshed," and which generally were synonymous with "'concealed

15  weapons' for the straightforward reason that they were designed to be carried

16  concealed."  SUF 41.  Lawmakers therefore adopted restrictions or outright bans on

17  concealed carry, because it was "*a particular mode* of bearing arms which [was]

18  found dangerous to the peace of society."  *State v. Jumel*, 13 La.Ann. 399, 400

19  (1858).

20         Those concerns are comparable to California's present concerns.  The State

21  has determined that the widespread open carry of firearms "would create a highly

22  stressful and unsafe environment for everyone"—particularly in densely populated

23  "urban and suburban communities."  SUF 42; *see Baird*, 2023 WL 9050959, at *9,

24  *39.  Indeed, "[t]he presence of a firearm carried openly" in such environments

25  "has the high potential to create panic and chaos," SUF 43, which is of course

26  "dangerous to the peace of society."  *Jumel*, 13 La. Ann. at 400; *see Baird*, 2023

27  WL 9050959, at *38 (same).  Nonetheless, California's "shall-issue" licensing

28  regime issues licenses to individuals who are not prohibited from possessing arms

based on several objective criteria (§§ 26150(a), 26155(a)), and state law authorizes the concealed carry of firearms by licensed individuals and open carriage in certain locations and under certain specified circumstances.  *See, e.g.*, §§ 26150, 26155.

Post-*Bruen* courts have observed that open-carry restrictions are constitutional, so long as concealed carry remains available.  *See, e.g.*, *Frey*, 661 F. Supp. 3d 176, 298 (S.D.N.Y. 2023); *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023); *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022).  And examining a similar record, the Eastern District of California upheld California's open-carry licensing scheme under the Second Amendment. *See Baird*, 2023 WL 9050959, at *39.  Because California amply accommodates the right to public carry, this Court should similarly conclude that the State's modest open-carry restrictions are "consistent with the principles . . . underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898; *see Bruen*, 597 U.S. at 29.

## II.   PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW

Plaintiff also claims that Penal Code sections 26150 and 26155 violate the Fourteenth Amendment's Equal Protection Clause by limiting the issuance of open-carry licenses to counties with populations of less than 200,000.  This Court has already rejected a variation of this argument (ECF No. 162 at 40-42) and should do so again here.

The equal protection analysis ordinarily has two steps:  first, a plaintiff must show that "a class that is similarly situated has been treated disparately;" and second, if that is the case, the plaintiff must show that the challenged law fails the applicable level of scrutiny—either rational basis or some form of heightened review.  *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024). If a classification "does not concern a suspect or semi-suspect class or a fundamental right, [courts] apply rational basis review and ask whether the ordinance is rationally-related to a legitimate government interest." *Honolulu Weekly, Inc.*, 298 F.3d 1037, 1047 (9th Cir. 2002) (internal quotation marks

omitted).

Here, rational basis review applies because California's reasonable restrictions on Plaintiff's desired conduct do not implicate a fundamental right. *Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc). As discussed above, the plain text of the Second Amendment does not guarantee the unlicensed open carriage of a firearm. *See supra*, pp. 7-10; *Rahimi*, 144 S. Ct. at 1897; *Bruen*, 597 U.S. at 59. And California's laws, including those prohibiting the open carry of firearms in more populated areas, are consistent with the nation's historical tradition of firearms regulation. *See supra*, pp. 10-20.

Rational basis is a deferential standard. A law satisfies rational basis review if "there is any reasonably conceivable state of facts that could provide a rational basis for the challenged law." *Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) (citation omitted); *accord Olson*, 104 F.4th at 78. This Court previously determined that a "Legislature could rationally determine that openly carrying firearms poses a greater threat to public safety in densely-populated urban areas than in sparsely-populated rural areas." ECF No. 162 at 42; ECF No. 166. And the California Legislature made findings that it "has compelling interests in protecting both individual rights and public safety," that "laws allowing open carry of firearms imperil law enforcement officers on the front lines," and that "[w]hen firearms are present in public spaces, it makes those spaces less safe." S.B. 2, §§ 1(a), (j), (m), 2023-2024 Leg. Sess. (Ca. 2023); *see* SUF 44 ("restrictions on the open carry of firearms greatly enhance public safety"); *see also Baird*, 2023 WL 9050959, at *38-9 (the open carry of firearms is especially "threatening or intimidating . . . in more heavily populated places").

Because California's reasonable restrictions on the open carry of firearms in densely populated counties rationally further those purposes, Plaintiff's equal protection claim fails as a matter of law. *See Gallinger v. Becerra*, 898 F.3d 1012, 1020 (9th Cir. 2018) (finding that the "Legislature's interest in public safety is

21

sufficiently connected to" the challenged state action); *see also Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017) (rational basis review neither allows judicial second-guessing nor requires that a law address every aspect of a problem).

### CONCLUSION

The Court should grant Defendant's motion for summary judgment and enter judgment in Defendant's favor.[8]

Dated:  July 24, 2024                          Respectfully submitted,

                                               ROB BONTA
                                               Attorney General of California
                                               R. MATTHEW WISE
                                               Supervising Deputy Attorney General


                                               */s/ Iram Hasan*

                                               IRAM HASAN
                                               Deputy Attorney General
                                               *Attorneys for Rob Bonta in his official capacity as Attorney General of California*

SA2012104470
44209024.docx

---

[8] If the Court enters judgment to the contrary, Defendant respectfully requests that the Court stay enforcement of any such judgment pending appeal to preserve the status quo.

22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Rob Bonta in his official capacity as California Attorney General, certifies that this brief contains 6,979 words, which:

<u>X</u>  complies with the word limit of L.R. 11-6.1.

___ complies with the word limit set by court order dated [date].

Dated:  July 24, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California

*/s/ Iram Hasan*

IRAM HASAN
Deputy Attorney General
*Attorneys for Defendant Rob Bonta in his official capacity as Attorney General of California*

23

## CERTIFICATE OF SERVICE

Case Name:   ***Nichols, Charles v. Rob Bonta***   No.   **2:11-cv-09916-SSS-KES**

I hereby certify that on <u>July 24, 2024</u>, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>July 24, 2024</u>, at San Francisco, California.

| | |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |