ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
IRAM HASAN
Deputy Attorney General
State Bar No. 320802
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3793
  Fax:  (415) 703-5480
  E-mail:  Iram.Hasan@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his*
*official capacity as Attorney General*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHARLES NICHOLS,**<br><br>                                    Plaintiff,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of California,**<br><br>                                    Defendant. | 2:11-cv-09916-SSS-KES<br><br>**DEFENDANT'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:            September 17, 2024<br>Time:           10:00 a.m.<br>Courtroom:   6D<br>Judge:          The Honorable Sunshine S. Sykes<br>Magistrate Judge: The Honorable Karen E. Scott<br>Trial Date:    None set<br>Action Filed:  November 30, 2011 |

Pursuant to Local Rule 56-1, Defendant Rob Bonta, in his official capacity as Attorney General of California, submits the following statement of uncontroverted facts and conclusions of law in support of the concurrently filed motion for summary judgment in this action.

///

///

| No. | Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 1. | Plaintiff Charles Nichols is a resident of the City of Lawndale, California. | Hasan Decl., ¶ 2, Ex. 1 at Hasan Decl._11 (Nichols Dep. 145:15). |
| 2. | Plaintiff Charles Nichols does not challenge Penal Code section 626.9, the California Gun Free School Zone Act of 1995. | Hasan Decl., ¶ 2, Ex. 1 at Hasan Decl._09 (Nichols Dep. 98:5-7). |
| 3. | Licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._064 (Spitzer Decl. at 32). |
| 4. | "Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America." | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._49 (Spitzer Decl. at 17). |
| 5. | As it evolved, the Nation's historical tradition of regulating weapons and ammunition through licensing regimes represented "a more flexible form of government regulation[.]" | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._50-51 (Spitzer Decl. at 18-19). |
| 6. | At the start of the Revolutionary War, the Continental Congress recommended the disarmament of loyalists and those "notoriously disaffected to the cause of America." | *Journals of the Continental Congress 1774-1789* 205 (Worthington Chauncey Ford ed., 1906). |
| 7. | In 1713, Philadelphia penalized "'firing a Gun without a license,'" and other colonial laws from 1750 imposed criminal penalties on "'shooting . . . guns' or setting off | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._059 (Spitzer Decl. at 27). |

| | | |
|---|---|---|
| | fireworks" without "a 'governor's special license.'" | |
| 8. | Gunpowder—an item essential to the use of firearms for purposes of self-defense or otherwise—was extensively regulated through licensing. | Hasan Decl., ¶ 3, Ex. 2, Spitzer Decl. at 30. |
| 9. | Licensing regimes increased in popularity following the Civil War, in part because of the "dramatic rise in the availability" of revolvers, which coincided with "a proliferation of interpersonal violence" in American communities. | Hasan Decl., ¶ 4, Ex. 3 at Hasan Decl._389 (Rivas Decl. at 11). |
| 10. | Throughout the post-Civil War period, State and local legislatures required residents to acquire licenses after satisfying "review criteria and discretionary judgment of local officials who were empowered to grant carry licenses." | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._51 (Spitzer Decl. at 19). |
| 11. | The open carry of firearms was not a customary practice for much of the Nation's history due to technology limitations and societal norms. | Hasan Decl., ¶ 4, Ex. 3 at Hasan Decl._381-383, 399-400, 402 (Rivas Decl. at 3-5, 21-22, 24). |
| 12. | Licensing schemes regulating the open carry of weapons became more common over time. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._051-056, 264-369 (Spitzer Decl. at 19-24, Ex. K). |

| | | |
|---|---|---|
| 13. | A wide range of concealed or public-carry licensing schemes became ubiquitous in the late 1800s. *See, e.g.*, licensing laws from Hawaii, Indiana, Michigan, New Hampshire, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, and South Carolina. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._038-042 (Spitzer Decl. at 6-10). |
| 14. | Jersey City enacted a law in 1873 that "bears great similarity to contemporary gun licensing schemes[,]" permitting its municipal court to grant permits to carry certain weapons and "impose such conditions and restrictions as the court shall deem proper." | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._052 (Spitzer Decl. at 20); Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._421 (Rivas Decl. at 43). |
| 15. | "[P]ermits would not be granted to 'any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control.'" | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._052 (Spitzer Decl. at 21). |
| 16. | Municipalities in California, "[o]ne of the earliest proponents of licensing as a way of regulating the carrying of pistols . . . began passing ordinances that provided for licensing in order to carry a pistol in public" after 1866. | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._420 (Rivas Decl. at 42). |
| 17. | Florida adopted a law in 1893 that made it unlawful for any person "to carry around with him on his person and in his manual possession [a] Winchester rifle or other | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._055 (Spitzer Decl. at 23). |

| | | | |
|---|---|---|---|
| | | repeating rifle" "without first taking out a license from the County Commissioner of the respective counties." | |
| | 18. | Laws restricting particular methods of public carry were in effect when the Second and Fourteenth Amendments were ratified, and even before the founding. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._038-051, 058-061, 063-065, 120-122, 126-129, 167-168, 171, 173-177, 179, 181-182, 185-189, 191-193, 195-196, 198-202, 205-206, 210-212, 215-216, 218, 222, 226-228, 232-233, 235, 241, 245-247, 254-256, 261, 265-267, 272-274, 277, 281-282, 289-291, 299, 309-311, 329, 342, 347, 356-377 (Spitzer Decl. at 6-19, 26-29, 31-33; *id.*, Ex. B at 1-3; *id.*, Ex. C at 2-5; *id.*, Ex. E at 2-3, 6, 8-12, 14, 16-17, 20-24, 26-28, 30-31, 33-37, 40-41, 45-47, 50-51, 53, 57, 61-63, 67-68, 70, 76, 80-82, 89-91, 96; *id.*, Ex. K at 1-3, 8-10, 13, 17-18, 25-27, |

| | | | |
|---|---|---|---|
| | | | 35, 45-47, 65, 78, 83, 92; *id.*, Ex. M at 1-2); Hasan Decl., ¶ 4, Ex. 3 at Hasan Decl._381, 386-387, 398-399, 402, 405-411, 413, 415-416, 418-419, 421-423 (Rivas Decl. at 3, 8-9, 20-21, 24, 27-33, 35, 37-38, 40-41, 43-45). |
| | 19. | The Second Amendment right was understood as "a public allowance," subject to "due restrictions" necessary to protect the peace. | Hasan Decl., ¶ 6, Ex. 5 at Hasan Decl._456 (1 Blackstone, *Commentaries on the Laws of England* 139 (1765)). |
| | 20. | The public carry of firearms was generally prohibited in populous areas in England before the founding, with limited exceptions for community defense, law enforcement, and the upper class. | Henry Summerson, *The Enforcement of the Statute of Winchester 1285–1327*, 13 J. LEGAL HIST., 232 (1992). |
| | 21. | A 1642 provision in the colony of New Netherland (later New York) prohibited the drawing or displaying of knives. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._043-044 (Spitzer Decl. at 11-12). |
| | 22. | A 1686 New Jersey law prohibited the wearing of "pistols" and other specified weapons "privately," and also levied penalties for the open carrying of weapons. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._044 (Spitzer Decl. at 12). |

| 23. | Several colonial governments adopted laws that prohibited the carry of firearms because the act was considered to be "in terror of the people." | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._044-045 (Spitzer Decl. at 12-13). |
|---|---|---|
| 24. | Those colonial statutes punished individuals who "'went armed offensively'" in public places like "'fairs,'" "'markets,'" or "'in the presence of the King's Justices.'" | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._045 (Spitzer Decl at 13 (quoting a 1699 New Hampshire law and a 1795 North Carolina law, and citing similar laws adopted in the 1700s in Virginia and Massachusetts)). |
| 25. | "[P]ublic-carry restrictions proliferate[d]" in the period after the ratification of the Second Amendment in 1791, most often "proscrib[ing[ the concealed carry of pistols and other small weapons," but certain jurisdictions also imposed restrictions on open carry. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._039-042 (Spitzer Decl. at 7-10); Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._399, 403-406 (Rivas Decl. at 21 n.58, 25, 25 n.71, 25-26, 26 n.72, 26 n.74, 27 n.75, 27-28). |
| 26. | In the 1850s, Pennsylvania, Hawaii, and the District of Columbia criminalized the carrying of firearms or other specified deadly | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._410-412 (Rivas Decl. at 32-34). |

| | | |
|---|---|---|
| | weapons, whether they were carried in a concealed manner or openly. | |
| 27. | States also adopted less direct methods for discouraging the public carry of firearms, like imposing one- or ten-dollar taxes on pistols and other specified weapons. Such laws were enacted in Florida in 1838 and North Carolina in 1850. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._040 (Spitzer Decl. at 8); Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._414-415 (Rivas Decl. at 36-37). |
| 28. | Public-carry restrictions increased in frequency during the Reconstruction era and through the early-20th century. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._041 (Spitzer Decl. at 9). |
| 29. | An 1871 Texas law criminalized the carry of certain weapons "on or about [one's] person, saddle, or in his saddle bags . . . unless for provable self-defense or in service to the government." | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._041 (Spitzer Decl. at 9). |
| 30. | An 1875 Arkansas statute and an 1872 Nebraska City ordinance criminalized the carry of pistols and other firearms. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._041-043 (Spitzer Decl. at 9-10). |
| 31. | California's policy choice to allow open-carry licensing in less populated counties fits within a long historical tradition of governments drawing distinctions "about the relative danger of deadly weapons in urban versus rural locales." | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._416 (Rivas Decl. at 38). |

| 32. | Governments have historically applied stricter requirements concerning the public carry of weapons in more urban centers versus rural locales. | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._416 (Rivas Decl. at 38). |
|---|---|---|
| 33. | From 1852-1889, Colorado, Idaho, Montana, Arizona, New Mexico, and Wyoming prohibited the concealed carry of weapons in towns and settlements. | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._423 (Rivas Decl. at 45). |
| 34. | Cities and towns located near western railheads prohibited the carrying of any weapons within city and town limits. | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._423 (Rivas Decl. at 45 n.137 (Matt Jancer, *Gun Control is as Old as the Old West*, SMITHSONIAN MAGAZINE (Feb. 5, 2018), https://www. smithsonianmag.com/ history/gun-control-old-west-180968013/)). |
| 35. | Dodge City, Kansas passed an ordinance prohibiting the carrying of any weapons within city and town limits in 1878. | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._423 (Rivas Decl. at 45 n.137 (Matt Jancer, *Gun Control is as Old as the Old West*, SMITHSONIAN MAGAZINE (Feb. 5, 2018), https://www. |

| | | |
|---|---|---|
| | | [smithsonianmag.com/history/gun-control-old-west-180968013/)](smithsonianmag.com/history/gun-control-old-west-180968013/). |
| 36. | Laws restricting the public carry of weapons often made exceptions for long-distance travelers, who would openly carry because they were vulnerable to attack. | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._421-423 (Rivas Decl. at 43-45). |
| 37. | The long-distance traveler exception was "closely guarded" by requiring travelers to "check [their] weapons upon arriving to a town or to depart town as soon as [their] business was finished without visiting shops or restaurants." | Hasan Decl. ¶ 4, Ex. 3 at Hasan Decl._421-422 (Rivas Decl. at 43-44). |
| 38. | Licensing schemes adopted in the years immediately following the Civil War relied on criteria that "were generally highly discretionary for the individuals or bodies granting them." | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._051 (Spitzer Decl. at 19). |
| 39. | In some laws, "no criteria were specified," and thus licenses could be issued (or revoked) "at the pleasure" of the relevant government official. | Hasan Decl., ¶ 3, Ex. 2 at Hasan Decl._051 (Spitzer Decl. at 19). |
| 40. | Historically, jurisdictions adopted licensing regimes for reasons of public safety. | Hasan Decl. ¶ 3, Ex. 2 at Hasan Decl._049 (Sptizer Decl. at 17); Hasan Decl. ¶ 4, Ex. 3 at Hasan |

| | | | |
|---|---|---|---|
| | | | Decl._401 (Rivas Decl. at 23). |
| 41. | Governments hoping to mitigate the risk of "interpersonal violence" tended to focus their regulatory efforts on "deadly weapons," which were "associate[ed] with crime and needless bloodshed," and which generally were synonymous with ""concealed weapons' for the straightforward reason that they were designed to be carried concealed." | | Hasan Decl. ¶ 4, Ex. 3 at at Hasan Decl._384 (Rivas Decl. at 6). |
| 42. | The widespread open carry of firearms "would create a highly stressful and unsafe environment for everyone"—particularly in densely populated "urban and suburban communities." | | Hasan Decl. ¶ 5, Ex. 4 at Hasan Decl._440 (Raney Decl. at 9). |
| 43. | "The presence of a firearm carried openly" in densely populated urban and suburban communities "has the high potential to create panic and chaos." | | Hasan Decl. ¶ 5, Ex. 4 at Hasan Decl._440 (Raney Decl. at 9). |
| 44. | "[R]estrictions on the open carry of firearms greatly enhance public safety." | | Hasan Decl. ¶ 5, Ex. 4 at Hasan Decl._437 (Raney Decl. at 6). |

///

///

///

///

///

1

## CONCLUSIONS OF LAW

2      1.    "Summary judgment is appropriate when there is no genuine dispute as

3   to any material fact and the movant is entitled to judgment as a matter of law."

4   *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020).  "If the evidence is merely

5   colorable, or is not significantly probative, summary judgment may be granted."

6   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).  To survive

7   summary judgment, a party "must establish *evidence* on which a reasonable jury

8   could find for" that party.  *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325,

9   330 (9th Cir. 2017).

10      2.    Where, as here, a plaintiff asserts a facial challenge to a state law, he

11   must "'establish that no set of circumstances exists under which the [law] would be

12   valid.'"  *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S.

13   739, 745 (1987)).

14      3.    The Supreme Court has adopted a two-part test for assessing Second

15   Amendment claims, requiring (1) the plaintiff to demonstrate that the Second

16   Amendment's plain text covers and presumptively protects the conduct at issue,

17   and, if that is the case, (2) the government to show that the regulation of that

18   conduct is "consistent with the Nation's historical tradition of firearm regulation."

19   *Bruen*, 597 U.S. at 24; *see Rahimi*, 144 S. Ct. at 1887(explaining that "when [a]

20   government regulates arms-bearing conduct," its burden is to demonstrate that "the

21   challenged regulation is consistent with the principles that underpin our regulatory

22   tradition.").  Plaintiff's claim fails at both stages because the Second Amendment

23   does not presumptively protect his proposed conduct, and even if it did, California's

24   laws are consistent with principles that underlie the Nation's historical tradition of

25   firearms regulation.

26      4.    Plaintiff seeks an injunction enjoining Penal Code sections 25850, 26350,

27   and 26400 (*see* ECF No. 83 at 30, 37), but fails to meet his burden at the threshold

28   because the plain text of the Second Amendment does not presumptively protect

Plaintiff's proposed conduct—the unlicensed, open carriage of firearms. *See Bruen*, 597 U.S. at 17. *Bruen* confirmed that states may retain licensing regimes for the public carry of firearms, and explicitly approved shall-issue licensing regimes. *Bruen*, 597 U.S. at 13-15. *Bruen* clarified "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. But the Court did not announce a right to openly carry a firearm without a license. In fact, it has repeatedly cautioned that "[t]he right to keep and bear arms is . . . 'not unlimited.'" *Rahimi*, 144 S. Ct. at 1891 (quoting *Heller*, 554 U.S. at 626); *see Bruen*, 597 U.S. at 9, 15, 26, 29-31, 34, 38, 60, 70-71 & nn.8-9 (internal citations omitted)). The Supreme Court has also repeatedly explained that the Second Amendment "does not imperil every law regulating firearms," *McDonald*, 561 U.S. at 786 (plurality opinion), that many "regulatory measures" concerning firearms are, in fact, "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26; and, most relevant here, that "shall-issue" licensing regimes are lawful so long as they are not "put toward abusive ends" (for example, where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry"), *Bruen*, 597 U.S. at 38 n.9.

5.    Accordingly, governments remain free under the Second Amendment to enact and enforce "'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain a permit.'" *Id*. That is what California has done. *See* §§ 26150, 26155. Such regimes are consistent with the Second Amendment because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9; *id*. at 79 (Kavanaugh, J., concurring) (The Second Amendment "does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense.").

6.    Courts therefore have understood *Bruen* and *Heller* to say that "shall-issue" licensing schemes and similar background check requirements "are presumptively constitutional." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir.

2024); *see also Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). *Bruen* implicitly endorsed "reasonable, well-defined" restrictions on the public carrying of firearms, with "narrow, objective, and definite standards." *Id.* at 38 n.9, 69. And both the majority opinion and Justice Kavanaugh's concurring opinion approved of states continuing to require that a public carry license applicant first pass a background check—as California law does in section 26185 and 26195—and pass a firearms safety course—as required in sections 26150(a)(4) and 26155(a)(4). *See Bruen*, 597 U.S. at 12-15, 78-79. Notably, the Court endorsed such "shall issue" licensing schemes without conducting any historical analysis under *Bruen*'s second step. Under the Supreme Court's jurisprudence, then, the Second Amendment's plain text does not prevent States from prohibiting the carrying of firearms by those who do not secure a license in the first instance.

7.    While the term "bear" in "to keep and bear arms" requires some form of public carry, it does not require a particular manner of public carry. U.S. Const. amend. II; *see Rahimi*, 144 S. Ct. at 1891, *see also Bruen*, 597 U.S. at 32, 59. It has long been understood that "States could lawfully eliminate one kind of public carry" so long as they did not "ban public carry altogether." *Bruen*, 597 U.S. at 53, 59; *Frey v. Nigrelli*, 661 F. Supp. 3d 176, 199 (S.D.N.Y. 2023) (declining to preliminarily enjoin New York's open-carry laws because New York allows public carry), appeal pending sub nom. *Frey v. Bruen*, No. 23-208 (2d Cir. 2023). Accordingly, the Second Amendment does not require any right to openly carry when concealed carry (and open carry under more limited circumstances) is authorized, as it is in California. *See id.* at 52.

8.    In California, concealed-carry licenses are available to residents of all counties and, once issued, the licenses are valid in all counties. §§ 26150, 26155. Plaintiff does not challenge the concealed-carry licensing regime. ECF No. 83 at 3-4. Nor does he claim that he applied for or was denied such a license. And it is

undisputed that California law exempts all persons from criminal prosecution under the challenged statutes, regardless of locality, if a statutory exception applies—for example, if a person possesses an appropriate license to carry a firearm or reasonably believes it necessary to openly carry to prevent an immediate and grave danger to any person or property. §§ 26010, 26362, 26045. Taken together, California's law amply accommodates the right to publicly carry. [1]

9. The operative inquiry under *Bruen*'s second step is whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (emphasis added) (citing *Bruen*, 597 U.S. at 26-31). To demonstrate consistency with those principles, the government need not identify "a 'dead ringer' or a 'historical twin.'" *Id.*; *see id.* at 1897 (observing that "some courts have misunderstood the methodology of our recent Second Amendment cases," and noting that those "precedents were not meant to suggest a law trapped in amber"). Instead, the government need only show that "the new law is 'relevantly similar' to laws that our tradition is understood to permit" "in both why and how it burdens the Second Amendment right." *Id.* at 1898, 1891; *see id.* at 1925 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold."). In ascertaining the governing historical principles, it is appropriate to consider post-ratification laws and practices. *See, e.g.*, *id.* at 1900 (majority opinion); *id.* at 1916 (Kavanaugh, J., concurring) ("post-ratification history" can "be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights").

10. Even if Plaintiff could show that California's restrictions on the unlicensed open carriage of firearms implicate the Second Amendment, these restrictions are constitutionally sound because they are consistent with "the

---

[1] For this reason, Plaintiff cannot satisfy his burden to show that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745.

historical tradition" that "delineate[s] the contours of the right" to keep and bear arms. *Rahimi*, 144 S. Ct. at 1897.

11.   Historical analogues confirm that the challenged laws comport with the Second Amendment.  Plaintiff claims that California cannot "prohibit Plaintiff or similarly situated individuals from openly carrying a fully functional firearm (loaded and unloaded) for the purpose of self-defense (or for other lawful purposes) in non-sensitive public places[.]"  ECF No. 83 at 3.  But the historical "principles that underpin our regulatory tradition" do not support that argument.  *Rahimi*, 144 S. Ct. at 1898.  Indeed, the unrebutted evidence from the government's experts establishes both that "licensing and registration requirements were commonly and ubiquitously applied to guns and other dangerous weapons," Def.'s Stmt. of Unrefuted Facts & Concl. of L. Supp. Mot. for Summ. J. (SUF) 3, and that "the manner of public carry [of firearms] was subject to reasonable regulation." *Bruen*, 597 U.S. at 59.  The principles thus justify California's licensing and manner-of-carry statutory schemes.

12.   Before formal licensing regimes became common, colonial governments identified classes of persons who were ineligible to possess or carry arms. "[L]egislatures have long disarmed groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *United States v. Perez-Garcia*, 96 F.4th 1166, 1186-89 (9th Cir. 2024).

13.   The widespread adoption of such licensing regimes is particularly notable because the record contains no evidence that these regimes were ever determined to be unconstitutional or even challenged on constitutional grounds.  *See Baird v. Bonta*, __ F. Supp. 3d __, 2023 WL 9050959, at *26 (E.D. Cal. Dec. 29, 2023), appeal pending, No. 24-565 (9th Cir. 2024); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 320 (2d Cir. 2023) (concluding that licensing schemes "appear to have

existed without constitutional qualms or challenges").[2]  This is strong evidence that licensing regimes are "part of the nation's tradition of firearm regulation" and thus constitutionally sound.  *Id.* (emphasis omitted); *see Rahimi*, 144 S. Ct. at 1898 ("[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."); *see also Baird v. Bonta*, 2023 WL 9050959, at *22 (observing that "[t]he Supreme Court has all but confirmed that states may require people to obtain licenses before they carry firearms in public" (internal citations omitted)).

14.  Historical regulators placed restrictions on particular methods of public carry and often "eliminate[d] one kind of public carry" altogether.  *Bruen*, 597 U.S. at 59 (emphasis omitted).  In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors."  *Bruen*, 597 at 20 (internal quotation marks omitted).  That "'*pre-existing* right'" was "'not unlimited.'"  *Id.* at 20, 21 (quoting *Heller*, 554 U.S. at 626); *see Rahimi*, 144 S. Ct. at 1889, 1897.

15.  Applying the history and principles framework to 18 U.S.C. § 922(g)(8), which prohibits individuals subject to a domestic violence restraining order from possessing a firearm, the Supreme Court identified "two distinct legal regimes" relevant to its analysis:  surety laws and prohibitions on "going armed" in public.  *Rahimi*, 144 S. Ct. at 1891; *see supra*, p. 10.  It then distilled from those regimes the applicable Second Amendment principle.  "Taken together," the Court explained, those laws "confirm what common sense suggests:  When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  *Id.* at 1901.  The Court acknowledged that section 922(g)(8) is "by

---

[2] On July 2, 2024, the Supreme Court granted a petition for a writ of certiorari in *Antonyuk*, vacated the Second Circuit's decision, and remanded for further consideration in light of *Rahimi*.  Such an order is not a reversal on the merits.  *See Tyler v. Cain*, 533 U.S. 656, 666 n.6 (2001).  The *Antonyuk* decision is referenced for the persuasive value of its prior reasoning.

no means identical" to the surety and going armed laws, but recognized that "it does not need to be" because the statute "fits neatly within the tradition the surety and going armed laws represent." *Id.* Ultimately, the Court had "no trouble" concluding that section 922(g)(8) falls within this regulatory tradition, which allows the government to "disarm individuals who present a credible threat to the physical safety of others." *Id.* at 1902.

16. Following this approach, California's public-carry restrictions compare favorably to historical precursors—they impose only a minimal burden on Plaintiff's Second Amendment right, far less severe than the historical "manner of carry" and licensing laws that date back to before the founding. *See Baird v. Bonta*, 81 F.4th 1036, 1047 (9th Cir. 2023) (directing the district court to look for analogues for California's scheme that burden the open carry of firearms "to a comparable degree, with a comparable severity, and with a comparable blanket enforcement"); *see also Baird*, 2023 WL 9050959, at *30 (finding that "California's licensing system . . . imposes a similar or lesser burden" than "historical restrictions on how people could carry firearms in public"). Many of those historical precursors entirely eliminated one form of public carry for all individuals, typically concealed carry. *See Bruen*, 597 U.S. at 52-55. But California's more modest statutory scheme allows public carry for those who possess valid licenses—concealed carry statewide, and open carry in certain geographic locales—or who fall under an applicable exception. *See* §§ 26150, 26155, 26045, 26050; *see also Bruen*, 597 U.S. at 38 n.9 (public carry restrictions "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'" are consistent with the Second Amendment). In addition, California's "shall-issue" regime relies entirely on objective criteria, *Baird*, 2023 WL 9050959, at *26, *28.

17. The minimal burden imposed by California's licensing regime is also comparably justified when held next to its historical precursors. *See Baird*, 2023

WL 9050959, at *39 (finding that "California's licensing system is similarly justified by reference to widespread and categorical expectations about what is intimidating, frightening and dangerous.").  Historically, lawmakers adopted restrictions or outright bans on concealed carry, because it was "*a particular mode of bearing arms which* [was] *found dangerous to the peace of society.*" *State v. Jumel*, 13 La.Ann. 399, 400 (1858).

18.  Those concerns are comparable to California's present concerns.  *See Baird*, 2023 WL 9050959, at *38 ("historical regulations on concealed weapons and concealed carrying are analogous to California's modern system); *see also id.* ("Today . . . the concealable [of handguns] connotes no evil intent; nor does the bearer's decision to conceal them. . . . [B]y contrast, the open carrying of firearms by those who are not law enforcement officers is threatening or intimidating, especially in more heavily populated places.").  Nonetheless, California's "shall-issue" licensing regime issues licenses to individuals who are not prohibited from possessing arms based on several objective criteria (§§ 26150(a), 26155(a)), and state law authorizes the concealed carry of firearms by licensed individuals and open carriage in certain locations and under certain specified circumstances.  *See, e.g.*, §§ 26150, 26155.

19.  Post-*Bruen* courts have observed that open-carry restrictions are constitutional, so long as concealed carry remains available.  *See, e.g.*, *Frey*, 661 F. Supp. 3d 176, 298 (S.D.N.Y. 2023); *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 92 (D. Conn. 2023); *Abed v. United States*, 278 A.3d 114, 129 n.27 (D.C. 2022).  And examining a similar record, the Eastern District of California upheld California's open-carry licensing scheme under the Second Amendment.  *See Baird*, 2023 WL 9050959, at *39.  Because California amply accommodates the right to public carry, this Court should similarly conclude that the State's modest open-carry restrictions are "consistent with the principles . . . underlying the Second Amendment."  *Rahimi*, 144 S. Ct. at 1898; *see Bruen*, 597 U.S. at 29.

20.  The equal protection analysis ordinarily has two steps:  first, a plaintiff must make a threshold showing that "a class that is similarly situated has been treated disparately;" and second, if that is the case, then the plaintiff must show that the challenged law fails the applicable level of scrutiny—either rational basis or some form of heightened review.  *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024).  If a classification "does not concern a suspect or semi-suspect class or a fundamental right, [courts] apply rational basis review and ask whether the ordinance is rationally-related to a legitimate government interest."  *Honolulu Weekly, Inc.*, 298 F.3d 1037, 1047 (9th Cir. 2002) (internal quotation marks omitted).

21.  Here, rational basis review applies because California's reasonable restrictions on Plaintiff's desired conduct do not implicate a fundamental right.  *Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc).

22.  Rational basis is a deferential standard.  A law satisfies rational basis review if "there is any reasonably conceivable state of facts that could provide a rational basis for the challenged law."  *Merrifield v. Lockyer*, 547 F.3d 978, 989 (9th Cir. 2008) (citation omitted); *accord Olson*, 104 F.4th at 78.  This Court previously determined that a "Legislature could rationally determine that openly carrying firearms poses a greater threat to public safety in densely-populated urban areas than in sparsely-populated rural areas."  ECF No. 162 at 42; ECF No. 166 (accepting findings, conclusions, and recommendations in R&R).  In addition, the California Legislature made findings that it "has compelling interests in protecting both individual rights and public safety," that "laws allowing open carry of firearms imperil law enforcement officers on the front lines," and that "[w]hen firearms are present in public spaces, it makes those spaces less safe."  S.B. 2, §§ 1(a), (j), (m), 2023-2024 Leg. Sess. (Ca. 2023); *see also Baird*, 2023 WL 9050959, at *38-9 (finding that the open carrying of firearms is especially "threatening or intimidating . . . in more heavily populated places).

23.  Because California's reasonable restrictions on the open carry of firearms in densely-populated counties rationally further those purposes, Plaintiff's equal protection claim fails as a matter of law.  *See Gallinger v. Becerra*, 898 F.3d 1012, 1020 (9th Cir. 2018) (finding that the "Legislature's interest in public safety is sufficiently connected to" the challenged state action); *see also Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1048 (9th Cir. 2017) (rational basis review neither allows judicial second-guessing nor requires that a law address every aspect of a problem).

Dated:  July 24, 2024                              Respectfully submitted,

                                                   ROB BONTA
                                                   Attorney General of California
                                                   R. MATTHEW WISE
                                                   Supervising Deputy Attorney General


                                                   */s/ Iram Hasan*

                                                   IRAM HASAN
                                                   Deputy Attorney General
                                                   *Attorneys for Defendant Rob Bonta
                                                   in his official Capacity as Attorney
                                                   General of California*

SA2012104470
44209160.docx

## CERTIFICATE OF SERVICE

Case Name:  **_Nichols, Charles v. Rob Bonta_**    No.  **2:11-cv-09916-SSS-KES**

I hereby certify that on July 24, 2024, I electronically filed the following
document(s) with the Clerk of the Court by using the CM/ECF system:

### DEFENDANT'S SEPARATE STATEMENT OF
### UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I certify that **all** participants in the case are registered CM/ECF users and that
service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the
United States of America the foregoing is true and correct.

Executed on July 24, 2024, at San Francisco, California.


|                  |                  |
| ---------------- | ---------------- |
| Vanessa Jordan   | _Vanessa Jordan_ |
| Declarant        | Signature        |