# EXHIBIT 3

**Exhibit 3**

**Hasan Decl._378**

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
LARA HADDAD
Deputy Attorney General
State Bar No. 319630
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6250
  Fax: (916) 731-2124
  E-mail: Lara.Haddad@doj.ca.gov
*Attorneys for Defendants Gavin Newsom in his*
*official capacity as Governor of California and Rob*
*Bonta in his official capacity as Attorney General of*
*California[1]*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CHARLES NICHOLS,** | Case No. 3:11-cv-09916-SJO-SS |
| Plaintiff, | **EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS** |
| **v.** | |
| **GAVIN NEWSOM, in his official capacity as Governor of California, et al.,** | Magistrate Judge: The Honorable Karen E. Scott |
| Defendants. | Action Filed: Nov. 30, 2011 |

---

[1] Each defendant currently holds the position of the former respective named defendants. *See* Fed. R. Civ. P. 25(d).

**Exhibit 3**
**Hasan Decl._379**

## EXPERT REPORT AND DECLARATION OF BRENNAN RIVAS

### BACKGROUND AND QUALIFICATIONS

I am a Ph.D. historian and independent scholar. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). My educational background includes a Ph.D. in History from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

My expertise includes historical weapon regulations in the United States. I have authored multiple publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly* and a chapter in an edited collection forthcoming by Oxford University Press; in 2022, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript based upon my dissertation research.

I have provided expert witness declarations or reports in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.); *Frey v. Nigrelli*, Case No. 21 Civ. 5334 (NSR)( S.D. N.Y.); *Brumback v. Ferguson*, No. 1:22-cv-03093-MKD (E.D. Wash.); *Siegel v. Platkin*, No. 22-cv-7463 (RMB) (AMD) (D.N.J.); *NAGR v. Campbell*, No. 1:22-cv-11431-FDS(D. Mass.); *Oregon Firearms Federation, Inc. v. Kotek* No. 2:22-cv-01815-IM (D. Or.); *NSSF v. Jennings*, No. 22-cv-01499-RGA (D. Del.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Weise v. Bonta*, No. 2:17-cv-00903-WBS-KJN (E.D. Cal.); *Nguyen v. Bonta*, No. 3:20-cv-

**Exhibit 3**
**Hasan Decl._380**

1  02470-WQH-BGS (S.D. Cal.); and *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE

2  (C.D. Cal.). I am currently working on potential expert witness reports and

3  declarations that may be provided in other jurisdictions. I have been deposed in one

4  matter, *Oregon Firearms Federation, Inc. v. Kotek*, No. 2:22-cv-01815-IM (D. Or.).

5  A true and correct copy of my current curriculum vitae is attached as **Exhibit A**

6  to this declaration. It contains all publications that I have authored within the last ten

7  years. I am currently being paid a rate of $130/hour for research, $150/hour for

8  document preparation, and $200/hour for deposition and trial testimony.

## OPINIONS

10  Throughout the nineteenth century, Americans defined *deadly weapons* in

11  contradistinction to militia arms and regulated their presence in public spaces. Laws

12  regarding the carrying or concealment of such weapons in public spaces were

13  statutory enactments derived from longstanding English common law customs.

14  Nineteenth-century Americans enacted these laws to preserve order, protect the

15  peace, and reduce violent crime. Rates of homicide and crime fluctuated over time

16  and by locale, but were generally made worse by easier access to inexpensive

17  weapons like bowie knives and pocket pistols that were not only conducive to

18  concealment, but designed for it. The proliferation of these weapons, and particularly

19  pocket pistols, in the post-Civil War era unleashed a staggering wave of gun crime

20  which American communities tried to staunch through a host of regulatory measures.

21  Public carry laws were foundational to their efforts and often coexisted with other

22  regulations pertaining to taxing and selling deadly weapons.

23  Nineteenth-century public carry laws explicitly prohibited *concealed* weapons

24  because the primary mode of carrying bowie knives, pocket pistols, brass knuckles,

25  and other deadly weapons was concealed in one's pocket. These were weapons

26  designed for concealment, not open-carry akin to the militiaman's musket, rifle, or

27  cavalry sabre. But the existence of these laws should not be interpreted to mean that

28  Americans have historically approved of open-carry. Primary source evidence from

**Exhibit 3**
**Hasan Decl._381**

the period strongly shows that Americans generally condemned the habitual carrying of weapons for preemptive self-defense—even if those weapons were carried openly. To carry a pistol or knife openly was to invite the intervention of local officers of the law and would have been an indication of an emergency, as is described further below.

It has not been uncommon in American history for towns and cities to be ruled by different deadly weapon policies than the state more broadly. There are examples of cities enacting public carry ordinances within states that lacked a public carry law. Many of these examples come from the state of California and involve licensing requirements for carrying deadly weapons. Public carry laws, for both concealed weapons and the open-carry of weapons, have often reserved special exemptions for "travelers" as defined under state law, reinforcing the idea that population density was a factor in developing and enforcing weapon policies in the nineteenth century.

This report identifies the various knives and pistols referred to as *deadly weapons* during the nineteenth century, and explains how their development and accessibility affected rates of interpersonal violence and created the need for a regulatory response. It then turns to various regulatory measures, including public carry laws that targeted open- as well as concealed-carry of weapons, taxation of weapons or their dealers, sensitive places requirements, and licensing laws.

## DEFINING DEADLY WEAPONS & THE CONTEXT OF AMERICAN VIOLENCE

### Deadly Weapons and Their Uses

Americans living in the nineteenth century generally distinguished between two types of weapons: arms suitable for militia service or hunting, and concealable weapons associated with interpersonal violence and known as *deadly weapons*.[2] In

---

[2] There are some exceptions to this tendency, such as sales restrictions that applied to all firearms rather than just pistols, or certain sensitive place laws that prohibited all firearms in addition to deadly weapons. *See* Ohio 1880 at 79–80, establishing a minimum age for the sale of "any air-gun, musket, rifle-gun, shot-gun, revolver, pistol, or other firearm, of any kind or description whatever, or ammunition

**Exhibit 3**
**Hasan Decl._382**

the decentralized, agricultural environments that characterized early American life, hunting knives, rifles, muskets, and shotguns were important tools present in most rural homes. Men used these firearms for militia service and for the occasions when they were required to participate in local policing efforts through the *posse comitatus*; but otherwise, they would have much more frequently used such weapons for hunting—be it killing predatory animals, driving birds away from their crops, or hunting for meat. Firearms borne for these purposes were carried openly, by a shoulder strap or attached to a saddle. Various accoutrements necessary for them to function, such as powder flasks, were also visible. Rifles, muskets, and shotguns that could not readily be concealed on a person were not likely to be used in the commission of crimes, especially crimes of passion that resulted in murder or manslaughter. Those offenses were much more likely to be committed with bare hands, blunt instruments, or other types of weapons such as concealable knives and pistols.[3]

A series of socio-economic and political factors prompted Americans of the nineteenth century to be more likely to publicly carry and use deadly weapons such as dirks, bowie knives, and pocket pistols. Rates of homicide, violence, and crime were rising in many parts of the country, and weapon technology rose in tandem. The greater prevalence of deadly weapons in public spaces, and the bloody consequences of it, prompted American people across the country to turn to weapon regulations as a solution. These regulations tended to focus upon readily concealable "deadly weapons" like knives and pistols rather than the firearms used for militia and hunting

---

for the same." *See also* John A. Hockaday, et al, *Revised Statutes of the State of Missouri* (Jefferson City: Carter & Regan, State Printers, 1879), 224 § 1274, prohibiting the carrying of "any firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" at "public assemblages." Nonetheless, this distinction between deadly weapons and militia or hunting weapons was foundational to nineteenth-century regulatory policies.

[3] Guns were used in less than half of the murders of unrelated adults, and less than ten percent of marital murders during the seventeenth and eighteenth centuries. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 115.

**Exhibit 3**

**Hasan Decl._383**

purposes. Unlike militia arms, deadly weapons tended to be carried concealed—in fact, they were designed for such a purpose. A characteristic feature of deadly weapons was their association with crime and needless bloodshed; as a result, the people habitually carrying them were presumed to be ruffians, burglars, and assassins—those ready to settle personal difficulties with blood rather than by reason and law. Some states listed and defined deadly weapons by code or statute. An 1892 edition of the Mississippi Penal Code carried forward a public carry law from 1888 as Sec. 1026, entitled "Deadly weapons; carrying of concealed."[4] The other feature shared by deadly weapons was their suitability for concealment; in fact, deadly weapons were often referred to as "concealed weapons" for the straightforward reason that they were designed to be carried concealed.[5] For example, Article 47, Chapter 25 of the Oklahoma Territory Penal Code was titled "Concealed Weapons" and its first two sections enumerated "prohibited weapons" that were not to be carried upon the person or concealed.[6]

During this time "deadly weapons" primarily included large knives, "pocket pistols," and, later, revolvers ranging from 4-shot to 6-shot. They are addressed below.

---

[44] R. H. Thompson, et al, *Annotated Code of the General Statute Laws of the State of Mississippi* (Nashville: Marshall & Bruce, 1892), 326 § 1026.

[5] For example, see "What They Think of It: The State Press on the Carrying of Concealed Weapons," *Daily Constitution* (Atlanta, Georgia), April 11, 1879, 4; and "Concealed Weapons: What Is Thought of the Practice by the Press of the State," *Daily Constitution* (Atlanta, Georgia), March 27, 1879, 1. The articles quote numerous other newspapers from Georgia which condemn carrying deadly weapons in terms that associate going armed and carrying deadly weapons with the habit of carrying concealed weapons.

[6] Will T. Little et al, compilers, *Statutes of Oklahoma, 1890* (Guthrie, OK: State Capital Print Co., 1891), Art. 47, "Concealed Weapons," 495 § 1–2. It is worth noting that these provisions prohibited not only carrying concealed, but carrying about the person generally. See *Ex parte Thomas*, 1908 OK 155. A later section within Article 47 (§ 5) even went so far as to specify the circumstances in which rifles and shotguns could be carried publicly in the Territory of Oklahoma: "for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise."

Exhibit 3
Hasan Decl._384

## A.  Large Knives

Prior to the widespread availability of revolvers near the mid-nineteenth century, large knives were considered the most dangerous weapon around. There were so many different styles and names of knives that Americans sometimes struggled to define them and distinguish them from one another. The "dirk knife" originated in Scotland as a knife carried into battle or for martial ornamentation by soldiers. It has come to be identified as having a straight blade. "Dagger" is an older word, and generally connotes a double-edged blade. Bowie knives were often associated with long blades that curved and became double-edged near the tip. An "Arkansas toothpick," on the other hand, was more likely to be a knife that was as long as a bowie, double-edged, and sharply tapered. The narvaja was of Spanish origin and tended to refer to a large folding blade. To make matters even more complicated, these definitions might vary geographically, change over time, and were not set in stone during the nineteenth century.[7]

By far the Bowie knife became the style most widely known, used, and discussed by Americans in the nineteenth century. These knives could be easily concealed within a pocket or tucked into a waistband. The blade took its name from a man named Jim Bowie who was born in Kentucky in 1796 and died at the Alamo during the Texas Revolution in 1836.[8] He began carrying a large hunting knife in a leather scabbard in 1826, after an enemy tried to assassinate him in the street.[9] The following year, Bowie used it to great effect in a duel that turned into a melee and became the subject of nationwide news coverage.[10] His death at the Alamo cemented

---

[7] Worthen, *Arkansas Made*, I:267–268.

[8] William R. Williamson, "Bowie, James," *Handbook of Texas Online*, accessed February 25, 2023, https://www.tshaonline.org/handbook/entries/bowie-james. Published by the Texas State Historical Association.

[9] Clifford Hopewell, *James Bowie, Texas Fighting Man: A Biography* (Austin: Eakin Press, 1994), 25-30.

[10] "Terrible Recontre," *Niles' Register* (Baltimore, Maryland), November 17, 1827, 182: https://archive.org/details/sim_niles-national-register_1827-11-17_33_844/page/182/mode/1up The same article was also reprinted here: https://chroniclingamerica.loc.gov/lccn/sn83045110/1827-10-31/ed-1/seq-2/.

**Exhibit 3**
**Hasan Decl._385**

the legend of his namesake knife, which became one of the most widely denounced deadly weapons of the antebellum nineteenth century.

Fighting knives were certainly not new in the 1830s, and the exact styling of the original Bowie knife remains unknown, but Bowie's life story became a vehicle for Americans to discuss and address the growing problem of knife-violence. As rates of violence rose during the nineteenth century, people were more likely to carry and use large knives, both concealed and openly carried; the increased presence of knives— even if ostensibly carried for personal defense—had the regrettable consequence of exacerbating the problem.[11] This was especially notable in southern areas, where "so certain, indeed, is the bowie-knife to appear in a quarrel, that the great anxiety of a disputant in the South seems to be always to strike the first blow."[12]

The response on the part of Americans confronting knife-violence was the regulation of such weapons. Going back to 1801, nineteenth-century weapon restrictions regulated the presence of knives larger than a regular pocket knife in public places, as described in the footnote and further below in this report.[13] As

---

[11] *See* "Another Victim of the Bowie Knife," *Cheraw Gazette* (Cheraw, South Carolina), September 6, 1837, 3: https://chroniclingamerica.loc.gov/lccn/sn88084121/1837-09-06/ed-1/seq-3/

[12] "The Bowie-Knife In the South," *San Francisco Evening Bulletin* (San Francisco, California), October 18, 1861.

[13] Tenn. 1801 ch. 22 § 6 (prohibiting "privately" carrying "any dirk, large knife, pistol or other arm or any other dangerous weapon."). Similar laws existed in numerous states during the antebellum nineteenth century, including: Florida, which clearly distinguished between fighting knives and pocket knives, *see* 1846 Fla., ch. 75 ("any dirk, pistol or other arm or weapon, except a common pocket knife . . . ."; Virginia, *see* 1838 Vir., ch. 101 ("any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue . . ."); Alabama, *see* 1840 Ala., ch. 7 ("a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun…"; Indiana, *see* 1819 Ind., ch. 23 ("any dirk pistol, sword in cane, or any other unlawful weapon . . ."); Mississippi, *see* 1821 Miss., ch. 49 ("any pistols, dirk or other such offensive weapons . . ."); Kentucky, *see* 1812 Ken., ch. 89 ("a pocket pistol, dirk, large knife, or sword in a cane . . ."; Louisiana, *see* 1813 La., ch. 5 ("any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon,") Wisconsin, *see* Revised Statutes, Wisconsin, 1849, Title XXXI, Ch. 142, "Of Proceedings to Prevent the Commission of Crime," Sec. 18 ("a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon . . ."); and Michigan, *see* Revised Statutes, Michigan, 1846, Title XXXI, Ch. 162, "Of Proceedings to Prevent the Commission of Crime," Sec. 16 ("a dirk, dagger,

Exhibit 3
Hasan Decl._386

homicide rates increased and the popularity of bowie knives grew, so did laws restricting bowie knives, as described further below in this report.[14]

## B. Pocket Pistols Pre-1836

Another weapon that came to be associated with lawless violence in the antebellum period was the "pocket pistol." Prior to the mid-nineteenth century, most of the pistols available on the American consumer market were single-shot, muzzle-loading pistols modeled after designs that appeared in the eighteenth century.[15] After being fired, they were useful only as clubs until they could be reloaded through a process that took upwards of fifteen seconds.[16] The largest of these muzzle-loading pistols were called "horse" pistols and had been adapted to cavalry and dragoon[17] service in the early modern era. Horse pistols measured a foot or more in length and were carried in holsters that attached to a saddle; they were not designed to be carried on the person.[18] Mid-sized pistols were designed to be carried either on the belt (sometimes attached by a ring on the firearm), in the pocket of a greatcoat, or in a portable case. One of the main uses of these seven-to-ten-inch pistols prior to the nineteenth century was for defensive purposes while traveling.[19] The smallest size, measuring approximately five or six inches in length, was the pocket pistol. As the

_____

sword, pistol, or other offensive and dangerous weapon . . ."). This is not an exhaustive list.

[14] As a general rule, public carry laws included knives within their purview, and some jurisdictions prohibited the sale of bowie knives as well. *See infra*, pp. 17–24, 29, 36–39.

[15] Claude Blair, ed., *Pollard's History of Firearms* (New York: Macmillan Publishing Company, 1983), 114–116.

[16] For example, see the websites: https://timothyrjeveland.com/how-to-load-and-fire-a-musket-or-flintlock-pistol-explained-briefly-with-appropriate-jargon/; and https://www.quora.com/How-long-did-it-take-to-load-a-flintlock-pistol.

[17] Dragoons emerged in the early modern era as a type of unit that could fight both mounted and dismounted. In many instances, they rode to battle on horseback but fought on foot. Dragoon units within the US Army were organized in 1833 and stationed in the West (initially Fort Smith, Arkansas) where Indian conflicts necessitated mounted warfare. *See* https://www.nps.gov/fosc/learn/education/dragoon5.htm

[18] Blair, *Pollard's History*, 104, 119.

[19] *Id.* at 117–118. In most instances, these weapons would have been at least partially obscured by coats, waistcoats, pockets, etc.

**Exhibit 3**
**Hasan Decl._387**

name suggests, these firearms were purposefully designed to be carried within the pockets of everyday attire.[20] The most famous of these was the deringer pistol, named for its designer, Henry Deringer, and notorious as the gun used to assassinate Abraham Lincoln. Deringers (often misspelled as "derringers") were capable of firing large calibers, which made them exceedingly lethal at close range—often more lethal than mid-sized navy revolvers.[21]

While early pistols were overwhelmingly single-shot weapons, an early repeating pistol existed prior to the development of the revolver in 1836. It was called a "pepper-box" pistol and had multiple barrels rather than just one. Where a revolver has a cylinder carrying multiple shots that turns at each cocking of the hammer, a pepper-box had rotating barrels loaded with shot.[22] In the early nineteenth century, pepper-boxes were not widely available in the United States and appear to have been rarities or curiosities rather than commonly used weapons.[23] For a brief period of time near the 1840s, a competitor to the revolver was a type of pepper-box called an Allen pistol. These weapons were developed in the United States by a Massachusetts gun-maker named Ethan Allen and carried six shots per load (much like a revolver). The popularity the Colt revolver caused American manufacture of Allen pistols and

---

[20] *Id.* at 116–118; *id.* at 117 ("These [pocket pistols] were intended to be carried in the pocket of a person wearing normal civilian attire.").

[21] Lee A. Silva, "Henry Deringer's Popular 'Pocket Cannons' Packed a Wallop from California to Washington, D.C.," *Wild West* (April 2002), 12–13.

[22] Blair, *Pollard's History*, 210.

[23] Advertisements for multi-barreled pocket pistols can be found in historical newspapers, though the advertisement of them points toward them as rarities and curiosities. See *The Madisonian* (Washington, D.C.), December 22, 1838, 1. This particular example emphasizes their use for travelers, a category of gun-carriers that was generally exempted from public carry regulations during the nineteenth century. The term "pepper-box" is not used. https://chroniclingamerica.loc.gov/lccn/sn82015015/1838-12-22/ed-1/seq-1/.

Exhibit 3
Hasan Decl._388

pepper-boxes to all but disappear during the Civil War Era.[24] Historical newspapers and dictionaries rarely mention "pepper-boxes" or Allen pistols.[25]

Even though pocket pistols were less frequently the targets of popular outrage in the early nineteenth century, they were still regulated alongside other deadly weapons like bowie knives. Small, concealable pistols lent themselves to the same violent ends as fighting knives, and it was a single-shot, muzzle-loading pocket pistol used in the assassination of Abraham Lincoln in 1865. Public carry laws generally included "pistols" within their purview, and other regulatory strategies attempted to discourage their presence in public spaces.

## C. Revolvers and Pocket Pistols Post-1836

The year 1836 proved to be a turning point in the history of firearm development and a major catalyst for both a proliferation of interpersonal violence and intensification of firearm regulation in the nineteenth century. That was the year that Samuel Colt patented his first revolver design. The patent extended until 1857, by which time his revolvers had received U.S. military contracts and penetrated American consumer markets. Other manufacturers pounced upon the opportunity to manufacture revolvers, and the Civil War Era stretching from 1850 to 1870 saw a dramatic rise in the availability of these weapons. Even though it took several decades, the revolver eventually overtook dirks and bowie knives as the weapon considered most problematic in American communities.[26]

---

[24] On pepper-boxes and Allen pistols in the United States, see S. Basil Haw, "The 'Pepper-Box' Pistol: That Strange Weapon with Revolving Barrels," *Army Ordnance* 17, no. 98 (September-October 1936), 90–94; Lewis Winant, *Pepperbox Firearms* (New York: Greenberg, 1952).

[25] An exploration of digitized newspaper databases showed that "pepperbox," "pepper-box," "pepper box," and plural permutations of these terms were not used to describe firearms; rather, they described a box for keeping pepper, which was a kitchen-related item. The primary definition for "pepperbox" in the *Oxford English Dictionary* is: "A small box with a (usually domed) perforated lid, used for sprinkling pepper on food; a pepper pot." According to *OED*, another term for pepper-box pistols was "Allen pistol," which also does not appear to be in common use in nineteenth-century America.

[26] On the life of Samuel Colt and the history of his firearm manufacturing companies, *see* Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that*

Exhibit 3
Hasan Decl._389

The Colt revolver diverged from pistols widely available at the time in two critical ways. First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading). Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.[27] The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process. By about the 1870s, technological developments in the design and functionality of ammunition meant that later-model revolvers could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more efficient—a boon on the battlefield, but a new danger in other contexts.

Revolvers were produced in the three historical sizes or styles: "horse," "belt," and "pocket" models. By Colt's era, "horse" pistols tended to be called "army" or "holster" pistols because they were used by mounted soldiers and kept in saddle holsters. Army pistols became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, and they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras. The "belt" or midsized pistol would have been worn in a hip holster attached to the belt, usually concealed. Colt's version of it came to be called the "navy"[28] model and may have been the most common type of revolver among civilians around the time of the Civil War. The first pocket pistol produced by Colt was released in 1848 and had five

_____

*Changed America* (New York: Scribner, 2020).

[27] Revolvers' firing capacity could range anywhere from four to seven shots depending on the manufacturer and design of the firearm in question.

[28] The label "navy" may have been derived from the fact that the model featured an engraving of a naval battle. The name may also have been related to its having a smaller size and caliber that were more suited to being used in naval engagements. It is not entirely clear why Colt named the midsized belt pistol the "navy" model.

Exhibit 3
Hasan Decl._390

shots.[29] In later decades, pocket revolvers could be purchased in small sizes and calibers and at a relatively low cost. Cheap revolvers, particularly imitation brands of a lesser quality, could be had for a few dollars, with used ones selling for even less.[30]

## D.    Slung Shots and Other Deadly Weapons

There were other deadly weapons which Americans tended to regulate in the nineteenth century. These included sword-canes and loaded canes, as well as metal knuckles (often referred to as "knucks") and slung shots. A slung shot was a makeshift weapon associated with organized crime and street gangs. Unlike a sling shot that we might think of today, a slung shot was "a shot, piece of metal, stone, etc., fastened to a strap or thong, and used as a weapon."[31] Like large knives and pocket pistols, slung shots, sword-canes, and metal knuckles were weapons associated with crime and interpersonal violence rather than militia service or communal policing; they were typically concealed when worn.

## CONTEXT OF AMERICAN VIOLENCE

Rates of violence and homicide fluctuated during the nineteenth century, largely as a result of political and socio-economic factors. Where Americans failed to unite together based upon common interests and principles, and where they viewed governing institutions with skepticism, violence tended to rise. The southern society predicated upon racial slavery made slaveholding states more violent places than northern counterparts. Areas that were isolated from governing officials or on the fringe of Anglo-American settlement also experienced more violence than the more

---

[29] Haven and Belden, *Colt Revolver*, 63–73.

[30] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[31] This is the definition of the nineteenth-century American phrase from the *Oxford English Dictionary*.

**Exhibit 3**
**Hasan Decl._391**

established parts of the country closer to the Atlantic seaboard.[32] Across the nineteenth century, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[33]

The American Civil War was a time of violence, turmoil, and political instability. It coincided with the United States' divergence from the rest of the Western world in terms of homicide rates. When the nations of Western Europe were becoming less violent and homicidal, Americans were becoming more so. The most severe violence occurred in the former Confederate States, where military defeat, emancipation, and reconstruction inflamed white supremacism and set the stage for racist paramilitaries, lynchings, and widespread electoral fraud. Even northern and midwestern areas that had previously been relatively peaceful saw more murders and violent assaults during the era of the war than earlier in the century. A lack of faith in governing institutions and a failure to become a cohesive citizenry drove both the war itself and the coinciding bloodshed.[34] The proliferation of revolvers during the

---

[32] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. *See* Roth, *supra* note 2, at 17–26 (2009).

[33] On homicide in American history, particularly as broken down into northern and southern regions, *see* Roth, *supra* note 2, at 297–326, 386–88 (for trends in northern areas); at 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); at 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[34] On homicide in American history, particularly as broken down into northern and southern regions, see Roth, *American Homicide*, 297–326, 386–388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for

Exhibit 3
Hasan Decl._392

same time period exacerbated these problems, rendering armed encounters even more deadly than they had been before.

By the Civil War, Samuel Colt had finally achieved the kind of commercial success that he had been working toward since the 1830s. Beginning in 1848, his company started to receive military contracts for outfitting mounted units (like dragoons and cavalry) with repeating horse pistols, and War Department patronage grew exponentially during the war. By the time the conflict was over, gun-makers like Colt, Smith & Wesson, and Remington had achieved a tremendous capacity to manufacture firearms in staggering numbers. Some of their factories were producing thousands of guns per month.[35]

But when the armies stopped fighting, the chief buyer of these firearms—the United States military—no longer needed such a large supply. Manufacturers turned to the civilian market, promoting revolvers to potential buyers across the country. They marketed pocket pistols heavily. For instance, Colt produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[36] The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[37] These cheap revolvers, which were primarily carried concealed as opposed to openly, could be acquired for a few dollars, with used ones selling for even less.

---

large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[35] Bridesburg, a smaller company, produced 5,000 muskets per month during a part of the war. *See* Smith, *Warman's Civil War Weapons*, 128–29. On firearms and revolvers as critical to industrialization and the American System of Manufacture, see Rasenberger, *Revolver*, 113–15, 287–88.

[36] For example, *see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It* (1875), 23 (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[37] *See supra*, n. 30.

Exhibit 3
Hasan Decl._393

In the post-Civil War period, the structural forces driving Americans to be more violent and homicidal did not go away. Northern states experienced brief reduction in homicide rates immediately following their victory (inspired largely by renewed faith in the American experiment), but socio-economic forces subsequently turned the tide once again toward instability, violence, and homicide. Industrialization, class stratification, urban living conditions, labor unrest, and ethnic division all combined to make American cities and manufacturing centers more dangerous places than in the antebellum era. Poverty begat crime, and the ease with which the criminally inclined could acquire pocket pistols led to more armed robberies and armed assaults.[38] North and South, pocket revolvers became the preferred weapon for revenge killings, particularly those carried out by spurned lovers and cuckolded husbands.[39] In the southern states, rates of violence and homicide remained high throughout the Reconstruction and the Jim Crow eras.[40] "Difficulties" such as shootouts at bars still erupted on a regular basis due to the persistence of manly honor culture as well as flippant and habitual pistol-toting while under the influence of alcohol.

The introduction of pocket revolvers into these political, racial, personal, and criminal conflicts was profound. The causes and kinds of violence were largely the same—racism, classism, desperation, manly honor, etc.—but the ease with which pocket pistols could be acquired made these conflicts more likely to be *armed* conflicts. Low prices, easy access, and concealable sizes also acted to encourage men to carry a revolver in public (often contrary to law) even when they had not done so previously; having it about one's person was a great temptation to use it in a moment of anger, which ruined the lives of the combatants as well as their families.[41] The

---

[38] Roth, *American Homicide*, 386–88.

[39] Hendrick Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997), 67–96.

[40] Roth, *American Homicide*, 386–88.

[41] *See* "The Deadly Revolver," *Stephenville Empire* (Stephenville, Texas)

Exhibit 3
Hasan Decl._394

1  situation had a significant impact upon the justice system by forcing jurists,

2  lawmakers, and even jurors to reevaluate the law of self-defense and the "heat of

3  passion" defense. Eventually, legal opinion coalesced around the idea that having

4  deadly weapons upon one's person "raises a presumption of guilt"[42] (regardless of

5  whether they were openly carried or concealed) whether the carrier intended to use

6  them in an assault or not.[43]

7       The post-Civil War period became the country's first experience with rampant

8  gun violence, leading Americans to discourage the carrying and use of guns through

9  state and local regulations. A rallying cry beginning in 1879 was, "The revolver must

10  go!"[44] Denunciations of carrying deadly weapons were widespread, with critics

---

April 5, 1884, 2; reprinted from *Houston Post* (Houston, Texas) (that "the law of the land cannot afford to make the distinction" between "a murderer with a malice aforethought, and a homicide, whose hand in an unguarded moment pulls the trigger and discharges the contents of a deadly weapon into an adversary, even before the nature of the act is realized.").

[42] *State v. Reams* 121 N.C. 556 ("The offence of carrying a concealed weapon about one's person and off his own premises consists in the guilty intent to carry it concealed and not upon the intent to use it; and the possession of the weapon raises the presumption of guilt, which presumption may be rebutted by the defendant.").

[43] Some legal guidebooks asserted that intent or motive for carrying deadly weapons was immaterial, while other commentators advocated inferring malicious intent from the act of carrying weapons in much the same way that carrying lockpicks and other tools of burglary were evidence of intent to burglarize. *See* "Concealed Weapons," *Criminal Law Magazine and Reporter* 8, no. 4 (October 1886), 412; "Entirely Too Many Revolvers," *Albany News* (Albany, Texas), August 22, 1884, 5 ("The man who, while drunk, shoots and kills another may not be hanged, because he was not competent to premeditate. He was, however, competent to premeditate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."); "Toy Pistols and Concealed Weapons," *The Sun* (Baltimore, Maryland), July 19, 1881, 2 ("but the mayor contends that any man carrying a concealed deadly weapon in Philadelphia 'carries it for a purpose not self-defense'."); "War on the Pistol," *Philadelphia Enquirer* (Philadelphia, Pennsylvania), July 25, 1881, 2 (Mayor's proclamation stating, "Whosoever carries *concealed* deadly weapons carries also the *concealed* thought of murder.").

[44] *See* "The Revolver Must Go," *Clarksville Weekly Chronicle* (Clarksville, Tennessee) May 24, 1884, 1 (reprinted from *Gainesville Register*, Gainesville, Texas). https://chroniclingamerica.loc.gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/; "Personals," *Chicago Daily Tribune* (Chicago, Illinois) March 29, 1879, 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go—go off?"). https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-1/seq-5/; "Current Opinion," *Rocky Mountain News* (Denver, Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it

---

Exhibit 3
Hasan Decl._395

comparing the practice to "barbarism" and evil intent.[45] Commentators opposed the idea of preemptively arming oneself—the "vicious custom of going armed so as to be 'ready for an emergency'."[46] In the words of a Georgia resident: "The habitual carrying of deadly weapons on the ground of self-defense in a peaceful and enlightened community of the nineteenth century is simply nonsense. The thousands who do not choose to load themselves down with weapons need protection on the other hand from the few who are at once a terror, a disgrace and a nuisance to the community."[47] To the retort that the right to bear arms protected such behavior, the response was that "it is certain that in no sense was that provision [the Second Amendment] intended to authorize a wanton disregard of the sacredness of human life and defiance of the laws and peacefulness of an orderly and well-disposed community," and that "such a construction of the necessary right to bear arms in defense of home and country should not be tolerated."[48]

## CARRYING DEADLY WEAPONS

Nineteenth-century Americans (North and South) criticized the everyday carrying of deadly weapons. Even though they were particularly opposed to the concealment of them beneath one's clothes, there was an overarching opposition to having weapons in public at all—even when carried openly. The habitual carrying of

---

would be one more step in the interests of civilization.").

[45] For example, see "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2; "Carrying Deadly Weapons," *The Independent* (New York, New York), August 18, 1881, 17, ("The man who arms himself with a concealed weapon and carries it with him as he mingles with others assumes a quasi-belligerent position toward human society. He prepares himself for a combat beforehand.").

[46] "Carrying Deadly Weapons," *Washington Post* (Washington, D.C.) January 20, 1887, 2.

[47] "Carrying Deadly Weapons," *Daily Constitution* (Atlanta, Georgia) February 13, 1879, 2. The author associates weapon carrying with barbarism saying, "Let the cowardly barbaric practice be stamped out."

[48] "A Remnant of Barbarism," *The Sun* (Baltimore, Maryland) March 22, 1879, 2. This writer also stated that: "It is simply inexcusable for men in civilized communities, and where they have police authorities, courts and juries, and intercourse with newspapers and railroads and telegraphs . . . to wear pistols or bowie-knives as part of their daily raiment."

18

Exhibit 3
Hasan Decl._396

deadly weapons on one's person (openly or concealed) was the behavior of "ruffians"—bullies who imposed their will on others through force or intimidation, and who engaged in unforgivably brutal behavior in order to do so. Ruffians carried bowie knives and used them to stab someone who insulted them, and ruffians turned a minor conflict into a melee by drawing a pocket revolver and shooting their opponents.[49] To carry weapons was also described as a relic of barbarism—"that most barbarous of all customs, the habit of wearing concealed weapons."[50] Commentators later in the century described pistol-toting as a "relic of barbarism"[51] and rallied to the cry, "The revolver must go!"[52]

The fact that nineteenth-century Americans discussed *concealed* weapons and legislated specifically against *concealing* weapons has invited some modern readers to interpret them as de facto protecting the open carrying of pistols, knives, and other deadly weapons. This idea is largely a result of simplified interpretations of the nineteenth-century case law surrounding public carry statutes that emphasize judges' protection of openly carrying deadly weapons without considering the narrow context in which such behavior would have occurred.

---

[49] For example, see *The 'Science of Defence,'* Public Ledger (Philadelphia, PA) August 5, 1840 (carrying swords as "refined ruffianism."); *The Ruffian Foote*, Barre Patriot (Boston, MA) April 26, 1846 (Sen. Henry S. Foote of Mississippi as a "ruffian" for being armed in the Senate chamber, bullying an enemy, and pulling a knife on him in the presence of the full Senate); *Shocking Outrage*, The Miners' Express (Dubuque, Iowa) September 24, 1851, at 2 ("some ruffian or ruffians unknown" stabbed a pair of stabled horses, killing one). *See* https://chroniclingamerica.loc.gov/lccn/sn86083363/1851-09-24/ed-1/seq-2/

[50] *Concealed Weapons*, Daily Picayune (New Orleans, Louisiana) February 28, 1845, at 2.

[51] *The Cattlemen*, Fort Worth Daily Democrat, March 5, 1883. *See also* Brenham Daily Banner (Texas), March 7, 1883.

[52] *See* "The Revolver Must Go," *Clarksville Weekly Chronicle* (Tennessee) May 24, 1884, at 1 (reprinted from *Gainesville Register* (Texas)): https://chroniclingamerica.loc.gov/lccn/sn88061082/1884-05-24/ed-1/seq-1/ ; *Personals*, Chicago Daily Tribune, March 29, 1879, at 5 (mocking the movement developing in the South by saying, "Southern papers say the revolver must go—go off?") https://chroniclingamerica.loc.gov/lccn/sn84031492/1879-03-29/ed-1/seq-5/; *Current Opinion*, Rocky Mountain News (Colorado) March 26, 1879 ("If the west and south would rally around the sentiment, 'The revolver must go,' it would be one more step in the interests of civilization.").

Exhibit 3
Hasan Decl._397

1    In the early nineteenth century, state legislatures began enacting new statutes

2    against the carrying of weapons (in response to rising levels of violence, as discussed

3    above). Some of these statutes were challenged in state courts as violations of either

4    the Second Amendment or an analogous state right. With a few exceptions[53], the case

5    law that developed held that concealed carry statutes did not violate the right to bear

6    arms. There were two strains of thought leading to this conclusion. One, which was

7    invoked much less frequently, held that the open carrying of deadly weapons was

8    permissible within the context of self-defense, and that statutes prohibiting such

9    activity violated a person's right to self-defense.[54] The other strain of thought, which

10   was far more common across the country, held that concealed carry laws were

11   constitutional because the Second Amendment and state analogues protected

12   appropriate uses of militia arms, not the carrying of deadly weapons.[55] This second

13   strain of thought gained ground across the nineteenth century as the societal problems

14   posed by ready access to pocket pistols accelerated in the post-Civil War era.

15   Especially influential were the writings of legal scholar Joel Prentiss Bishop, who

16   explained that "the keeping and bearing of arms has reference only to war, and

17   possibly also to insurrections wherein the forms of war are as far as practicable

18   observed," and "not to broils, bravado and tumult, disturbing the public repose, or to

19   private assassination and secret revenge."[56] He observed that such behavior was not

20   ───────────────

[53] The most significant of these few exceptions was *Bliss v. Commonwealth*, 12 Ky. 90 (1822) ("…there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise.").

[54] An excellent example of this strain of thought is *Nunn v. State*, 1 Ga. 243 (1846) ("…so far as the act [contested] seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms." Emphasis in original). See also *State v. Reid*, 1 Ala. 612 (1840) ("…the Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.").

[55] For example, see *Amyette v. State*, 21 Ten. 154 (1840); *State v. Buzzard*, 4 Ark. 18 (1842); *English v. State*, 35 Tex. 473 (1872); *Hill v. State*, 53 Ga. 472 (1874); *Ex parte Thomas*, 1908 Ok. 155.

[56] Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes*

Exhibit 3
Hasan Decl._398

necessary to the security of a free state, and "[n]or yet are dirks, bludgeons, revolvers and other weapons which are not used in war, 'arms'."[57] Bishop's explication of the right to bear arms, and his explanation as to why deadly weapon statutes did not violate it, aligned with the reigning view that such laws were an acceptable strategy to reduce gun violence.

Even though nineteenth-century case law generally coalesced around the principle that concealed weapon laws were constitutional, that did not mean that people wishing to openly carry deadly weapons as a form of preemptive self-defense were engaging in what was considered constitutionally protected behavior—or accepted behavior at all. The text of public carry laws themselves, when taken together, show quite plainly that nineteenth-century Americans did not understand concealed carry laws to de facto allow everyday open-carrying of deadly weapons. Some states specifically prohibited open carry, and others tailored open-carry exceptions to be as narrow as possible in order to prevent people engaging in everyday open carry as a mode of preemptive self-defense.[58] But more importantly,

---

(Boston: Little, Brown & Co., 1873), § 793. Bishop's following point is worth quoting: "Moreover, there is no species of property, and no private right, the 'keeping' and 'bearing' of which may not be *regulated* by legislation for the public good. Hence, in reason, statutes [about carrying weapons] do not violate any of our constitutions."

[57] *Ibid.*

[58] For example, see 1882 West Virginia ch. 110, 317 § 8; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; 1870 Tenn. 13, p. 28-29. In response to appellate court decisions, lawmakers in Arkansas and Tennessee enacted public carry laws with an open-carry exception that was as tightly restricted as possible. Their "open in his hands" exception allowed open-carry only in a real emergency (not preemptive armed self-defense as a matter of course) and only applied to certain kinds of firearms (not pocket pistols). *See* 1871 Tenn. 90, p. 81-82; Ark. 1881 ch. 96. A public carry law from the Florida Territory (1835) allowed for open carry, but the legislation proved to be ineffective—presumably because so many people were choosing to avail themselves of the open carry exception. In 1838, lawmakers enacted a prohibitively high tax upon anyone wishing to engage in open carry, showing that Floridians and their elected lawmakers did not view unrestrained open carry as a benign activity and indeed tried to discourage the behavior as much as possible. 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318; 1838 Florida, ch. 24. The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835) entitled "An Act to prevent any person in this Territory from carrying arms secretly."

Exhibit 3
Hasan Decl._399

the everyday open carrying of deadly weapons was not particularly common in the nineteenth century, and primary source evidence shows that it was not socially acceptable outside of emergency circumstances.

Deadly weapons like knives and pistols were designed to be carried concealed, so concealed carry regulations struck at the primary, preferred mode of carrying them. A commentator writing in 1877 said, "The very fact that men are careful to conceal their revolvers argues that they are doubtful as to the propriety of carrying of them," and that if a young man were to walk along the street "with his silver-mounted deringer hanging from his waist belt, he would expose himself to unlimited ridicule."[59] The tendency toward concealing deadly weapons rather than carrying them openly was in fact so strong that in the latter nineteenth century, men's trousers were often sold with a *pistol pocket* sewn into the rear hip.[60]

Courts determined that even partially visible weapons were violations of the law. In 1856, a Louisiana court reasoned that partially exposed weapons were "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[61] An Arkansas case

---

[59] "Carrying Concealed Weapons: True Comment on an Almost Universal American Custom," *Daily Constitution* (Atlanta, Georgia), May 23, 1877, 1. Reprinted from *Baltimore American*. Some of the manners and etiquette books of the nineteenth century also addressed the impropriety of carrying deadly weapons. For example, see William A. Alcott, *Advice to a Young Gentleman on Entering Society* (Philadelphia: Lea and Blanchard, 1839), 147-149. https://books.google.com/books?id=430_rAHEPn8C&newbks=1&newbks_redir=0&source=gbs_navlinks_s.

[60] Scott Way, "A Few Random Remarks about Pockets," *Puck* 16 (January 1885), 294 ("We will merely glance at the pistol-pocket, in which a concealed deadly weapon is often carried, especially in Prohibition districts, and then pass on to the coat-tail pocket."); "The Pistol Pocket," *Chicago Daily Tribune* (Chicago, Illinois), February 11, 1885, 3 ("An important step toward securing an abolition of the practice of pistol-carrying, a Galveston (Tex.) paper suggests that the pistol-pocket should be prohibited by law."); "The Hygiene of Pockets," *Phrenological Journal and Science of Health* (March 1886), 176 ("It is common now-a-days for trousers to be made with a pocket placed little below the band in the back part of the garment. It is commonly termed the hip or pistol pocket.").

[61] *State v. Smith*, 11 La. Ann. 633 (1856).

**Exhibit 3**
**Hasan Decl._400**

from 1879 upheld the idea that a partially exposed weapon constituted an attempt at concealment.[62]

There was some acceptance of the idea that a true emergency situation might justify the open carrying of a deadly weapon temporarily. A version of Delaware's 1881 concealed carry law provides some insight into what nineteenth-century Americans understood their concealed carry laws to allow in terms of open carry. The law as-passed ended up being substantially different from the version summarized by a newspaper while the legislature was still debating and amending the bill, and that earlier bill version contained a level of detail and context rarely found in historical public carry laws.[63] The bill prohibited concealed carry and also prohibited anyone "to carry a gun or other deadly weapon in the street, except in a vertical position, and with the muzzle pointed toward the zenith."[64] This is the kind of open carry which certain drafters of the bill envisioned—one that prioritized public safety and precluded habitual open carry as an acceptable mode of preemptive self-defense. Other elements of the bill, some of which ended up in the law that passed, addressed other impermissible ways of using, carrying, and handling firearms. "It is likewise unlawful for any person to point a gun or other firearm at any person, either in jest or earnest," and there were specific penalties for anyone who might draw a concealed weapon in a crowd or display one in public.[65]

Nineteenth-century public carry laws were also understood to coexist with the right defend oneself. In Texas, where deadly weapons could not be carried in public at all, a self-defense exception was actually written into the law.[66] A weapon-carrier

---

[62] *Carr v. State*, 34 Ark. 448 (1879).

[63] Text of a bill in the Delaware legislature, quoted in "Doings of the Legislature," *Smyrna Times* (Smyrna, Delaware), March 30, 1881, 2 https://chroniclingamerica.loc.gov/lccn/sn84020422/1881-03-30/ed-1/seq-2/.

[64] *Id.*

[65] *Id.* For the law as passed, see 1881 Delaware ch. 548 "Of Offenses Against Public Justice: An Act providing for the punishment of persons carrying concealed deadly weapons," 716-717.

[66] 1871 Texas, ch. 34, § 2 ("Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on

Exhibit 3
Hasan Decl._401

who was technically breaking the law simply by carrying could plead self-defense, show a judge or jury that his/her circumstances justified the behavior, and receive an acquittal or dismissal. Public carry laws were designed to stop preemptively going armed on a habitual basis, not foreclose people in deadly emergencies from defending themselves in accordance with the law of self-defense.

Where gun-toters were convicted despite a plea of self-defense, it resulted from a failure to demonstrate that they had actually engaged in lawful self-defense. The proclivity of men (especially southern men) to respond to personal conflicts with violence led to "difficulties" in which wounded pride left otherwise decent men dead. Appellate rulings and legislative enactments aimed to preclude men in such circumstances from pleading self-defense. This happened to an Alabama man in 1840 who argued that he needed to conceal a weapon in order to defend himself from an attack; the court disagreed, stating that, "If the emergency is pressing, there can be no necessity for concealing the weapon, and if the threatened violence, will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail."[67] The nineteenth-century tendency toward not specifically outlawing the open carrying of deadly weapons is more a byproduct of that era's persistent and torturous acceptance of a violent male honor culture than it is evidence of widespread acceptance of preemptive armed self-defense.

In Arkansas and Tennessee, post-Civil War public carry restrictions were part of a back-and-forth between legislatures and appellate courts, illustrating a commitment to restricting public carry that understood open-carry to be primarily related to militia service and secondarily reserved for emergency situations. Both

---

his person or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.").

[67] *State v. Reid*, 1 Ala. 612 (1840).

Exhibit 3
Hasan Decl._402

states enacted laws that prohibited the public carrying of pistols with very limited exceptions.[68] Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[69] But the respective legislatures of Arkansas and Tennessee quickly changed the rule to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand. By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms were to be regulated differently than deadly weapons.[70] The revised Tennessee law held that "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[71] Arkansas's

---

[68] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[69] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

[70] Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited. This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic weapons (capable of firing repeatedly with a single pull of the trigger) and select-fire weapons (capable of either automatic or semiautomatic fire) for military use.

[71] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872). It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand. The purpose of this additional phrase was to

**Exhibit 3**

**Hasan Decl._403**

replacement statute was similar to that of Tennessee.[72] Tennessee and Arkansas courts did not strike down these revised public carry statutes as they had done previously.[73]

Interpreted within the context of rising levels of gun violence and political instability in the American South in the post-Civil War era, these laws and their tightly restricted open-carry exceptions illustrate a widespread social contempt for publicly carrying deadly weapons. These statutes represented the best efforts of lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[74] while also respecting the parameters set forth by their state supreme

curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.

[72] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[73] See *State v. Wilburn*, 66 Tenn. 57, 61 (1872); *Haile v. State*, 38 Ark. 564 (1882).

[74] Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871). The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception. *See English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke*

Exhibit 3
Hasan Decl._404

1  courts. The amendatory statutes did not simply provide an exemption for army/navy

2  pistols—it specified that even those pistols could not be carried in public unless

3  openly in the hand. Just like today, it was not common at that time to see a person

4  walking along a public street carrying a gun in hand; such behavior would have been

5  understood as an emergency requiring the intervention of local officers of the law.

6         Concealed carry laws did not automatically protect open carry as a mode of

7  being preemptively armed in public. In fact, preemptive arming is precisely what

8  nineteenth-century Americans condemned. An 1838 Virginia statute prohibited

9  "habitual" carrying of deadly weapons—its purpose was to penalize those who

10  carried weapons as an everyday matter of course.[75] An 1813 Louisiana statute

11  included a lengthy preamble explaining why the legislature was taking this action. It

12  is worth quoting in full:

13         Whereas assassination and attempts to commit the same, have of late
          been of such frequent occurrence as to become a subject of serious alarm
14         to the peaceable and well disposed inhabitants of this state; and whereas
          the same is in a great measure to be attributed to the dangerous and
15         wicked practice of carrying about in public places concealed and deadly
          weapons, or going to the same [public places] armed in an unnecessary
16         manner . . . .[76]

17         An appellate judge in North Carolina went so far as to say that "there is

18  scarcely a man in the community who does not own and occasionally use a gun of

19  some sort," but that "No man amongst us carries it about with him, as one of his every

20  day accoutrements—as a part of his dress—and never we trust will the day come

21  when any deadly weapon will be worn or wielded in our peace loving and law-

22  abiding State, as an appendage of manly equipment."[77] Public carry laws, whether

23  42 Tex. 455 (1874).

24         [75] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed
25  weapons," 76 § 1 ("That if any person shall hereafter habitually or generally keep or
   carry about his person any pistol, dirk, bowie knife, or any other weapon of the like
26  kind, from the use of which the death of any person might probably ensue, and the
   same be hidden or concealed from common observation . . . .").

27         [76] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and
   Going Armed in Public Places in an Unnecessary Manner § 1.

28         [77] *State v. Huntley*, 25 N.C. 418 (1843).

27

**Exhibit 3**
**Hasan Decl._405**

they used the terms "concealed" or "open," were fundamentally about protecting public spaces by keeping deadly weapons away from them.

## FURTHER REGULATIONS OF PUBLIC CARRY

Widespread criticism of deadly weapons and the bloody toll which they exacted upon American society prompted state and local governments to enact regulations, as discussed above. Even though the English common law inherited by the colonies had provided an avenue for disarming public spaces through the Statute of Northampton, nineteenth-century Americans chose to address the problem of weapon-carrying through new criminal enactments. Some of the earlier statutes and ordinances originated in southern and southwestern[78] areas and spread across much of the country by the Civil War Era. Regulations carried on unabated in the postbellum era.

An early example of an American state government translating a common law violation of the Statute of Northampton into a state-level statute occurred in Massachusetts in 1795. Justices of the peace were empowered to "cause to be staid and arrested" anyone who disturbed the peace, engaged in assault or affray, or "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth."[79] Much of the statute's text repeated phrasing and clauses from within the Statute of Northampton, and prohibited the carrying of arms into public spaces without a justifiable reason. Anyone violating this rule would have been subject to questioning by local officials and "bound" to the peace through a peace bond or surety, which was itself part of the common law inheritance.[80] Decades later,

--------------------------------------------

[78] In the antebellum era, the Old Southwest stretched from Louisiana to Missouri, Kentucky, and Alabama.

[79] 1795 Mass. Ch. 2, 436; from *Acts and Laws Passed by the General Court of Massachusetts: Begun and held at Boston, in the County of Suffolk, on Wednesday the Twenty-eighth Day of May, Anno Domini 1794; and from thence continued by adjournment, to Wednesday, the Fourteenth of January, 1795.* The act was passed on January 29, 1795.

[80] The peace bond was one of many processes inspired by America's common

**Exhibit 3**
**Hasan Decl._406**

1    Delaware adopted a nearly identical policy.[81]

2          The 1795 Massachusetts law, which addressed going armed within the context

3    of riot, affray, and disturbing the peace, was translated into a penal code edition

4    published in 1836, and in that process the "going armed" portion was isolated into its

5    own section. It read: "If any person shall go armed with a dirk, dagger, sword, pistol,

6    or other offensive and dangerous weapon, without reasonable cause to fear an assault

7    or other injury, or violence to his person, or to his family or property, he may, on

8    complaint of any person having reasonable cause to fear an injury, or breach of the

9    peace, be required to find sureties for keeping the peace, for a term not exceeding six

10   months, with the right of appealing as before provided."[82] The statute clarified the

11   law by showing that "going armed" was a separate offense from disturbing the peace,

12   riot, and affray.

13         The early nineteenth century was a time when many states were drafting legal

14   codes—making the law known and accessible to the people, which was part of the

15   law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and
16   the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill:
     University of North Carolina Press, 2009), 73–74, 96; Saul Cornell, "History, Text,
17   Tradition, and the Future of Second Amendment Scholarship: Limits on Armed
     Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems*
18   83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of
     the Home: Separating Historical Myths from Historical Realities," *Fordham Urban*
19   *Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace
     bonds is worth quoting at length: "Peace bonds threw enforcement back on the
20   community, summoning family, friends, and neighbors to police the troublemakers.
     Bonds required one or more other people to put up the amount, making them liable
21   if the accused broke the peace again. That economic obligation represented the
     signers' promise to keep the offender in line. Peace bonds put everyone else in the
22   community on notice as well, investing them with the responsibility of policing the
     peace until the end of the probation period."

23   [81] *Revised Statutes of the State of Delaware, to the Year of Our Lord 1852*
24   (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace
     may also cause to be arrested and bind to surety of the peace all affrayers, rioters,
25   breakers and disturbers of the peace, and all who go armed offensively to the terror
     of the people, or are otherwise disorderly and dangerous."

26   [82] *Revised Statutes of the Commonwealth of Massachusetts, Passed November
27   4, 1835* (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites
     "Persons who go armed may be required to find sureties for the peace &c., 1794, 26
28   § 2," which appears to be a reference to 1795 Mass. ch. 2, 436; *see also supra*, n. 41.

**Exhibit 3**

**Hasan Decl._407**

democratic spirit of the age. In undertaking that process, numerous states adopted verbatim the penal code version of the Massachusetts public carry law. It was repeated in Wisconsin (1839), Maine (1840), Michigan (1846), Virginia (1847), Minnesota (1851), and Oregon (1853).[83] Much like Massachusetts, Maine had a preexisting statute vesting justices of the peace with necessary powers to arrest and penalize affrayers and disturbers of the peace.[84] But for Wisconsin, Michigan, Minnesota, and Oregon, this was their first public carry law.

Virginia, like Maine, had previously enacted a public carry law; but unlike Maine, that statute was not identical to the Massachusetts approach adopted in 1836. In 1838, Virginia had enacted a different type of law—one that explicitly prohibited the carrying of concealed weapons and punished such behavior by fine and/or jail time.[85] The extent to which this 1838 statute coexisted and overlapped with the 1847 statute remains unknown[86], but the example of Virginia highlights the fact that there were different approaches to public carry legislation during the antebellum nineteenth century. The other approach—which was more common in southern states—also grew out of the Statute of Northampton, but tended to prohibit *concealed*

---

[83] 1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16; *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; 1853 Oregon, General Laws, 5th Regular Session, 220 § 17.

[84] 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1.

[85] 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76 § 1. "That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation . . . ."

[86] It is unclear whether the 1847 Virginia penal code section pertaining to going armed effectively repealed the statute put in place in 1838.

Exhibit 3
Hasan Decl._408

weapons and require criminal penalties for violation rather than sureties to keep the peace.

A good example of the southern, concealed-carry approach to public carry legislation comes from Tennessee. An 1801 public carry law made use of longstanding common law language and phrases providing that anyone who "shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" would be required to post a bond, go to jail, or "be punished as for a breach of the peace, or riot at common law."[87] An updated statute from 1821 read: "Every person so degrading himself by carrying a dirk, sword cane, Spanish stiletto, belt or pocket pistols, either public or private, shall pay a fine of five dollars for every such offence."[88] The language had been simplified substantially, and the list of prohibited weapons (a deviation from the traditional Statute of Northampton and common law phrasing) formed the basis for the statute.

Tennessee was not the only state to adopt this language to regulate public carry during the early nineteenth century. Corresponding weapon restrictions were enacted in Louisiana and Kentucky in 1813, at a time when both states were experiencing dramatic population growth and economic expansion as a result of river transportation.[89] Like Tennessee, their statutes provided a list of prohibited deadly

---

[87] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821), The Making of Modern Law: Primary Sources.

[88] Robert Looney Caruthers, A Compilation of the Statutes of Tennessee, of a General and Permanent Nature, from the Commencement of the Government to the Present time: With References to Judicial Decisions, in Notes, to Which is Appended a New Collection of Forms Page 100, Image 105 (1836) available at The Making of Modern Law: Primary Sources.

[89] See 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1 ("any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view . . ."); 813 Ky. Acts 100, An Act to Prevent

Exhibit 3
Hasan Decl._409

weapons that could not be concealed on the person and penalized violators with a fine and/or jail time.[90] States and territories following this model included: Indiana (1819), Florida (1835), Georgia (1837), Virginia (1838), Alabama (1839), Ohio (1859), and New Mexico (1859).[91]

In the post-Civil War period, when access to pistols and political instability were fostering a rise in gun violence, a first step in many communities was to enact or strengthen public carry laws. Jurisdictions that did not already have such laws began enacting them, and those using the older mechanism of sureties to keep the peace often transitioned toward the implementation of criminal statutes mandating fines and/or jail time for violators.[92] The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and generally attempted to eliminate

---

Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1 (" any person in this Commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars . . . .");.

[90] Kentucky mandated a fine of not less than $100, half of which to go to the informer. Louisiana provided for a fine of $20 to $50, with half to go to the informer; violations occurring before a court received a find of not less than $100 and imprisonment up to six months. *See* 1813 Ky. Acts 100, An Act to Prevent Persons in this Commonwealth from Wearing Concealed Arms, Except in Certain Cases, ch. 89 § 1; 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner § 1.

[91] 1819 Indiana ch. 23, "An Act to prohibit the wearing of concealed weapons," 39; 1835 Florida ch. 860, "An Act to prevent any person in this Territory from carrying arms secretly," 318; 1837 Georgia, "An Act to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons," 90; 1838 Virginia ch. 101, "An Act to prevent the carrying of concealed weapons," 76; 1838 Alabama ch. 77, "An Act to suppress the evil practice of carrying weapons secretly," 67-68; 1859 Ohio "An Act to prohibit the carrying or wearing of concealed weapons," 3:56; 1859-1860 New Mexico "An Act prohibiting the carrying of Weapons, concealed or otherwise," 94–99 (English and Spanish).

[92] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century. *See* https://firearmslaw.duke.edu/repository/search-the-repository/.

Exhibit 3
Hasan Decl._410

small, easily concealable weapons from the public sphere.[93] By the turn of the twentieth century, no fewer than sixteen more states and territories had enacted public carry laws—in other words, at least 35 of the 50 states and territories (including the District of Columbia) in existence as of 1899 had public carry laws.[94] Hawaii, which

---

[93] In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes. For example, see 1883 Ariz., ch. 36 ("dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol . . ."); 1882 W.V., ch. 85 ("revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of the like kind or character . . ."); 1871 Tex., ch. 34 ("any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense . . ."); 1886 Md., ch. 375 ("any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted) . . ."); 1873 Penn., ch. 810 ("any pistol, dirk-knife, slung-shot or deadly weapon . . ."); 1879 N.C., ch. 127 ("any pistol, bowie-knife, dirk, dagger, slung-shot, loaded cane, brass, iron or metallic knuckles, or other deadly weapon of like kind . . ."); 1866 N.Y., ch. 716 ("any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword cane or air gun . . ."). This is not an exhaustive list.

[94] *See supra*, pp. 17–24 and corresponding citations; 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1863 California ch. 485, "An Act to prohibit the Carrying of Concealed Weapons," 748-749; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1864 Dakota Territory *Penal Code* § 455; 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27; Harvey B. Hurd, editor, *Revised Statutes of the State of Illinois* (Springfield: Illinois Journal Co., 1874), ch. 38 § 56, "Disturbing the Peace"; 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76; Guy A. Brown, compiler, *Compiled Statutes of the State of Nebraska* (Omaha: Gibson, Miller & Richardson, 1881), ch. 5, "Offenses Against Public Peace and Justice," § 25; Washington (State), *Code of Washington* (Olympia: C. B. Bagley, 1881), 181 § 929; 1882 West Virginia ch. 110, 317 § 8; 1883 Missouri 76; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31; 1890 Oklahoma "Crimes and Punishment," ch. 25, Art. 38, "Of Crimes Against the Public Health and Safety," 476 § 20; "To Punish the Carrying or Selling of Deadly or Dangerous Weapons within the District of Columbia, and for other Purposes," ch. 159, 52 Congress, Public Law 52–159, 27 Stat. 116 (1892), 116-117; *Revised Codes of the State of North Dakota* (Bismarck: Tribune Co., 1895), "Penal Code: Public Health and Safety," 1293 § 7313; Fred F. Barker, *Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867 to March 3, 1905* (Washington, D.C.: U.S. Gov. Print. Off., 1906), "Appendix A.," ch. 6, "Offenses Against the Public Peace," 139–140 § 118.

Exhibit 3
Hasan Decl._411

became a territory in 1900, had enforced public carry regulations since 1852.[95] Those states which did not have public carry laws generally had local ordinances on the subject in the larger towns or had other statutes pertaining to carrying weapons with intent to assault, burglarize, etc.[96]

## TAXATION AND SENSITIVE PLACES STATUTES

Other methods of gun and weapon regulation of public carry existed in the nineteenth century, including taxation policies and disarmament requirements at certain sensitive places. These laws often coexisted with public carry laws, adding another regulatory layer to Americans' relationships to their weapons and their communities. These policies were designed to protect the public by discouraging people from being armed in public spaces, or established standards for dealers in firearms that could appropriately regulate the trade in and access to deadly weapons within American communities.

**Taxation**

One mode of regulating weapons during the antebellum nineteenth century involved taxation. The taxing power exists to raise revenue, but it has also historically been exercised as part of the police power. Some taxes are more about discouraging certain behaviors, such as modern day taxes on tobacco and alcohol, deemed harmful to society rather than simply to raise revenue.[97] Americans living in the antebellum

---

[95] "An Act to Prevent the Carrying of Deadly Weapons," *Hawaii: Kingdom of Kamehameha*, III-V, Regular Sessions (1852), 19.

[96] Jersey City, New Jersey had local public carry and registration laws, illustrating the approach of using ordinances in the larger cities of states without a public carry statute. See *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), 41, 86–87. California also pursued what was essentially a local option for license-to-carry programs. See infra, pp. 47–48 and corresponding citations. New York used the approach of penalizing being in possession of certain weapons with intent to commit a crime. See John W. Edmonds, editor, *Statutes at Large of the State of New York* (Albany: Weed, Parsons & Company, 1874), ch. 716, "An Act to prevent the furtive possession and use of slung-shot and other dangerous weapons," 810–811.

[97] For historical understandings of the taxing power, see Thomas M. Cooley, *A Treatise on the Law of Taxation: Including the Law of Local Assessments* (Chicago: Callaghan, 1876), 396; Ernst Freund, *The Police Power: Public Policy and Private*

**Exhibit 3**
**Hasan Decl._412**

period sometimes turned to taxes upon the sale, possession, and use of deadly weapons as a mode of regulating them.

Sometimes taxes were straightforward attempts to prohibit the carrying of weapons without saying so explicitly. This approach was practiced in Florida during its territorial phase and remained a policy option for much of the nineteenth century.[98] In 1835, the territorial government enacted a public carry law with a steep fine of $50 to $500 for violations and an exemption for "carrying arms openly, outside of all their clothes."[99] Unsatisfied with the public carry law, leaders established a new series of prohibitive taxes designed to further reduce the presence of deadly weapons in public. This 1838 enactment held that anyone who chose "to vend dirks, pocket pistols, sword canes, or bowie knives" had to first pay an annual tax of $200, "and all persons carrying said weapons openly shall pay…a tax of ten dollars annually."[100] In 2023 dollars, the annual occupation tax would amount to approximately $6,300, and the annual open carry tax would amount to approximately $320.[101] In a sparsely populated, rural environment, these taxes were clearly designed to discourage trade in and public carry of deadly weapons. The architects of the statute saw it as intrinsically connected to the previously enacted concealed carry restriction—as a way of more effectively reducing the number of weapons carried in public spaces.[102]

---

*Rights* (Chicago: University of Chicago Press, 1904), 33–34.

[98] In some ways, possession taxes came close to being carry taxes or even proto-licensing policies. Taxation as a form of public carry regulation was considered in Texas in 1866 as well as in Tennessee in 1893. See *infra*, n. 124; "Tennessee State News," *Bolivar Bulletin* (Bolivar, Tennessee) February 10, 1893, 1. https://chroniclingamerica.loc.gov/lccn/sn89058007/1893-02-10/ed-1/seq-1/.

[99] John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources. *See supra*, nn. 53, 57.

[100] 1838 Fla., ch. 24.

[101] The amounts reach $319.14 and $6,382.73. *See*: https://www.in2013dollars.com/us/inflation/1838?amount=200.

[102] The title of the 1838 tax was "An Act in addition to An Act, (approved January 30, 1835,) entitled An Act to prevent any person in this Territory from carrying arms secretly." *See supra*, n. 68.

**Exhibit 3**
**Hasan Decl._413**

Some southern states also placed annual taxes upon the owners of deadly weapons. Prior to the Civil War, taxation of property was the primary vehicle for states to raise revenue. In the South, taxes upon slave property made up the lion's share of contributions, with other ad valorem taxes or poll taxes making up the difference. [103] Real property exceeding certain thresholds would be taxed, "intangible" property like investments were taxed, and moveable property (especially luxury goods or items associated with vices) could be taxed at standard rates as well.[104] Bowie knives, dirks, and pistols sometimes made their way into the lists of taxable items.[105]

A North Carolina revenue measure from 1850 provides an example of moveable property taxes in the antebellum South. The law spanned nine pages and included nineteen sections spelling out which forms of property could be taxed, at what rates, how they were to be paid, the manner in which tax information should be reported, and the penalties for failure to comply with the law.[106] Section 5 provided for ad valorem taxes upon "plate, jewelry, vehicles, &c.," a category that included items like buggies, pianofortes, watches, billiard tables, and playing cards alongside pistols and bowie knives.[107] The items on the list were decidedly *not* necessities, and they included accoutrements associated with gambling, drinking, sumptuous living,

---

[103] Robin Einhorn, *American Taxation, American Slavery* (Chicago: University of Chicago Press, 2006); Peter Wallenstein, "Rich Man's War, Rich Man's Fight: Civil War and the Transformation of Public Finance in Georgia," *Journal of Southern History* 50, no. 1 (February 1984), 15–42.

[104] Brian Sawers, "The Poll Tax before Jim Crow," *American Journal of Legal History* 57, no. 2 (June 2017),175–78.

[105] For example, see 1850 NC, ch. 121; 1856 N.C., ch. 34; 1866 N.C. ch. 21; Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848, Page 182, Image 182 (1848) available at The Making of Modern Law: Primary Sources. This is not an exhaustive list. Mississippi repealed its tax upon "Bowie-knives, Sword-canes and Dirk-knifes" during the first year of fighting in the Civil War. 1861 Miss. Ch. 125.

[106] 1850 North Carolina, ch. 121.

[107] *See id.* § 5.

Exhibit 3
Hasan Decl._414

and the reckless carrying of weapons—in other words, items associated with extravagance, vice, and irresponsibility.[108] The rate of tax upon pistols and knives was relatively high: $1 on all pistols ("except such as shall be used exclusively for mustering") and bowie knives, and $0.50 on all dirks and sword canes.[109] One dollar was the same rate of taxation as that for buggies and carriages valued at $100-200. The relatively high tax rate on knives and pistols seems to have prompted the addition of a proviso that limited its scope to "only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner."[110] In other words, a person wanting to avoid the tax upon these deadly weapons need only leave them at home rather than carry them habitually. This North Carolina tax was not necessarily prohibitive, but it certainly incentivized public disarmament through potential tax savings. In this way, the 1850 North Carolina possession tax functioned much like the 1835 Florida open carry tax in its purpose of discouraging the public carry of deadly weapons.

Local governments also pursued occupation taxes and licensing requirements for certain business enterprises, which often included dealers in firearms and owners of shooting galleries. Charters issued by state governments bestowed upon American city governments immense power over the lives and economies of their residents. City leaders often taxed shooting galleries along with other venues of entertainment, and sometimes they taxed dealers in firearms.[111]

---

[108] Law and policy scholars writing about taxation have historically understood the tax power as being invoked sometimes for the raising of revenue and at other times for the discouragement of problematic activities or behaviors. *See supra*, n. 65.

[109] There was an exception for these weapons that were "kept in shops and stores for sale." *See supra*, n. 75.

[110] *Id.*

[111] The Duke Repository of Historical Gun Laws identifies more than one hundred "taxation/registration" laws across the colonial period to 1930. Further research has uncovered (and will likely continue to uncover) additional laws, at both the state and local level. *See, e.g.*Dave Kopel, "Bowie Knife Statutes," *The Volokh Conspiracy* (November 20, 2022), https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/ (describing

**Exhibit 3**
**Hasan Decl._415**

By the post-Civil War period, taxation policies generally focused upon occupation or other dealer taxes rather than taxes upon personal use or possession of deadly weapons as some states had done in the antebellum era. Alabama was one exception, where taxes of $2 and $3 on pistols, revolvers, and bowie knives "in the possession of private persons not regular dealers" was in effect as of 1867.[112] Georgia lawmakers enacted a firearms possession tax in 1866, and their counterparts elsewhere considered similar measures. Still, taxation as a form of regulation came to be applied to the point of sale rather than fall upon the weapon owner.[113]

Occupation taxes and sales taxes were one method employed by postbellum lawmakers. For instance, an occupation tax in Alabama applied to "dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not." The dealer had to pay an annual licensing fee of $300 in order to legally

---

personal taxes upon weapons not in Repository). But ome example regulations from the Repository include: Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149–50, Image 149–150 (1856) available at The Making of Modern Law: Primary Sources (taxing shooting batteries within the city); 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement §§ 1, 2 (levying an annual tax of no more than $200 on anyone owning rifle galleries or pistol galleries in the city); John W.A. Sanford, The Code of the City of Montgomery, Prepared in Pursuance of an Order of the City Council of Montgomery Page 7–9, Image 12 (1861) available at The Making of Modern Law: Primary Sources (levying an annual tax of unspecified value upon pistol galleries within the city).

[112] *Revised Code of Alabama* (1867), 169, "Taxation," § 10. This citation is drawn from the Duke Repository of Historical Gun Laws. It remains unclear when the tax went into effect and when it was removed, but it was part of the code in 1867. The tax was assessed at $2 for pistols and revolvers and $3 for bowie knives and "or knives of the like description." These taxes amount to $40.79 and $61.18 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1867?amount=2 and https://www.in2013dollars.com/us/inflation/1867?amount=3.

[113] 1866 Georgia 27-28 § 3–4 (assessing a tax of $1 for each "gun or pistol, musket or rifle over the number of three kept or owned on any plantation" in select counties.). Texas lawmakers, also acting during Presidential Reconstruction, considered a public carry tax but could not agree on the details. Brennan Gardner Rivas, "An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," *Southwestern Historical Quarterly* 121, no. 3 (January 2018), 290.

Exhibit 3

Hasan Decl._416

conduct business, which amounts to nearly $10,000 today.[114] In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons." A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business—which would be nearly $900 today.[115]

In the early twentieth century, members of the Texas legislature put in place a 50% tax on the gross receipts from the sale of pistols. All dealers had to report quarterly the number sold along with payment, which functioned as an occupation tax for them to remain in business.[116] The intention of the measure was to make pistols prohibitively expensive. Dealers and buyers found loopholes, which the lawmakers did not attempt to close. But a trade organization representing gun dealers opposed the law and challenged it in state court. A Texas appellate court upheld the stringent sales tax, describing the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society." As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging

---

[114] *See* 1892 Alabama ch. 95, 183; and Robert C. Brickwell, et al, *Code of Alabama, Adopted by Act of the General Assembly Approved February 28, 1887* (Nashville: Marshall & Bruce, 1887), ch. 9, Art. I § 629. The $300 licensing fee was in effect some time prior to 1887, and an 1892 amendment closed a loophole for dealers in "pistol cartridges." The subsequent Article specifies that all licenses expire annually; *see* ch. 9, Art. II § 634.

[115] Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; *see* https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Bfacet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc. Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet. Twenty-five dollars in 1894 would be $874.53 in 2023 dollars. *See* https://www.in2013dollars.com/us/inflation/1894?amount=25.

[116] 1907 Texas ch. 18, "An Act providing for the levy and collection of an occupation tax . . .[]" 485 § 12.

39

Exhibit 3
Hasan Decl._417

1    therein."[117]

2    **Sensitive Places**

3          Statutes disarming certain sensitive places date to the colonial era and were

4    already longstanding by the 1870s, but the escalating gun violence prompted an overt

5    expansion of that policy to meet the needs of the day. Where historical laws had

6    protected polling places and court buildings (which were the major occasions for

7    public gatherings in rural early America—not just sites of government activity),

8    updated laws added theaters, open-air presentations, and even private parties to the

9    assemblies protected through disarmament. In 1869, Tennessee lawmakers

10   prohibited the carrying of deadly weapons "concealed or otherwise" at elections or

11   "any fair, race course, or other public assembly of the people."[118] Similarly in 1870,

12   Georgia lawmakers prohibited the carrying of deadly weapons "to any court of

13   justice, or any election ground or precinct, or any place of public worship, or any

14   other public gathering in this State, except militia muster-grounds."[119] A law from

15   Texas prohibited all deadly weapons, including "fire-arms, wither known as a six

16   shooter, gun or pistol of any kind" at a host of events ranging from churches to polling

17   places "or other social gathering composed of ladies and gentlemen."[120] Laws in

18   effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to

19   ───────────────

20          [117] *Caswell & Smith v. State*, 148 S.W. 1159 (Tex. App. 1912).

            [118] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act
21   to Amend the Criminal Laws of the State," § 2 (Ex. M). The section read in full:
     "That it shall not be lawful for any qualified voter or other person attending any
22   election in this State, or for any person attending any fair, race course, or other public
     assembly of the people, to carry about his person, concealed or otherwise, any pistol,
23   dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling
     a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The
24   following section (§ 3) stated: "That all persons convicted under the second section
     of this act shall be punished by fine of not less than fifty dollars, and by
25   imprisonment, or both, at the discretion of the court."

            [119] Act No. 285, 1870 Ga. Laws 421 (Ex. N). The list of prohibited weapons
26   included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon."
     There was also no implicit or explicit exception for open carry. Violators convicted
27   received a fine ($20–50), imprisonment (10–20 days), or both.

            [120] 1870 Tex. Gen. Laws 63, ch. 46 § 1.
28

40

**Exhibit 3**
**Hasan Decl._418**

it.[121] Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[122] Other laws prohibited the carrying of weapons within the general vicinity of polling places, churches, and parks.[123]

## LICENSING PUBLIC CARRY IN CALIFORNIA HISTORY

As structural forces like industrialization and urbanization propelled the growth

---

[121] *Revised Statutes of the State of Missouri* (1879), ch. 24 § 1274; 1890 Okla. Stat. 495–96.

[122] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," § 1030. "A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both." *Laws of Vermont*, Special Session (1891), No. 85 § 2. "A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars." It is worth noting that disarmament laws and policies had been in effect at both public and private colleges long before this time. For example, *see* The Minutes of the Senatus Academicus of the State of Georgia, 1799–1842, at 86 (1810); University of Virginia Board of Visitors Minutes, 6–7 (October 4–5, 1824); Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina, Laws for the Government of the University, at 15 Chapter V (1838). This is not an exhaustive list.

[123] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317–1318 (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 § 1 (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace § 21 (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (no one save city police officers shall carry weapons into public parks).

Exhibit 3
Hasan Decl._419

1    of more sophisticated governmental administration in the United States, gun policies

2    evolved in ways that increased official oversight of weapon sales and carrying. The

3    sales registries enumerated above placed special requirements on dealers, but their

4    intention was to empower police and other officials to solve crimes by providing

5    them with information.[124] In a similar way, licensing either for purchase of a pistol

6    or for public carry of one grew out of American traditions of regulating deadly

7    weapons.

8        One of the earliest proponents of licensing as a way of regulating the carrying

9    of pistols was California. The state had enacted a public carry law that prohibited

10   concealed deadly weapons, but residents grew frustrated that it did not seem to be

11   effective. In 1866, members of the state legislature divided over what to do about the

12   problem.[125] One camp proposed issuing licenses to people who needed a pistol for

13   personal protection. The state did not adopt their proposal and instead repealed the

14   public carry law. In the aftermath of that decision, California municipal governments

15   began passing ordinances that provided for licensing in order to carry a pistol in

16   public.[126] The policy proved popular, and by the turn of the twentieth century a

17   majority of California residents lived in municipalities that had implemented a

18

19       [124] The examples cited above (*supra*, n. 151, n. 152) included requirements that registries be open for the review of police and others.

20       [125] Theodore Henry Hittell, *The General Laws of the State of California, from 1850 to 1864, Inclusive* (1868), "An Act to prohibit the carrying of concealed

21   weapons," 261 § 1–2. On frustration among the public, see "Concealed Weapons," *Morning Union* (Grass Valley, California), February 20, 1869 ("The object was to

22   prevent indiscriminate shooting among a class about whose welfare there need not have been any extraordinary solicitude; but the result has been to place the law-

23   abiding portion of the community at the mercy of night-prowlers, footpods, and garroters.").

24       [126] For example, *see* Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, reprinted in R. M. Clarken, editor,

25   *Charter and Ordinances of the City of Sacramento* (1896), 173; Prohibiting the Carrying of Concealed Deadly Weapons, Sep. 17, 1880, reprinted in *General

26   Orders of the Board of Supervisors Providing Regulations for the Government of the City and County of San Francisco* (1884), 8; "Concealed Weapons," *Napa

27   Daily Register* (Napa, California), November 10, 1880, 2. This is not an exhaustive list.

28

Exhibit 3
Hasan Decl._420

permitting process for the public carry of concealed weapons.[127] Municipalities elsewhere during the nineteenth century implemented licensing policies: Jersey City, New Jersey did so in 1873 and the District of Columbia in 1892.[128]

## NINETEENTH-CENTURY DISTINCTIONS BETWEEN URBAN AND RURAL LOCALES

In American history, it has been common for people to draw distinctions about the relative dangers of deadly weapons in urban versus rural locales. Public carry laws often featured modified rules for long-distance travelers venturing beyond the safety of their local communities. When exposed to the dangers of the highway bushwhacker or the prowling coyote that went along with nineteenth-century horseback travel, laws generally allowed the carrying of weapons—including those statutorily restricted as deadly weapons.[129] But these travel exceptions were closely guarded by appellate courts, who typically required the travel to last overnight, cross county lines (which was a much more significant marker of distance in then than it is now), or otherwise take a person beyond his "circle of neighbors."[130] Another

---

[127] Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth Amendment," *UC Davis Law Review Online* 55 (September 2021), 84.

[128] *Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871* (1874), "An Ordinance in Relation to the Carrying of Dangerous Weapons," § 3 (*supra*, n. 116); *supra*, n. 115 § 2.

[129] 1840 Ala., ch. 7, "Of Miscellaneous Offenses," 148-149 ("Every one who shall hereafter carry concealed about his person, a bowie knife…or any other deadly weapon, pistol or any species of fire arms, or air gun, unless such person be…setting out on a journey…"); 1878 Mississippi ch. 46, "An Act to prevent the carrying of concealed weapons, and for other purposes," 175–76 ("That any person not…traveling (not being a tramp) or setting out on a journey…who carries concealed, in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon…"); 1871 Texas ch. 34, "An Act to Regulate the Keeping and Bearing of Deadly Weapons," 25–27, § 1 ("Provided, that this section shall not be so construed as…to prohibit persons traveling in the State from keeping or carrying arms with their baggage."); 1831, Indiana – Revised Laws, 15th Session, Chapter 26, "An Act relative to Crime and Punishment, 180-199 at 192, §58 ("That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other dangerous weapon concealed…"); 1871Tenn., ch. 90, "An Act to preserve the peace and prevent homicide," 81-82, § 3 ("That the provisions of the first section of this Act shall not apply to…any person who is on a journey out of his county or State.").

[130] *Carr v. State*, 34 Ark. 448 (1879); *Eslava v. State*, 49 Ala. 355 (1873); *Smith*

Exhibit 3
Hasan Decl._421

1  requirement was often that a traveler check his weapons upon arriving to a town or

2  to depart town as soon as his business was finished without visiting shops or

3  restaurants.

4       There are examples of cities and towns, many of them in California, enacting

5  local public carry ordinances in jurisdictions that did not have statewide laws.

6  Between 1870 and 1917, California did not have a statewide public carry law. Instead,

7  municipalities themselves—ranging in size from Los Angeles and San Francisco to

8  Lompoc and St. Helena—issued licenses to applicants who could show that they were

9  particularly vulnerable to attack and therefore in need of a weapon for self-defense.[131]

10 In the immediate aftermath of the Civil War, several towns of varying size within

11 Texas enacted ordinances against the carrying of weapons.[132] At that time, the state

12 did not have a public carry law; rather than try to stop the cities from pursuing policies

13 that promoted safety, the legislature provided protection to their public carry laws.

14 For instance, Galveston's public carry law went into effect in 1865[133], and the

15 following year state lawmakers issued a new charter to the City of Galveston,

16 granting its leadership the power "To regulate the carrying of weapons, and prevent

17 the carrying of the same concealed."[134] It was not until 1870-1871 that Texas pursued

18

19 *v. State*, 50 Tenn. 511 (1872); *Darby v. State*, 23 Tex. Ct. App. 407 (1880). See also, John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's

20 Journey Exception to the Offense of Carrying a Weapon," *Arkansas Law Review* 66, no. 2 (2013): 463-484.

21 [131] See Saul Cornell, "The Right to Regulate Arms in the Era of the Fourteenth

22 Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America," *US Davis Law Review Online* 55 (September 2021), 65-90 at 84-85 (see Table 3: Municipalities with Permit Schemes in Post-Civil War California).

23 [132] "Proceedings of the City Council," *Flake's Bulletin* (Galveston, Texas),

24 December 28, 1865; "Ordinances Passed," *Goliad Intelligencer* (Goliad, Texas) March 17, 1866; "Ordinance Concerning Deadly Weapons," *Texas Countryman*

25 (Hempstead, Texas) August 10, 1867.

    [133] Ibid.

26 [134] 1866 Texas ch. 173, "An Act to Reincorporate the City of Galveston," Title

27 4: Of the City Council—Its General Powers and Duties, § 27, 13th,320, quoted in H. P. N. Gammel, ed., *The Laws of Texas, 1822-1897*, vol. 5 (Austin: Gammel Book Company, 1898),1540.

28

Exhibit 3

Hasan Decl._422

a statewide gun-safety policy by enacting a sensitive places law along with a public carry law. Kansas's deadly weapon policy specifically authorized towns to regulate the carrying of weapons "concealed or otherwise."[135]

And in the American West more broadly, different rules often applied in organized towns than in the expansive countryside beyond their borders. Colorado, Idaho, Montana, Arizona, New Mexico, and Wyoming explicitly prohibited the carrying of concealed weapons in towns and settlements.[136] Dodge City, Kansas and some of the other cattle towns at western railheads famously prohibited the carrying of guns within city and town limits.[137] While it may be tempting to interpret these laws as allowing an "anything goes" attitude toward deadly weapons outside of towns and cities, such a conclusion would be a mistake. People traveling in isolated areas may have carried a bowie knife or pistol on their belt for protection, and such behavior would be in line with the longstanding travel exceptions that had been in force in much of the country for decades. But more importantly, a person traveling long distances and subject to attack from bushwhackers or wild animals would be much more likely to turn to a rifle for self-preservation than a pistol. Breech-loading rifles were becoming the national standard in the post-Civil War period and could fire several shots before needing to reload. The Winchester rifles of the late 1860s and early 1870s could hold upwards of ten rounds in their fixed magazines attached

---

[135] See *Salina v. Blaksley*, 72 Kan. 230 (1905); 1881 Kan. Sess. Laws 92, c. 37, § 24.

[136] 1852 New Mexico, "An Act Prohibiting the carrying of a certain class of Arms, within the Settlements and in Balls," 67-70 (in English and Spanish); 1862 Colorado ch. 4, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 56; 1864 Montana ch. 43, "An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of this Territory," 355; 1888 Idaho "An Act Regulating the Use and Carrying of Deadly Weapons in Idaho Territory," 23; 1889 Arizona ch. 13, "An Act Defining and Punishing Certain Offenses Against the Public Peace," 30–31.

[137] For the famous photo and a brief explanation of Dodge City and other western ordinances, see Matt Jancer, "Gun Control Is as Old as the Old West," *Smithsonian Magazine*, February 5, 2018, https://www.smithsonianmag.com/history/gun-control-old-old-west-180968013/ .

Exhibit 3
Hasan Decl._423

below the barrel of the gun. These firearms could shoot farther and more accurately than a pistol, and generally carried a higher caliber. Though not commonly possessed in the US during Reconstruction, Americans venturing into the rural West as immigrants or hunters would certainly have turned to a rifle for protection, and their exemption for carrying deadly weapons in uninhabited or sparsely inhabited zones was essentially a recapitulation of the exemption for travelers that had taken root in some Old Southwest states (Texas, Arkansas, Missouri, etc.).

When considering how nineteenth-century Americans viewed the urban-rural distinction and its consequences for gun policy, sensitive places laws are particularly helpful. They identified as protected spaces those spaces of gathering and assembly that define life in an organized, incorporated community—meeting halls, entertainment venues, educational facilities, city parks, and social parties. These laws often prohibited *all firearms* in addition to deadly weapons, and effectively turned any gathering space into a de facto disarmed zone; they show us that nineteenth-century Americans believed that gatherings—the quintessential feature of town or city life—and guns simply did not go together.

## CONCLUSION

Public carry laws are an integral part of the American tradition of regulating the presence of deadly weapons in public spaces—those carried openly as well as those carried concealed. These weapons were generally defined by law and had in common the fact that they were not only concealable, but designed to be carried concealed. The term *deadly weapons* generally referred to pocket pistols, bowie knives, metal knuckles, slung shots, and other weapons that were associated with crime rather than civic service. Technological developments made pistols simultaneously smaller and more lethal, and socio-political events encouraged Americans to view one another and their institutions with suspicion rather than respect. This confluence of events created an increase in weapon-carrying and crime which Americans addressed by enacting public carry statutes.

**Exhibit 3**
**Hasan Decl._424**

In addition, weapon policies might distinguish between urban versus rural locales, and these differences speak to a nineteenth-century understanding of towns and cities as areas deserving of special protection. When considered in conjunction with overlapping sensitive places requirements and municipal ordinances, public carry laws demonstrate that Americans have historically recognized that assemblies, entertainment venues, and other social gatherings are intrinsic to community life and endangered by the presence of weapons. Exemptions for persons outside of settled areas, which were fairly common in the American West, operated like the traveler exemptions that were in force in other states. Those travel exemptions were about providing some security to people who were exposing themselves to potentially lethal situations involving bushwhackers or predatory animals, not an unmitigated license to engage in behaviors that were customarily condemned and otherwise prohibited by law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 31, 2023, at Fort Worth, Texas.

*Brennan Rivas*

Dr. Brennan Rivas

47

Exhibit 3
Hasan Decl._425

# Exhibit A

**Exhibit 3**

**Hasan Decl._426**

# Brennan Gardner Rivas

Curriculum Vitae · May 2023

## Employment

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
  University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
  2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
  Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
  the Lone Star State, 1836-1930"
  Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
  Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
  1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
  on the Place of Guns in American Law and Society* (New York: Oxford University Press,
  forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
  (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
  Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
  Journal of the Early Republic*, forthcoming, 2023.
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
  Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
  Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
  *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History

**Exhibit 3**
**Hasan Decl._427**

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures
"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)
"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"
"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers
"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records
"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards
Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in American history
Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books
The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students
Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress
*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the Great Plains and trans-Mississippi West

**Exhibit 3**
**Hasan Decl._428**

Status: Research and writing in progress

## University Teaching Experience
*Instructor of Record*
Lecturer in American History, Texas Christian University                          2019-2020
    "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
    "American History since 1877: The Quest for Equality" (HIST 10613)
    "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*
Teaching Assistant, Texas Christian University                          2017-2018
    American History to 1877 (HIST 10603)
    American History since 1877 (HIST 10613)

*Teaching Interests*
American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks
"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service
Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020

**Exhibit 3**
**Hasan Decl._429**

~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016

~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015

~ Informal departmental program designed to ease the transition for incoming graduate students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM, D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC, D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Jones v. Bonta*, California, 3:19-cv-01226-L-AHG, S.D. Cal.

## Professional Memberships

Society for Historians of the Gilded Age and Progressive Era

Texas State Historical Association

Southern Historical Association

American Historical Association

## Languages

Spanish (Proficient)

Latin (Proficient)

**Exhibit 3**

**Hasan Decl._430**