1   ROB BONTA
    Attorney General of California
2   R. MATTHEW WISE
    Supervising Deputy Attorney General
3   IRAM HASAN
    Deputy Attorney General
4   State Bar No. 320802
     455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3793
6    Fax:  (415) 703-5480
     E-mail:  Iram.Hasan@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta, in his official
    capacity as California Attorney General*

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11

12

13  | **CHARLES NICHOLS,** | 2:11-cv-09916-SSS-KES |

14  | Plaintiff, | **NOTICE OF FILING** |

15  | **v.** | **PLAINTIFF'S DEPOSITION TRANSCRIPT** |

16  | | Magistrate Judge: The Honorable |

17  | **ROB BONTA, in his official capacity as Attorney General of California,** | Karen E. Scott |
    | | Trial Date:      None Set |
    | | Action Filed:    November 30, 2011 |

18  | Defendant. | |

19

20      In accordance with the Court's October 2, 2024 order (ECF No. 216),

21  Defendant files a full copy of Plaintiff's 2013 deposition transcript, attached as

22  Exhibit 1 to this cover pleading.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

                                    1

1    Dated:  October 4, 2024                    Respectfully submitted,

2                                              ROB BONTA
                                              Attorney General of California
3                                              R. MATTHEW WISE
                                              Supervising Deputy Attorney General
4

5

6                                              */s/ Iram Hasan*

7                                              IRAM HASAN
                                              Deputy Attorney General
                                              *Attorneys for Defendant Rob Bonta,*
8                                              *in his official capacity as California*
                                              *Attorney General*

9

10   SA2012104470

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1:
# Deposition Transcript

1              IN THE UNITED STATES DISTRICT COURT

2

3          FOR THE CENTRAL DISTRICT OF CALIFORNIA

4

5                LOS ANGELES - SPRING STREET

6

7
                                    )
8   CHARLES NICHOLS,                )
                                    )
9            Plaintiff,             )
                                    )
10           vs.                    )  Case No.
                                    )  CV-11-09916-SJO-SS
11  EDMUND G. BROWN, JR., in his    )
    official capacity as Governor   )
12  of California, KAMALA D.        )
    HARRIS, Attorney General, in    )
13  her official capacity as        )
    Attorney General of California,)
14  CITY OF REDONDO BEACH, CITY OF  )
    REDONDO BEACH POLICE            )
15  DEPARTMENT, CITY OF REDONDO     )
    BEACH POLICE CHIEF JOSEPH       )
16  LEONARDI; and DOES 1 to 10,     )
                                    )
17           Defendants.            )
                                    )

18

19                      DEPOSITION OF
                       CHARLES NICHOLS
20                 LOS ANGELES, CALIFORNIA
                  FRIDAY, OCTOBER 18, 2013
21

22  ATKINSON-BAKER, INC. COURT REPORTERS
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  MONIKA C. COYLE, CSR NO. 4254
    FILE NO.: A70AA47
25

1

1                IN THE UNITED STATES DISTRICT COURT

2

3            FOR THE CENTRAL DISTRICT OF CALIFORNIA

4

5                 LOS ANGELES - SPRING STREET

6

7

8                                          )
     CHARLES NICHOLS,                      )
9                                          )
              Plaintiff,                   )
10                                         )
              vs.                          )  Case No.
11                                         )  CV-11-09916-SJO-SS
     EDMUND G. BROWN, JR., in his          )
12   official capacity as Governor         )
     of California, KAMALA D.              )
13   HARRIS, Attorney General, in          )
     her official capacity as             )
14   Attorney General of California,)
     CITY OF REDONDO BEACH, CITY OF )
15   REDONDO BEACH POLICE                   )
     DEPARTMENT, CITY OF REDONDO           )
16   BEACH POLICE CHIEF JOSEPH             )
     LEONARDI; and DOES 1 to 10,          )
17                                         )
              Defendants.                  )
18                                         )

19

20
              Deposition of CHARLES NICHOLS, taken on
21   behalf of Defendants, at 300 South Spring Street,
     6th Floor, Los Angeles, California, commencing at
22   8:59 a.m., Friday, October 18, 2013, before Monika
     C. Coyle, CSR No. 4254.
23

24

25

APPEARANCES:

For the Defendants:

STATE OF CALIFORNIA
BY:  JONATHAN M. EISENBERG, ESQ.
300 South Spring Street
Suite 1702
Los Angeles, California 90013
(213) 897-6505

```
 1                              INDEX

 2   Witness:   CHARLES NICHOLS

 3
     EXAMINATION                                      Page
 4
     BY MR. EISENBERG                                 5
 5

 6   EXHIBITS

 7   1   Notice of Deposition                         15
     2   Examiner.com, October 30, 2009               17
 8   3   OpenCarry Forum, July 11, 2010               24
     4   CalGuns.net, August 30, 2010                 27
 9   5   OpenCarry Forum, September 3, 2010           28
     6   OpenCarry Forum, June 3, 2011                30
10   7   Examiner.com, August 25, 2011                34
     8   OpenCarry Forum, August 31, 2011             35
11   9   OpenCarry Forum, November 17, 2011           48
     10  Declaration of Charles Nichols               49
12   11  Firing Line Forum, April 23, 2012            56
     12  OpenCarry Forum, May 16, 2012                58
13   13  OpenCarry Forum, May 24, 2012                68
     14  First Amended Complaint                      70
14   15  Laguna Niguel Patch, June 19, 2012           76
     16  Article, NoozHawk                            79
15   17  Opposition to Ex Parte                       89

16

17

18

19

20

21

22

23

24

25
```

                      CHARLES NICHOLS,

1                  having been first duly sworn, was

2                  examined and testified as follows:

3

4

5

6                         EXAMINATION

7  BY MR. EISENBERG:

8       Q.  Good morning, Mr. Nichols.  I know that

9  you know my name, but I'm just going to state it for

10 the record.  I am Jonathan M. Eisenberg.

11          I'm a Deputy Attorney General in the

12 Office of the California Attorney General

13 representing Attorney General Kamala D. Harris in

14 the lawsuit Nichols v. Brown that you brought

15 regarding California's laws regulating the open

16 carrying of firearms in public places.

17          I'll be asking you questions today about

18 the allegations and issues raised in your lawsuit.

19 You understand that you've just taken an oath to

20 tell the truth, the whole truth and nothing but the

21 truth, sir?

22      A.  I have affirmed.  I have not sworn.

23      Q.  I believe you were sworn by the witness

24 (sic) -- by the court reporter on affirmation, yes?

25      A.  I have -- I have affirmed that I will

1    tell the truth under penalty of perjury.  I've made

2    no sworn oath to the effect.

3        Q.  Fine.  Fine.  Okay.  Please state your

4    full name for the record.

5        A.  Charles Erwin Nichols.

6        Q.  How do you spell your middle name?

7        A.  At this point I'm required to -- before

8    the deposition begins I'm required to state my

9    objections for the record.  I object to the taking

10   of this deposition.

11           This case involves pure questions of law

12   and no triable facts.  There's been no Rule 26

13   discovery conference or plan.  I was not consulted

14   prior to being served with Deposition Notice.  I

15   have not stipulated to this deposition, to early

16   discovery or to being served by e-mail.

17           In order to take a deposition prior to

18   the Rule 26 discovery conference the parties must

19   either stipulate to early discovery or must seek

20   permission from the court.  I have not been served

21   with an order from this court giving permission to

22   conduct this deposition.

23           Let the record show that the Deposition

24   Notice states that Defendant Kamal Harris in her

25   official Attorney General of the State of California

1  will depose Plaintiff Charles Nichols and the

2  Attorney General is not present.  The Deposition

3  Notice was post marked fewer than 14 days before the

4  deposition.

5          The Deposition Notice does not contain my

6  address as required by Rule 30(b)(1).  I did not

7  discover this defect until it was too late to notify

8  opposing counsel by mail.  I was unable to secure an

9  attorney to represent me.  Via e-mail I was

10 threatened with sanctions by Mr. Eisenberg were I to

11 file a Motion for a Protective Order.

12          Should Mr. Eisenberg decide to proceed

13 with this deposition, let the record show that I'm

14 doing so under threat I request 30 days after being

15 notified by the officer that the transcript or

16 recording is available in which to review the

17 transcript or recording.

18          And if there are changes in form or

19 substance to sign the statement listing the changes

20 and the reasons for making them.

21     Q.  Do you have further statements to make on

22 your objections?

23     A.  That is my objections at this point.  The

24 rest will be in regards to the questions posed.

25     Q.  Okay.  So I had asked you to spell your

```
 1  middle name, please?

 2          A.  E-r-w-i-n.

 3          Q.  Your last name is spelled N-i-c-h-o-l-s,

 4  correct?

 5          A.  That is correct.

 6          Q.  Have you ever been deposed before?

 7          A.  I have not.

 8          Q.  You made a statement that you were unable

 9  to secure an attorney to represent you today.  And

10  there is no attorney in the room presently.

11  Correct?

12          A.  There --

13          Q.  Other than me.

14          A.  There is -- to my knowledge there is no

15  attorney in the room other than you.

16          Q.  Did you review any documents prior to

17  today's deposition in preparation for the

18  deposition?

19          A.  No, I did not.

20          Q.  I'm going to spend a little bit of time

21  going over the deposition process.  Do you

22  understand that I will be asking you questions and

23  you're obligated to answer them unless you interpose

24  an objection that you believe gives you -- or that a

25  court would later deem give you a reason not to
```

1    answer in substance?

2         A.   It's my understanding that under FRCP

3    26(b)(1) questions must be reasonably calculated to

4    lead to the discovery of admissible evidence.  The

5    key word here is reasonable.

6         Q.   Okay.

7         A.   This is a -- this is a case involving

8    true questions of law.  There are no triable facts.

9    Therefore no question you can ask can be reasonably

10   calculated to lead to the discovery of admissible

11   evidence.

12             I'm not required to answer certain

13   questions regarding private information about

14   myself, privileged communications or product or

15   evidence of criminal activity.  I am allowed and

16   required, unfortunately, to make various form

17   objections to your questions or otherwise waive them

18   at trial.  Which there won't be.

19        Q.   I move to strike all nonresponsive parts

20   of that answer, which are most of them.  We have a

21   certain amount of time to do the deposition, Mr.

22   Nichols, and --

23        A.   You have seven hours of on the record

24   time to ask questions which you -- there are not any

25   you can ask, but go ahead, start asking your

1  questions.

2       Q.  If you make a speech that's off topic for

3  each question that I ask you, that's going to add

4  time to the deposition but it's not going to take

5  away from the seven hours that I get to question

6  you.

7       A.  You will not be allowed more than seven

8  hours on the record.  I will leave and you will be

9  required to obtain a court order to require me to

10 submit to any further questions after the seven

11 hours of on the record time has elapsed.

12      Q.  So you understand that that's how the

13 process works, but the process --

14      A.  I understand that you are allowed seven

15 hours in one day, which is today, to ask your

16 questions.  So you should start asking your

17 questions.

18      Q.  Right.  But I just want to make sure that

19 you understand that if you don't answer responsively

20 and you make a speech off of a piece of paper that

21 you have there for each question then I'm going to

22 contend that you didn't really sit for the full

23 seven hours.  You can't eat up the time by talking?

24      A.  It will still be  --

25      Q.  And making speeches -- please don't talk

1    over me.

2          A.  I'm not making any speeches.  I am just

3    informing you that what you're telling me is

4    incorrect.  You will have to go to court after our

5    seven hours has elapsed of on the record time and

6    you'll have to obtain a court order to require me --

7          Q.  I understand the procedures.  Please --

8          A.  Don't lecture me on procedures if you're

9    not going to be honest about the procedures.  So

10   if -- do you have any questions for me?

11         Q.  I'm being honest about the procedures and

12   I want to move forward.  I do want to more forward.

13         A.  Then start asking the questions.  You're

14   the one wasting the time.

15         Q.  You understand that you are --

16         A.  There you go.  Is that a question?

17         Q.  Yes, this is a question.  Please don't

18   interrupt me.  One thing that I will say in the

19   admonitions about the process is, if you and I speak

20   over each other there will be no record really

21   because the court reporter won't be able to take

22   down what two different people are saying at the

23   same time.

24             So we must not interrupt each other for

25   that reason.  Okay?

1              You understand that even though we're in

2    a conference room and not a court, and it's somewhat

3    of an informal setting, the oath you took is the

4    same in substance as the oath that you would take if

5    you were a witness in court?

6         A.  Yes.

7         Q.  I'm going to be asking questions and if

8    you don't understand a question, will you please

9    tell me that you didn't understand it?

10        A.  Yes.

11        Q.  Otherwise I'm going to assume that you

12   did understand it.  Okay.  In other words, if you

13   answer I'm going to assume that you understood the

14   question.  Okay?

15        A.  That would be an invalid assumption on

16   your part.

17        Q.  You understand my position at least?

18   Yes?

19        A.  No.  I understand that you are a lawyer

20   and you're allowed to lie.

21        Q.  If you don't hear part of a question that

22   I ask you, will you please tell me I didn't hear all

23   of that or I didn't hear some of that?  Okay?

24        A.  I'm sorry, could you repeat the

25   question?

1      Q.  The question is, if you don't hear all or

2  part of a question that I ask you, will you please

3  tell me that you didn't hear the question in part or

4  in whole?

5      A.  If I'm aware of it.

6      Q.  If during the course of the deposition

7  you realize that an earlier answer that you gave to

8  a question was inaccurate or incomplete, please let

9  me know and I will give you a chance to modify or

10  correct what you said.  Okay?

11      A.  Yes.

12      Q.  The court reporter may have a hard time

13  taking down testimony that's not spoken in English.

14  In other words, words like um-um, huh-uh.  So will

15  you please try to answer each of your questions in

16  plain English?

17      A.  Yes.

18      Q.  You made a statement indicating that you

19  are going to be requesting a transcript of the

20  proceedings here today.  So you understand the

21  proceedings are being transcribed?

22      A.  Yes.

23      Q.  You'll have an opportunity to make

24  corrections in pen on the transcript that is given

25  to you.  Do you understand that?

1          A.  I understand that I have 30 days to make

2     the corrections.  Is that an audio recording

3     device?

4               THE COURT REPORTER:  Yes.

5               MR. EISENBERG:

6          Q.  You also understand that if you do make

7     changes to this transcript they will be visible, the

8     transcript will not be retyped?

9          A.  As I recall, and I'm not certain, but I

10    believe I have to right the corrections in the

11    margins.

12         Q.  Right.  But at trial or at a later

13    proceeding I will be able to comment on the original

14    testimony and the changes.  Do you understand that?

15         A.  No.  But if it's whatever the Federal

16    Rules of Civil Procedure state it will be what

17    applies at trial, which is not going to happen.

18         Q.  Do you have any other questions about the

19    procedures of the deposition?

20         A.  Any questions about the procedure of the

21    deposition?  That was your question?

22         Q.  Correct.

23         A.  Not at this time.

24         Q.  Is there any reason today that you feel

25    that you cannot give your best testimony today?

1          A.   I don't believe I'm required to give my

2     best testimony.   I'm required to answer certain

3     questions.

4          Q.   Right.   Well, is there something about

5     your conditions today, for example you're on

6     medication, although I don't want you to tell me

7     what they are if you are, that would interfere with

8     your ability to testify completely and truthfully?

9     In other words, something that might effect your

10    memory.   Is there a factor like that?

11         A.   Other than having to get up at 4:30 in

12    the morning to be here, no.

13         Q.   You had to get up at 4:30 in the morning

14    to be here?

15         A.   Shower, shave, take the bus.

16         Q.   You have -- I'm sorry.   Did we mark --

17    let's go ahead and mark the Deposition Notice as

18    number one.   Exhibit Number 1.

19              (Whereupon, Defendant's Exhibit 1

20              was marked for identification and is

21              attached to the original transcript of

22              this deposition.)

23              MR. EISENBERG:

24         Q.   Have you seen this document before, sir?

25         A.   I cannot testify to any document.   All I

1  can say is that I received a deposition -- I can't

2  say that this is the Deposition Notice that I

3  received.

4       Q.  Will you take a moment, maybe 30 seconds

5  to scan it and see if it looks like the one that

6  you've seen before?  Tell me if it looks the same to

7  your memory.

8       A.  I cannot say that it looks the same.  It

9  looks similar.

10       Q.  What is different about this versus the

11  one that you saw before?

12       A.  The one that you sent me by e-mail -- I

13  can't tell you what's different.  I don't have a

14  photographic memory.

15       Q.  Okay.

16       A.  It looks similar.  That's all I can say.

17       Q.  Let me have you look on the third page of

18  the Deposition Notice, the Certificate of Service.

19  There's an indication there that it was mailed to

20  you by U.S. Mail as well.  Did you receive the U.S.

21  Mail copy?

22       A.  I did.  It was post marked less than 14

23  days before this deposition.  In other words, it was

24  not post marked on the third.

25       Q.  Do you remember what day it was post

1    marked for?

2           A.   I believe it was the fourth.

3           Q.   Okay.

4           A.   That is the post marked -- doesn't mean I

5    received it on the fourth.

6           Q.   Yeah.  I'm not contending that you

7    received it on the fourth.

8           A.   You stated that this would be video

9    recorded.  Is there a video camera that I'm not

10   aware of?

11          Q.   No, there's not a video camera.  There's

12   just an audio recording and the transcription being

13   taken down by the court reporter.

14               Let me mark the following exhibit next in

15   order, which I believe is Exhibit 2.

16               (Whereupon, Defendant's Exhibit 2

17               was marked for identification and is

18               attached to the original transcript of

19               this deposition.)

20               MR. EISENBERG:

21          Q.   Have you ever been a reporter for a media

22   outlet called Examiner.com?

23          A.   Objection.  Private.

24          Q.   Well, you're saying that -- are you

25   staying that this question invades your personal

17

1  privacy?

2        A.   The information is private and has

3  nothing to do with this case.  I may reconsider and

4  answer the question if you explain why the

5  information would have some bearing on this case.

6        Q.   You stated in your complaint that one of

7  the ways that you make income is by being a

8  reporter, correct?

9        A.   I do not recall making that statement in

10 my complaint.

11       Q.   In any complaint?

12       A.   I do not recall making that statement.

13       Q.   Do you recall in one of your complaints

14 saying that you write books about hieroglyphics?

15       A.   I do write books about hieroglyphics.  I

16 do not recall whether I entered that into any of my

17 complaints.

18            Keep in mind my original complaint was

19 filed in I believe November of 2011.  And this is

20 October of 2013.  As I previously stated, I do not

21 have a photographic memory.

22       Q.   Have you ever had a reputation as a

23 brawler in your life?

24       A.   That question falls under FRCP 26(c).

25       Q.   What's your answer to the question?

 1          A.  My question is you're asking me to --

 2    let's see now.  You're asking me to either speculate

 3    on what other's -- opinions of others have on me or

 4    what others may have said about me.  I have no

 5    knowledge of that.

 6          Q.  So are you denying that you have a

 7    written -- a publication in which you said you have

 8    a reputation as a brawler when you were a teenager?

 9    Are you denying that you ever wrote something like

10    that that was published?

11          A.  I do not recall, but any -- that's still

12    private and not relevant to this deposition.

13          Q.  Let me have you look at Exhibit 2, sir.

14          A.  Lack of authentication.

15          Q.  Right.  I'll represent that I got this

16    off of the Internet.  And it looks --

17          A.  Objection.  Lack of authentication.

18          Q.  I'm representing to you where I got it.

19    You are questioning the authenticity so I am --

20          A.  It hasn't been authenticated.  You're

21    saying --

22          Q.  I ask the questions.  Okay.

23          A.  And I'm making the objection.

24          Q.  Don't make speeches?

25          A.  Don't engage in a dialog.

1          Q.  I'm trying to lay a foundation for you

2     before I ask the question.  I am allowed to do

3     that.

4          A.  Foundations are laid by question.  Do you

5     have a question to make the foundation?

6          Q.  Well, I asked you the question if you've

7     been a reporter for the Examiner and you made a

8     fallacious objection that that invades your

9     privacy.  Given that you publish things all over the

10    Internet those things are not private.

11              I'm trying to get you to admit the facts

12    here instead of obstructing the deposition.

13         A.  Information is -- information is private

14    if it has nothing to do with -- private -- I do not

15    have to answer private questions.  Particularly ones

16    that don't have anything to do with this case.  You

17    know that.  And if you continue to ask it that means

18    you're asking repetitive questions.

19         Q.  Stop making speeches?

20         A.  This not a speech.  It's ground for a

21    motion to terminate the proceedings based on

22    annoyance, harassment, embarrassment, oppression and

23    undue burden or expense.

24         Q.  Okay.  Let's have you move to page two of

25    the exhibit that's before you.  The article title

1    "Why hasn't California executed Randy Kraft?"

2    Please turn to that page.

3         A.   That's not a question.   It's an

4    instruction.

5         Q.   I know.   I can't ask you the question

6    about the text unless I see that you're looking at

7    the text.   Please turn to page two.   Please turn to

8    page two of the exhibit.   Let the record reflect

9    that you have the exhibit in front of you.

10             I'll go ahead and read what it says on

11    page two and I'll ask you to confirm if you wrote

12    this.

13             "I realized later that I was never in

14    any danger of being hazed, part of it was a

15    consequence of my having matured early and the two

16    hours a day of working out with weights I had begun

17    in the eighth grade.   I was pretty much full grown,

18    weighed 173 pounds and was all muscle.   Couple that

19    with the reputation I had already earned as a

20    brawler and I was never in any danger but what did I

21    know, I still had the mind of a 14 year old."

22             You wrote those words, didn't you?

23         A.   I'm sorry, what was the question?

24         Q.   My question is, did the write the words

25    that I just read out loud?

```
 1          A.  Objection.  Private information.
 2          Q.  Have you ever heard of an Internet forum
 3  called OpenCarry.org, I believe the precise name is
 4  forum.OpenCarry.org?
 5          A.  I'm sorry, what?
 6          Q.  Have you ever heard of an Internet forum
 7  called forum.OpenCarry.org?
 8          A.  Heard of?  I don't recall anyone ever
 9  telling me that there's a forum called
10  OpenCarry.org.
11          Q.  Have you ever been online and gone to the
12  website that's known as the OpenCarry.org forums?
13          A.  Objection.  Personal information.
14          Q.  You know, if -- you're going to just make
15  us come back for another deposition.  These are
16  not -- if you make objections that don't have any
17  legal basis then I'll just have to make us come back
18  and do this again.
19          A.  You'll have to do so with a court order.
20  With a judge ordering me to answer irrelevant
21  questions to which I have a valid objection.  Which
22  unfortunately orders of that nature -- and we can
23  fight this if you want to.
24          Q.  Don't -- didn't you make posts at the
25  OpenCarry forum under the name CN Reporter?
```

```
 1          A.  Objection.  Private information.
 2          Q.  It's your contention that if you posted
 3 something online it's private?
 4          A.  Calls for me to speculate.
 5          Q.  I'm asking you what your contention is.
 6 You should know what your own contentions.  You
 7 don't need to speculate about that.  Is that your
 8 contention, that something that you posted on the
 9 Internet for everyone to see I can't ask a question
10 about because it's private?
11          A.  You can ask the questions.  You don't
12 have to answer them.
13          Q.  Right.  That you're not going to answer
14 those questions on the grounds of privacy?
15          A.  I'm not going to answer any private
16 questions that cannot be reasonably calculated to
17 lead to the discovery of admissible evidence in this
18 case.
19          Q.  You've discussed this lawsuit online a
20 lot, haven't you?
21          A.  Private information.  Objection.
22          Q.  You have a website -- well, sorry.
23          You are the president of an organization
24 called California Right to Carry, correct?
25          A.  Private information.  Objection.
```

23

1          Q.  You've posted commentary about this

2    lawsuit for years online, haven't you?

3          A.  Objection.  Private information.

4          Q.  Let's mark the following exhibit next in

5    order as Exhibit 3.  I want to ask you questions

6    about this document but I --

7          A.  Objection.  Lack of authentication.

8               (Whereupon, Defendant's Exhibit 3

9               was marked for identification and is

10              attached to the original transcript of

11              this deposition.)

12          MR. EISENBERG:

13          Q.  I'm allowed to ask you questions about a

14   document even if it's not been authenticated by

15   you.  And I didn't even have a question pending when

16   you made that objection.

17          A.  My objection is to the admission of the

18   document.

19          Q.  You're objecting to the what?

20          A.  Admission of the documents.  They haven't

21   been authenticated.

22          Q.  I'm not admitting the documents.  I'm

23   putting the documents in front of you and asking you

24   questions about them.

25          A.  You just that it was marked as Exhibit 3,

1    I believe.

2        Q.   Yes.   It has been identified as Exhibit

3    3.   I'm not -- it has not been admitted into

4    evidence, however.   I just want to ask you questions

5    about it.   My question is that you seem to be

6    refusing to answer questions about your own

7    statements about this lawsuit that you posted

8    online.

9            Am I going to be getting a privacy

10   objection if I ask you questions about your -- what

11   seem to be your statements here in Exhibit 3?

12       A.   You'll get privacy questions (sic) to any

13   questions that are not reasonably calculated to lead

14   to discovery of admissible evidence.   And are fact

15   questions about private -- that are private.   I

16   don't know how many times I have to say that.

17           You're not allowed to -- you can ask

18   these questions and I am required to object to them

19   or I waive the objection.   So I'm making the

20   objection.   We've already gone through what the

21   procedure is.

22           If you believe the -- my objections

23   should be overruled, you go to court and you get a

24   court order requiring me answer the questions.

25       Q.   Let me tell you, if I would agree for the

1  purposes of this deposition to make the deposition

2  confidential, would you then answer the questions

3  upon which you're making an objection based on

4  privacy?

5          A.  No.

6          Q.  You're contending that the privacy

7  objection means you don't have to answer the

8  questions at all?

9          A.  In the context of what I've already

10  said.  Yes.

11          Q.  Do you know of a person who -- either is

12  or was the Hermosa Beach police chief, last name

13  Savelli, S-a-v-e-l-l-i?

14          A.  I've never personally met the Hermosa

15  Beach police chief.

16          Q.  Have you ever communicated with him even

17  if it wasn't in person?

18          A.  That would be privileged communication.

19          Q.  Privileged on what basis?

20          A.  It would be work product.

21          Q.  Work product of who?

22          A.  Of me.  I'm pro se in this case.

23          Q.  Had you interviewed Chief Savelli as of

24  July 2010?

25          A.  Objection.  Private information.

1          Q.  May I have you turn to page three of the

2    Exhibit Number 3?  Please turn to page three of

3    Exhibit Number 3.  Are you refusing to do that?

4          A.  I am refusing to turn to page three of

5    any exhibit.

6          Q.  Okay.  I implore you to just go along

7    with the process, because I'm going to have to ask

8    the judge to do this all over again.  The judge is

9    not going to say you're allowed not to look at

10   exhibits that I put in front of you.

11         A.  The judge will be required to issue an

12   order instructing me to answer questions in a case

13   which involves pure questions of fact and no triable

14   issues of fact.  If she wants to do so, fine.  But

15   that will be on the record.

16         Q.  Have you ever stated publicly that in

17   your opinion the biggest obstacle to open carry are

18   the gun free school zones?

19         A.  Objection.  Private information.

20         Q.  Let's mark the following exhibit as next

21   order, which I think is number four.

22              (Whereupon, Defendant's Exhibit 4

23              was marked for identification and is

24              attached to the original transcript of

25              this deposition.)

```
 1              MR. EISENBERG:

 2         Q.  My question is have you ever looked at an

 3   Internet site called CalGuns.net?

 4         A.  Objection.  Private information.

 5         Q.  All right.  There are some postings that

 6   I located on there by CN Reporter.  Aren't you CN

 7   Reporter?

 8         A.  Objection.  Private information.

 9         Q.  I will make the following exhibit next in

10   order, Madame Court Reporter.

11              (Whereupon, Defendant's Exhibit 5

12              was marked for identification and is

13              attached to the original transcript of

14              this deposition.)

15              MR. EISENBERG:

16         Q.  Have you ever seen these pages before,

17   not necessarily in paper form but perhaps online?

18         A.  Objection.  Lack of authentication.  And

19   private information.

20         Q.  I'm asking you if you've seen the

21   document before.

22         A.  I've answered your question.

23         Q.  It's not something that needs to be

24   authenticated.  If you've --

25         A.  I've answered your question.
```

1          Q.   You are not going to answer further?

2          A.   Objection.   Counsel is trying to

3     intimidate me.

4          Q.   I'm not trying to intimidate you.   I'm

5     just trying to get information from you.   Have you

6     ever had your posts at the OpenCarry forum removed

7     by moderator for bashing other gun rights groups?

8          A.   Objection.   Private information.

9          Q.   Will you please turn to page nine of the

10    exhibit that's before you?

11         A.   No.

12         Q.   You are refusing to turn to page nine of

13    the exhibit, yes?

14         A.   Yes.

15         Q.   Okay.   Because I was going to show you

16    some text that indicates that you did have comments

17    removed for that reason and I was going to see if

18    your memory was refreshed by looking at the

19    document.   But I can't do that if you refuse to look

20    at the document.

21         A.   Is there a question in there?

22         Q.   Do you still refuse to look at the

23    document?

24         A.   I refuse to look at the document.

25         Q.   Okay.   All right.   Let's mark the

1  following exhibit next in order.  Which I believe is

2  Exhibit 6.

3          A.  Objection.  Authentication.

4              (Whereupon, Defendant's Exhibit 6

5              was marked for identification and is

6              attached to the original transcript of

7              this deposition.)

8              MR. EISENBERG:

9          Q.  On page --

10         A.  You did record that didn't you?

11             THE COURT REPORTER:  I take everything

12 down that you say.

13             THE WITNESS:  I didn't see you typing.

14             THE COURT REPORTER:  I was.

15             THE WITNESS:  Okay.

16             MR. EISENBERG:

17         Q.  I'd like to have you move to page two of

18 the document.  Where it says that Charles E. Nichols

19 made a post on this website on June 3rd, 2011.

20 Please turn to that page.  I have a question for

21 you.

22         A.  You can ask the question, but I won't be

23 turning to the page.

24         Q.  As of June 2011 were you raising money to

25 fund the present lawsuit through posts -- through

 1  posts at the OpenCarry forum?

 2       A.  Objection.  Private information.

 3       Q.  It says here on the second page,

 4  Shortly -- and under the name Charles E. Nichols,

 5  Shortly after the Nordock decision was released, a

 6  lawyer I know offered to take on the federal civil

 7  rights challenge to the California statute with me

 8  which makes it a crime to openly carry a loaded

 9  firearm in most urban areas of the state for a flat

10  and very reasonable fee.

11       Do you write those words?

12       A.  Objection.  Private information.

13       Q.  Did you consult with a lawyer about

14  bringing the present lawsuit?

15       A.  That would be privileged and private.

16       Q.  Have you made public statements to the

17  effect that the lawyers for the Plaintiffs in the

18  so-called CCW cases, Richards v. Peruta, County of

19  San Diego, quote, "Are still basing their arguments

20  on the inadequacy of unloaded open carry," unquote?

21       A.  Objection.  Private information.

22       Q.  You've been raising money publicly to

23  fund this lawsuit, haven't you?

24       A.  Objection.  Private information.  And

25  work product and since I was engaged did engage an

1    attorney it would also be privileged.  I'm sure

2    there are more objections that can be raised, but

3    that's enough for now.  Next question.

4        Q.  You've heard of an organization called

5    CalGuns Foundation?

6        A.  Private information.  Objection.

7        Q.  Do you believe that the CalGuns

8    Foundation opposes your lawsuit?

9        A.  Objection.  Private information.  Also

10   requires me to speculate on the opinion of others.

11       Q.  Have you come to the opinion in your own

12   mind that there are gun rights organizations that

13   oppose the present lawsuit?

14       A.  Objection.  Private information.  I have

15   to state before the conclusion of the testimony that

16   I also object to the fact that this deposition was

17   improperly -- the public has been denied access to

18   this deposition.  They have a right to be here

19   absent a court order.

20       Q.  The public has not been denied access to

21   this deposition.

22       A.  Let the record show that I inquired of

23   the receptionist as to whether or not this office

24   would be open to the public.  She said that it would

25   not.  It is obviously -- and let the record show

1  that both the court reporter and I obtained access

2  to this office through a security key card, which

3  Mr. Eisenberg used to open the doors.

4          The public cannot obtain entry without a

5  key card or an escort.  Therefore it is obviously

6  not a public -- no, there's no access to the public.

7          Q.  Let the record reflect that this is the

8  first time you've mentioned all this stuff to me.  I

9  have no idea what you talked about with the

10  receptionist.  You have not asked me before if this

11  is a public deposition or a closed deposition.

12          You have not made a request that it be

13  open to the public or closed to me.  Let's move on.

14  Did you --

15          A.  No, let's not move on.

16          Q.  You're the one who made a speech here.  I

17  want to move on.

18          A.  Shh, shh, shh.  Time out.  Let the record

19  show that Mr. Eisenberg has raised his voice.

20          Q.  I am not raising my voice.

21          A.  Is using an angry tone.  He's attempting

22  to bully me.  And I -- as I stated before for the

23  record depositions are by default open to the

24  public.

25          And as I stated before, Mr. Eisenberg did

1   not consult with me prior to sending the Deposition

2   Notice.  And I did not stipulate to any of the terms

3   of this Deposition Notice.  Now ask your questions.

4        Q.  Haven't you stated that you've posted the

5   name of the attorney that you've been consulting

6   with on this case in quote multiple open carry

7   groups and e-mail all who have specifically

8   inquired, closed quote?

9        A.  Objection.  Assumes facts not in

10  evidence.  And private information.

11       Q.  We can make the following exhibit next in

12  order.  Mark Exhibit 7?

13       A.  Objection.  Authentication.

14            (Whereupon, Defendant's Exhibit 7

15            was marked for identification and is

16            attached to the original transcript of

17  this deposition.)

18            MR. EISENBERG:

19       Q.  Didn't you write an article for

20  Examiner.com that was titled, "The SAF and CalGuns

21  continue their war against open carry (the NRA

22  too)"?

23       A.  Objection.  Private information.

24       Q.  Didn't you write an article on the

25  Examiner.com that was headlined, "Are you in favor

1   of gun control, join the NRA"?

2          A.   Objection.  Private information.

3          Q.   We can mark the following exhibit next in

4   order.  Eight.

5               (Whereupon, Defendant's Exhibit 8

6               was marked for identification and is

7               attached to the original transcript of

8               this deposition.)

9               MR. EISENBERG:

10         Q.   You contended --

11         A.   Excuse me, what exhibit number?

12         Q.   Number eight.

13         A.   Objection.  Authentication.

14         Q.   You've contended in this case that you

15   were subject to a death threat.  Correct?

16         A.   Contended.  Explain contended.

17         Q.   You've said, you've asserted that you

18   were the subject of a death threat in approximately

19   September 2011.  Correct?

20         A.   That is correct.

21         Q.   Who made this death threat against you?

22         A.   It was via e-mail -- of course the

23   Attorney General already knows this since I sent her

24   an e-mail -- but the -- and I filed a police report,

25   which the Attorney General has access to.  Xavier

1  Hermosillo -- I believe it is spelled

2  H-e-r-m-o-s-i-l-l-o -- is the one who made the death

3  threat.

4       Q.  Is Mr. Hermosillo, to your understanding,

5  an elected official or has he ever been an elected

6  official?

7       A.  My recollection -- and bear and mind this

8  was as I recall back in September of 2011 -- is that

9  he used to be a -- have a -- was a commentator on

10  one of the local television stations, either channel

11  nine or 13, I forget which.  He -- I believe he was

12  also a member of a police board.

13          And he was apparently a long time well

14  known figure in the South Bay.  But I was living in

15  Oregon at the time.  So he was unfamiliar to me

16  until -- well, did not make it a point to find out

17  who -- his background until after he sent the death

18  threat.

19       Q.  So he sent what you say is a death threat

20  in September of 2011, correct?

21       A.  My recollection is I received it on the

22  first of September.  I've no way of remembering the

23  exact date.

24       Q.  Before you got this message from Mr.

25  Hermosillo had you ever met him before?

36

1        A.   I never met him before, no.   Not to my

2   knowledge.   I had met a lot of people.   I have no

3   way of remembering every person that I ever met.

4   No, I did not recognize him from his online Facebook

5   picture.   Or the news reports.   He's made

6   articles -- several articles of him on the web.   I

7   did not recognize him.

8        Q.   Had you ever communicated with him before

9   not person-to-person, in other words not

10  face-to-face?

11       A.   Yes.   As I recall during one of my events

12  or probably back in 2010, when I was actively

13  engaged in promoting the South Bay Open Carry

14  Movement Mr. Hermosillo wanted us to confront a

15  group of L.A.P.D. officers and I advised Harley

16  Green, who was the spokesperson for the movement at

17  the time, that would not be a good idea.

18            And Mr. Hermosillo, as I recall, in a --

19  in the e-mail distribution list had some rather

20  heated words.   I do not recall if they rose to the

21  level of a death threat at the time towards me.

22            But as I said you're asking me to recall

23  an online exchange that occurred in probably 2019 or

24  maybe 2011.   I have no way of saying for sure

25  exactly what transpired.

```
 1          Q.  Have you -- when was the last time you
 2    heard from Mr. Hermosillo?
 3          A.  The -- I believe it would have been the
 4    two-page e-mail he sent me somewhere around the
 5    first of September of 2011.  To the best of my
 6    knowledge.
 7          Q.  You mentioned the South Bay Open Carry
 8    Movement in your past answer.  What is that?  Would
 9    you describe that further, please?
10          A.  What is that?
11          Q.  Right.
12          A.  It isn't anymore.
13          Q.  Okay.  What was that?  What was the South
14    Bay Open Carry Movement to which you referred?
15    Please describe it in words other than just what the
16    title of it is.
17          A.  I'm sorry.  You are going to have to keep
18    your questions simpler.  Ask again.
19          Q.  Please tell me what the South Bay Open
20    Carry Movement that you referred to before was.
21          A.  To the best of my recollection, I believe
22    it was around the first week of May 2010, late
23    winter, early spring, I got a -- what's known as a
24    tweet online message service called Twitter, which I
25    had recently discovered, from a Harley Green telling
```

1    me that he was starting an open carry movement in

2    the South Bay and he wished me to lead it.

3            I subsequently -- can you repeat the

4    question?  I think you are giving me an open ended

5    question here.

6        Q.  I asked you --

7        A.  Please repeat the question.

8        Q.  -- what the South Bay Open Carry Movement

9    was.

10       A.  Too broad.  You have to be more

11   specific.

12       Q.  Was there -- well, was there an

13   organization called South Bay Open Carry that you're

14   aware of?

15       A.  Define organization.

16       Q.  A group of people working together.

17       A.  This -- I have to apologize again, but

18   can you repeat the question?

19       Q.  Do you have the question that you can

20   read it back, ma'am?

21                    (Record read.)

22            MR. EISENBERG:

23       Q.  Right.  I'd like you to answer the

24   question.  If you can.

25       A.  The South Bay Open Carry Movement was an

1    informal movement.

2         Q.  Did you ever attempt to register the name

3    south Bay Open Carry with any governmental agency?

4         A.  I did.  And I did.  It was registered as

5    a nonprofit California association.  Same type of

6    organization as labor unions use.

7         Q.  Did you have an affiliation with that

8    organization beyond being the person who filed the

9    papers to formally organize it?

10        A.  Well, I was the president of the

11   organization.  Actually that was in September --

12   wait -- my recollection is I filed early in 2011.

13   But it had to come back and be refiled at least

14   once, perhaps twice, for undocumented roles in

15   filling out the form.  Which would have made it

16   similar.  And the long time it took the Secretary of

17   State to process.

18             Sorry.  You'll have to repeat the

19   question.  I don't know if that was the answer that

20   you -- to the question you asked.

21        Q.  I'll just move on.  So you say a person

22   named Harley Green asked you to be the president of

23   the South Bay Open Carry Movement?

24        A.  No.  The president is required -- was a

25   required title I had to give to form the nonprofit

40

1   association.  And that was in -- wasn't approved by

2   the Secretary of State until around the first of

3   September.

4          And Harley Green had asked me to lead,

5   not become the president, to lead the group back in

6   early 2010.  Which I declined.  Explaining to him

7   that this -- in order for it to be successful it

8   would have to be a youth movement.  I'm too old to

9   be the public face of the movement.

10          All right.  I remember the question.  The

11  purpose of it was to educate and inform the public

12  that open carry is legal or was legal at that time

13  in the State of California.

14          Q.  Did Mr. Green tell you why he was asking

15  you to be the leader of this group?

16          A.  I don't recall.  That was too long ago.

17  I don't -- all I remember is I closed that down --

18  that down quickly.

19          Q.  All right.  Let me ask you to look at

20  page two of the exhibit.

21          A.  I'm not going to look at an

22  unauthenticated exhibit.

23          Q.  You're refusing to turn to page two?

24          A.  Asked and answered.

25          Q.  Let me read part of what appears to be a

1  post from the H. Green at the OpenCarry Forum and

2  tell me if you've ever heard these words before or

3  read them before.

4          "2A group killed by Charles Nichols.

5  Just wanted the larger OC community to be aware of

6  the slime tactics being used by Charles Nichols (CN

7  Reporter, Examiner author, California Right to Carry

8  Group organizer)."  Have you ever heard or read

9  those words before?

10         A.  Objection.  Private information.

11         Q.  Let me read a little bit more.  And I'll

12  be asking you the same question.

13         "Since I left California I left the

14  running of SBOC to a group of individuals in

15  California who have been working diligently to

16  establish SBOC as a nonprofit organization.  It has

17  been slow going as they are all voluntaries and been

18  wanting to do it correctly without rushing."

19         "Out of the blue Charles Nichols decides

20  to register SBOC with the state by himself and is

21  now threatening all SBOC members and directors with

22  legal action unless they stop using 'South Bay Open

23  Carry'."

24         A.  Objection.  Hearsay.

25         Q.  Do you recall reading or hearing those

1  words -- let me finish my question before you make

2  your objection.

3        A.  I can make the objection any time you --

4        Q.  No, you need to let me finish my question

5  before you make an objection.

6        A.  Any time the question becomes defective

7  in form I can make the objection.  I don't have to

8  wait for you to read the Gettysburg or "War and

9  Peace" into the record before making an objection.

10 You're asking -- objection.

11       Q.  Have you heard or read those words

12 before?

13       A.  Hearsay and -- objection.  Hearsay and

14 personal information.  To which I would add

15 objection, hearsay to every document you've

16 submitted.

17       Q.  Mr. Green also wrote, "These tactics are

18 despicable and I hope you all take this to heart

19 before dealing with any organization that Charles is

20 affiliated with.  I am truly sorry for ever

21 defending Charles in any manner as he clearly had me

22 deceived, thinking he had good intentions with 2A

23 advocacy and was a decent individual."

24            Do you remember seeing, reading or

25 hearing those words before?

1           A.   Objection, private information.

2    Objection, hearsay.   Objection, counsel is using

3    unauthenticated statements from persons who have not

4    submitted any sworn depositions, to my knowledge, to

5    attack me personally.

6           Q.   There's -- on the second and third

7    page -- oh, you're not done with your objection?

8           A.   Counsel is trying to intimidate me.   He's

9    being abusive and continues -- and this is just

10   another repetitive example of his attempting to

11   annoy, embarrass, oppress me in this lawsuit.   This

12   is a Civil Rights lawsuit.   Ask your next question.

13   If you can.

14          Q.   I'm not trying to intimidate you or abuse

15   you.

16          A.   You're --

17          Q.   On pages two and three there is an

18   embedded message that Mr. Green says is an e-mail

19   message that you wrote.   Will you look at that and

20   tell me if you wrote that?

21          A.   Objection, hearsay.   No, I will not look

22   at it.   And objection, private information.

23          Q.   Did you ever send out e-mail messages

24   telling people that they could not use the name

25   South Bay Open Carry without your permission?

1          A.   Objection, private information.

2          Q.   Aren't the incidents that I'm referring

3     to the things that you think prompted the so-called

4     death threat against you?

5          A.   Objection, private information.

6          Q.   Do you know why Mr. Hermosillo sent you

7     the message that you characterize as a death threat?

8          A.   I would have to speculate Mr. Hermosillo,

9     based on the death threat, is a mentally unstable

10    and dangerous man.

11         Q.   Were you a member of the organization

12    called SBOC?

13         A.   Objection, private information.

14         Q.   There's an organization presently called

15    California Right to Carry of which you're the

16    president, correct?

17         A.   Objection, private information.

18         Q.   Have you ever said publicly that you're

19    the president of California Right to Carry?

20         A.   Objection, private information.

21         Q.   Again, I just want to make sure it's

22    clear when you are objecting on the basis of privacy

23    you're refusing to answer the question in substance,

24    correct?

25         A.   Refusing to -- could you repeat the

1   question?

2         Q.   Would you read it back, Madame Court

3   Reporter?

4                     (Record read.)

5              THE WITNESS:  I don't understand the

6   question.

7              MR. EISENBERG:

8         Q.   I would ask you to state your privacy

9   objection and then answer the question in

10  substance.  Will you do so?

11        A.   My objections to privacy are -- is as

12  follows, the information is private and has nothing

13  to do with this case.  I may reconsider and answer

14  the question if you can explain why the information

15  would have some bearing on this case.  And that the

16  question may be reasonably calculated to lead to the

17  discovery of admissible evidence at trial in a case

18  in which there is no trial.

19        Q.   So please answer -- you're saying that

20  unless I give you a rationale for why the question

21  is related you're not going to answer?

22        A.   I stand by the answer I gave.

23        Q.   So I'm trying to show the facts behind

24  the incident that led to Mr. Hermosillo sending you

25  the death threat because it will reveal that it

1  wasn't really a death threat.  That's my rationale.

2  Will you please answer the questions instead of just

3  objecting on the basis of privacy?

4        A.  As I recall the death threat -- which is

5  something you have access to since the Attorney

6  General has all the powers of a District Attorney,

7  and it was in the police report I filed -- I

8  particularly remember along the lines of, When the

9  air around me fills with gun smoke I will realize

10 that I have messed with the wrong people.

11            Now, how you can take that to be anything

12 but a death threat is beyond me.  But I'm sure if he

13 had sent that to you or a judge or a police officer,

14 or a district attorney, or any other government

15 official he would be in prison convicted of a felony

16 right now.  But since he sent it to me he gets to

17 walk free.

18       Q.  Have you ever consulted with the attorney

19 Jason Davis about the present case?

20       A.  That obviously is privileged

21 communication.  Why ask questions about attorneys

22 I've consulted with.  You know I'm not required to

23 answer any -- regarding any communication with an

24 attorney.

25       Q.  That's not necessarily true.

1          A.   Then get a court order instructing me to

2     require me to answer privileged communications.   I

3     mean that's --

4          Q.   Let's make the following exhibit next in

5     order.

6          A.   That's just absurd.   Objection,

7     authentication.

8               (Whereupon, Defendant's Exhibit 9

9               was marked for identification and is

10              attached to the original transcript of

11              this deposition.)

12              MR. EISENBERG:

13         Q.   Exhibit 9.   I'd like to ask you to turn

14    to page 12 of the document.

15         A.   Which I refuse.

16         Q.   Okay.   On page 12 there's a post from CN

17    Reporter saying, "I spoke on the phone with the

18    attorney Jason Davis who brought the Richards case

19    shortly before he filed it.   Richards has now been

20    consolidated with Haney.   We spent two hours going

21    over my case and he was satisfied that it does not

22    conflict with Richards or any other case he plans to

23    bring."

24              Didn't you write those words?

25         A.   Objection, both privileged and private

1  information.

2      Q.   Then it says, "Nor could he articulate

3  any defect in my legal arguments."  Didn't you write

4  those words as well?

5      A.   Objection, privileged and private

6  information.

7      Q.   Page 13 it says, "Proponents of concealed

8  carry should be begging these attorneys to drop

9  their cases before they do irreparable harm."

10 Didn't you write those words?

11     A.   Objection, private information.

12     Q.   Is it your opinion that the attorneys

13 that are pursuing the Peruta case and the Richards

14 case are doing irreparable harm?

15     A.   Objection, private information.

16     Q.   Let me mark the following exhibit next in

17 order.  It's Exhibit 10.

18     A.   Objection, lack of authentication.

19          (Whereupon, Plaintiff's Exhibit 10

20          was marked for identification and is

21          attached to the original transcript of

22          this deposition.)

23          MR. EISENBERG:

24     Q.   Well, I'm going to ask you to try

25 authenticate this document, because if you look on

1  page four there's the word Charles Nichols in type

2  and above it a signature.  Isn't that your

3  signature?

4       A.  You've asked me to self-authenticate a

5  document you brought in.  Had this been my document

6  you should have properly requested me to bring in

7  the document so there will be no question of

8  authentication.  So --

9       Q.  Is that your signature that's written

10 there?  I mean it's a photocopy but --

11      A.  It's your document.  I'm not going to

12 self-authenticate a document that you provided when

13 I could have provided the authentic.

14      Q.  Did you submit a declaration in this case

15 on or around February 6, 2012?

16      A.  What's today?

17      Q.  Today is October 18th, 2013.

18      A.  So you're asking me if I filed a

19 declaration in February when this is October.  I

20 have no way -- I cannot recall any specific date

21 that I filed a declaration.  I am aware I filed one

22 declaration, perhaps more in this case, but --

23      Q.  Look at this document and tell me if this

24 is the declaration that you filed in this case or

25 not.

1          A.  I can't do that.

2          Q.  Yes, I'm asking you to look at it and see

3   if you can recognize it as a declaration that you

4   filed in this case.  Please do so and answer yes or

5   no.

6          A.  You handed me a document and are asking

7   me to authenticate a document you're providing when

8   you could have asked me to have brought -- if it is

9   my document -- the document to this deposition.  You

10  didn't do so.  I'm not going to authenticate any of

11  your documentation.

12         Q.  Look at the document and tell me is this

13  your declaration --

14         A.  I refuse to look at the document.  I'm

15  not going to authenticate any of your documents for

16  you.  That's your problem.  You failed to -- you

17  screwed up in the process.

18         Q.  In or around August of 2002 did you have

19  a riding accident --

20         A.  August of 2002.

21         Q.  Let me finish the question before you

22  start -- let me finish the question.  In or around

23  August of 2002 were in a riding accident which left

24  you virtually bedridden with a severe back injury

25  until September of 2007?

1          A.   Objection, both to private and medical.

2          Q.   When you put this information --

3          A.   Objection.  I have made my objection.  If

4     you have a question, ask the question.

5          Q.   Have you -- well, you contended in this

6     case that you are partially disabled.

7          A.   Objection.

8          Q.   Why are you making that contention?  How

9     does that relate to the case?

10         A.   Objection, private and medical.  I find

11    it bizarre that you're asking a question of

12    relevancy to a -- you're the one asking the question

13    of relevancy when you've yet to ask a relevant

14    question.

15         Q.   You've contended that you find it

16    difficult to use a concealed weapon for

17    self-defense, correct?  And --

18         A.   I'm sorry, can you repeat the question?

19         Q.   Would you read the question back?

20                    (Record read.)

21              THE WITNESS:  I do not recall making that

22    exact statement.  I do know that concealed carry

23    presents a substantial disadvantage to the person

24    who carries concealed for obvious reasons.  You have

25    to retrieve it, which takes several seconds, while

1  your attacker -- given the attacker several seconds

2  of advantage that would be fatal to a person trying

3  to defend himself.

4          MR. EISENBERG:

5      Q.  Okay.  I'm not asking you to agree that

6  you made the exact statement that I said, but I'm

7  asking you --

8      A.  Well perhaps --

9      Q.  -- to agree that the sentiment is

10  something that you conveyed before, that you --

11      A.  That would be vague.  I have my own

12  personal experience --

13      Q.  Let me finish the question before you

14  start answering.

15      A.  You're lecturing me.  Don't lecture me.

16      Q.  I can't conduct a deposition if you

17  interpret my questions before they're finished.

18      A.  You're not making questions you are

19  making speeches.  Ask me questions.  Stop giving the

20  speeches.  If you have relevant questions, make

21  them.

22      Q.  Have you ever expressed a sentiment

23  similar to what I said before, which was that you

24  find it difficult to defend yourself if you have to

25  be carrying your firearm concealed?

1          A.   You asking if I expressed -- if I ever

2    expressed that sentiment?

3          Q.   Correct.

4          A.   I'm not sure that's the correct word.  I

5    have the position that concealed carry provides no

6    advantage to an honest person, it only provides the

7    disadvantage to the honest person and the only

8    person who benefits from concealed carry is a

9    criminal who uses -- as Supreme Court -- secrete

10   advantage.

11          It's -- otherwise it's -- to respond to

12   an attack it's -- presents a burden on the person

13   carrying the concealed weapon unless he's out there

14   seeking to engage in an attack.

15          For other obvious reasons just simply

16   because of the weather.  You're -- this is Southern

17   California where it reaches 100 degrees in the shade

18   and you are expecting people to have to wear a coat

19   to fully cover their weapon.  Because California

20   construes partially concealed weapons as concealed.

21          It's many objections to concealed carry.

22   And I have not hidden my objections to concealed

23   carry for sometime.

24          Q.   Move to strike that answer as

25   nonresponsive.  My question is about you personally

54

1 not about the general person.  So please answer the

2 question with that in mind.

3        A.  I've answered your question.  You don't

4 like the answer, fine.  Move on to the next

5 question.  I've -- asked and answered.

6        Q.  Do you believe that your back injury is

7 something that makes it particularly difficult for

8 you to defend yourself with a concealed firearm?

9        A.  Objection, private and medical.

10        Q.  You've talked about your back injury in

11 the pleadings in this case, haven't you?

12        A.  Objection, private and medical.

13        Q.  You're not going to answer my question?

14        A.  What question?

15        Q.  Will you read the question back, ma'am?

16 The one before.

17                    (Record read.)

18        THE WITNESS:  My answer was that it's

19 been asked and answered.

20        MR. EISENBERG:

21        Q.  You're refusing to answer beyond what you

22 just said?

23        A.  Is that a statement or a question?

24        Q.  That's a question.

25        A.  I have given -- once again -- first of

55

1  all, it's medical so I don't have to answer any

2  question regarding medical.  So that's not a

3  controversy in this case.  I'm not suing the

4  Attorney General for any alleged back injury.

5  There's absolutely no controversy to raise medical

6  questions.

7         Q.  You made allegations or statements in the

8  complaint that you need to be allowed to carry

9  openly instead of concealed because of the back

10  injury you sustained some years ago, haven't you?

11         A.  Whatever I've written in my pleadings I

12  stand by.  And I do not agree to any

13  characterization of your -- of my -- that you make

14  of my pleadings.  They speak for themselves.

15         Q.  If we can mark the following exhibit next

16  in order as Exhibit 11.

17              (Whereupon, Defendant's Exhibit 11

18              was marked for identification and is

19              attached to the original transcript of

20              this deposition.)

21              THE WITNESS:  Objection, lack of

22  authentication.  Will I need to make that objection

23  every time he says it's an exhibit or can you just

24  do it?  Can we just agree that every exhibit

25  submitted I object to.

1              MR. EISENBERG:

2         Q.   I will agree that you have a running

3    objection for lack of authentication so that you

4    don't have to keep restating the objection.

5         A.   Thank you.

6         Q.   Have you heard of an online forum known

7    as The Firing Line?

8         A.   Objection, private information.

9         Q.   Doesn't this page reflect printouts of

10   your -- some of your posts on that --

11        A.   Objection.

12        Q.   -- one about the present lawsuit?

13        A.   Did you finish your question?

14        Q.   Correct.

15        A.   Objection, private information.

16        Q.   Have you ever read a federal lawsuit that

17   was written -- where the complaint was written in

18   pencil?

19        A.   Objection, private information.

20        Q.   The reason I'm asking you that question

21   is because it reflects something that is printed

22   here and I'm trying to shoe you -- I'm trying to get

23   you to admit that you made these postings.  Are you

24   still going to refuse to answer the question?

25        A.   What was the question?

1        Q.   Please read it back, ma'am.

2                  (Record read.)

3             THE WITNESS:   I stand by my objection.

4             (Whereupon, Defendant's Exhibit 12

5             was marked for identification and is

6             attached to the original transcript of

7             this deposition.)

8             MR. EISENBERG:

9        Q.   Let's mark the following exhibit next in

10   order as 12.   Tell me, have you ever seen this

11   document before?   Not necessarily in this printed

12   out form, but the text and the image of the gun and

13   the belt.

14             Let the record reflect that Mr. Nichols

15   is not looking at the document, he's looking at a

16   page of typed up words that he brought into the

17   deposition room.

18        A.   Could you repeat the question?

19                  (Record read.)

20             THE WITNESS:   Did we not read before that

21   that I would not have to raise my objection --

22             MR. EISENBERG:

23        Q.   Right, right.   The authentication

24   objection is a standing objection.

25        A.   To every exhibit?

Q.  To every exhibit.

A.  Which I thought we had agree I didn't -- wouldn't have to make to every exhibit.

Q.  I know, that's why I don't know why you're asking the question.  It's a standing objection.  In other words, you don't have to repeat it.  It will count as an objection.  I won't say otherwise.  For each document.

A.  The objection I have given to authentication for every previous exhibit applies to this one as well.  So if you have a question beyond the objections to authentication that I made to every exhibit prior to this one --

Q.  I do.

A.  -- please ask.

Q.  My question is -- this has nothing to do -- my question is asking you if you've seen this document before.

A.  Do we have to roll back to my last authentication objection?

Q.  You're refusing to answer the question?

A.  Okay.  Apparently -- all right.  I guess I have to make it every time.  I object to the authentication.  You're asking me to authenticate a document.  And -- you messed up on the process.  You

1  should have requested me to bring in any documents

2  towards the deposition.  You didn't.

3          Now you're requiring know to -- you're

4  asking me to authenticate documents that you

5  provided.  Which I won't do.

6      Q.  Mr. Nichols, it's not a mess up in the

7  process for me to bring in documents and show them

8  to you and try to get --

9      A.  Don't -- I refuse to authenticate your

10  documents.  So if you have a question that doesn't

11  have to deal with authenticating your documents ask

12  it.

13      Q.  What's your legal basis for not

14  authenticating documents that I present to you?

15      A.  I'm only required to answer certain

16  specific questions which I've repeated over and over

17  again what questions I have to answer.  I'm not

18  required to authenticate -- the Federal Rules of

19  Civil Procedure, the law, doesn't require me to

20  authenticate your documents for you.

21          I'm not required to do anything the law

22  does not require.

23      Q.  You're in a deposition.  You are under

24  oath.

25      A.  That's right.

```
 1          Q.  If I show you a document and it --

 2          A.  Your document.

 3          Q.  Right.  And it reminds you of a document

 4    that you know about you have to admit that.  You

 5    can't conceal that information.  I'm telling you

 6    that right now, because you don't have legal

 7    grounds -- I want you to be perfectly well aware of

 8    that when I bring the motion.  You're not going to

 9    be able to say you were ignorant of the law.

10          A.  In addition to a lack of authentication,

11    private information is my objection.

12          Q.  Isn't it true that on May 21st of 2012

13    you carried a long gun openly near the pier at

14    Redondo Beach?

15          A.  Objection, private information.  And

16    self-incrimination.  I refuse to answer on the

17    grounds that it may incriminate or further

18    incriminate myself.  Answering the question would

19    require me to provide evidence that may directly

20    support a criminal conviction or information that

21    would furnish a link in the chain of evidence that

22    could lead to prosecution or evidence that I

23    reasonably believe could be used against me in a

24    criminal prosecution.

25          Q.  I --
```

1      A.   I haven't finished my objection.   Given

2   that I've already been prosecuted by the state for

3   not break any law and was denied the basic -- due

4   process during and after the trial, a prosecution

5   and denial of due process to which this court

6   condoned, my refusal extends to questions where the

7   statutes of limitations would normally have applied

8   because the statute of limitations do not guarantee

9   that I would not be prosecuted again.

10      Q.   Didn't you plead no contest to the

11   charges that you violated the Redondo Beach

12   Municipal Ordinances?   I ask you that because I'm

13   showing that there -- that what you're claiming

14   would happen would violate double jeopardy.   You

15   can't refuse to answer questions about something you

16   have already been convicted on.

17      A.   I've never -- you are saying that I've

18   been convicted of a crime.   I've given my answer

19   regarding self-incrimination.   Double jeopardy

20   doesn't -- I was already -- you know, I have already

21   been unlawfully prosecuted for not breaking the

22   law.   So can't say that double jeopardy prevents me

23   from being unlawfully prosecuted again.

24      Q.   What was the outcome of the so-called

25   unlawful prosecution?

1        A.   Objection, private information and

2   self-incrimination.

3        Q.   You pleaded no contest, didn't you?

4        A.   Objection, private information and

5   self-incrimination.

6        Q.   You are refusing to answer whether you

7   pleaded in open court no contest, you're refusing to

8   answer that beyond what you've already said?

9        A.   Is that a statement or question?

10       Q.   It's a question?

11       A.   What is the question?  Put it in the form

12  of a question.

13       Q.   Are you refusing to say more about your

14  plea of no contest than you've already just said?

15       A.   I can't speculate about what questions

16  you might ask.  I can only answer questions you have

17  asked.

18       Q.   You pleaded no contest to the Redondo

19  Beach Municipal Ordinance charges based on the May

20  21st incident, didn't you?

21       A.   That was a statement followed by a

22  question.  Could you rephrase the question?  I mean

23  rephrase --

24       Q.   No, that's a perfectly proper question.

25       A.   Ask it again.

1        Q.   Will you read the question back, ma'am?

2        A.   Stop raising your voice.

3        Q.   I'm not raising my voice.

4        A.   You raised it and you expected me to

5   answer the question.

6        Q.   You can say whatever you want because

7   we're just getting an oral transcript.  But you know

8   I am not --

9        A.   It's on audio so watch your tone.

10       Q.   You know I'm not yelling at you.  Would

11   you reread the question, the one that had the didn't

12   you at the end?

13                 (Record read.)

14            THE WITNESS:  Did I not object private

15   information and Fifth Amendment?  If I didn't I do

16   now.

17            MR. EISENBERG:

18       Q.   You need to answer the question yes or

19   no.  Please answer the question yes or no.

20       A.   I am not required to answer a question

21   yes or no.  Now tell me -- I'm sorry, I'm still

22   confused as to which question we're on.  Could you

23   read back the last question?

24                 (Record read.)

25            MR. EISENBERG:

1        Q.   That's the question that's pending that
2   I'd like you to answer.
3        A.   I'm sorry.   Once again can you read back
4   the question that Mr. Eisenberg asked.   I'm not
5   understanding the question.
6        Q.   Let me just ask the question again.
7   Didn't you plead no contest to the charges that you
8   violated the Redondo Beach Municipal Ordinances on
9   open carry in parks for your May 21st, 2012
10  incident?
11       A.   And did I not object private information
12  and Fifth Amendment.   I'm certain I did.   If I did
13  not then I'm doing so now.   Your question has been
14  objected to and answered.
15       Q.   Do you train in the use of fire arms
16  currently?
17       A.   Objection, private information.
18       Q.   Haven't you stated that you didn't use a
19  gun -- or sorry, you didn't openly carry a gun in a
20  public place between the 1992 Los Angeles riots and
21  2011 in California, haven't you said that before or
22  words to that effect?
23       A.   I don't think I heard you correctly.   Did
24  you say that I didn't carry -- open carry?
25       Q.   Right.   Did you -- haven't you said

1    before or written that between the end of the 1992

2    L.A. riots and say the middle of 2011 you did not

3    openly carry a firearm in a public place in

4    California?

5        A.   You are aware I lived in the State of

6    Oregon, are you not?  So you're asking me did I --

7    did I carry -- openly carry in California while I

8    lived in Oregon?  No, I lacked the capability to be

9    in two places at one time.

10       Q.   What years did you live in Oregon?

11       A.   Best of my recollection, I moved there in

12   February of 1994 to -- I returned in February of

13   2006, I believe.

14       Q.   Between 2006 and 2011 you did not carry a

15   firearm openly in a public place in California,

16   correct?

17       A.   I refuse to answer on the grounds it may

18   incriminate or further incriminate myself.

19   Answering the question will require me to provide

20   evidence that my directly support a criminal

21   conviction or information --

22            I refuse to answer on the grounds that it

23   may incriminate or further incriminate myself.

24   Answering the question would require me to provide

25   evidence that may directly support a criminal

1   conviction or information that would furnish a link

2   in the chain of evidence that could lead to a

3   prosecution or evidence that I reasonably believe

4   could be used against me in a criminal prosecution.

5            Given that I have already been prosecuted

6   by the state for not breaking any law, I was denied

7   the basic rights of due process during and after the

8   trial.  A prosecution of denial of due process to

9   which this court condoned, my refusal extends to

10  questions of a statute of limitations -- have

11  applied.

12       Q.  You're reading that statement off of a

13  piece of paper.  We're going to make that an

14  exhibit.  We're going to make that the exhibit next

15  in order.  Okay.

16       A.  No.  This is my property.

17       Q.  I want to put that document into the

18  record.

19       A.  Unless you've got a court order to do so

20  you're not going to take my document away from me.

21  This is the only thing I have to refer to.

22       Q.  All right.  You said you're refusing to

23  let that document be put into evidence here.

24       A.  It's privileged.

25       Q.  I'm telling you, you read off of it.

1   It's not privileged.  You read off of it out loud.

2         A.   It contains privileged information.

3         Q.   You are advised that you may not destroy

4   that document now.  I've made reference to it on the

5   record.  I might be able to obtain it and if you

6   dispose of it then I will assert that you destroyed

7   evidence.  So now you're aware of that.

8         A.   You can assert whatever you wish.

9         Q.   Let's move.  The Fifth Amendment that

10  you're calling for there, is it based on perjury?

11        A.   I'm not going to elaborate on my

12  objection.  I made the objection.  I stand by the

13  objection.  If you don't like the answer get a court

14  order to compel a different answer.

15        Q.   Make the following exhibit next in

16  order.

17             (Whereupon, Defendant's Exhibit 13

18             was marked for identification and is

19             attached to the original transcript of

20             this deposition.)

21             MR. EISENBERG:  He is refusing to turn it

22  over so I am making a record that he is refusing.

23  I'm not going to grab it out of his hand.

24             THE WITNESS:  Because that would be theft

25  and a crime and lawyers aren't supposed to commit

1   crimes.  Unless they run for congress.

2           MR. EISENBERG:  Are you getting all of

3   that, Madam Court Reporter?

4           THE COURT REPORTER:  Yes.

5           MR. EISENBERG:

6       Q.  Good.  You had a video created of the May

7   21st incident at the Redondo Beach pier in which you

8   openly carried a long gun, correct?

9       A.  Objection, private information.

10      Q.  Then you posted that video on the

11  Internet, didn't you?

12      A.  Objection, private information.

13      Q.  That video is an exhibit to one of the

14  complaints in the case, correct?

15      A.  My exhibits are what they are.  I stand

16  by all pleadings and files in my lawsuit.

17      Q.  I'm asking you to characterize the

18  exhibit then.  You submitted the DVD as an exhibit

19  in -- as an attachment to the pleadings in this

20  case, correct?

21      A.  My exhibits speak for themselves.  I

22  stand by my exhibits.

23      Q.  Are you denying that you submitted a DVD

24  as an exhibit to one of your pleadings in this case?

25      A.  We've had over 100 pleadings in this

1    case, if there's a DVD that I have submitted then I

2    stand by the DVD.

3         Q.  Did you ask somebody to videotape what

4    happened at -- on May 21st, 2012 during your open

5    carry incident near the Redondo Beach pier?

6         A.  Objection, private information and

7    self-incrimination.

8         Q.  You can mark the following exhibit as

9    next in order.

10             (Whereupon, Defendant's Exhibit 14

11             was marked for identification and is

12             attached to the original transcript of

13             this deposition.)

14             MR. EISENBERG:

15        Q.  The one I'm going to give you doesn't

16    have staples.  Only has a binder clip,

17    unfortunately.  This is a copy of the First Amended

18    Complaint in the case, correct?

19        A.  I guess I should -- apparently we didn't

20    agree to what I thought we agreed.

21        Q.  You have a standing objection that I have

22    not authenticated documents, but I have to ask you

23    questions to get them authenticated.

24        A.  And my objection is that I will not

25    provide -- be the person to authenticate documents

1  for you.  That's going to be the standard objection

2  to authentication to every exhibit you submit.  I

3  thought we had agreed to that so we wouldn't get to

4  the same argument.

5        Q.  Isn't it true that except for an

6  approximately 12-year period between February of

7  1994 and February of 2006 you resided in California?

8        A.  Objection, private information.

9        Q.  Have you filed any pleadings in this case

10  in which you made a statement that was false?

11        A.  Wow, that's not only -- that's

12  self-incrimination right there.  You're asking me

13  to -- you're asking me to say yes, I filed a false

14  document or statement or whatever.  Objection,

15  self-incrimination.

16        Q.  I'm not telling you to answer that

17  question yes.  I'm just asking you have you filed

18  any document in the court that contains a statement

19  from you that you know is false?

20        A.  Objection, self-incrimination.

21        Q.  We've been going for about an hour and a

22  half.  I want to offer anybody a chance for a

23  break.  May we go off the record, sir?

24        A.  Can we stay on the record if you are not

25  here?

1          Q.  So we are off the record.

2              (Thereupon, a recess was taken.)

3              THE WITNESS:  We're on the record.  Court

4   Reporter, I have 10:43.

5              MR. EISENBERG:  I don't object -- I don't

6   really want to but if he's asking to -- I'm not

7   objecting to doing it, so please go ahead and do

8   it.

9              THE WITNESS:  I just want to make sure

10  there's no misunderstanding once the seven hours on

11  the record hits I'm did and out the door.

12             MR. EISENBERG:

13         Q.  I just want to state that I do not

14  believe that you're participating in this deposition

15  in good faith.  And I am articulating the Attorney

16  General's rights to move for terminating sanctions

17  on your case on that basis.

18         A.  Terminating sanctions.  You've already

19  threatened me with --

20         Q.  Because you are not participating in good

21  faith in the discovery process.  I'm just telling

22  you that so you're on notice.

23         A.  Okay.  I'm on notice.

24         Q.  In the complaints in this case you've

25  contended that you would be staging an open carry

1  incident at the Redondo Beach pier on the seventh of

2  each month, haven't you?

3        A.  Whatever I stated in my pleadings I stand

4  by and do not agree to any characterizations that

5  you have made.  And otherwise objections are private

6  information and Fifth Amendment.

7        Q.  Have you been in fact openly carrying a

8  firearm each month on the seventh of the month --

9        A.  Objection, private.

10        Q.  Let me finish the question.

11        A.  I thought you had finished.  And stop

12  raising your voice and getting angry.  You paused.

13  I thought the question was over.

14        Q.  You need to stop raising your voice.

15        A.  You're the one that -- you do this every

16  time we have an on phone conference, you start --

17  you think you can intimidate me, I don't know why.

18  Use a respectful tone of voice.

19        Q.  I am using a respectful --

20        A.  I told you, you had paused, thought that

21  was the end of the question.  Now go ahead and

22  repeat -- finish your question.  From the beginning.

23        Q.  You have not in fact openly carried a

24  firearm near the Redondo Beach pier on the seventh

25  of each month, correct?

1          A.   You just made a statement.

2          Q.   That is a perfectly valid question.

3    Answer the question, please.

4          A.   I don't believe it's perfectly valid, but

5    I object on grounds of personal information and

6    Fifth Amendment privileges right.

7    Self-incrimination.

8          Q.   You've given interviews to the media

9    about the May 21st, 2012 open carry incident in

10   Redondo Beach, haven't you?

11         A.   Objection, private information.  And

12   self-incrimination.

13         Q.   How do you contend that it would

14   incriminate you by talking to a reporter?

15         A.   I refuse to answer on the grounds that it

16   may incriminate or further incriminate myself.

17   Answering the question may provide evidence that may

18   directly support a criminal information or -- chain

19   of evidence that could lead to prosecution.  Or

20   evidence that I reasonably believe could be used

21   against me in the criminal prosecution.

22              Given that I've already been prosecuted

23   by the State for not breaking any law and was denied

24   the basic tenants of due process during and after

25   the trial, prosecution and denial of due process to

1  which this court condoned, my refusal extends to

2  question -- statute of limitations -- applied.

3          Q.  Have you ever applied for a license to

4  carry a firearm concealed in California?

5          A.  Objection, personal information.  One

6  that you, by the way, would have on the record if I

7  had.

8          Q.  Have you ever applied for a license to

9  carry a firearm openly in California?

10         A.  Objection, personal information.

11         Q.  You discussed your communication with the

12 City of Redondo Beach about an open carry license in

13 your complaint, didn't you?

14         A.  I stand by whatever is in my complaint.

15 There are, to my knowledge, no license to --

16 available to openly carry a firearm available to

17 residents of the City of Los Angeles -- I mean the

18 County of Los Angeles.  Because state law precludes

19 the issuance of a license to person's who live in

20 counties with a population of 200,000 or more

21 persons.

22              And such licenses are theoretically only

23 available to residents of those counties and are

24 valid only within those counties.  Los Angeles

25 County has a population of 200,000 or more people.

```
 1          Q.  Have you applied for a license to carry a
 2   firearm openly in a county in California that's not
 3   Los Angeles County?
 4          A.  Objection, privileged information.
 5   Private information.
 6          Q.  Have you received a license to carry a
 7   firearm openly in a county in California other than
 8   Los Angeles County?
 9          A.  Objection, private information.
10   Information that the Attorney General will know as
11   it would be in her database.
12          Q.  Haven't you stated publicly before if
13   successful in obtaining a junction against
14   California ban on loaded open carry I will then seek
15   to overturn California's Gun Free School Zone Law?
16          A.  Objection, private information.
17          Q.  Let's mark the following exhibit next in
18   order.  This one would be 15.
19              (Whereupon, Defendant's Exhibit 15
20              was marked for identification and is
21              attached to the original transcript of
22              this deposition.)
23          THE WITNESS:  Objection, authentication.
24   Lack of authentication.
25              MR. EISENBERG:
```

1          Q.   Again, I'm not attempting to put this

2     document in evidence.   So your authentication

3     objection is not well taken.

4               Secondly, the authentication objection

5     does not preclude me from asking you questions about

6     whether you recognize the document.   And that's what

7     I'm going to do.

8          A.   I'm required to make objections with

9     exceptions of relevance or I waive the objections

10    unless of course the relevance comes in the form of

11    an improperly asked questions, which is defective in

12    form.   And if I answer the defectively formed

13    question then I waive the relevancy.

14              Ergo, I am required to make the objection

15    and I have made the objection to the authenticity of

16    the document.   Don't lecture me on the law or on the

17    rules of the court.

18         Q.   I'm only doing it to give you notice.

19         A.   If you have something to put on the

20    record tell the court reporter.

21         Q.   I am.   I'm giving you notice because I'm

22    trying to get you to comply with the rules so that

23    we don't have to do this again and/or you don't get

24    sanctioned.

25         A.   Did I not report you for lying early on

1    in this case Mr. Eisenberg?  With the County --

2    State of California Bar.

3           Q.  I have no idea.  Did you do that?  Did

4    you actually -- you actually said that I lied?  You

5    told the State Bar that I lied?

6           A.  I did.  And they sent me a letter saying

7    that you're allowed to lie.  So you'll forgive me if

8    I don't take you at your word since you're allowed

9    to lie.  But since I'm not an attorney, I'm not.

10          Q.  You have this letter that came to you

11   from the State Bar?

12          A.  I believe I kept it.  I don't know where

13   it is offhand.  I imagine I tossed it in my box of

14   files.

15          Q.  I'm putting you on notice not to destroy

16   that letter.

17          A.  Doesn't guarantee I'll find it.  But

18   since it was an official complaint the State Bar --

19   doesn't the State Bar have some connection with the

20   Attorney General's office?

21          Q.  I'm not going to answer any more

22   questions.  This is your deposition not mine.

23          A.  I thought this was your deposition.

24          Q.  The deposition of you Charles Nichols.

25   Not the deposition of Jonathan Eisenberg?

1          A.   Brought by you and not by me.

2          Q.   Please look at Exhibit 15 and tell me if

3     brings into your mind a memory that you made posts

4     at the website of Laguna Niguel Patch.

5          A.   I decline to look at the exhibit.   I

6     won't be answering any questions to require personal

7     information based on the objections on personal

8     information I've already given in the past.   Same

9     context.

10          Q.   You've told me before over the phone that

11     you -- if you are successful in this lawsuit you're

12     going to bring a lawsuit to fight down California's

13     Gun free School Zone Law.   Haven't you?

14          A.   Objection, private information.   Lack of

15     foundation.   Belated objections.   Hearsay.   Gosh.

16          Q.   Mark the following exhibit next in

17     order.

18          A.   Guess what?   Objection, authentication.

19     Lack of authentication.

20               (Whereupon, Defendant's Exhibit 16

21               was marked for identification and is

22               attached to the original transcript of

23               this deposition.)

24               MR. EISENBERG:

25          Q.   You wrote an article for a website called

1  NoozHawk.com around Christmas of last year, didn't

2  you?

3         A.  I have no recollection of ever writing an

4  article for NoozHawk.  But if I did it was private

5  information.  So I object.

6         Q.  Did you write an article for a

7  publication about the New Town massacre right around

8  Christmastime of last year?

9         A.  Objection, private information.

10         Q.  In the article that's under your name, it

11  says on the bottom of the printed page, page two,

12  "Most school teachers are not good people.  And

13  those who are good people are not necessarily

14  mentally suited to engage in conduct with a

15  madman."  You wrote those words, didn't you?

16         A.  Objection, private information.  And I

17  will amend my earlier answer, I -- this is the first

18  I've even heard of a place called NoozHawk.  Which

19  appears to be an online website.  I've certainly not

20  written any articles for them.  And they've never

21  paid me to write any articles for them.

22             I've not heard of them until today.  To

23  the best of my knowledge.  This document is --

24         Q.  Well, whether you intended to have this

25  article published on NoozHawk or not, it has been.

1  You're saying you never knew about this until just

2  now?

3       A.  I've never -- to the best of my

4  recollection I've never heard of NoozHawk before

5  until you showed me this document.

6       Q.  But this article is one that you wrote,

7  isn't it?

8       A.  Objection, private information.  I have

9  to stand for a moment.  Stay on the record.

10      Q.  Are you okay?

11      A.  Off the record.

12      Q.  No, I'm not going off the record.

13      A.  Okay.  Go ahead and ask your question.

14  Can you hear me from here?  If you have a question,

15  ask it.

16      Q.  Are you in pain?

17      A.  If you have a question ask the question.

18      Q.  I'm happy to go off the record but I need

19  know what you're doing.

20      A.  I'm standing, aren't I.

21      Q.  You made a grunting sound like in pain.

22  You're in pain?

23      A.  Do you have a question related to this

24  case.

25      Q.  Have you done any research into gun death

1  rates in states that allow open carry versus states

2  that do not allow open carry?

3       A.  Objection, private information.

4       Q.  Do you want to take a break?  I don't

5  want to ask you questions if you don't think you can

6  give your best answers.

7       A.  I'm giving you my answers.  I'm still

8  anxiously awaiting for you to ask a question I can

9  answer.  Curious if you have any relevant question.

10  This is -- okay.  Ask your question.

11       Q.  So you --

12       A.  Next question, please.

13       Q.  So you have -- have you or not done

14  research about gun death rates in American states

15  with open carry versus American states without open

16  carry?

17       A.  I believe that was asked and answered.

18  But if it wasn't, objection, private information.

19       Q.  Have you done any research regarding gun

20  death rates in American states that have open carry

21  versus concealed carry?

22       A.  Objection, private information.

23       Q.  Have you done any research regarding gun

24  death rates in American states that allow -- that

25  allow open carry or concealed carry versus states

1  that allow either open carry or nor concealed carry?

2          A.  Objection, private information.

3          Q.  Do you own any fire arms?

4          A.  Objection, private information.

5          Q.  What training have you had in your life

6  in the use of firearms?

7          A.  Objection, private information.

8          Q.  Do you contend if you're allowed to carry

9  a firearm openly in California that you would be

10  better able to defend yourself than if you were not

11  allowed open carry?

12          A.  Asked and answered.

13          Q.  That question has not been asked and

14  answered.  Please answer it.

15          A.  You've already asked me about my opinion

16  on concealed versus open carry.  And the impediments

17  that -- Mr. Eisenberg had already asked my opinions

18  on concealed carry versus open carry and the burden

19  that concealed carry places on an honest person such

20  as myself.

21              And I answered the question which was

22  raised previously.  Mr. Eisenberg has asked the same

23  question again.  It's asked and answered.

24          Q.  First of all, it's not asked and

25  answered.  Even if it is that's not a reason not to

1  answer a second time.  I did not ask you the last

2  question about concealed carry.  The last question

3  was just about open carry.

4       A.  It's an objection to a compound

5  question.  You've asked me multiple questions and

6  the same question.

7       Q.  Let me rephrase the question.  I don't

8  believe I need to.  Do you contend that you're

9  better able -- that you would be better able to

10 defend yourself if you were permitted to carry a

11 firearm openly in public places in California versus

12 not being allowed to carry a firearm openly in

13 public places in California?

14      A.  If I hadn't already answered that in the

15 affirmative before I do so now.

16      Q.  If you haven't been trained in the use of

17 firearms why do you think that you're going to be

18 able to defend yourself now carrying openly?

19      A.  I have not stated that I haven't been

20 trained in the use of firearms.  That's your

21 contention.  My objection to your question was it's

22 personal information as to what training I have or

23 have not received in the use of firearms.

24      Q.  What training have you received?

25      A.  Objection, personal information.

1          Q.  What do you do right now to protect

2   yourself from Mr. Hermosillo?

3          A.  Objection, personal information.  You

4   realize of course that deposition testimony is

5   public record.

6          Q.  Move to strike the second part of that

7   answer as nonresponsive.

8          A.  Do you disagree that the deposition

9   testimony is public record?

10         Q.  I'm not answering any questions.

11         A.  Let the record show that -- let the

12  record show that the -- unless the court issues an

13  order a deposition testimony is conducted as if it

14  were in court and before the public.  And barring a

15  sustainable objection it can be used in trial and in

16  open court in this case.  Assuming that there would

17  be.

18         Q.  I'll be happy to stipulate with you that

19  whatever you state in response to that question will

20  be deemed confidential and not made public.  If we

21  agree to that will you answer the question?

22         A.  No.  And I won't be stipulating to

23  anything.  We already tried that with

24  authentication.  So next question.

25         Q.  Have you filed any other lawsuits

1  challenge the Constitutionality of a California

2  California Penal Code Section?

3       A.  Objection, private information.  Any

4  lawsuit I may have filed would be a matter of public

5  record accessible to the Attorney General.

6       Q.  Whether I can get the information

7  elsewhere is not the question.  The question is,

8  have you done such a thing.  Have you filed such

9  another lawsuit besides the one we're here for

10 today?

11      A.  And I already objected as to personal

12 information.  Same question.

13      Q.  When you say personal information do you

14 mean privacy?

15      A.  Yes.  Private information.

16      Q.  Okay.  You corresponded with me by e-mail

17 saying that you are going to bring ex parte motion

18 for a protective order to halt this deposition.  I

19 never received any ex parte papers.  Did you serve

20 any?

21      A.  Unfortunately by the time I was able to

22 research the law and find what was required for me

23 to properly format an ex parte application or motion

24 given that my loan ex parte application or motion

25 was denied by this court, it was too late for me to

1  file it in time to prevent this deposition.

2           Given the two day intake clerk's delay in

3  delivering the -- any motion I would have been able

4  to file and the response time from the court to

5  notify me by mail of it -- any order that may have

6  occurred preventing the deposition from occurring.

7           Q.  So yes or no, did you file such papers?

8           A.  Can you read back my answer?

9           Q.  No, no.  I don't want you to read back

10 the whole answer please.  I'm asking you a yes or no

11 question.

12          THE WITNESS:  Could you read back the

13 first sentence of my answer?

14          MR. EISENBERG:  I'll agree to that.

15                  (Record read.)

16          THE WITNESS:  She answered.  It was too

17 late.  That was the question -- answer to your

18 question.

19          MR. EISENBERG:

20          Q.  So after the person at the court said it

21 was too late you did not file anything, correct?

22          A.  Did I state the person at the court said

23 it was too late.

24          Q.  I thought that was the answer.

25          A.  Perhaps you should ask her to read back

87

1    the entire answer.

2         Q.  I don't want to do that.  Listen, I'm

3    happy to take a break right now --

4         A.  I'd rather not.  I want to get this -- I

5    want to get this over with as soon as possible.  I

6    can see by your stack you're going to want to drag

7    this out to the last seven hours.

8         Q.  Do you think that whatever was bothering

9    you before is going to make it hard for you to give

10   full, complete, accurate answers?

11        A.  Objection, private information.

12        Q.  Okay.  I'm giving you the opportunity to

13   say yes, because if you don't I'm going to contend

14   that there was nothing preventing you from making

15   full, accurate and complete answers.

16        A.  I did not say that there was anything

17   preventing me from making full, accurate and

18   complete answers.

19        Q.  Okay.

20        A.  Do you have a medical degree?  I didn't

21   think so.

22        Q.  If we could mark the following next in

23   order.  Seventeen.

24        A.  And the objection is lack of

25   authentication.

1          (Whereupon, Defendant's Exhibit 17

2          was marked for identification and is

3          attached to the original transcript of

4          this deposition.)

5          MR. EISENBERG:

6      Q.  Have you ever seen this document before

7  just now?

8      A.  I will not be authenticating any

9  documents that you bring in.

10     Q.  All right.  Let's move to the Exhibit B

11 in this document.  Which starts on page -- well, the

12 page saying Exhibit B is page 9 of 18.  The exhibit

13 itself starts at page ten of 18.  Please look at

14 those pages.

15         You're not looking at those pages.  Are

16 refusing to look at those pages?

17     A.  I'm refusing to look at those pages.

18     Q.  Have you seen the court records

19 reflecting your no contest plea in the May 21st

20 incident in Redondo Beach that we've been talking

21 about before?

22     A.  Objection, private information.  And

23 self-incrimination.

24     Q.  The judge in your case, your criminal

25 case was Sotelo, S-o-t-e-l-o, right?

1          A.   Objection, private information.

2    Self-incrimination.

3          Q.   Have you contended that Mr. Sotelo had

4    racial bias?

5          A.   Objection, private information.

6    Self-incrimination.   Lack of foundation.

7          Q.   In this case you've requested information

8    from California's Criminal Justice databases,

9    haven't you?

10         A.   Objection, private information.   Work

11   product.

12         Q.   Do I take it that you won't answer any

13   questions about that topic on those basis?

14         A.   What topics?   You've asked me one

15   question and I answered the one question.

16         Q.   I will not ask questions about your

17   attempt to obtain database records if you tell me

18   now I'm just going to object to everything on

19   privacy and work product.

20         A.   I'm not going to say that.   I'm going to

21   only object to individual questions.   I can't

22   predict what questions you are going to ask.   And

23   what objections I will raise.

24         Q.   You sent me an e-mail message requesting

25   downloads from the California Department of Justice

1  crime databases, correct?

2          A.   Could you repeat the question.

3          Q.   Can you read it back?

4                    (Record read.)

5          THE WITNESS:  I seem to recall weeks ago,

6  at least two weeks, could be three weeks, probably

7  closer to two weeks, requesting certain public --

8  well, formerly publicly available databases which

9  are no longer available, according to the e-mail

10 response that I received from the -- your -- from

11 the Attorney General due to budge cuts.

12          My recollection is you refused to provide

13 me with copies of those databases.  And that's the

14 best of my recollection.

15         Q.   What information are you hoping to find

16 in those databases?

17         A.   I was hoping to find information that you

18 were required to provide to me which is rebuttable

19 evidence that the California Penal Code Section

20 25850 former Penal Code Section 12030 is not

21 disproportionately enforced against minorities.  The

22 evidence would have been contained in the

23 databases.  That was my belief.

24          But as you refused to provide those

25 databases and have refused to provide any rebuttable

1  evidence, I didn't press the issue.

2      Q.  Haven't you made a publics record request

3  for the same information?

4      A.  I have made requests -- at least one

5  request in 2012 where I was told the -- given the

6  same lack of budget -- budgetary constraints.  And I

7  made again a request -- I believe it was three

8  requests this year, got budgetary constraint

9  responses.

10          And I seem to recall -- I don't remember

11  when exactly, could have been within the last week,

12  that one of the several requests I made has been

13  interpreted in public records access request but

14  they're going to hold off responding to my request

15  until the end of this --

16      Q.  Did you not intend to make a public

17  records -- request of the California Department of

18  Justice?

19      A.  My intent was to obtain copies of the

20  database.  If that requires that it be a PRA

21  request -- PRA request was not in my mind in my mind

22  when I made it.  I just wanted copies of the

23  databases.  Not particularly an issue.  As I see

24  it.  Since it's basically seeking information that

25  you were required to provide to me and did not.

 1          Q.  Do you have any evidence that when

 2     California Penal Code Section 25850 was enacted with

 3     that number the legislature had any racial or race

 4     based motives?

 5          A.  The act which repealed 12031 and

 6     recodified 12031(a)(1) as PC 25850(a), stated that

 7     the intent of the bill was to provide for a

 8     unsubstantial reorganization of the Penal Code.

 9          Q.  Do you have any other information of what

10     the purpose was for the -- for that enactment?

11          A.  It's in the opening chapter I believe.  I

12     believe that was the central purpose.  There should

13     also be language concerning that this reorganization

14     should not be construed to effect the -- any

15     question of constitutionality of any of the new

16     statute numbers.  So --

17               Wasn't their intent to say that any

18     law -- that are reorganized was constitutional or

19     unconstitutional.  It was intended as a -- simply

20     reorganization.  I believe it was Senate bill 1080.

21     But don't quote me on that even though I just did

22     that.

23               That is public record and available to

24     anybody who wants to look it up on the website.

25          Q.  You contended in this case that you are

1    not asking that Californian's be allowed to carry

2    fire arms openly in any public place where

3    fisherman -- or sorry, where hunters are not

4    currently allowed.   Sorry.   Strike that.

5              You have contended that in this lawsuit

6    you're not asking that ordinary citizens in

7    California be granted an open carry right for places

8    where hunters are not allowed to carry openly,

9    correct?

10        A.   You're going to have to break that

11    question up.

12        Q.   Okay.   You've made contentions in the

13    case about what rights hunters have -- licensed

14    hunters have to carry firearms openly in California,

15    correct?

16        A.   I stated the State statutes.   The -- what

17    effect -- in the conclusion of law as to the affect

18    of those statutes is up to the court.   I believe the

19    statutes speak for themselves.   There is an

20    exemption provided for licensed hunters for all

21    three of the state statutes which are the primary

22    focus of my lawsuit.   Which are the loaded and

23    unloaded open carry bans.

24        Q.   Is it your understanding that a person

25    has to be a licensed hunter to be afforded the

1    exemptions that you're referring to?

2         A.   I only go by what the statute says --

3    instructions there I'm aware of.

4         Q.   I'm asking for your understanding.  Is

5    that your understanding?

6         A.   Well, you're asking me to recall the text

7    in judicial -- of state statutes.  My recollection

8    is that there is somewhere buried in the Penal Code

9    at least three penal Code sections which say that

10   hunters are exempt from the three laws at issue in

11   my lawsuit.

12        Q.   Are you a licensed hunter in California?

13        A.   Am I a licensed Hunter in California?

14   That would also be information that the Attorney

15   General has.  Personal information.  But no, I'm not

16   a licensed hunter in the State of California.

17            And I'll go further.  I'm not a licensed

18   hunter in any state.  I have nothing against hunting

19   personally as long as it's done for food and to keep

20   the -- fox out of the hen house.  I do object to

21   hunting for "sport."

22        Q.   Have you applied -- have you ever applied

23   for a license to engage in hunting anywhere in

24   California?

25        A.   Also the Attorney General has the

1    information to that effect.  I did apply and obtain

2    a -- I don't know if it was a hunting license or a

3    hunting safety certificate.  It would have been in

4    the late 1970s, very early 1980's.  I cannot give a

5    recollection.  It would be 30 years or more ago.

6          I just remember taking the class and

7    there were a couple of interesting aspects of the

8    class that I remember.

9          Q.  Have you openly carried a firearm in the

10    course of hunting in California in the last ten

11    years?

12          A.  Normally I would refuse to answer any

13    questions regarding my carrying fire arms, but since

14    I've never hunted anywhere ever I will -- I think

15    that is as you requested.

16          Q.  The answer is no, you've never carried a

17    firearm in the course of hunting in California in

18    the last ten years?

19          A.  California is part of anywhere ever.

20    Yes, I've never hunted.  So I obviously have not

21    hunted in California in ten years or ever.

22          Q.  You believe that in urban areas in

23    California there are very few places which do not

24    fall within the so-called Gun Free School Zone,

25    correct?

1        A.  I apologize.  It wasn't intentional.  I

2   believe there is an exhibit to one of my -- what

3   complaint are we -- second amended -- three

4   complaints.  I think it was the first amended

5   complaint.  There is an exhibit of the -- I'm going

6   to make a further leap.  I think it was Exhibit

7   2-1.  That just popped in my head.  I have no way of

8   knowing for certain.

9            There is a map of the City of Redondo

10  Beach and shaded in red are the Gun Free School

11  Zones which are 1,000 feet from any K through 12

12  public or private school.  My recollection is that

13  most of the City of Redondo Beach falls within 1,000

14  feet of the K through 12 public or private school.

15           I do not believe based on that and the

16  other open carry events I promoted in other cities

17  around California where I had to pay particular

18  attention to were these schools were, the Gun Free

19  School Zones were, that there are very many places

20  in an incorporated city where it was legal to openly

21  carry a firearm without being within the 1,000 feet

22  of a public or private school.

23           I hope that answers your question.

24       Q.  If you achieve an injunction in this case

25  won't you still be prohibited from carrying a

1  firearm openly in most places in urban areas in Los

2  Angeles County?

3      A.  No.  I would be prohibited from openly

4  carrying loaded or unloaded hand guns within 1,000

5  feet of a K through 12 school.  Because I have not

6  challenged Penal Code Section 626.9, the California

7  Gun Free School Zone act of 1995.

8          And I would be required to openly carry

9  long guns unloaded within 1,000 feet of the K

10 through 12 public school.  That of course does not

11 mean I would be allowed to actually go onto a school

12 grounds that's covered under separate California

13 Penal Code Sections.  So I hope that answers your

14 question.

15     Q.  You've stated in this case that you want

16 to be able to carry firearms openly in Redondo Beach

17 in particular.  Correct?

18     A.  Redondo Beach is an incorporated city.  I

19 believe I stated I wished to openly carry firearms

20 loaded and unloaded in every incorporated city and

21 unincorporated county territory where the discharge

22 of a firearm is prohibited at this time.

23     Q.  You communicated with the Redondo Beach

24 police authorities for a license, you didn't

25 communicate with any other cities or law enforcement

1    authorities to get a license, correct?

2         A.   Objection, private information.   Licenses

3    are not available in the County of Los Angeles.

4    Either from police chief or county sheriffs open

5    carry licenses.

6         Q.   Haven't you stated or written words to

7    the effect that you do a lot of your shopping in

8    Redondo Beach and you visit people, maybe relatives

9    in Redondo Beach, and it's Redondo Beach in

10   particular where you want to carry a firearm openly?

11        A.   Objection, private information.

12        Q.   Haven't you said words to that effect in

13   the complaint in this case?

14        A.   Whatever I've stated in my complaints I

15   stand by.

16        Q.   Don't you stand by those statements about

17   Redondo Beach being the place you particularly want

18   to carry openly?

19        A.   I do not have a copy of my second amended

20   complaint  which is the operative --

21        Q.   You do.   It's Exhibit 14.   You're

22   refusing to look at it.

23        A.   No, I did not -- I do not have an

24   authenticated copy or copy that I know to be

25   genuine.   I'm not going to comment on any copy that

1   you've provided which purports to be my second

2   amended complaint.

3            As to your question, whatever I have

4   stated on the record in my operative complaint I

5   stand by.  If I ever run across an error or omission

6   I will file an errata to it.  I haven't.  It's on

7   the record.  Whatever is on the record I stand by.

8        Q.  Are you presently accusing the Attorney

9   General of violating your Fourth Amendment rights?

10       A.  To the best of my recollection the --

11  operative complaint being the second amended

12  complaint contains allegations against the Attorney

13  General for the Second, Fourth and 14th Amendments.

14       Q.  What is the alleged Fourth Amendment

15  violation that the Attorney General perpetrated

16  against you?

17       A.  The -- her continued enforcement, which

18  you admit to in the answer to your complaint of

19  Penal Section 25850(b) is the target of a Fourth

20  Amendment -- is one of my Fourth Amendment

21  allegations.

22            Of course there is a Fourth Amendment

23  allegation not just against -- well, I think

24  25850(b) I believe is the enumerated Penal Code

25  statute which states that refusal to consent to the

1    search of a firearm constitutes probable cause for

2    an arrest for violating the section, the section

3    being Penal Code Section 25850.

4         Q.   Anymore to your answer or are you

5    finished?

6         A.   I was trying to answer your question

7    accurately and fully.

8         Q.   I'm just trying to see if you're done

9    with your statement.  Do you have more to say?

10        A.   I'm trying to go from memory from a

11   document which you could have requested in advance

12   had this deposition been correctly -- were this a

13   correct deposition you could have asked for

14   documents.  I could have brought copies of my -- we

15   wouldn't have to go through this.  But you didn't.

16             I have to go from memory.  And I do not

17   have a photographic memory.  Nor am I a young man.

18        Q.   How many times has Penal Code Section

19   25850's Subsection B, the chamber check section,

20   been enforced against you in your life?

21        A.   You're asking me -- well, I'll just

22   simply say that's -- objection, Fifth Amendment and

23   self-incrimination.

24        Q.   Don't you contend that it's

25   unconstitutional for a law enforcement officer to

1    conduct a chamber check of a person openly carrying

2    a firearm as a violation of the Fourth Amendment?

3          A.  My contention is as stated in the

4    complaint.  That -- if it's not stated -- it is in

5    the complaint -- it's done so in the pleadings.

6    That one does not have to give up his Fourth

7    Amendment right to exercise his Second Amendment

8    right.

9              And that refusal to consent to a search

10   cannot in and of itself constitute probable cause

11   for an arrest.  Also the conclusion of the Ninth

12   Circuit Court of Appeals and Supreme Court, which is

13   in the pleadings.  Citations to which are in the

14   pleadings.

15         Q.  Has Mr. Hermosillo made a physical attack

16   against you?

17         A.  I am unaware of any overt physical attack

18   by Mr. Hermosillo.  Beyond the death threats which

19   he posted on my website.  And to the persons in the

20   e-mail distribution list mentioned in the criminal

21   complaint.

22             I have not -- as I have said I've never

23   personally met Mr. Hermosillo.  And I would only --

24   I'm not even sure I would recognize him given that

25   his Facebook was probably 15 or 20 years out of

1    date.  And I have no idea what he looks like beyond

2    what was on his Facebook page.

3          Q.  To your knowledge, has Mr. Hermosillo

4    made a covert attack -- covert physical attack

5    against you?

6          A.  If they were covert I wouldn't know about

7    them, would I.

8          Q.  I'm asking for a yes or no answer.

9          A.  I -- the question is not answerable.

10   It's -- you can't -- you're asking me -- I've

11   answered the question.  It's not answerable

12   question.  If you need a formal answer it's a vague

13   question.

14         Q.  Have you experienced any physical attack

15   that you believe came from Mr. Hermosillo?

16         A.  Has Mr. -- any physical attack -- I am

17   not aware of any physical attack made by Mr.

18   Hermosillo on my person.

19         Q.  Are you aware of any people that you

20   believe were acting on Mr. Hermosillo's instructions

21   made a physical attack on you?

22         A.  I have not been physically attacked since

23   the threat was made.  So the answer would be I guess

24   no.

25         Q.  What was the physical threat -- what was

1    the physical attack that happened around the time

2    the threat was made?

3            A.  I'm sorry.  Can you repeat the question?

4            Q.  What physical attack did you suffer at

5    the time that you received the threatening message

6    from Mr. Hermosillo?

7            A.  I did not say I was physically attacked.

8    I said I was threaten with physical -- with a

9    physical attack.  He threatened to shoot me.  Which

10   I think counts as a physical attack.

11           Q.  So there was no actual physical attack

12   that occurred around the time that the threat was

13   made?

14           A.  No.  If he had I would be dead and we

15   wouldn't be sitting here now, would I.

16           Q.  You have to admit it's possible that he

17   could have attacked you and the result might have

18   been something besides your death?

19           A.  No.  He thinks I live in Redondo Beach.

20           Q.  What I'm saying is --

21           A.  He didn't know where I lived.  I'm sure

22   if he knew where I lived he may -- he called on

23   other people to track me down in Redondo Beach and

24   shoot me.  So I imagine that if he actually knew

25   where I lived it would not surprise me that, as he

1  said in his death threat, that I should keep an eye

2  if my rearview mirror 'cause he'll be sneaking up on

3  me.

4          Q.  Do you stay out of Redondo Beach to avoid

5  him?

6          A.  Do I stay -- I do not stay out of Redondo

7  Beach.  I won't say exactly where I go in Redondo

8  Beach.

9          Q.  Prior to receiving this threat from Mr.

10  Hermosillo weren't you in the Redondo Beach a lot?

11          A.  It's subjective.  I believe I stated in

12  one of the complaints that that's where I do my

13  shopping.  So yes, I frequently go there.

14          Q.  Have you changed those patterns of your

15  life style since --

16          A.  Since the death threat?

17          Q.  Well, because of the threat?

18          A.  I certainly am far more cautious.  Yes.

19          Q.  But you still go to the same places with

20  roughly the same frequency in Redondo Beach as you

21  used to?

22          A.  I don't -- I used to do a lot of my

23  shopping at night.  Grocery shopping.  I don't do

24  that anymore.  I shop in broad daylight.  Try to do

25  it in the middle of the day when there are lots of

1  people around.  Make it less convenient for an

2  attack.

3         But I'm required to, you know, eat like

4  everybody else.  And the most convenient nearest

5  shopping center that doesn't require me to go at

6  least a mile or two out of my way is in Redondo

7  Beach.

8         Q.  It's been two years since this threat,

9  correct?

10        A.  Yes, two years.  Almost.  And a month.

11        Q.  Do you know that Mr. Hermosillo even

12  remembers making the threat against you?

13        A.  I would have no idea what Mr. Hermosillo

14  remembers or doesn't remember.

15        Q.  Has anything happened in your life that

16  gives you an indication that he still -- he's

17  keeping that as a live threat against you?

18        A.  A threat was made.  I have no idea what

19  Mr. Hermosillo does or doesn't do.  And it's not

20  really even relevant.  He made -- he committed a

21  felony.  Which I reported to the Attorney General.

22  Who told me to go file a civil complaint with the

23  civil grand jury.

24             I reported it to the Los Angeles

25  Sheriffs' Department and Sergeant Inge, I-n-g-e,

1  told me, well, threatening to shoot someone is not a

2  crime unless you use the word kill.  And I sent him

3  several e-mails, at least two e-mails of cases in

4  which persons were convicted of making criminal

5  threats where they did not use the word kill.

6        One of which was where all that was

7  required was to be charged with making a criminal

8  threat was a young man put an ad in the newspaper

9  advertising a yard sale at a District Attorney's

10  house.  I believe the yard sale was entitled

11  memorial blow-out sale, everything must go.

12        People started showing up at his door at

13  ten o'clock in the morning asking where the yard

14  sale was.  They tracked down who he was.  Who placed

15  the ad.  Which frankly is more along the lines of

16  ordering a pizza.  A prank.  You know.  And sending

17  it to somebody else's house.

18        But anyhow.  I gave him several online

19  examples.  I sent him the -- as I recall the

20  judicial constructions of a criminal threat.  And as

21  to the examples of the convictions and the law,

22  which was pretty clear.  Says oh, well, those cases

23  were wrongly decided.  Well, I have no recourse,

24  which I believe was also in my complaint or at least

25  one of the complaints, under California law to

1    privately prosecute Mr. Hermosillo as the California

2    Supreme Court did away with the last -- of private

3    criminal prosecutions in -- I think it was in 1991.

4           I have no recourse.  Mr. Hermosillo made

5    the threat.  I have every reason to believe the

6    threat was genuine.  I was in fear for my life.  I

7    still am.  And the Los Angeles, L.A.P.D., and the

8    District Attorney's office and the Attorney General

9    refuse to prosecute Mr. Hermosillo for clearly

10   making a criminal threat.

11       Q.  What makes you believe that the threat

12   was genuine?

13       A.  Well, as I explained earlier, Mr.

14   Hermosillo had sent out an e-mail to the

15   distribution list via South Bay Open Carry

16   distribution list, sent a message to an address and

17   it goes out to everybody subscribed to the list.

18   Wanting us to confront the L.A.P.D. over open

19   carry.

20           And I had always argued against seeking

21   confrontation.  And I believe there was a heated

22   exchange, an e-mail, but as I recall there wasn't a

23   death threat made at that time particular time.  The

24   death threat came later.

25       Q.  It was something about the prior heated

1    exchange that made you believe that the threat was a

2    genuine death threat?

3          A.  He had made a number of highly

4    emotional -- I can't tell the exact number -- of

5    posts in the distribution list.  His posts indicated

6    that he's not a rational man.  And I -- and the two

7    page death threat, which your Attorney General has

8    access to, it was filed with my police complaint,

9    clearly shows that he is a dangerous, mentally

10   unstable person.

11              And who has, according to him, firearms.

12   And according to him every intention of using them

13   against me.

14         Q.  You say that he made this threat on an

15   e-mail distribution list, meaning to your

16   understanding the threat was communicated to many

17   other people besides you, correct?

18         A.  It was e-mailed to me, to a man by the

19   flame of Gene McCarthy who had been fraudulently

20   operating a website pretending to be a California

21   nonprofit corporation.  I did the web search of the

22   nonprofit entities at the Secretary of State

23   website.  There was no corporation called South Bay

24   Open Carry registered in the State of California.

25              His name is I believe Gene McCarthy.  I

1  believe he's also a board member of the California

2  Rifle and Pistol Association.  Which has a lawsuit

3  seeking to reserve California's 1967 ban on openly

4  carrying loaded firearms.

5          It was sent to me and it was carbon

6  copied -- or maybe -- either carbon copied or in the

7  to of the e-mail line in the distribution list as

8  well.  Regardless it went to the distribution list,

9  it went to Mr. McCarthy and it went to me.

10          And to my recollection at the time the

11  distribution listed was well over 500 people.  May

12  have had as many as 800.  I don't recall an exact

13  number.

14      Q.  How do you know how many people were on

15  the e-mail distribution list?

16      A.  Harley Green told me.  He's the one who

17  posted the website and administered the distribution

18  lists until he handed it over to Gene McCarthy.  Who

19  became the admin for the distribution list.

20      Q.  You were involved with the group South

21  Bay Open Carry at the time, correct?

22      A.  It wasn't so much as group as a

23  movement.  Informal movement.

24      Q.  You were aware that there were other

25  people that were part of the South Bay Open Carry?

1    A.  If it's true that there were over 500

2  people in the distribution list, yes, it was a

3  significant none of people.  We had -- I promoted

4  various open carry events in the South Bay and

5  Pasadena.  Well, Pasadena is not part of the South

6  Bay.  And San Diego.

7          Particularly here in the South Bay we

8  had -- we started out with getting 12 or 13 people

9  showing up.  And by the time I stopped promoting the

10  events in 2011 we were having well over 60 people

11  who opened carried.

12          I only counted people who openly carried

13  unloaded hand guns and their family and friends.

14  Easily 60 to 100 people were showing up at our

15  dinners.

16    Q.  Do you know that any of those 60 to 100

17  people received the e-mail from Mr. Hermosillo that

18  we've been talking about?

19    A.  I do not know personally.  I would have

20  to assume given that the distribution list was one

21  of the means of communicating people where we would

22  be meeting and people showed up to the meetings,

23  that it seems a reasonable cause and effect there.

24          But I do not know and I was never given

25  the contents of the persons subscribed to the

```
 1   distribution list.  I can say that e-mail addresses
 2   and names of persons who sent messages to the
 3   distribution list were known to me who did show up
 4   at the dinners.  So there was a subset of those
 5   persons.
 6            I do not know everybody who showed up,
 7   obviously.
 8        Q.  Did any of the other members of the
 9   movement, the 60 to 100 people that you're talking
10   about, did they ever talk to you or e-mail you about
11   this threat?
12        A.  The specific threat by Mr. Hermosillo or
13   the --
14        Q.  That's --
15        A.  -- message that Mr. Hermosillo posted
16   which prompted other people to receive several
17   threats -- I'm sorry.  I got confused with your
18   question.  Can you please repeat it?
19        Q.  So did -- let me -- what you said
20   actually makes ask a slightly different area.  You
21   said that you had other threats besides the threat
22   from Mr. Hermosillo?
23        A.  I received a couple of additional
24   e-mails, but one -- neither of them -- well, one was
25   somebody in Texas who didn't threaten me.  He just
```

1  made some moral comment.  Didn't like my parentage.

2  Apparently I'm a bastard of some type.  Sorry for

3  the language.  Didn't like me personally.

4          The other one was a -- I knew of him

5  'cause he posted before.  But he had -- who didn't

6  make a threat of violence against me.  But he --

7  based on his earlier posts he was combined to a V.A.

8  Hospital and I believe his condition was terminal.

9          And I did not interpret it as a threat

10  because he obviously had no -- based on his earlier

11  posts on the distribution list he really had no way

12  of carrying out the threat.  I mean he was a sick

13  and dying old man.

14      Q.  He sent you a message saying I'm going to

15  kill you?

16      A.  No.  He said he was going to punch me in

17  the nose or break my nose.  Beat my face in.  It was

18  something he was incapable of carrying out based on

19  his previous postings.

20      Q.  Also you didn't interpret what he was

21  threatening as murder or ending your life?

22      A.  He didn't say he was going to shoot me.

23  He was going to punch me in the face.  He was the

24  person -- based on, like I said, his earlier posts

25  he couldn't have punched me in the face.  Even if he

1  knew where I was.

2         So I did not take that one as a serious

3  death threat.  So I didn't report it.  The one

4  threat I did take as a serious threat and still do,

5  I did report.  And nothing became of it.

6         Q.  Did anybody else who got the e-mail

7  message make a reply message that was something

8  other than a threat against you?

9         A.  Trying -- I didn't understand the

10 question.

11        Q.  I'm assuming that these two people, the

12 one in Texas and the one in the V.A. Hospital were

13 sending a follow on message to Mr. Hermosillo's

14 message?

15        A.  Yes.

16        Q.  Did anybody else besides these two people

17 send a follow on message to Mr. Hermosillo's

18 message?

19        A.  To me, threatening me?

20        Q.  Not necessarily threatening you.  Just

21 saying anything.

22        A.  I would not have remembered saying

23 anything -- I would only have remembered the ones

24 involving threats.  To the best of my recollection I

25 can only recall the one threat and the one person

114

1  who criticized me -- my character.  I don't recall.

2          The e-mail fall out was minimal.  I was

3  surprised at the almost nonexistent fall out.  Those

4  are the only three, Hermosillo's death threat and

5  the other two are the ones that I can recall that

6  were negative.

7      Q.  Did anybody send a responsive e-mail

8  message saying -- words to the effect of, Hey Mr.

9  Hermosillo, cut it out or don't say something like

10  that?

11      A.  After I sent an e-mail to Gene McCarthy

12  who administered -- I don't think the list is --

13  well, the list must be defunct.  I haven't

14  received -- or nobody has sent anything to me.  I

15  haven't received anything from it in a long time.

16  Maybe a year or more.

17          So I think once I -- not -- I did send

18  Gene McCarthy who was the admin -- as far as I know

19  I don't even know if the website is still

20  operational.  You'd have to go to it.  Last time I

21  checked it was closed for maintenance, but I think

22  that was a year ago.

23          They shortly afterwards shut down the

24  state when it became -- they actually were

25  collecting money -- claimed to be a nonprofit

1  corporation and they weren't.  They pretty much went

2  away.

3          I did e-mail Gene McCarthy.  I can't give

4  the exact date or -- after the -- criticizing him

5  for allowing that to go out.  Because it was a

6  moderated list.  A moderated list where messages

7  have to be reviewed prior to going out to the

8  general distribution list.

9          My recollection is he may -- but I'm not

10 certain -- he may have had some cursory remarks that

11 Hermosillo's death threat was inappropriate.  But I

12 can't give you language.  Like I said, that was two

13 years ago.  Over two years ago now.

14         Q.  What's the name of the website?

15         A.  South Bay Open Carry.  I don't recall if

16 it was dot com or dot org.  I know that I own a

17 South Bay Open Carry, or I did, domain.  But I

18 cancelled that a long time ago.  So whatever South

19 Bay Open Carry website still -- if it is still

20 functional.

21         You've got to ask your network people.

22 They can do what is called a who it which is a as

23 Internet look up program which will tell you the --

24 if the domain name is registered and who the domain

25 name is registered to.

1         Q.  Do you know how Gene McCarthy spells his

2    first name?

3         A.  I think it's M-c-C-a-r-t-h-y but I

4    haven't had any communications with him since

5    September of 2011.  It might be McCartny.  But I

6    think it's McCarthy.  But his name and the correct

7    spelling of it will be in the police report which

8    you have access to.

9         Q.  I thought I said first name.  Do you know

10   how he spells his first name?

11        A.  He went by Gene.  But I believe it was

12   Eugene.

13        Q.  So the first letter would be G or J?

14        A.  No.  Eugene is E-u-g-e-n-e.  So he went

15   by G-e-n-e.

16        Q.  Okay.

17        A.  Well, I'm not saying for certain that he

18   actually was Eugene.  For all I know he birth

19   certificate said Gene, G-e-n-e.

20        Q.  You say you were surprised by the minimal

21   amount of response to Hermosillo's threat to you.

22   Why were you surprised?

23        A.  Based on my understanding of the number

24   of people who were on the subscribed list.  And it

25   is a reasonable understanding if you look at the

1  number of people who actually participated in the

2  making posts to the list.  It was a large number of

3  people.

4           And most people are known as lurkers.

5  They don't actually post.  They just read.  Whenever

6  you see a number of people -- X number of people you

7  can multiply that by some factor and get an

8  indication of the actual audience of the list.

9      Q.  Had you seen prior messages on this

10  website that had received a lot of responses?

11      A.  The website reposted the -- there was a

12  URL link, it's Internet speak for HTTP -- the

13  messages that were sent to the distribution list and

14  the distribution list went out to everybody who was

15  subscribed.  That distribution list was also

16  available by a web link on the website, the South

17  Bay Open Carry website, so there were two ways you

18  could read what was sent to the distribution list.

19           You could either subscribe to the list or

20  if you didn't want to subscribe you just clicked on

21  the link and read all the correspondence that went

22  to the list.

23      Q.  So I guess I'm trying to get at if you

24  had seen prior messages that had a lot of responses

25  and that was reason that you thought the response to

1   Hermosillo's message was minimal.  Is that right,

2   that you were comparing the number of response --

3            In your mind did you compare the number

4   of responses to Hermosillo's message with the number

5   responses to prior messages at the same website?

6            A.  You understand the website South Bay Open

7   Carry was just a link to the distribution -- I mean

8   the messages -- there wasn't -- as far as I recall

9   there wasn't an online forum on South Bay Open Carry

10  where you leave messages.  It was just a link to the

11  distribution list.

12           Q.  So you received the messages in an e-mail

13  in-box somewhere?

14           A.  Yes.

15           Q.  So when you saw --

16           A.  Copies of the e-mail --

17           Q.  Right.

18           A.  -- were provided to my police report.  I

19  gave a stack of the e-mail, the Penal Codes --

20  similar cases.  It's like crime and -- Mr.

21  Hermosillo's Facebook page.  I did a web search.  I

22  got two hits for Hermosillo in San Pedro.  His

23  nickname is San Pedro Shooter.

24           There was only -- there were only two

25  hits.  He was the only one in the age bracket.  So I

1    had a probable address which I included in the

2    police report.  I did a Google street view search.

3    In the front of the yard for that address was a sign

4    for Craig Huey when he was running for congress in

5    the South Bay.

6              In his death threat he mentioned that he

7    was a friend of Craig Huey.  Craig Huey also happens

8    to be a friend of mine.  So he mentioned that.  The

9    evidence was that this was his address.  I gave

10   that -- I even pointed out that the person who sent

11   the death threat made no attempt to hide his IP

12   address.

13             I did what's known as a trace route.

14   Which is a computer program where you give a

15   destination IP address it will step through the --

16   it will walk the path through the Internet to the

17   ultimate destination.  That indicated a location in

18   San Pedro serviced by only one cabling company.  You

19   don't get choices here.

20             Serviced by the same cable company that

21   was in the IP header.  So I mean any first year

22   computer science student would have no problem

23   confirming that this IP address came from that

24   house.  There was absolutely no way he could

25   have -- Hermosillo could have said oh, that was sent

1    to somebody else by me.

2          But the police did not care.  D.A. did

3    not care.  Your Attorney General, your client, did

4    not care.

5          Q.  Did you ever talk to Craig Huey about

6    this threat?

7          A.  In passing -- he obviously -- the only --

8    it was just very brief.  I told him that -- it would

9    have been about the same time that the threat was

10   sent.  And my recollection he just shook his head in

11   sadness.  I thought Hermosillo -- i foolishly

12   thought Hermosillo was going to jail.  And Craig

13   just was very -- appeared to me to be very sad and

14   sick over the whole thing.

15         But we did not discuss it in detail.

16   There was no need.

17         Q.  We can take a break.

18         (Thereupon, a recess was taken.)

19         MR. EISENBERG:

20         Q.  Just now you were talking to the court

21   reporter about a publication of yours.

22         A.  Anything that I was speaking with the

23   court reporter about was off the record.  And that's

24   it.

25         Q.  You just said that you track the

1  readership of your publications at various states,

2  correct?

3      A.  Objection, private information.

4      Q.  You're going to object to what you just

5  said five minutes ago in this room?

6      A.  Whatever I may or may not have said was

7  off the record to the reporter during the break.

8  I'm not -- I've once again given my objection.

9      Q.  You were talking about your online posts

10 though, weren't you?

11     A.  Objection, private information.

12     Q.  In your complaint you speak about an

13 interaction that you had with Officer Heywood of the

14 Redondo Beach police force, correct?

15     A.  Whatever is in my complaint I stand by.

16 They speak for themselves.

17     Q.  You also referred to a John Doe Defendant

18 police officer.  I'm wondering if you've ever

19 learned the name of that other police officer?

20     A.  If I have it's in the complaint and my

21 complaints speak for themselves.

22     Q.  Okay.  Well, it's not in the complaint.

23 Does that mean that you have not found out the

24 person's name, the John Doe name?

25     A.  I -- as I recall I was -- had to

1  voluntarily dismiss without prejudice the Redondo

2  Beach Defendants, and given the short, extremely

3  short scheduling period imposed by the District

4  Court on this case, it was simply impossible to do

5  discovery against Redondo Beach Defendants and

6  prosecute lawsuit against the State statute at the

7  same time.

8          I was unable to conduct discovery on any

9  of the Redondo Beach Defendants to identify any of

10  the Doe Defendants in the case.  Which is no longer

11  at issue in this lawsuit.

12      Q.  You refer to a -- in one of your

13  complaints you refer to an open carry event in

14  2012 -- sorry, in 2010.  Do you remember attending

15  that open carry event?

16      A.  I don't think I've quite made it clear.

17  Let me try to -- in hopes it will avoid future

18  questions of that type.  I'm not going to discuss

19  any alleged activity regarding firearms which could

20  potentially lead to my prosecution.

21          So any questions regarding my carrying of

22  firearms in the State of California I'm going to

23  claim the Fifth Amendment.

24      Q.  Well, I understood one of your prior

25  complaints to say that you did not carry a firearm

1    in that August -- I think it was August of 2010

2    incident in Redondo Beach?

3         A.  I -- apparently you did not understand

4    that I'm -- well, all right I'll just say it.  Fifth

5    Amendment.  You will get the Fifth Amendment to any

6    question regarding my carrying of firearms in

7    public.

8         Q.  My question was that you were not

9    carrying a firearm.  I don't see how you can

10   interpose the Fifth Amendment objection --

11        A.  I would have to either answer -- because

12   if I had been carrying a firearm and I'm not

13   agreeing that I wasn't or was caring a firearm,

14   anywhere, at any time in the State of California the

15   question falls under Fifth Amendment.

16             I'm not -- you know, for me to answer

17   that I was or wasn't could either be construed as

18   perjury or grounds for prosecution by your client.

19   I'm not going to give your client the same

20   opportunity to do what the City of Redondo Beach

21   did.

22        Q.  Let's talk a bit again about the threat

23   by Mr. Hermosillo.  Did anybody else talk to you not

24   through the e-mail distribution list about Mr.

25   Hermosillo's -- strike that.

1          Let me -- of the people who were in the

2    South Bay Open Carry movement at the time Mr.

3    Hermosillo sent you that threatening message, did

4    any of those people talk to you off line about the

5    threat?

6          A.  At this moment I do not recall that.  It

7    was too long ago.

8          Q.  Is there something that if you saw it or

9    heard it it would refresh your memory on that topic?

10         A.  I assume that it would be an

11   unauthenticated document that you would provide,

12   which I would object to.  So I'm going to have to

13   say no.

14         I would have to check my own e-mails

15   perhaps, but I would not -- unless it's out of the

16   ordinary, such as a death threat by Mr. Hermosillo,

17   it isn't something I'm likely to remember.  People

18   don't remember ordinary things.  They remember the

19   exception.

20         I can't tell you what I had for dinner

21   yesterday.  That was 24 hours ago or less.

22         Q.  So again you have no memory of anybody

23   coming up to you off line saying something about Mr.

24   Hermosillo's threatening e-mail message?

25         A.  I'm sure they did.  I don't recall at

1    this moment, no.

2         Q.  Why are you sure that they did then?

3         A.  It's just something that probably

4    happened.  I don't know.  I don't know one way or

5    the other.  I told you I can't remember.  It's too

6    long ago.

7         Q.  In the lawsuit you sought damages from

8    the City of Redondo Beach Defendants, correct?

9         A.  My recollection is I sought unspecified

10   damages.  I was quite intent on not putting a

11   specific dollar amount.  Once you put a dollar

12   amount on the -- a constitutional right the court

13   can give you a buck and send you on your way and you

14   will never get you injunction.

15        Q.  You did not seek damages against the

16   Attorney General?

17        A.  Attorney General is immune from damages.

18        Q.  Well, you kind of anticipated my next

19   question.  Which is why did you seek damages from

20   Redondo Beach and not from the Attorney General?

21        A.  Because -- well, the City of Redondo

22   Beach violated my Constitutional rights and I seek

23   monetary damages from the City of Redondo Beach.

24   I'm prevented from seeking monetary damages against

25   the State of California.  Which you well know.

1       Q.   Do you believe that you are damaged in a

2   way that could be quantified in money by the

3   Attorney General?

4       A.   Wow, I can't believe you asked that after

5   what I just told you.  No.  There's no quantifiable

6   number -- amount of money to substitute for the

7   deformation of Constitutional rights.  How much

8   money do you put on your liberty?

9       Q.   Did you participate in an open carry

10  demonstration in the City of San Diego a couple of

11  years ago?

12      A.   Objection, Fifth Amendment and private

13  information.

14      Q.   You put videos up at You Tube of -- or

15  you have put videos up at You Tube of past open

16  carry events, haven't you?

17      A.   To the best of my recollection I have --

18  I do have a -- I have two You Tube sites.  Only one

19  is related to the Second Amendment.  And my

20  recollection is the only videos -- and I'm not sure

21  you can actually call them videos since the -- my

22  recollection is they are audio -- publicly domain

23  audio recordings of Circuit Court of Appeals oral

24  arguments, which I've uploaded to You Tube for

25  people to listen to.

1          I have no recollection of uploading any

2  open carry videos to anywhere.  In fact I think --

3  I'm not even -- I'm only certain of my Second

4  Amendment related You Tube site.  I know I have at

5  least one of the oral arguments from the Tenth

6  Circuit Court of Appeals available.  That's actually

7  at this particular moment the only one I'm actually

8  certain is on there.

9          There may be a second.  As I recall the

10  Tenth Circuit oral arguments took place in two

11  parts.  They had to reconvene.  So both the first

12  session -- the case of Peterson v. Martinez.  And

13  the second might be quote, unquote videos on You

14  Tube.  But I can't recall any other videos that I've

15  uploaded to You Tube.

16          Q.  What are the names of -- what's the name

17  of the You Tube site that you're referring to that

18  Second Amendment related?

19          A.  Probably California Right to Carry or

20  some variation on that.  California open Carry

21  maybe.  I rarely go to it.  I don't have -- I have

22  not had time with this lawsuit taken up all my

23  time.

24          Q.  You have the ability to upload videos

25  under that handle at You Tube, the California Right

128

1  to Carry handle, correct?

2        A.   Whatever the actual handle name is, and I

3  think it's California Right to Carry or something

4  very similar, I certainly have the -- had the

5  ability when I uploaded Peterson oral arguments.  I

6  don't know -- as I said it's -- I -- I so

7  infrequently go to it.

8            I think it may have been -- I'd have to

9  look.  Could be a couple of months before I even

10  posted a comment on that page.  I don't now know how

11  long a site can go dormant before Google, which owns

12  You Tube, deletes an account.  As far as I know

13  today it may not even exist.

14       Q.   Is there anyone else that you know of who

15  has access to that user name for uploading videos at

16  You Tube?

17       A.   No one that I've given authority to.  As

18  far as has anybody hacked my account or -- I'm sure

19  whoever works at Google or You Tube has access to

20  the account.  But --

21       Q.   Have you seen anyone -- sorry.  Have you

22  seen any uploaded items there that you didn't

23  upload?

24       A.   I haven't -- I don't even recall -- I

25  created the account I don't remember when.  I did

1   not get a chance to utilize it.  I simply have not

2   had time in this -- in my lawsuit.  This lawsuit

3   sucked up all my time.

4           It's -- as I said it's -- it's -- I don't

5   even know if it's still active.  If it is active I

6   can only recall uploading one video.  Could be 100.

7   I don't recall doing 100.  I'd be surprised if it

8   were more than three.  And my intention was to

9   promulgate all of these oral arguments on the Second

10  Amendment.  So people would have one spot where they

11  can go listen to the oral arguments.

12          But as I said, I have not had time to do

13  that.

14      Q.  When you say that you were intending to

15  propound discovery on the City of Redondo Beach

16  Defendants in this case, --

17      A.  I'm sorry have intended?

18      Q.  You did intend to.

19      A.  Oh, yes.

20      Q.  Why did you intend to propound discovery

21  to the City of Redondo Beach?

22      A.  That would take us back to the Fifth

23  Amendment privilege that I warned you about before.

24      Q.  You're saying that you would incriminate

25  yourself by telling me why you're propounding

1  discovery -- why you were considering propounding

2  discovery on the City of Redondo Beach?

3        A.  I'm sorry, could you repeat that?

4        Q.  You're telling that it would violate your

5  Fifth Amendment rights for you to tell me why you

6  were planning to propound discovery on the City of

7  Redondo Beach?  Yes or no?

8        A.  The discussion of discovery on Redondo

9  Beach would require me to compromise my Fifth

10 Amendment right against self-incrimination.  That's

11 an area I won't go.

12       Q.  Why did you contemplate propounding

13 discovery on the City of Redondo Beach yet contend

14 there's no need for discovery on the Attorney

15 General?

16       A.  The case at issue on the Attorney General

17 involves pure posting of law.  Does it not?  What

18 issue of triable fact is there for a jury?  Either

19 the laws at issue in this case are constitutional or

20 they aren't.

21           Juries do not -- at least haven't in a

22 long time, juries are not allowed to decide

23 questions of law.  They are only allowed to decide

24 questions of fact.  There are no triable facts in

25 this case.

1          Q.  In your complaint you challenge the

2    constitutionality of a couple of Redondo Beach

3    ordinances as well, correct?

4          A.  Which complaint?

5          Q.  Exhibit 14, the First Amended Complaint.

6          A.  Actually my recollection is in all three

7    complaints I challenged the constitutionality of a

8    Redondo Beach municipal ordinary, which at the time

9    prohibited the use or carrying of any weapon in any

10   public place designated by the City as a park.

11          The City subsequently designated every

12   public place in the city as a park.  Including the

13   section of the city exempt from the "park ban."  As

14   I recall the -- in my initial complaint the

15   Magistrate judge got confused, because I also sited

16   a hunting ordinance in Redondo beach.

17          My intent was to enjoin the so-called --

18   well, park ban which applies to all public places.

19   And we -- and the accompanying misdemeanor section

20   of the municipal ordinance which made a violation of

21   that ban on weapons possession in public punishable

22   by a year in jail and $1,000 fine.

23          My recollection is that wasn't clear in

24   the first initial complaint, but it became clear by

25   code section in the First Amended Complaint.  I hope

1  that answers your question.

2       Q.  Why do you believe that the case against

3  the Attorney General and the California statutes

4  involves pure questions of law but the challenge to

5  the Redondo Beach ordinances does not involve only

6  questions of law?

7       A.  There is no challenge to the Redondo

8  Beach ordinances.  As I stated before I voluntarily

9  dismissed without prejudice my lawsuit against the

10 City and John Doe Defendants -- City of Redondo

11 Beach John Doe Defendants.

12      Q.  Well -- but you did originally complain

13 that those ordinances were -- the Redondo Beach

14 ordinances were unconstitutional, didn't you?

15      A.  I did.  I'm certain I did.  That would be

16 in my -- and probably my Second Amended Complaint as

17 well.  I'm sure that was an issue.

18      Q.  But at the time you did not believe that

19 the constitutionality of those ordinances was purely

20 a question of law?

21      A.  Which time?  When?

22      Q.  When you filed -- let's say when you

23 filed your Second Amended Complaint in May of last

24 year.

25      A.  Which is my final complaint?

1        Q.   Yes.

2        A.   Yes.

3        Q.   Didn't you believe that the

4   constitutionality or unconstitutionality of those

5   Redondo Beach ordinances was a question of law only?

6        A.   The constitutionality would be but the

7   damages would have been up to the jury.  There's no

8   damages complaint against the Attorney General.

9        Q.   Okay.  In your complaint you mentioned

10  two people who were members of the California Right

11  to Carry who are -- or have been on trial for

12  violating California Penal Code Section 25850.

13  What's the names of those two people?

14       A.   First name was Jason Sarno.  I believe

15  that was back in -- I'm sorry.  Could you begin the

16  question -- I want to make sure I'm getting the

17  right Penal Code Section.

18       Q.   The question concerning section 25850.

19       A.   Repeat.

20       Q.   The question is, what are the names of

21  the two people who are or were members of California

22  Right to Carry who are or were on trial for

23  violating that section?

24       A.   Okay.  The first person is Jason Sarno.

25  He wasn't charged with violating -- he was charged

1  with violating the former Penal Code Section

2  12031(a)(1) which is identical to PC 25850(a)

3  today.

4         And you wanted the name of the second

5  person.  Second person is, as I recall, David

6  Brayton.  I think the spelling is B-r-a-y-t-o-n.

7  That was also a long time ago.  Both were -- I think

8  it was 2011 as well.

9         Any how both cases were dismissed.  It

10 took both of them about a year of trial before the

11 cases were finally dismissed against them.

12      Q.  Do you know what counties those trials

13 took place in?

14      A.  Sarno's took place in Ventura County.  I

15 thought -- hadn't we discussed this before?

16      Q.  I don't think so.

17      A.  I seem to recall that we did in one of

18 our conferences.

19      Q.  I thought you meant in the deposition.

20 Okay.

21      A.  No.  No.

22      Q.  All right.  The other person's --

23      A.  You are -- you do remember me bringing

24 this up before?

25      Q.  I actually don't.  Whether you said that

1    then or not I can't make evidence of it.

2          A.  Go ahead.

3          Q.  Where was Brayton's case?

4          A.  His was Los Angeles County.  I believe he

5    was pulled over for tinted windshields.  Which is

6    probably why he got -- I think it was in the

7    Valley.  What do you call that again, San Fernando.

8              I tend to forget names of places given my

9    long absence in Oregon.  But anyhow right over the

10   hill.  I think the San Fernando Valley.  It's part

11   of L.A. County.

12         Q.  How do you spell Sarno's last name?

13         A.  S-a-r-n-o, I believe.

14         Q.  How about Brayton's last name?

15         A.  B-r-a-y-t-o-n.

16         Q.  Okay.  In the complaint you also

17   mentioned a third member of California Right to

18   Carry who was arrested for lawfully transporting an

19   unloaded handgun in a fully enclosed locked

20   container.  What's the name of that person?

21         A.  A California Right to Carry member?

22         Q.  That's what your complaint says.

23         A.  Well, it may have been a typo.  I said

24   these were a couple of years ago.  I do know a third

25   person in the South Bay Open Carry movement,

1    female -- what was her name.  I think her first name

2    was Mindy.  I don't remember her last name.

3              She was arrested for a handgun in a fully

4    enclosed container or at least so she said.  I

5    wasn't present there.  She never gave me the

6    criminal report that I could look up the number.

7    Sarno gave it to me.  There's like 140 entries in

8    it.

9              I got periodic updates by Brayton.  He

10   sent me copies -- I think he sent me a copy of

11   something -- the citation or something in which --

12   or he posted it on Facebook or something.  I forget

13   where.

14        Q.  The woman named Mindy, do you know where

15   her case was cited?

16        A.  Torrance.  So they should have a record

17   of it somewhere.

18        Q.  Give me your best estimate as to the

19   month --

20        A.  I'm not even sure if Mindy is the

21   actual -- I'm trying to think.  His in the --

22        Q.  There's no reference to Mindy in the sack

23   (sic).  There's a reference to a third member.  You

24   can check for yourself.

25              You know I'm not giving you fraudulent

```
 1   documents.  I'm not that clever.  I don't have that

 2   much time.  I just printed these things out.  You

 3   can look at them and it might refresh your

 4   recollection.

 5        A.  Third member of --

 6        Q.  Let the record reflect that Mr. Nichols

 7   is not looking at --

 8        A.  I'm making a note so I can check on it

 9   when I get home.  Third member arrested for -- oh, I

10   remember now.  Yeah.  This is  -- he waits 12 days

11   before the cut off date to bring up these -- brought

12   up a year ago.

13           Charles Miseroy.  I believe the spelling

14   of the name is of M-i-s-e-r-o-y.

15        Q.  Where was his case cited?

16        A.  I believe it was in Los Angeles County as

17   well.  He -- this was right after the unloaded

18   handgun ban open carry went into effect.  He had his

19   handgun unloaded, fully enclosed, locked container.

20           As I recall he said it was a Beretta in a

21   case.  Beretta his a firearm manufacturer.  Been

22   around for 500 years.  He had -- on his way to work

23   he had parked his vehicle in front of a doughnut

24   shop or coffee shop or something.  And he was

25   standing in line carrying his case.
```

1             And since it obviously had Beretta on it

2    there were two or three police officers, according

3    to his account, who asked him what was in the case.

4    Since it was unloaded and fully enclosed locked

5    container he did not think he was breaking any law.

6             They took him out -- according to his

7    account they took him outside and said can I see

8    it.  He opened up the case and showed it to him.

9    And they arrested him.  And I believe he said he was

10   in jail for either eight or 11 hours.  They took

11   away his belt.

12            He hired an attorney which cost him

13   $500.  They dropped the prosecution shortly

14   thereafter.

15            Q.  Do you know what he was cited for?

16            A.  Yeah.  The police, from his recount, the

17   police officers told him it was now illegal to

18   possess an unloaded handgun in public.  Which

19   obviously is not the case.

20            Q.  So you think the police officers mislead

21   or were lying to this gentleman?

22            A.  No, they just didn't understand.  You

23   know, the reorganization of the Penal Code was

24   30,000 lines in length.  You can't expect a police

25   officer to know every law.  You would expect them to

1  know before they make an arrest that they were

2  actually arresting someone for something that was a

3  crime.  They didn't do that in this case.

4         And I suspect the only thing they knew

5  about the ban was the note that the Attorney General

6  had sent to all of police stations, which I believe

7  is on your client's website, you know stating that

8  AB144 had gone into effect.  And oh, well, this

9  applies to all handguns.  And they weren't aware of

10 the exception for fully enclosed locked container.

11        As you may recall AB144 I think was 15

12 pages long.  It was not a -- it's a textbook case in

13 a simple law.

14     Q.  In 2012 you had the understanding that

15 you could not obtain a license to carry a firearm

16 openly in Los Angeles County, correct?

17        A.  In 2012 and today, as far as I'm aware,

18 it's -- to private citizens there are no licenses to

19 carry a firearm openly loaded or unloaded in

20 anywhere in the State of California.  Except for, as

21 I already mentioned earlier, those persons who live

22 in the counties with fewer than 200,000 people.  And

23 even then only to concealable weapons.

24        As far as -- you know, aware there are no

25 long gun open carry permits anywhere in the State of

1    California.  You haven't provided a code section to

2    indicate that there is.  My search of the Penal Code

3    Sections -- California Code Sections I can't find

4    anywhere such permit is available or license.

5            Q.  So in paragraph 34 of your Second Amended

6    Complaint you talk about how you sent an e-mail

7    message to Redondo Beach Captain Jeff Hank for an

8    application and a license to openly carry a loaded

9    handgun.  Why did you do that if you know that would

10   be futile to ask for that application?

11           A.  Because the City of Redondo Beach is --

12   was of the position that the Constitution doesn't

13   apply to the City of Redondo Beach.  That they get

14   to make up their own laws.  That the state -- does

15   not apply to the City of Redondo Beach.

16               So if the -- since it was their position

17   that the State -- in public does not apply to them,

18   they certainly could have issued me a permit.

19               And you'll notice that I included the

20   e-mail dialogues between myself and the City of

21   Redondo Beach.  I did not specifically ask for a

22   license under that code section.  I asked for an

23   application and license.  Presumably if they thought

24   that the California law does not apply to them they

25   can issue their own permits.

```
 1          Q.  Who in Redondo Beach told you that

 2   California law does not apply in Redondo Beach?

 3          A.  Mike Webb has stated that in two

 4   interviews, L.A. Times and local paper.

 5          Q.  Anybody else at Redondo Beach who has

 6   made statements to that effect that you know of?

 7          A.  Anybody in the City of Redondo Beach or

 8   government of --

 9          Q.  Anybody in the government of Redondo

10   Beach.

11          A.  I can find -- lawyers are prohibited from

12   communicating with Defendants in a lawsuit except

13   through their attorney.  Communications with the

14   chief of police and all the various people went

15   through the City Attorney.  So I can't specifically

16   say to them I can only tell you -- well, it's in I

17   believe -- the record is in the sack (sic) of long

18   correspondence.

19               And the two e-mail was to Mike Webb the

20   City Attorney.  He says he relayed the information

21   and he relayed the answer back.

22          Q.  Did you have an understanding before you

23   sent that e-mail to Captain Fink that there actually

24   was an application process for an open carry license

25   in Redondo Beach?
```

1        A.   I did not send an e-mail to Captain Hink.

2        Q.   H-i-n-k is what you wrote.

3        A.   Yeah.   The e-mail application, as I

4   recall -- or the request for an application of

5   license I sent to Mike Webb who forwarded it to --

6   who said -- as I recall said that he sent it to the

7   chief of police who may or may not have assigned it

8   to Captain Hink.   I don't recall.

9        And my Mike Webb who is the City Attorney

10  for Redondo Beach relayed their answer back to me.

11  I did not contact them directly.

12       Q.   Right.   But had you heard from anybody

13  that there actually was an application form in the

14  City of Redondo Beach for an open carry license?

15       A.   The only application form I'm aware of is

16  the one prepared by your client which is uniform

17  state wide.   I had not heard that the City of

18  Redondo Beach had their own application form.

19       And I'm fairly certain they did not.

20  Obviously if they had they would have sent it to me

21  instead of replying that they are unable to give me

22  an application or a license to openly carry a

23  handgun because they are precluded from state law

24  from doing so.   The exact text should be in

25  the --

1            I don't think I completely answered your

2    question.  Mike Webb did tell me as well that in

3    our -- the local real conference regarding his

4    motion to dismiss, it's his contention he's not

5    required to -- or was -- I don't know what his

6    current -- but at the time his position was the City

7    of Redondo Beach doesn't have to obey California

8    laws regarding the carrying of firearms because the

9    City of Redondo Beach is a charter city.

10           I tried to argue with him the exceptions

11   under the State -- for a charter city are actually

12   quite limited.  Certainly the State law which turned

13   out to be the District Court as well preempts local

14   ordinances regulating firearms.

15           So -- but did not object to the

16   conclusion of the District Court judge.

17      Q.   Okay.  When you applied for the Redondo

18   Beach open carry license, you were rejected, right?

19      A.   It -- the e-mail which is somewhere in

20   the First Amendment Complaint is copied and pasted

21   verbatim from the e-mail Mike Webb sent me.

22   Whatever it says there is what he said.

23           My recollection of it is I had asked him

24   for an application and license and he replied saying

25   he was unable to provide me with an application and

1    license.  And stated the California Penal Code

2    section which prohibits the issuance of a license.

3            Which I thought -- I found amusing

4    because it was his position that he is not bound by

5    California law because Redondo Beach is a charter

6    city.

7            Q.  Didn't he also tell you that one of the

8    reasons for rejecting your e-mail application was

9    that you were a resident of Lawndale and not Redondo

10   Beach?

11           A.  He may have mentioned the residency

12   requirement as well.

13           Q.  Is there any -- you are a resident of

14   Lawndale, correct?

15           A.  I am a resident of the City of Lawndale.

16   I'd rather you not get more specific than that.

17   This is public record.  I certainly don't want my

18   home address getting out to the public.

19           Q.  You'll notice I didn't put your home

20   address on the deposition I just said Lawndale but

21   you still slapped me down.

22           A.  You should have put my P.O. Box.

23           Q.  But you are not a resident of Redondo

24   Beach so I can't say -- but in any event.  Let's

25   move on.

1              You never applied to -- well, first of

2    all, you were living in Lawndale as of 2012 as well?

3         A.   When I made the request to Redondo Beach,

4    yes.

5         Q.   Does Lawndale have a police department to

6    your understanding?

7         A.   They do not.  They contract with the Los

8    Angeles County Sheriffs' Department.

9         Q.   Why didn't you apply in the same way

10   that -- why didn't you apply to Los Angeles County

11   Sheriff for an open carry license in the same manner

12   that you applied to the City of Redondo Beach?

13        A.   Los Angeles County Sheriffs' Department

14   never claimed that it was exempt from the State

15   law.  Sheriff Baca has ever claimed that he is

16   exempt from State law.  Even if he were so

17   inclined.

18        Q.   Your address is on the notice, so I met

19   that requirement.  Anyway, so you thought it would

20   be futile to apply to the Sheriff, is that what

21   you're saying?

22        A.   Hang on a second.  Where is my address?

23        Q.   On the proof of service, on the last

24   page.  You see it?

25        A.   One, two, three?

1          Q.  It's just there, Charles Nichols, P.O.

2    Box.  Most of the way down the typed page.

3          A.  I'm pretty sure the FRCP says it has to

4    be in the Deposition -- Notice of Deposition not in

5    the proof of service.  But that's not really a

6    crucial point.  I am just glad you did not put my

7    home address in the public document.

8          Q.  Isn't your ultimate goal here to strike

9    down not only the open carry laws that are

10   challenged but ultimately the Gun Free School Zones

11   Law as well?

12         A.  My ultimate goal is stated clearly in my

13   complaint.

14         Q.  What is that goal?

15         A.  To enjoin California's three bans on

16   openly carry firearms in incorporated cities and

17   incorporated counties -- where the discharge of a

18   firearm is prohibited.  I submit that no license

19   requirement is required for private citizens to

20   exercise the fundal individual right including the

21   Second and Fourth Amendment rights.

22              And that my complaint challenges the

23   California licensing statutes only in the

24   alternative and only as applied to licenses to

25   openly carry a firearm.  And that alternative is

1    only if the Courts ultimately conclude that a

2    license is required to exercise the fundamental

3    right.

4              I'm paraphrasing.  By my operative

5    complaint should state that quite clearly.

6         Q.  Don't you believe that you have a

7    Constitutional right to carry a firearm openly

8    within a thousand feet of a public school?

9         A.  Do I have -- yes, I do believe that

10   the -- I and everyone who is not -- everyone who

11   falls within the scope of the Second Amendment has a

12   right to openly carry a firearm within 1,000 feet of

13   a K through 12 public or private school.

14             Which is -- which the law requires long

15   guns to be unloaded, hand guns to be unloaded in a

16   fully closed and locked container.  I believe that

17   is unconstitutional but it is not an issue in this

18   lawsuit.  Which obviously makes the question

19   completely irrelevant.

20        Q.  Do you believe that you need to be openly

21   carrying a handgun as opposed to a long gun to be

22   able to protect yourself?

23        A.  A handgun is -- as the Heller decision

24   stated, I believe along the lines of the --

25   self-defense weapon.  Persons who lack the upper

1   body strength to use a long gun should not be denied

2   the use of a handgun under the many reasons -- upper

3   body strength to handle a long gun was an example

4   given by the Supreme Court as to why handguns could

5   not be prohibited.

6           First it -- I don't know if you have ever

7   fired a firearm.  But a rifle and a shotgun have

8   significant recoil.  I mean you're not -- some 1022

9   rifle for kid for plinking tin cans.  But a 12 gauge

10  shotgun has a significant amount of recoil.  Which

11  is painful.  So, yes, a handgun has many advantages

12  over a long gun.

13          Also long guns are for long range

14  self-defense.  Rifles, in particular shot guns, are

15  short range self-defense.  And they're easier to

16  shoot.  They're less painful -- within reason.

17  There are handguns out there which are 44 magnum

18  which is -- I have fired before once 25, 30 years

19  ago.

20          And, you know, typical 380 caliber pistol

21  or a -- even a 45 Colt ACP doesn't have the recoil

22  of a 12 gauge shotgun.  So less painful.  More

23  accurate.  It's easier to retrieve and use in a

24  self-defense situation where a fraction of a second

25  can -- between life and death.

 1            Long gun you either have to carry it in a

 2   sling or use it basically as a walking stick.  I

 3   guess -- certainly a modern shotgun or rifle is --

 4   which is used for a walking stick.  You have to take

 5   it off the sling, you have to raise it to your

 6   shoulder, you have to aim and point it.

 7            For short range self-defense it presents

 8   a substantial burden over a handgun.

 9       Q.  All the things that you just said is all

10   based on your personal experience with these

11   firearms?

12       A.  Are you asking if I've ever had personal

13   experience with firearms?

14       Q.  No, I'm not.  Let me break the question

15   down.  Do you lack the upper body strength to use a

16   long gun for self-defense?

17       A.  You're asking me a medical question,

18   which is not permissible.

19       Q.  I am not asking you to reveal any private

20   medical information.  I'm just asking you if you are

21   able to use an upper -- do you have upper body

22   strength to use a long gun for self-defense?

23       A.  That's a medical question.  I object.

24   I'm not required to answer any questions regarding

25   my medical -- my physical health.  That is not a

1    controversy in this cases.

2        Q.   Do you renounce any allegations in your

3    complaint that refer to a back injury that you have?

4        A.   I renounce nothing in my -- any of my

5    pleadings.  Including my operative complaint --

6    speak for themselves.

7        Q.   How do you know that there's painful

8    recoil with some long guns?

9        A.   Without specifying where or when, I have

10   fired a 12 gauge shotgun in my lifetime.  And I have

11   fired a rifle in my lifetime.  And I have fired a

12   handgun in my lifetime.  I know the recoils as would

13   anyone who has ever had any experience with a

14   firearm.  Which I assume you do not by your

15   question.

16       Q.   Were you a fully grown adult when you

17   used these firearms?

18       A.   First time I fired a firearm I was 15

19   years of age.  I believe I was five foot eight

20   inches tall.  And so 15 is a fully grown adult.  At

21   I'm five ten now.

22       Q.   Have you fired any of these shot guns

23   within the last ten years?  Or rather any of these

24   long guns.  Did you fire any of them within the last

25   ten years?

1          A.   No.

2          Q.   You're relying on distant memory of what

3     the pain is, aren't you?

4          A.   Back when -- it's not as if I only

5     fired -- I'm not admitting where or when I have ever

6     fired a firearm.  Not even admitting that I've ever

7     fired a firearm in the State of California.

8               My use of firearms was extensive.  Enough

9     for me to recall with clarity that recoil varies

10    with the type of firearm, the weight of the firearm,

11    the caliber of the -- the weight of the bullet

12    fired, the amount of powder in the bullet which is

13    fired.

14              All of these factors play into -- barrel

15    length is another factor of recoil.  So my

16    experience is extensive.

17         Q.   Earlier you said you can't remember what

18    you had for lunch or for dinner last night but you

19    remember the feel of these shot guns that was more

20    than ten years ago.  Or sorry, the feel of these

21    long guns from more than ten years ago.

22         A.   I remember from the 12 gauge.  Once again

23    saying -- not admitting that this was in

24    California.  But I used to go shooting -- trap

25    shooting monthly and I would at the end of the day

1    have a blood blister on my shoulder.  So yeah.  From

2    a 12 gauge shotgun.  So --

3         Q.  This was during the time that you were

4    living in Oregon?

5         A.  I wouldn't say when or where.

6         Q.  All right.  How do you know that the kind

7    of firearm that you have, long gun or handgun, can

8    make the difference between life and death?  How do

9    you know that?

10        A.  Are you familiar with the expression only

11   a fool takes a knife to a gun fight?  It's illegal

12   for me to carry a firearm in the State of California

13   in any incorporated city or incorporated county or

14   territory where the discharge of a firearm is

15   prohibited.  Therefore I have no means to defend

16   myself.

17        Q.  Right.  But I thought you said earlier

18   that the handgun is more maneuverable and that it

19   can give you an extra split second that could mean

20   the different between life and death?

21        A.  Compared to a long gun.

22        Q.  Right.  How do you know that?

23        A.  I just told you.  I've fired handguns and

24   I've fired long guns before.  Quite familiar with

25   the operation of them.  It's not as if -- you know,

1    I've also -- I think that -- I recall I had 20 or 25

2    hours -- maybe I got bored with it.

3             It's like, you know, there's some

4    things -- some things -- to operate a firearm is far

5    less complicated than operating an aircraft.  And --

6    but even with my relatively great experience

7    operating firearms compared to my relatively less

8    experience flying an airplane, there's still -- you

9    know, firearms are far less complicated.  Airplanes

10   are more complicated.

11            There are still simple things you don't

12   forget either.  I don't know what to tell you.

13   Firearm is very simply.  You put the bullet in and

14   you point.  You pull the trigger.  It's not as if

15   you have to worry about your air speed or any of a

16   dozen other things you have to worry about in an

17   aircraft.

18            I don't know why you're trying to make

19   this so complicated.  Only someone who's never

20   touched a gun before would be asking these kinds of

21   questions.  They're silly questions.

22        Q.  Have you been in a situation where your

23   life was in danger by a person attacking you?

24        A.  Ever been in a situation where my life

25   was in danger by a person attacking me -- well,

1  let's see now, I think if I answer yes to that

2  question I'm going to open a whole can of worms.  So

3  I'm going to claim objection, private information.

4       Q.  So you're refusing to answer the question

5  further than that?

6       A.  Repeat the question again.  Maybe I can

7  see if I can come up with a way to answer it that

8  won't be -- ask the question again.

9                 (Record read.)

10             THE WITNESS:  Yes, but I won't

11  elaborate.

12             MR. EISENBERG:

13       Q.  How long ago was that incident?

14       A.  There were several, but I'm not going to

15  elaborate.  I was unarmed in each of the instances.

16       Q.  When was the most recent?

17       A.  When I was -- the last time somebody

18  pointed a gun at me I was probably 30 years old.  So

19  that would have been around 1990.

20       Q.  Did you make a police report of that

21  incident?

22       A.  The last incident -- the last time

23  somebody pointed a gun at me it was a police officer

24  in my own yard, on my own property.

25       Q.  Was it in California?

1          A.   Yes.

2          Q.   So you did not make a police report of

3     the police officer pointing a gun at you?

4          A.   There had been a robbery in a nearby

5     liquor store.  He saw me in my yard.  Some reason,

6     particularly this as I recall, the guy was black and

7     for the record I look white, thought I robbed the

8     store.  The next thing I know I'm staring at the

9     barrel of a gun.

10         Q.   I'm sorry, go ahead.

11         A.   Actually thinking back it might have been

12    later in 1980's.  Between 25 to 30.  I obviously

13    don't remember the exact date.  A lot of time has

14    happened in intervening decades.

15              No, I didn't make a police report.  The

16    only police report I can recall making is the one

17    against Mr. Hermosillo.  I mean in terms of a felony

18    police report.  I think I have frequently called --

19    well, not frequently, but I have made noise

20    complaints in the past.  Doesn't count as a police

21    report.  It was neighbors were noises.  Turn down

22    their music.

23         Q.   What town did this police officer point

24    the gun at you happen in?

25         A.   Lawndale.

1          Q.  Did you believe that the police officer

2     was physically attacking you?

3          A.  I think when somebody points a gun at you

4     it can be -- under California law it is considered

5     an assault, isn't it?  I don't know.  I'm not a

6     criminal prosecutor.  But if it isn't it should be.

7          Q.  But what was your belief, did you believe

8     that this police officer was attacking you?

9          A.  I believe that I had a gun pointed at

10    me.  And to me that constitutes an attack.  I mean

11    obviously you don't -- I was taught you never point

12    a gun at anything you are not going to shoot.  So

13    yeah, somebody points a gun at me I consider it an

14    attack.

15         Q.  All right.  Earlier you said that you

16    were unarmed for all these -- I take it you were

17    unarmed for this incident in Lawndale?

18         A.  Yes.

19         Q.  At the time did you wish that you had a

20    firearm on me?

21         A.  At the time I wished he didn't shoot me.

22         Q.  My question was did you wish you had a

23    firearm on your person at that moment?

24         A.  At that time, to the best of my

25    recollection, the only thing I can recall is that I

1   hope he doesn't shoot me.  I think that would be

2   anybody's normal reaction.  I mean having a firearm

3   on you when somebody is already pointing a gun on

4   you really doesn't do you a whole lot of good, does

5   it.

6        Q.  Again, that's the most recent incident in

7   your life in which you felt that your life was in

8   danger by a physical attack from another person?

9        A.  No, Hermosillo would be the --

10       Q.  Hermosillo made a physical attack on you?

11       A.  That wasn't the question.  When I felt

12  that I'm in danger from a physical attack.

13       Q.  I see the ambiguity in my question.  Was

14  there another more recent time in your life when you

15  were actually physically attacked by someone and

16  believed that your life was in danger?

17       A.  By somebody pointing a gun at me or a

18  knife?

19       Q.  By any means.

20       A.  That's too vague a question.  You have to

21  be specific.  We obviously have two different

22  concept of what constitutes an attack.

23       Q.  What constitutes an attack?

24       A.  Somebody with the -- example, somebody

25  has got a knife or a weapon of some kind, or is

1    brandishing it, pointing it at you saying they're

2    going to attack you.

3              You don't have to actually wait for

4    somebody to punch you in the face.  If somebody --

5    threatening to harm you physically and obviously

6    within the proximity can do it, is engaged in a

7    physical attack.

8         Q.   Have you had one of those attacks more

9    recently than this incident with the police officer

10   in Lawndale?

11        A.   There was a -- the closest I've been with

12   a -- in a situation which could have become a

13   physical confrontation was maybe a year or two ago.

14   There was a tweaker who had lived on the corner who

15   has 1,500 watt stereos just vibrating the roof of my

16   home.

17             I went over and politely asked him to

18   turn it down.  He started threatening me

19   physically.  So I simply walked around the corner

20   with my cell phone and called the police.  Saying

21   that I'd asked my neighbor to turn down his speakers

22   and he threatened me.  They came out and he turned

23   down his speakers.

24             And I suspect that it would be somewhere

25   in their police log.  And easy enough to find if the

1  police logs are entered electronically.  Would have

2  been last year or so.

3          Q.  Did this person have a weapon that you

4  saw?

5          A.  No.  But he was muscular and he had gang

6  tattoos up and down his arms.  And certainly

7  threatening.  And he made threatening remarks.

8          Q.  Did he actually say he was going to harm

9  you physically?

10         A.  He postured.

11         Q.  What do you mean by postured?  Did he say

12 he was going to harm you physically or not?

13         A.  When somebody makes abusive comments,

14 they stick out their chest, they flex their muscles

15 and they walk towards you in a threatening manner,

16 I'll have to leave it to you to decide if that's

17 actually a physical threat or -- anyhow it was

18 enough for me to call the police.

19         Q.  So the things that you just described is

20 what he did?

21         A.  Yes.  And you'll notice my response was

22 to call the police.  I did not go home and get my

23 shotgun or my firearm and escalate the

24 confrontation.  I sought a peaceful resolution.

25         Q.  You called him a tweaker.  What is a

1    tweaker?

2         A.   I believe that's the current slang for

3    someone who is addicted to methamphetamines.   That's

4    my guess.

5         Q.   How did you know that he was a tweaker?

6         A.   I did not know for certain.   All I know

7    is that he had -- my limited experience, I'm just

8    assuming based on other people's descriptions, 20

9    years ago I would have thought he was on cocaine.

10   But apparently -- he didn't blink.   His eyes were

11   open.   He acted like somebody who was on drugs.

12            And my understanding is the drug of

13   choice today is methamphetamines.   They call them

14   speed freaks.   Today they call them Tweakers.   I'm

15   not certain if tweaker means speed freak.   I

16   probably shouldn't use that term.

17            He seemed to me -- this guy would --

18   would -- would -- I think he had drums as well.

19   Could have been -- could have been just playing a

20   recording nonstop for eight hours of badly played

21   drums.   But it sounded like from the inside of his

22   house that he was a drum player.   It would go on and

23   on for hour after hour.

24            So obviously he had a obviously had a

25   great deal of energy.   I don't think a normal person

1    would have.  He appeared to me to be somewhat --

2    used an illegal stimulant.  I don't think it was

3    caffeine.

4         Q.  In that situation did you think that if

5    you had a handgun you would be able to protect

6    yourself better?

7         A.  I probably -- well, I essentially would

8    have been at less risk of an attack had he attacked

9    me.  Obviously if he attacked me there was nothing I

10   could do.

11        Q.  Even with a handgun?

12        A.  If I had a handgun I don't think he would

13   have attacked me.  He would have saw I was carrying

14   a handgun.  If he had seen it.  Open carry provides

15   a visional deterrent.  If you walk -- if you --

16   someone sees that you're carrying a firearm.  A

17   rational person who sees that you're carrying a

18   firearm is going to temper his behavior and isn't

19   going to try to escalate a conflict.

20            A person with a concealed weapon you have

21   no idea.  He could easily have escalated and -- like

22   the Zimmerman case out in Florida.  The kid who

23   was -- if he had the opportunity to see he was

24   carrying a gun he might have changed his behavior

25   and that would have never escalated to a deadly

1    conflict.

2         Q.  Do you believe that if you would have

3    been carrying a long gun during this episode with

4    the person, the drummer, you would not have been

5    able to defend yourself?

6         A.  I wouldn't have confronted.  I would have

7    just called the police right off the bat.  You don't

8    confront people with a firearm because they are

9    being noisy.  Firearms were self-defense.  I didn't

10   know he was going to respond the way he did.

11           He was a neighbor.  Think back this might

12   have been more than just a few years ago.  Anyhow

13   that happens when you get older.  Anyhow, he has

14   moved.  But you don't respond to simple situations

15   like that with a firearm.  And I wouldn't have even

16   if it were legal back then to carry a firearm.

17        Q.  You believe you would have had the right

18   or you should have had the right to be carrying a

19   firearm if you confronted that person?

20        A.  I have the right to openly carry a

21   firearm in case of a confrontation.

22        Q.  You just think it would have been

23   unadvisable to do it in that situation?

24        A.  I don't believe that the Supreme Court

25   says you have a right to carry a firearm to seek out

1    confrontation.  You have a right -- I have a right,

2    according to the Supreme Court, to openly carry a

3    firearm in case I am confronted for the purpose of

4    self-defense.

5                We're in a confrontation right now.

6    Okay.  Even if it were legal I don't believe all

7    setting is an appropriate forum to bring a firearm.

8    In fact historically, as I recall, jurors were

9    required to bring firearms but they're impartial.

10               You know, they were the jurors.  They sat

11   there they watched and listened to the evidence.

12   There are many kinds of confrontations where

13   carrying a firearm is not appropriate.

14               AB144 and 1527 providers examples of

15   confrontations which the law has exempted which it's

16   inappropriate.  It's inappropriate for a bill

17   collector who is exempt from the -- to come to my

18   house -- but assuming that there was a bill

19   collector who wanted to hit me up for an unpaid

20   bill --

21               You don't have a right to confront

22   somebody with a gun to collect a debt.  You want to

23   collect debt you go through a legal process.  Take

24   him to court.  Use the legal system to collect a

25   date.  You don't confront him with a firearm.

1            Similarly, if I'm a financial agent or

2    a -- claims adjuster is another one.  You know.  I'm

3    out there looking at somebody's car just got smashed

4    and I don't have a right to carry gun because we

5    might -- I were a claims adjuster we might bicker

6    over the amount that I am going to write on the

7    check.

8            We have disagreement -- the guy who has

9    had the accident -- that's not an example of -- I'm

10   sure that's not an example of what the Supreme Court

11   had in mind in the carrying of firearms.

12           Same thing if you have a confrontation

13   over how much money I should get for my damaged

14   automobile or if I was a claims adjuster how much

15   I'm going to pay' you for the damaged automobile,

16   you take it to court.  Courtrooms aren't a place

17   where you resolve differences with firearms.

18           My stack has been consistent with

19   every -- with my original complaint and -- to carry

20   a firearm for the purpose of self-defense and for

21   other lawful purposes.  I've not seeking a

22   confrontation.

23           And I will mention one -- I don't

24   if -- might have been a declaration somewhere

25   between.  But I'm more than happy to cross the

1   street to avoid a confrontation.  That's the way I

2   was raised.   And 53 years later I've been fortune

3   enough to do so.  Confrontations I've gotten into

4   are ones I've been unable to avoid.  I don't think

5   there's any shame in walking away from a fight.

6           But there are many people out there who

7   won't let you walk away from a fight and who want to

8   do bad things to you.  My particular case is Mr.

9   Hermosillo.

10       Q.  So you believe that while a person may

11  openly carry a firearm a person does not have a

12  right to be carrying a firearm if he or she provokes

13  a confrontation with another person?

14       A.  That isn't the law.  Even when concealed

15  carry was not -- I think I may have misunderstood

16  your question.  Can you ask it again?

17       Q.  Your belief is that the open carry right

18  does not permit a person openly carrying a firearm

19  to provoke a confrontation with another person?  Is

20  that question clear?

21       A.  Well, let me give an answer and you can

22  tell me.  Regardless of whether someone is carrying

23  a firearm I don't believe there is any right to

24  provoke a confrontation.

25           My reading, particularly the California

1  law, is -- it's -- you're not -- it's not even legal

2  and probably hasn't been for 100 years to engage

3  what used to be known as individual combat.  You get

4  into a duel for example.  As far as I'm aware

5  that's -- in California is illegal and has been for

6  100 years.

7           So no, not -- regardless of whether you

8  are carrying a firearm, you can't pick a fight with

9  somebody.  I could be wrong.  That's my

10 understanding of the law.

11      Q.  So you are not saying that a person who

12 is openly carrying who intends to provoke a

13 confrontation needs to disarm before provoking the

14 confrontation?

15      A.  Provoking a confrontation is illegal

16 regardless of whether they're armed.  If you pick a

17 fight with somebody carrying a weapon, you kill the

18 person you're guilty of murder, at least second

19 degree murder.

20          Seems to me if you actually took a weapon

21 to a confrontation with the intent to use the weapon

22 at the confrontation and you kill somebody -- my

23 knowledge of criminal law is very small.  But seems

24 to me that would be a case for premeditated murder.

25          But if you took a weapon without the

1  intention of using it, but did so that would be

2  manslaughter at least.  But if you're attacked by a

3  robber or whatever, someone -- you didn't provoke

4  the fight.  You have the right to defend yourself

5  with as much force as is necessary to repel the

6  attack.

7          Obviously if the person has a gun and is

8  trying to rob you you have the right to use deadly

9  force.  If a person has a knife and he is advancing

10 on you and you tell him to stop and he continues,

11 you have the right to use deadly force.

12         If a person is yelling names at you and

13 backing away, there's no justification for the use

14 of force.

15         Q.  Who decides who provoked the

16 confrontation?

17         A.  Who decides who provoked the

18 confrontation?

19         Q.  Do you understand my question?

20         A.  Well, obviously I think you have to be --

21 I think I know what you're asking, but you're --

22         Q.  How can a person who's been accused of

23 using a firearm in a confrontation be expected not

24 to say well, the other person provoked it and that's

25 why I used my firearm?

168

1    A.   Theoretically the burden of proof is on
2    the prosecution.   In reality that's as farce.   But
3    theoretically the burden of proof is on the
4    prosecution to prove the criminal act of the
5    defendant.   So, you know, did that answer your
6    question?
7         Q.   Yeah.   Under the society that you want
8    where everybody is walking around with a gun, aren't
9    there going to lots of people who provoke
10   confrontations with their guns, kill someone and
11   then say it was the other person who provoked and I
12   was just defending myself?
13        A.   Can you tell me when this happened?   I
14   don't understand what period of American history
15   you're referring to.
16        Q.   Have you studied the history of the
17   American West?
18        A.   Yes, I have.
19        Q.   Have you heard of cases where the person
20   who did the shooting said it was the other person
21   who attacked me and I just defended myself, that's
22   not a common scenario that you've heard of?
23        A.   First of all, there were very few gun
24   fights in the period of the old west.   That's a
25   myth.   That's a Hollywood fiction.   I can give an

1    example probably, the most classic example would be

2    the gun fight at the OK corral.  It was on a side

3    street nearby.

4             Where you had three people who weren't

5    wearing badges, three people who were wearing

6    badges.  One of the three people who wasn't wearing

7    a badge was completely unarmed and the second only

8    had a long gun.  And that was on his horse or mule.

9    It was on his horse.

10            Hopefully I won't be prosecuted for

11   perjury saying it was a horse and it turns out to be

12   a mule.  The gun fight is well documented.  The

13   other guy carried a handgun.  After the shooting in

14   which the youngest person -- the kid who was unarmed

15   was killed, and the guy who was reaching for his

16   rifle was -- or shotgun, I forget which, was also

17   killed, I believe the third guy with the handgun was

18   killed as well.

19            So we had three guys killed.  Two of them

20   I am certain.  They prosecuted, privately

21   criminally -- that was still legal in those days.

22   In fact have you heard of private criminal

23   prosecutions.  You'll be the first lawyer who ever

24   has.  So don't be assumed to say no.

25            Used to be that if I were a victim of a

1  crime I could -- if this were as late as 1910 --

2  actually as late as 1940 or '50 in California, I

3  could have prosecuted Mr. Hermosillo.  I could have

4  taken him to court and criminally --

5            Anyhow, Mr.  -- I think it was Wyatt Earp

6  was put on trial for murder.  And they had

7  conflicting versions of the confrontation.  I think

8  that answered your question.

9       Q.  Did you ever bring a civil suit against

10 Mr. Hermosillo?

11      A.  I don't have the money.  He's rich.  I'm

12 not.  Guess who is going to win in that encounter.

13      Q.  Did you think about getting a lawyer on a

14 contingency fee for that case?

15      A.  Lawyer on a contingency fee for -- I

16 guess --

17      Q.  Do you know what a contingency fee is?

18      A.  I believe that's where you pay -- if --

19 like on consignment.  I think.  If the -- the lawyer

20 who takes the case, if he wins he takes a certain

21 percentage of the amount collected.  If you lose you

22 are stuck with, I think, the filing fee and the

23 documents and expenses.

24            Which I didn't have.  I don't have the

25 money to sue him.  Even if I could find -- there's

1    always the risk of losing.  And in my case great

2    risk of losing.  No money.  Lawyers I guess who take

3    contingency probably take a large number of them

4    just to play the percentages to, you know, let's

5    make a deal.

6            Besides the money still wouldn't have

7    done me any good.  You know.  The threat was made.

8    Not a threat he could have retracted.  Even if he

9    had expressed sincere remorse.  Which he never did.

10            So it's like, you know, it's -- he sends

11    out this threat to me and to hundreds of people, you

12    can't undo that.  It's not something you can

13    compensate with money.

14        Q.  Why could he not retract the threat?

15        A.  I suppose he could have sent the e-mail

16    out.  That doesn't guarantee that everybody who saw

17    the first threat would have seen the retraction of

18    the second.  People come and go.  People don't read

19    everything they get in their inbox.

20        Q.  What does it matters if other people read

21    the message?

22        A.  He called upon others to track me down

23    and shoot me in Redondo Beach.

24        Q.  He didn't say he was going to shoot you?

25        A.  Yes, he personally.  Don't you have these

1    records?

2         Q.   The only thing you've ever shown is the

3    e-mail message that you --

4         A.   It's in the police.

5         Q.   Whether or not I do I'm allowed to ask

6    you questions about it.  So he said -- he

7    threatened -- as you understood his message he

8    threatened to kill you and he also told everybody

9    else getting the message to come and attack you as

10   well?

11        A.   Yes.

12        Q.   You believe that he could not have

13   retracted that order?

14        A.   He could have sent out the retraction.

15   That would not have retracted it.  There's a

16   difference -- people see it and -- there are going

17   to be some crazies out there who are going to make

18   an emotional decision based upon his initial e-mail

19   and anything he said after that will never change

20   their mind.

21             It's not as if he's -- he's going to work

22   this -- do this or not do this.  He sent it out to

23   the world.

24        Q.   He sent it out to the people on the South

25   Bay Open Carry distribution list?

1    A.  And anybody who knew about the website

2  could click on the link to read it.

3    Q.  I thought you said that you received the

4  message in an e-mail inbox and it wasn't posted on

5  the website?

6    A.  No, I didn't say that.  I said I received

7  an e-mail.  It was either -- I believe I was the

8  cc -- my recollection is Jay McCarthy was a to, and

9  also in the to field of the e-mail or in the carbon

10 copy field was the e-mail distribution list we

11 discussed -- talked about earlier.

12        So when it went to Gene McCarthy the very

13 same time it went to it me, it went to the -- what

14 was supposed to have been a moderated distribution

15 list and then it was redistributed to everyone who

16 subscribed to that distribution list.

17    Q.  But was it posted on a website that

18 anybody could look at?

19    A.  Yes.  The e-mail -- do you not understand

20 how a distribution list works?  I'm not -- there

21 must be something you subscribe to.

22    Q.  The reason I'm asking is I understand

23 e-mail distribution lists to be like mass e-mails.

24 It doesn't mean they are automatically posted on a

25 website for anybody to view.

1        A.  They can be and they are.

2        Q.  That was the case here?

3        A.  That was the case.

4        Q.  At the time, September of 2011, not only
5   could you see this message in your e-mail inbox but
6   you could go to the South Bay Open Carry website and
7   see the same message posted?

8        A.  Yes.

9        Q.  Anybody with access to the Internet could
10  see it?

11       A.  That's correct.  And if you look at your
12  e-mails that you receive -- look towards the bottom
13  you might see something like to view this click.

14       Q.  It was not a password protected --

15       A.  No.

16       Q.  -- website?  Okay.  You are aware that
17  your appeal for the Ninth Circuit in this case has
18  been stayed.

19       A.  I haven't received the formal notice --
20  formal notice.  I'm sorry.  Formal notice from the
21  clerk yet.  But I did check Pacer on the 15th and
22  that was the same day it was posted.  So I should be
23  receiving it in the mail.

24       Q.  Is it your understanding that you should
25  have a priority on that appeal, the preliminary

1  injunction denial because it involved a

2  constitutional claim?

3          A.   No, I believe I have priority because I

4  followed the rules of court.   I submitted a letter

5  stating that I had priority in the appeal based on

6  the Ninth Circuit rules, which also require that I

7  request priority for argument and submission.   Which

8  I did.   Both by letter in my opening brief.

9          Technically the rule requires that you

10 make the request prior to filing your opening brief,

11 which I did in the second letter, which is in the

12 online and the Pacer appellate docket.   And I

13 reminded the court that I -- I reiterated my request

14 for early oral arguments.

15         So I followed the rules.   In fact the --

16 put this on the record.   Don't be shocked.   But I

17 did thank Mr. Eisenberg for joining with me in

18 opposing the National Rifle Association's request to

19 stay my case.   We both opposed that.   And for some

20 reason an assistant clerk decided to go ahead on

21 their own authority stay the appeal.

22         Peruta, Richards and baker.   Which are

23 three cases which were taken under submission last

24 December.

25         Q.   Do you feel that it's unconstitutional

1    that you're not going to get an adjudication on your

2    preliminary injunction for however long it takes

3    until the other cases are decided first?

4            A.    Unconstitutional?

5            Q.    Yeah.

6            A.    I think it's -- well, is there a

7    fundamental right -- I think the -- put it this

8    way.  I believe the stay was improper.  After I file

9    my Motion for Summary Judgment, which is due on the

10   13th of next month, I'm going to make a motion to

11   lift the stay if the motion isn't moot by then.

12           In other words, if we have a decision on

13   Peruta, Baker and Richards.  I will layout my

14   reasons why the stay should be lifted.

15           Constitutional -- that's not a simple

16   answer.  You've got to remember the Federal Court is

17   a creation of congress.  The Constitution talks

18   about the Supreme Court.  So there are no district

19   courts that -- Court of Appeals under the

20   Constitution.

21           So I don't know.  It's too complex a

22   question to answer.

23           Q.    Do you believe that what remains of this

24   case in the trial court involve pure questions of

25   law?

1          A.  I don't believe there are any triable

2    issues of fact.  We had gone over before.  You've

3    seen the type of evidence.  I mean everything is

4    going to be FRE 201 evidence.  It's questions

5    subject to dispute.

6               It's going to be in your Attorney

7    General's publication.  It's going to excerpts from

8    the AB -- the Mulford act of 1967.  That was the

9    Black Panther open carry ban that I'm challenging

10   today.  Or one of the things I'm challenging today.

11              It's going to be things which can be

12   judicially noticed, like the population of the

13   County of Los Angeles, the population of county up

14   in -- I think it's Redding, Northern California.

15   Has a city -- size of Redondo Beach but the

16   County -- you can get a license to carry handguns.

17              It's going to be -- it's going to be --

18   like I said, I've filed how many pages?  Two hundred

19   at least, maybe 250 documents.  It's all going to

20   be -- the judge can go, yep, sure enough, click on

21   the website.  Population of L.A. County --

22   whatever.  Sure enough Penal Code says or -- there's

23   not going to being any question of fact that a jury

24   has to resolve.  At least not for me.

25              All you can try to contrive a fact to

1   force this case to go to a jury.  I don't believe

2   that's necessary.  In fact really the only facts

3   that are necessary are going to be for even those

4   credible facts -- the judge is going to have to

5   collide on the suspect classification allegation

6   where minorities -- enforced -- the judge is going

7   to have to be the one who decides whether or not

8   three quarters of minorities being subject to

9   prosecution for 25850 is disproportionate.

10          Your documents -- Attorney General's

11  documents have the numbers, are going to lay it

12  out.  The judge is going to be the one who decides

13  whether or not that's disproportionate.  That's the

14  conclusion of law.

15          So unless you come up with anything I've

16  submitted into evidence or type of evidence I've

17  submitted -- you know, I have no idea what evidence

18  this case I could submit which would require an

19  attorney -- I mean a jury trial.  Which I put into

20  my -- in my statement last August.  I forgot what

21  it's called.  Progress report.

22          Look, I don't see need for a jury.  It's

23  facts.  I'll say to them I'm sure that Mr. Eisenberg

24  will probably object to the facts, but they're --

25  you know, how do you object to the population of the

179

1    County of Los Angeles or what's in the Penal Code.

2            Whether or not these -- well, not whether

3    or not.  These unconstitutional laws are completely

4    a question of -- the Court of Appeals is going to

5    have to look at the Heller decision, and the

6    McDonald decision, and the -- all cases that were

7    cited in support of open carry.  And look at it.

8            I'll have my citations of law.  You'll

9    have your citations of law.  The judge is going to

10   look at it and see -- either rule for one of us

11   fully or partially.  And we both know he's going to

12   rule for you fully.

13           I mean anyone who concludes that the

14   right to carry -- the right to carry arms openly

15   that is a right guaranteed by the Constitution.

16   Anyone who can read that and say that doesn't mean

17   what it actually says, it means something else,

18   isn't going to -- which the judge has already

19   decided in my preliminary injunction that the Heller

20   didn't mean exactly what it said.

21           Really, that's kind of the basis of my

22   Second Amendment portion of my lawsuit.  It meant

23   exactly what it said.  Scalia in particular isn't

24   one who isn't known --

25           It is a judgement of law.  What fact

1  could I submit which would change his mind.  That

2  would be a question left up to the jury.  What

3  triable fact.  I'm open to suggestions.  If I can

4  win by a jury trial I'm willing to go there, but I

5  don't see it.

6      Q.  At the present time I don't have any more

7  new questions for you.  But I want to ask you a

8  couple of closure type questions.  Have you

9  reflected on any of the answers you've given today

10  and realized that you need to change them or that

11  there's something wrong with them?

12      A.  You have asked me how many questions,

13  100, 200?  I have -- I don't remember what I had for

14  dinner last night.  I can't remember question number

15  50 from question number 29.  If there is anything I

16  will have to wait until I review the transcript.

17          It's my understanding I have 30 days to

18  review once I've been told that it's available.

19      Q.  My next question is, are you going to

20  withdraw any of the objections that you made about

21  authenticity or privilege or the Fifth Amendment?

22      A.  No.  I stand by my objections.  The

23  process is, as you are well aware -- first of all,

24  you're going to have to -- if you want an answer to

25  any of these questions you've got to go to court.

1  You've got to get a court order.  It's been referred

2  to the Magistrate Judge, Susan Segal.

3            She's going to have to look at this and

4  say wait a minute, why wasn't there even a

5  discovery.  Discovery wasn't properly conducted.

6  There's no 26 F conference.  And for all the reasons

7  I gave in my opening opposition to discovery.

8            And I'm -- you're asking for a court

9  order for him to answer a whole slew of

10 self-incriminating questions and private questions

11 which have absolutely nothing -- no -- absolutely no

12 relevance to a case which involves pure questions of

13 law and no triable facts.

14           She may go ahead and write a court order

15 forcing me to incriminate myself.  I'm more than

16 happy to appeal that court order.  That's something

17 which should -- even the liberals on the Ninth

18 Circuit of Appeals are probably going to raise an

19 eyebrow at a Magistrate Judge writing a court order

20 forcing someone to incriminate himself to answer

21 private questions which have no bearing on a civil

22 rights lawsuit.

23           That's the options ahead of you.  Get the

24 Court order and we can take it upstairs if need be.

25           Q.  Okay.  I have no further questions.  Off

1  the record.  Do you agree we're done?

2          A.  I believe the termination is entirely up

3  to you.  If you're saying we're done then I don't

4  object to we being done.

5          Q.  Okay.  Great.  I will need an expedited

6  transcript.  Sometime next week.

7              (Proceedings concluded at 2:21 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF CALIFORNIA                )

2                                      )   ss

3   COUNTY OF                          )

4

5           I, the undersigned, declare under penalty

6   of perjury that I have read the foregoing

7   transcript, and I have made any corrections,

8   additions or deletions that I was desirous of

9   making; that the foregoing is a true and correct

10  transcript of my testimony contained therein.

11          EXECUTED this _____ day of

12  _____, 2013, at _____, _____.

13                  (City)          (State)

14

15

16  Signed _____

17          CHARLES NICHOLS

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, MONIKA C. COYLE, CSR No. 4254, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 24th day of October, 2013.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

MONIKA C. COYLE, CSR No. 4254

# CERTIFICATE OF SERVICE

Case Name:  **Nichols, Charles v. Edmund G. Brown Jr**                No.   **2:11-cv-09916-SSS-KES**

I hereby certify that on <u>October 4, 2024,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **NOTICE OF FILING PLAINTIFF'S DEPOSITION TRANSCRIPT**
- **EXHIBIT 1: DEPOSITION TRANSCRIPT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>October 4, 2024</u>, at San Francisco, California.

| C. Tobin | */s/C. Tobin* |
|----------|---------------|
| Declarant | Signature |

SA2012104470